## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO.** ___6:19-cv-34___ |
| | § | |
| **REPEAT PRECISION, LLC; NCS** | § | |
| **MULTISTAGE, LLC; NCS** | § | |
| **MULTISTAGE HOLDINGS, INC.;** | § | |
| **ADVENT INTERNATIONAL** | § | |
| **CORPORATION; RJ MACHINE** | § | |
| **COMPANY, INC.; GARY MARTIN,** | § | |
| **GRANT MARTIN; and ROBERT** | § | |
| **NIPPER,** | § | |
| | § | |
| **Defendants.** | | |

## ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Now comes, Diamondback Industries, Inc. ("Plaintiff" or "Diamondback") and files this Original Complaint against Repeat Precision, LLC ("R-P"), NCS Multistage, LLC ("NCSM"), NCS Multistage Holdings, Inc. ("NCS M-H"), Advent International Corporation ("Advent"), Gary Martin ("Ga. Martin"), Grant Martin ("Gr. Martin") and Robert Nipper ("Nipper"), , collectively ("Defendants"), and would show the Court as follows:

## Summary of Action

This is an action for trade secret misappropriation under 18 U.S.C. § 1836, and includes additional claims of trade secret misappropriation under the Tex. Civ. Prac. & Rem. Code § 143A.001, *et seq.*, violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030) as well as common law claims for fraud, tortious interference with prospective business relations, breach of contract, fraudulent inducement, and fraudulent concealment. Additionally, the Complaint includes a declaratory judgment claim of no patent infringement under the Declaratory Judgment Act (28 U.S.C. § 2201). Through a protracted and calculated effort, Defendants targeted Diamondback's business to raid its intellectual property, including patents and trade secrets to exclude Diamondback from the setting tool market. The "R-P Defendants," which include R-P, Ga. Martin, and Gr. Martin, and the "NCS Defendants," which include Advent, NCS M-H, NCSM, and Nipper, used deception, misrepresentation, and betrayal of trust to gain access to Diamondback's trade secrets, and then used those trade secrets in violation of at least two confidentiality agreements to force Diamondback out of a market that it created through innovation as embodied in its intellectual property.

## Defendants Target Diamondback

Diamondback, which is owned by its president and majority shareholder, Derrek Drury ("Drury"), is a company engaged in the development, manufacture, and sale of oil and natural gas well-completion products, including, without limitation, setting tools, power charges, and igniters. Diamondback is also the assignee of U.S. Patent No. 9,810,035 (the

"'035 Patent"), titled "Disposable Setting Tool," which issued on November 7, 2017. (U.S. Patent No. 9,810,035, Nov. 7, 2017, Exh. 2), which names Drury as one of its inventors.  In early 2018, Diamondback was approached by Defendant Ga. Martin, purportedly as the owner of Defendant R-P, to Discuss the possibility of R-P licensing the '035 Patent from Diamondback. The parties entered into a Mutual Confidentiality Agreement on February 16, 2018, in furtherance of Ga. Martin's discussions with Drury regarding licensing and potential acquisition of Diamondback. (Mutual Confidentiality Agreement, February 25, 2018, Exh. 3).

Unbeknownst to Diamondback, at the time Ga. Martin first approached Drury, R-P was jointly owned by defendant RJ Machine Co. (Ga. Martin's company) and NCS M-H. Upon information and belief, and also unbeknownst to Drury, at the time Ga. Martin first made contact with Drury, Diamondback was on a list of target companies that the NCS Defendants had targeted for either acquisition or takeover.  Subsequently, and without revealing any of the foregoing information, R-P sought and received an exclusive right and license to make, have made, use, offer to sell, import, and export products that fall within the scope of the claims of the '035 Patent (the "Patent License").  (Patent License, March 16, 2018, Exh. 4, § 2).  Ga. Martin initially proposed the Patent License as part of a promise to expand the production capacity of the licensed products, and includes a confidentiality clause. (*See id.*, § 8).  In order to entice Diamondback to enter into the exclusive Patent License, R-P and its owner, Ga. Martin, repeatedly promised Diamondback that R-P's ultimate goal was to acquire Diamondback, and that the Patent License was a necessary step

for R-P to secure the funding necessary for the acquisition. (Declaration of Derrek Drury in Support of Original Complaint ("Drury Decl."), Ex. 1, ¶ 4, Appx. 003).  Additionally, on March 9, 2018, through a text message, Ga. Martin informed Drury that Defendant Nipper (with no mention of NCSM or NCS M-H) "owns the other half of" Repeat Precision.  (Text Message from Ga. Martin to Drury, March 9, 2018, Exh. 5, pp. 26/186 – 30/186 (redacted)). Consistent with Ga. Martin's prior representations, on or about April 12, 2018, Ga. Martin offered Drury $100,000,000.00 to purchase Diamondback.  (Drury Decl., Exh. 1, ¶ 5).

Thereafter, in continued, but what turned out be disingenuous efforts to purchase or otherwise acquire Diamondback, R-P sought an amendment to the Patent License that amended the definition of "License Products" and added a "Right of First Refusal" in the event Diamondback entered into discussions with a third party regarding acquisition or an asset sale.  During the period after the Patent License was executed, Diamondback entered discussions with a company unrelated to Defendants to sell Diamondback.  Ga. Martin sought the "Amendment to Patent License Agreement and Right of First Refusal Agreement," which has an effective date as May 30, 2018, to prevent Drury from selling Diamondback to this other company. (Amended Patent License, Exh. 6).  To obtain Diamondback's consent to amend the Patent License to include a different definition of "Licensed Products" and a "Right of First Refusal," Defendant Ga. Martin promised Diamondback that R-P would ramp up tooling for the production of Licensed Products for broad distribution, and increased its offer to purchase Diamondback to $170,000,000.00. (Drury Decl.. Exh. 1, ¶6).

During these continued discussions with R-P regarding R-P's stated intent to acquire Diamondback, R-P concealed the fact that R-P was jointly owned by RJ Machine Co. (Ga. Martin's Company) and Defendant NCS M-H, which Advent controls by virtue of owning greater than fifty percent (50%) of NCS M-H's stock..  However, and to continue discussions, R-P and Ga. Martin finally disclosed fully for the first time, on June 13, 2018, the extent of NCS M-H's involvement, including that NCS M-H was actually the real-party in interest for R-P, but only in the form of a draft "Project 'Power' Term Sheet" or "Letter of Intent") proffered by Ga. Martin, that listed NCS M-H as the acquiring party. .  (Draft LOI, Exh. 7).  On June 27, 2018, Diamondback and Defendant NCSM, a subsidiary of NCS M-H, agreed to a final version of the Letter of Intent ("LOI") for "Project Power" dated June 27, 2018, purportedly for the purpose of evaluating the purchase and/or acquisition of Diamondback. (Executed LOI, Exh. 17).

As part of the due diligence process, two R-P representatives from R-P (including Gr. Martin) along with several NCS personnel came to Fort Worth to meet in person with Drury. Marty Stormquist from NCS attended via telephone.  During that meeting, which all parties acknowledged was governed by the Confidentiality clause of the Patent Agreement between R-P and Diamondback, the NCS and R-P representatives questioned Drury extensively about Diamondback's customers, purportedly as part of the due diligence process.  Thereafter, on July 12, 2018, Diamondback set up a virtual secure data room for "Project Power" that included highly confidential and trade secret information and materials that were to be provided to NCSM and R-P for the purposes of evaluating the purchase and/or acquisition

of Diamondback.  (Drury Decl., Ex. 1, ¶ 8 , Appx. 005 – 6, Excel Spreadsheet, Project Power Project Report, Exh. 9).  NCS M-H also entered into a Mutual Confidentiality Agreement ("MCA") with Diamondback on July 25, 2018, which provided, *inter alia*, that NCSM and R-P, would keep all information and materials discovered during the evaluation of the potential acquisition of Diamondback confidential. (Executed MCA, Exh. 8).  NCSM and R-P personnel were granted access beginning on or about July 26, 2018, the day after the MCA was signed.  Virtually all of the information and materials provided to NCS M-H, NCSM, and R-P through access to the secure data room were trade secrets, including the sales numbers and contacts that Diamondback relied upon for its sales of well completion products to Diamondback's then largest customer, "Company A". (Drury Decl., Ex. 1, ¶9, Appx. 006 – 7 (redacted)).  It was clear from the initial meeting on July 5, 2018, that prior to that meeting, neither the R-P Defendants nor the NCS Defendants were even aware that Company A was in the setting tool market as a customer, much less a large customer of Diamondback.

After NCS M-H and its subsidiaries NCSM and R-P accessed Diamondback's trade secret customer and sales information, NCS M-H informed Diamondback that it would no longer pursue acquisition of Diamondback.  NCS M-H's decision to cease its efforts to acquire Diamondback was memorialized in a letter from Diamondback's then-counsel to NCS M-H's Chief Financial Officer, Ryan Hummer, on August 29, 2018.  (Letter from John Harenza to Ryan Hummer, August 29, 2018, Exh. 10).

After NCS M-H obtained Diamondback's trade secret customer and sales information, NCS M-H contacted Company A's representatives directly, as evidenced by Ga. Martin's text message response to Drury's text message on August 2, 2018:



(Text Msg. from Ga. Martin to Drury, Aug. 2, 2018, Exh. 11 (showing 842 messages between Drury and Ga. Martin between March 2, 2018 and October 7, 2018), p. 47/186 (redacted)). Upon learning of NCS M-H's unauthorized use of Diamondback's trade secrets, Diamondback met with Company A's representatives in person to ascertain the extent of NCS M-H's interference with Diamondback's business.  (Drury Decl. Ex. 1, ¶ 9).

Thereafter, NCSM informed Diamondback that it would agree that it would amend the Amended Patent License to remove the "Right of First Refusal" provision, apparently believing that it could steal Diamondback's largest customer and force Diamondback out of the setting tool market.  (Email from Robert Nipper to Derrek Drury, Sept. 11, 2018, Exh. 12).   After Diamondback met with Company A's representative, Company A ceased negotiations with NCS M-H, NCSM, and R-P.  But thereafter, R-P refused to remove the Right of First Removal Provision from the Amended Patent License.  (Drury Decl. ¶ 9).

**<u>Involvement of Kingdom, Trea Baker and Justice Baker</u>**

In March of 2018, Diamondback learned that one of its employees, Trea Baker ("T. Baker"), Vice President of Operations, had, without authorization, stolen trade secrets and highly confidential information in the form of technical specifications for Diamondback's setting tool technology in an effort to compete directly against Diamondback.  Before T. Baker's termination, he had authorization to access Diamondback's confidential and trade secret information in for the sole purpose of performing his duties and responsibilities to Diamondback, but not for his own personal benefit.  Drury informed Defendant Ga. Martin of T. Baker's dismissal on March 26, 2018, via text message:



(Text Msg. Between Drury and Ga. Martin, March 26, 2018, Exh. 5, (showing 842 messages between Drury and Ga. Martin between March 2, 2018 and October 7, 2018), p. 47/186 (redacted)).

On April 12, 2018, Drury captured an email that Justice Baker ("J. Baker") mistakenly sent to T. Baker's Diamondback email account, which Drury was monitoring after T. Baker's termination for inappropriate workplace conduct.  In that email, J. Baker had attempted to send T. Baker detailed technical specifications of Diamondback tools and products.  When

confronted, J. Baker admitted that he was "stealing" Diamondback's information. After the Bakers' termination, T. Baker and J. Baker formed Kingdom Downhole Tools LLC, and have created marketing materials utilizing Diamondback's proprietary trade secrets and highly confidential information. Additionally, Ga. Martin admitted to Diamondback that R-P and NCS M-H paid T. Baker over a period of approximately six weeks, including his health insurance, for what Ga. Martin called "consulting." Upon information and belief, Ga. Martin was paying T. Baker for Diamondback's proprietary trade secret and confidential information and materials.

On October 4, 2018, R-P's representative Ga. Martin conducted a telephone conversation with Diamondback's Derek Drury, during which R-P informed Diamondback that it "owned" the subject matter of the '035 Patent by virtue of the exclusive nature of the Amended Patent License, and that R-P would never purchase or acquire Diamondback, and that there was nothing that Diamondback could do about it. (Drury Decl., Ex. 1, ¶ 10, Appx. 007).

Through the facts as summarized above, it is clear that R-P and its owner Ga. Martin, NCS M-H and NCSM, with their owner Defendant Nipper, have engaged in fraudulent and illegal conduct. First, before the first contact between Ga. Martin and Drury, NCS M-H targeted Diamondback for acquisition and/or takeover. Second, R-P fraudulently induced Diamondback to enter into the Patent License without disclosing to Diamondback that it could not act without NCS M-H's approval and authority, much less that R-P was controlled by NCS M-H. Third, R-P promised to Diamondback that it would itself provide a more

robust offer to acquire Diamondback in exchange for a broadened definition of "Licensed Products" and the inclusion of the "Right of First Refusal" in the Amended Patent License. Fourth, only after R-P obtained the amendment to the Patent License did R-P disclose to Diamondback that its co-owner/parent company, NCS M-H was necessary to pursue acquisition and/or purchase of Diamondback. Finally, NCS M-H entered into the Letter of Intent with the sole purpose to access Diamondback's proprietary customer and sales trade secrets in an effort to steal Diamondback's largest customer and then force Diamondback out of the setting tool market.

Defendants R-P, NCSM, NCS M-H, Ga. Martin, Gr. Martin, Nipper, with the assistance of T. Baker and J. Baker have engaged in concerted activity to steal Diamondback's trade secrets, perpetrate a fraud on Diamondback to induce Diamondback's agreement to the Patent License, the Amended Patent License, and to provide access to Diamondback's trade secrets under the false pretense of acquiring and/or purchasing Diamondback. Additionally, NCS M-H and its co-defendants tortiously interfered with Diamondback's prospective business relationship with Company A. R-P's actions in concert with its co-Defendants has resulted in the breach of the Patent License's "Confidentiality Provision," the July 25, 2018, Confidentiality Agreement, and render the Patent License void. Additionally, Defendants' conduct represents a violation of the Securities Act of 1934 (15 U.S.C. § 78j & 17 C.F.R. § 240.10b-5) because the fraud committed by Defendants was based on false representations regarding the R-P Defendants and the NCS Defendants acquiring the equity interests of Diamondback.

Plaintiff originally filed a complaint with substantially similar allegations in the United States District Court for the Northern District of Texas, Fort Worth Division (Civil Action No. 4:18-cv-902-A).   Thereafter, R-P filed a complaint in the Southern District of Texas, Houston division, alleging that by virtue of the Amended Patent License, Diamondback infringed the '035 Patent (Civil Action No. 4:18-cv-04456).   The parties agreed on January 8, 2019 to mutually dismiss those actions and attempt to resolve the parties competing claims.   As a part of that agreement, the parties agreed that to avoid venue and jurisdiction disputes, any further action between the parties would be filed in the United States District Court for the Western District of Texas, Waco Division.

## I.      PARTIES

1.      Diamondback is a Texas corporation with its headquarters and principal place of business located at 3824 Williamson Road, Crowley, TX 76036.

2.      Defendant Repeat Precision, LLC is a Texas limited liability company with a principal place of business at 130 Northridge Road, Marble Falls, Texas, 78654, and may be served through its registered agent, NCS Multistage, LLC, c/o General Counsel, 19450 State Highway 249, Suite 200, Houston, Texas 77070.

3.      Defendant NCS Multistage Holdings, Inc. is a Delaware corporation with a principal place of business at 19450 State Highway 249, Suite 200, Houston, Texas 77070. NCS Multistage Holdings, Inc. does not have a registered agent for service in the State of Texas, and therefore may be served at its principal place of business pursuant to the Federal

Rules of Civil Procedure, or by service on the Texas Secretary of State pursuant to the Texas Long Arm Statute.

4.      Defendant NCS Multistage, LLC is a Texas limited liability company with a principal place of business at 19450 State Highway 249, Suite 200, Houston, Texas 77070, and may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

5.      Defendant Advent International Corporation is a Delaware corporation with a principal place of business at Prudential Tower 800 Boylston Street, Boston, Massachusetts, 02199-8069.  Plaintiff is not aware of any registered agent for service in Texas.  Therefore, service may be made through the Secretary of State under the Texas Business Organizations Code § 5.251.

6.      Defendant RJ Machine Company, Inc. ("RJM") is a Texas corporation with a principal place of business at 130 Northridge Rd, Marble Falls, Texas, and may be served through its registered agent, Gary H. Martin, 130 Northridge Rd, Marble Falls, Texas, 78665.

7.      Defendant Gary Martin is an individual residing, upon information and belief, in Marble Falls, Burnet County,Texas, and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure.

8.      Defendant Grant Martin is an individual residing, upon information and belief, in Marble Falls, Burnet County, Texas and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure.

9.      Defendant Robert Nipper is an individual residing, upon information and belief, in Houston, Harris County, Texas and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure.

## II.    JURISDICTION AND VENUE

10.     This is an action for trade secret misappropriation arising under Title 18 of the United States Code, declaratory judgment of non-infringement of a patent under 35 U.S.C. § 1, *et seq.*, and 28 U.S.C., § 2201, as well as various claims under the laws of the State of Texas.

11.     This Court has original jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1338,and Supplemental Jurisdiction of Plaintiff's claims under Texas Law pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), (d) and/or 1400(b).  On information and belief, Defendants conduct business in this District, at least a portion of the claims alleged in this Complaint arise in this District, and at least some of the acts of misappropriation, fraud, fraudulent inducement, fraudulent concealment, breach of contract, and tortious interference have taken place and are continuing to take place in this District.

13.     Defendants are subject to this Court's general and specific personal jurisdiction because Defendants have sufficient minimum contacts within the State of Texas and this District, pursuant to due process and/or the Texas Long Arm Statute because Defendants purposefully avail themselves of the privileges of conducting business in the State of Texas and in this District, because Defendants are in the process of establishing a competing

enterprise, which is in the State of Texas, and based on fraudulent activities and breaches of contracts entered into in this District, and because Plaintiff's causes of action arise directly from Defendants' business transactions and other activities in the State of Texas and in this District. Additionally, Defendants are subject to this Court's jurisdiction because the Patent License requires that it be construed under the laws of the State of Texas, and was at least partially executed in this District. All of the claims herein are inextricably intertwined with the claims under 18 U.S.C. § 1836, *et seq.*, which are under the original jurisdiction of the Federal Courts of the United States and specifically are subject to the jurisdiction in the Northern District of Texas. Finally, because Defendants have committed acts of misappropriation in the Northern District of Texas, jurisdiction and venue are proper in this district.

14.     Additionally, the parties have agreed that both jurisdiction and venue are proper in this District for the allegations asserted herein.

15.     The subjects of the misappropriation include the customer sales and volume information, which are the trade secrets and confidential information provided in the secure data room under the LOI that Defendants entered into under false pretenses or as the result of fraudulent conduct by the Defendants. Additionally, other confidential and trade secret information obtained, upon information and belief, by Defendants through Plaintiff's former employee Trea H. Baker, was also misappropriated. Additionally, the trade secrets Defendants have misappropriated relate directly to products sold by Plaintiff in interstate commerce.

## III.    BACKGROUND FACTS

16.    The allegations set forth in paragraphs 1 – 14 and the Summary of Action are incorporated into the foregoing.

17.    Diamondback was founded by Derrek Drury ("Drury") on July 12, 1999, and has become a leading source of setting tool and explosive setting tool technology in the drilling industry.

18.    As part of its technology development, Diamondback's owner and former employees Jimmy L. Carr (deceased) and Trea H. Baker (terminated) developed a setting tool that resulted in the '035 Patent.  The '035 Patent issued on November 7, 2017.

19.    Shortly after the '035 Patent issued, on February 7, 2018, Clint Mickey ("Mickey"), R-P's Product Line Manager, contacted T. Baker via telephone, to inquire as to whether Diamondback was interested in licensing the '035 Patent.  T. Baker followed up with an email to T. Baker and Drury referencing the call, and inviting Drury to contact Ga. Martin directly.  (Email from T. Baker to Drury, Feb. 8, 2018, Exh. 13).

20.    Upon information and belief, prior to Clint Mickey or anyone else from Defendants made contact with Diamondback personnel, the R-P Defendants and the NCS Defendants had determined that Diamondback was a target for acquisition and/or takeover.

21.    On February 8, 2018, Drury responded to a follow-up email from T. Baker, stating that Diamondback would "not be licensing the product," but was "thinking about" R-P's proposal.  (*Id.*).

22.    Also on February 8, 2018, Drury called Ga. Martin to discuss R-P's proposal. During that call Ga. Martin averred that he owned a company called "Repeat Precision,"

discussed R-P's international manufacturing capabilities, and discussed his company's composite frac plugs, which are marketed under the name "Purple Seal."  During the call, Ga. Martin proposed coming to Diamondback's facility in Crowley, Texas, which Drury accepted, ostensibly to discuss a mutually beneficial business arrangement.

23.     On February 16, Diamondback and R-P entered into a Mutual Confidentiality and Non-Disclosure Agreement.  (Exh. 3).

24.     On February 19, 2018, Ga. Martin, Gr. Martin, and Mickey visited Diamondback's Crowley headquarters, and met with Drury, T. Baker, and J. Baker.  At the meeting Ga. Martin led off the meeting by explaining that R-P had begun the development of a "short disposable setting tool" in November 2017, and immediately stopped development after he discovered that Diamondback was the assignee on the '035 Patent, which led to the emails and telephone calls on February 7th and 8th, respectively.

25.     Also at the February 19, 2018, meeting, Ga. Martin proposed a deal through which R-P would manufacture the setting tools in its Mexico facility, would label all sales materials and packaging with Diamondback's brand, but promised that R-P would not manufacture power charges.  However, upon information and belief, no Defendant currently holds sufficient licensing and approval to manufacture explosives of the type required to manufacture power charges for the Diamondback setting tools.  Yet, during this initial face-to-face meeting, Ga. Martin accentuated the benefit to Diamondback through partnering with R-P to leverage R-P's manufacturing capabilities.  Ga. Martin also represented to Drury that R-P could easily design around Diamondback's '035 Patent.

26.     Ultimately, Drury committed to a license arrangement based on Ga. Martin's representation of his company's (R-P's) manufacturing capabilities, R-P-s threat to design around the '035 Patent, R-P's promise to sell all tools under the license with Diamondback power charges and igniters, the prospect of a substantial near-term market presence of Diamondback's patented setting tool with Diamondback's igniters and separately-patented power charges.

27.     .   On March 16, 2018, R-P and Diamondback entered into the Patent Agreement, which includes a grant clause that reads "[Diamondback] hereby grants to [Repeat Precision] and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products…."  (Exh. 4, § 2).  At the time of the Patent Agreement, neither Ga. Martin, nor any other representative of R-P had disclosed to Diamondback that anyone other than Ga. Martin and Robert Nipper were the owners of R-P.  Had Drury known that R-P was controlled by NCS M-H, a publicly traded holding company that is owned and controlled by Advent International Corporation by virtue of a 2012 buyout of NCS M-H, he would never have agreed to the terms of the Patent License.

28.     The Patent Agreement defines "Confidential Information: as follows:

> **"Confidential Information"** means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party.  Confidential Information shall not include Nonproprietary Information.

(Exh. 4, § 1).

29.     The Patent Agreement also includes a confidentiality clause, which states as follows:

> 8.1     Confidentiality Obligations. The parties acknowledges that in connection with this Agreement it will gain access to Confidential Information of the other party. As a condition to being furnished with Confidential Information, parties agree, during the Term and for 1 years thereafter to:
>
> (a)     not use the Disclosing Party's Confidential Information other than as strictly necessary to exercise its rights and perform its obligations under this Agreement; and
>
> (b)     maintain the Disclosing Party's Confidential Information in strict confidence and, subject to the exceptions below, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent, provided, however, the Receiving Party may disclose the Confidential Information to its Representatives who:
>
> (i)     have a "need to know" for purposes of the Receiving Party's performance, or exercise of its rights with respect to such Confidential Information, under this Agreement;
>
> (ii)     are aware of this restriction; and
>
> (iii)     are themselves bound by confidentiality, provided further that the Receiving Party shall be responsible for ensuring its Representatives' compliance with, and shall be liable for any breach by its Representatives of, this section.
>
> The Receiving Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

(*Id.*, ¶ 8.1, Appx. 032 – 33).

30.     On or about March 22, 2018, Drury became aware of a personal conduct issue related to T. Baker, which led to his termination from Diamondback.  (Disciplinary Action Report to T. Baker, March 22, 2018, Exh. 14  (redacted)).

31.     On March 28, 2018, Drury sent a subsequent email to the leadership of Diamondback, reiterating that it was unlawful to take any proprietary materials from Diamondback.  J. Baker was included on that email:



**From:** Derrek Drury
**Sent:** Wednesday, March 28, 2018 12:49 PM
**To:** Tonya Cheek; Rob Andres; Ron Swiger; Justice Baker; Kim Bellah; Jeb Wright; Nichole Bucher; Kevin Carter; Taylor Davis
**Subject:** Notification

Please be advised that divulging or disseminating Diamondback Industries proprietary trade secrets, designs, prints, emails, sales numbers, or other such items to individuals or companies outside the approval of the Owner of Diamondback is expressly prohibit.  Such behavior or actions could lead to that individual being terminated and or prosecuted by law.

Derrek Drury
President
Diamondback Industries, Inc.
3824 Williamson Road
Crowley, TX 76036
Office: 817-297-1059
Cell: 817-480-2139
derrek.drury@diamondbackindustries.com

(Email to Diamondback Personnel, March 28, 2018, Exh. 15).

32.     On or about April 12, 2018, Drury discovered that J. Baker was sending emails to T. Baker that included trade secrets.  J. Baker was terminated immediately.  (Termination Notice of J. Baker, April 12, 2018, Exh. 16).

33.     At the time of his termination, J. Baker admitted to "stealing" Diamondback's proprietary information, including knowing that it was "wrong."  Less than two weeks after J. Baker was terminated, Diamondback received a document created on April 22, 2018 called "Kingdom Downhole Tools – Executive Summary."  This document states clearly that it "contains confidential, trade-secret information," and states that Kingdom has "expertise in

automation of Power Charge manufacturing and perfecting the one-run tool design." (Exh. 20 (redacted)). Both J. Baker and T. Baker are listed as managing members of Kingdome Downhole Tools, LLC, an entity formed on June 18, 2018. Any trade secret information in the possession of Kingdom, J. Baker, and/or T. Baker is, upon information and belief, the trade secret and/or highly confidential information of Diamondback.

34. On or about April 12, 2018, Ga. Martin offered to purchase Diamondback through R-P for $100,000,000.00, which Ga. Martin stated he could "pay in cash."

35. Drury rejected Ga. Martin's offer to purchase Diamondback, stating that he believed the value of the company well above $200,000,000.00. At this point, Ga. Martin disclosed, for the first time, that Advent International and Robert Nipper were "investors" in R-P, and that R-P required their approval to enter into any further discussions regarding acquisition of Diamondback. At this point, Ga. Martin still had not discussed any involvement by Defendants NCSM or NCS M-H. (*See* Drury Decl., Exh. 1, ¶ 7 (redacted)).

36. After the rejection of the R-P offer, Diamondback entered into negotiations with another company ("Company B") for the sale of Diamondback for approximately $170,000,000.00. When Drury was about to sign a letter of intent with Company B, on May 23, 2018, Ga. Martin reemerged, stating that the "hand cuffs were off" from his investors, and that he had approval to offer $170,000,000.00 to $180,000,000.00 for the purchase of Diamondback. (Drury Decl., Ex. 1, ¶ 6, Exh. 4).

37. On May 25, 2018, Drury cut off negotiations with Company B because of the perceived trusted relationship with Ga. Martin and Ga. Martin's renewed interest in acquisition for almost the same amount Diamondback was discussing with Company B.

38.     As part of the new opening offer to Diamondback, Ga. Martin and R-P also proposed an amendment to the patent license agreement that included a Right of First Refusal ("ROFR"), which Ga. Martin stated that he needed to secure the needed funding for retooling and expansion of R-P's manufacturing capabilities in its Mexico manufacturing facility.

39.     The amendment also purported to expand the license grant, changing the definition of "Licensed Products" from "bridge plugs" to "electric wireline setting tool." (Amended Patent License, Exh. 6).

40.     The Amended Patent Agreement, that includes the expanded definition of "Licensed Products" and the ROFR, does not recite any consideration for the amendment.

41.     In fact, Ga. Martin presented the Amended Patent Agreement to Drury at a lunch on or about May 28, 2018, and actually *discouraged him from seeking legal counsel*, stating words to the effect of "your lawyers will just mess this up," and encouraging Drury to sign it on the spot, with no review by Diamondback's legal counsel.

42.     Once R-P obtained Diamondback's execution of the Amended Patent Agreement, on May 30, 2018, Ga. Martin continued to discuss the acquisition of Diamondback with Drury.

43.     On June 13, 2018, Ga. Martin sent Drury a first draft of the LOI, which for the first time listed NCSM, a direct subsidiary of NCS M-H (a publicly traded company, NASDAQ: NDSM), as the real party in interest to any transaction.  (Draft "Project 'Power' Term Sheet ("LOI"), June 13, 2018, Exh. 7).  Ga. Martin explained to Drury when the LOI was delivered, that Defendant RJ Machine Company, Inc. ("RJM") was his company, and was 50% owner of R-P, and NCS M-H owned the other 50% of R-P.  This was the first time

that Ga. Martin, Gr. Martin, or R-P disclosed any ownership relationship between R-P and NCS M-H or NCSM.

44.     After a single round of edits, Gr. Martin, general manager of R-P, sent an edited copy of the LOI to Drury for execution.

45.     Despite concealing NCS M-H's role in the proposed acquisition of Diamondback, NCSM and R-P continued to pursue the acquisition, so ultimately Drury signed the LOI on behalf of Diamondback, on June 27, 2018.  (Executed LOI, June 27, 2018, Exh. 17).

46.     Diamondback agreed to continue acquisition discussions because of the relationship of trust and the confidence that Ga. Martin had cultivated regarding the potential success of R-P's acquisition and subsequent distribution of Diamondback's patented products with Diamondback's power charges and igniters.  Additionally, Drury had yet to discovery the significant airworthiness issues of the Learjet 60 that Ga. Martin had sold to Drury.  Additionally, Ga. Martin continued to assure Drury that the fact that NCS M-H was involved did not have any effect on the success of closing the deal.

47.     Shortly after the LOI was signed, on or about July 5, 2018, Diamondback set up a secure data room that included most of Diamondback's technical, financial, and sales data so that NCS M-H could conduct due diligence to complete the acquisition of Diamondback.  (Project Power Session Log, Exh. 18).

48.     None of the information regarding Diamondback's technical specifications for products, including diamondback's charge formula, igniter technology, automated charge manufacturers, single run setting tool technology manufacturing specifications, testing data,

customer data, customer identity, sales volume, pricing, or sales contacts information was or is publicly available, as evidenced by the need for a secure data room to provide Defendant NCS M-H and its affiliates, and representatives, including all named defendants in this lawsuit (excepting T. Baker and J. Baker) with access for the purposes of due diligence surrounding the acquisition.

49.     On July 25, 2018, Diamondback and NCS M-H entered another Confidentiality Agreement (Project Power Confidentiality Agreement, July 25, 2018, Exh. 8), which specifically named Defendants R-P and NCSM as "subsidiaries" to be bound by the provisions of that agreement.  This additional confidentiality agreement did not supersede the Patent License Agreement confidentiality clause.. (Exh. 4, § 8.1).

50.     Throughout the period of time between February 16, 2018 and July 25, 2018, the Patent Agreement prohibited the use of Diamondback's confidential information and trade secrets for any purpose other than the purpose of the Patent Agreement, which was to make, have made, use, sell, offer to sell, import, and export Licensed Products.

51.     Diamondback's information in the secure data room was under confidentiality agreement either by the Patent Agreement and/or the Confidentiality Agreement at all times from February 16, 2018 through the present.

52.     Neither Ernst & Young, nor Baker Botts, the two entities NCS M-H listed as their accounting and legal teams for the acquisition, ever contacted Diamondback for materials related to the acquisition, further indicating that Defendants proposed the LOI with fraudulent intent, to access Diamondback's trade secrets.  In fact, between Ernst & Young

and Baker Botts, the two companies spent only a combined sixteen (16) minutes in the secure data room.  (Session Log, Exh. 18).

53.     NCS M-H and its affiliates never intended to follow through with the acquisition of Diamondback.

54.     Rather, Ga. Martin, Nipper, and other representatives of NCS M-H, NCSM, and R-P continually questioned Drury regarding his largest customers, sales volume, pricing, sales tactics, contacts, overhead, and technical information regarding power charges, igniters, and setting tools, none of which was publicly available.

55.     On or about August 3, 2018, after NCS M-H's representatives had access the secure data room, Nipper approached Drury to tell him that NCS M-H and NCSM intended to meet Company A (Diamondback's largest customer) on August 6, 2018, ostensibly related to due diligence.

56.     Drury refused to allow the meeting, because Nipper proposed to conduct the meeting without Drury or a Diamondback representative.

57.     On August 10, 2018, Drury met with Company A's representatives in person. At the meeting, Company A confirmed that NCS M-H and NCSM had been in contact with some of Company A's representatives for the purpose of negotiating an exclusive contract whereby NCSM would, upon information and belief, supply power charges, setting tools, and igniters to Company A, to the exclusion of Diamondback.

58.     Upon information and belief, from August 10, 2018 until approximately mid-September 2018, Defendants NCS M-H, NCSM, and R-P continued to attempt to negotiate

with Company A in an effort to negotiate an exclusive distribution agreement in which Diamondback would be excluded.

59.     From July 26, 2018, until Defendants NCS M-H and its affiliates (including NCSM and R-P) had access to Diamondback's trade secrets, that Ga. Martin also admitted to having paid six weeks of T. Baker's salary, including going as far as adding T. Baker to his company health insurance plan.

60.     Having effectively raided Diamondback's proprietary information through the guise of acquisition, on September 10, 2018, informed Diamondback that it was no longer pursuing the acquisition.  (Letter to Ryan Hummer, August 29, 2018, Exh. 10).

61.     NCS M-H did not disclose the complete relationship to between NCS M-H, NCSM, Ga. Martin, and R-P until June 2018. (Amended and Restated Company Agreement of Repeat Precision, LLC, February 1, 2017, ("R-P Company Agreement") Exh. 19).

62.     Upon information and belief, Ga. Martin was also paying T. Baker for Diamondback's proprietary information regarding Diamondback's setting tool, igniter, and power charge technology.

63.     In July 2018, Drury became aware that T. Baker had begun Kingdom Downhole Tools, and is planning to enter the market as a competitor using the technology and materials stolen from Diamondback.  (Kingdom Downhole Tools Request for Financing ("Prospectus"), [undated], Exh. 20 (redacted)).  In fact, Kingdom Downhole Tools LLC was formed on June 18, 2018, with filing number 803046167, listing both Justice Baker and Trea Baker as Managing Members.  (Kingdom Downhole Tools, LLC Certificate of Formation, June 18, 2018, Exh. 21).

64.    In this document, T. Baker seeks financing for his company, which states that Kingdom Downhole Tools intends to enter the market in each of the areas that Diamondback is an established market presence, in direct competition with Diamondback.

### Competition

#### Power Charges

There are currently only two major competitors with power charges one containing 60% of the market and the other at 30% of the market.

#### Setting Tools

There is only one setting tool manufacturer of the one run type of setting tools.

### Why Us?

We provide an extensive background in downhole tool manufacturing. We are the chief designer of the first ever one run setting tool the market has ever seen. We also have designed and approved for production the first automation system for Power Charge manufacturing. We operate under Christian principles and ethics.

*Id.*

65.    On September 11, 2018, Nipper informed Drury that NCSM was willing to terminate the ROFR, apparently believing that with the R-P exclusive patent license and an exclusive distribution deal with Company A, Defendants NCSM and NCS M-H had effectively usurped Diamondback's market value by conning Drury to grant the exclusive Patent Agreement and entering into the disingenuous LOI to acquire Diamondback.  (Exh. 12).

66.    Later, on September 26, 2018, Ori Lev, an NCSM employee confirmed to counsel for Diamondback that NCSM would terminate the ROFR, but refused to revisit the other terms of the Patent Agreement.  (Email from Ori Lev to Todd Blumenfeld, Sept. 26, 2018, Exh. 22).

67.     Once Company A realized that NCSM, NCS M-H, and R-P were going behind Diamondback's back in attempting to negotiate with Company A, Company A refused to continue to negotiate with Defendants.  Subsequently, on October 4, 2018, Ga. Martin informed Drury that Defendants "owned Diamondback's IP," and refused to amend the Amended Patent Agreement to remove the ROFR.

## IV. SUMMARY OF BACKGROUND FACTS

68.     Based on the foregoing, it is clear that Defendant R-P, together with its members RJ Machine Company, Inc., and NCS M-H, and its managers Ga. Martin and Gr. Martin, sought to defraud Diamondback from the initial discovery that Diamondback owned patented technology related to disposable setting tool technology.

### a.  Gary Martin, Grant Martin, and R-P

69.     Upon information and belief, Ga. Martin used terminated employees T. Baker and J. Baker to obtain Diamondback's proprietary trade secret information.

70.     Other than the initial meeting with Diamondback during which Ga. Martin stated that R-P had begun development of a single-run setting tool, R-P has never shown that it had performed any research and development on single-run setting tools.

71.     Defendants Ga. Martin (by himself and through RJM), Gr. Martin, and R-P (collectively, the "R-P Defendants") orchestrated a scenario by which Diamondback was led to believe he was being courted for acquisition by R-P, when in fact it was a publicly traded company (NCS M-H) that was behind the acquisition.

72.     Upon information and belief, Ga. Martin and Nipper constructed the ruse of acquisition to obtain the rights to Diamondback's '035 Patent.

73.   The deception continued after the original Patent Agreement, with Ga. Martin seeking to expand the definition of "Licensed Products" to include all wireline setting tools, rather than just "bridge plugs," all while maintaining the guise of acquisition.   This amendment, made without any consideration to Diamondback, was entered into, upon information and belief, to allow Defendants to sell setting tools with non-Diamondback charges and igniters, which was the entire purpose of the original deal with R-P.

74.   Meanwhile, Ga. Martin built further on the trusting relationship he had developed with Drury by convincing Drury to purchase a plane that was not airworthy, much less in "tip top" shape.

75.   After Diamondback terminated T. Baker and J. Baker, Ga. Martin sought to pay T. Baker for the proprietary information that T. Baker and J. Baker stole from Diamondback in the wake of T. Baker's departure, and that T. Baker and J. Baker were and are attempting to use to compete directly with Diamondback.

76.   Ga. Martin effectively concealed the fact that he was, in fact, an agent working on behalf of NCS M-H the entire time.

77.   Once NCS M-H, NCSM, and the R-P Defendants had effectively raided the trade secret coffers of Diamondback, believing his corporate raid was complete, he completely turned on Drury and Diamondback, telling Drury that he "owned" Diamondback's technology.

78.   Gr. Martin is the general manager of R-P, and as such, orchestrated the signing and made representations regarding the Patent Agreement and Amended Patent Agreement, as well as the acquisition, that he knew to be false.

79.    Gr. Martin worked with Ga. Martin to secure the data from Diamondback regarding Company A and Diamondback's other customers, so that once NCS M-H, NCSM, and R-P had acquired the exclusive license, as well as Diamondback's proprietary sales, financial, and technical data, Diamondback was no longer needed, and publicly traded NCS M-H could pursue new markets without public disclosure.  Ga. Martin, Gr. Martin, and R-P were willing and complicit partners in this scheme to destroy Diamondback to Defendants' benefit.

### b.    Advent, NCS M-H, NCSM, and Robert Nipper

80.    At all times from the first contact by Ga. Martin, Defendants Advent, NCS M-H, NCSM, and Nipper (collectively the "NCS Defendants") were involved in this scheme to defraud Diamondback by using the R-P Defendants as front men to obtain the exclusive patent license, at which point Diamondback was so far down the road of acquisition it had no choice but to cooperate with the NCS Defendants.  Defendant Advent, at all times was in control of the NCS Defendants, as evidenced by Ga. Martin's statement to Drury that he could not make an offer over $100,000,000.00 without permission from Advent and NCS.  According to public records, Advent owns 66.67% of NCS M-H stock, and Advent and NCS M-H share at least one common director.

81.    Yet the NCS Defendants never intended to acquire Diamondback, as evidenced by the fact that neither Ernst & Young nor Baker Botts ever so much as contacted Diamondback, and accessed the Secure Data Room for no more than sixteen minutes combined.

82.     The facts as a whole demonstrate that the NCS Defendants and R-P Defendants worked in concert at every step to:

1) Obtain the exclusive license agreement;

2) Expand the exclusive license agreement to exclude the requirement of using Diamondback's power charges and igniters;

3) Under the ruse of acquisition, obtain Diamondback's technical specifications for manufacture, sale, and distribution of the licensed technology; then

4) Unceremoniously cast Diamondback aside once all of Diamondback's useful technology and trade secrets were in the NCS Defendants' possession.

83.     The NCS Defendants' intent in its entire relationship with Diamondback has been to take all information and trade secrets of value and to supplant Diamondback in the marketplace, through nothing more than deception and fraud.

## CLAIM I – THE R-P DEFENDANTS' MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836, *et seq.*

84.     The allegations set forth in paragraphs 1 –83 and the Summary of Action are incorporated herein.

85.     Ga. Martin, RJM, Gr. Martin, and R-P obtained access to Diamondback's trade secrets through false pretenses of the Patent Agreement and the Letter of Intent by NCS M-H, which Defendants led Diamondback to believe were in furtherance of Defendants' efforts to acquire Diamondback.

86.     Plaintiff's trade secrets include the proprietary technical, sales, and financial information that Diamondback uses to build and sell its products in the marketplace.

87.     Plaintiff's trade secrets explicitly include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, charge formula, investment history, data regarding past investment performance, data regarding Plaintiff's clients' investments, including the ability of clients to invest, Plaintiff's methods, techniques, processes, and procedures pursuant to 18 U.S.C. § 1839(3) among others.

88.     Plaintiff has taken reasonable measures to protect the secrecy of its trade secrets, including, but not limited to, limiting access to financial information, technical specifications for the manufacture of Diamondback's products, sales volume and information, and the formula for Diamondback's power charge.  Access was limited for each of the above categories to the officers of the company and selected employees in each area of the business that had a "need to know."  Diamondback's measures surpassed "reasonable," in fact, as evidenced by the establishment of the secure data room, which prohibited any download or electronic copying of the information contained therein.   Officers of Diamondback and the select employees with a "need to know" had to sign hard-copy information in- and out- of locked files, and could only access the proprietary information with their own specific passwords.  Additionally, Diamondback maintains the trade secrets, including, but not limited to, the power charge formula, in a secure share file with access restricted to officers of the company and specific individuals with a "need to know."  The

power charge formula is also kept in what Diamondback refers to as the "Sacred Book,"
which is kept in the Vice President of Accounting's locked office.

89.     Plaintiff is the owner of the trade secrets now in the possession of the R-P
Defendants, as the term "owner" is defined in 18 U.S.C. § 1839(4).

90.     The information in the R-P Defendants' possession as described herein derives
independent economic value, both actual and potential, from not being generally known to,
and not readily ascertainable through proper means by, another person who can obtain
economic value from the disclosure or use of the information, pursuant to 18 U.S.C. §
1839(3)(B).

91.     The R-P Defendants misappropriated Plaintiff's trade secrets, at least because
the R-P Defendants used the trade secrets of Diamondback without any consent – express or
implied – and the Diamondback trade secrets were acquired under circumstances giving rise
to a duty to maintain the secrecy of the trade secrets *and limit the use of the trade secrets*,
and, in the case of information obtained from T. Baker, was derived from or through a person
who owed a duty to Diamondback to maintain the secrecy of the trade secrets and limit the
use of the trade secrets.

92.     The R-P Defendants remain in possession of Diamondback's trade secrets, and
are attempting to use them in a way that is harmful to Diamondback and for the financial
gain of the R-P Defendants.

93.     The R-P Defendants acquired Plaintiff's trade secrets through theft,
misrepresentation, and based at least upon their breach of their duty to maintain the secrecy
of Plaintiff's trade secrets.  The R-P Defendants breached their duty under the July 25, 2018,

Confidentiality Agreement and the Confidentiality Clause of the Patent Agreement at least by their use of the trade secrets to contact Company A – Diamondback's largest customer – to attempt to enter into an exclusive distribution agreement with Company A to the exclusion of Diamondback.  This unauthorized contact was a use of Diamondback's trade secrets that was not authorized under either the Patent Agreement or the July 25, 2018, Confidentiality Agreement, because the trade secrets misappropriated were not necessary to practice the license.

94.     The R-P Defendants also, upon information and belief, misappropriated Plaintiff's trade secrets by paying T. Baker for information about Diamondback products and trade secret technology and information after T. Baker's termination from Diamondback, because the trade secrets were obtained from a person (T. Baker) who either used improper means to acquire the trade secret, or owed a duty to the person (Diamondback) seeking relief to maintain the secrecy of the trade secrets or limit the use of the trade secrets or both.

95.     Plaintiff has been harmed by the R-P Defendants' misappropriation of Plaintiff's trade secrets, and, pursuant to law, is entitled to both monetary and injunctive relief, including damages for actual loss by Plaintiff and damages – including disgorgement – for unjust enrichment caused by the misappropriation that is not included in a claim for actual loss, or at a minimum, a reasonable royalty for the R-P Defendants' misappropriation.

96.     The R-P Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious.  To the extent that the other Defendants have acted jointly and in concert with the R-P Defendants, they too are liable for misappropriation of trade secrets.

## CLAIM II – MISAPPROPRIATION OF TRADE SECRETS AGAINST THE NCS DEFENDANTS UNDER 18 U.S.C. § 1836, *et seq.*

97.     The allegations set forth in paragraphs 1 – 96 and the Summary of Action are incorporated herein.

98.     The NCS Defendants obtained access to Diamondback's trade secrets through false pretenses of pretending to be in pursuit of acquiring Diamondback, a ruse perpetrated by entering into the Patent Agreement and the Letter of Intent by NCS M-H to acquire Diamondback.  Upon information and belief, the NCS Defendants were fully aware of Ga. Martin's and the other R-P Defendants' efforts from the earliest contact that R-P made with Diamondback.

99.     Plaintiff's trade secrets include the proprietary technical, sales, and financial information that Diamondback uses to build and sell its products in the marketplace.

100.    Plaintiff's trade secrets explicitly include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, charge formula, investment history, data regarding past investment performance, data regarding Plaintiff's clients' investments, including the ability of clients to invest, in Plaintiff's methods, techniques, processes, and procedures pursuant to 18 U.S.C. § 1839(3) among others.

101.    Plaintiff has taken reasonable measures to protect the secrecy of its trade secrets, including, but not limited to, limiting access to financial information, technical

specifications for the manufacture of Diamondback's products, sales volume and information, and the formula for Diamondback's power charge. Access was limited for each of the above categories to the officers of the company and selected employees in each area of the business that had a "need to know." Diamondback's measures surpassed "reasonable," in fact, as evidenced by the establishment of the secure data room, which prohibited any download or electronic copying of the information contained therein. Officers of Diamondback and the select employees with a "need to know" had to sign hard-copy information in- and out- of locked files, and could only access the proprietary information with their own specific passwords. Additionally, the trade secrets, including the power charge formula, are kept in a secure share file with access restricted to officers of the company and specific individuals with a "need to know." The power charge formula is also kept in what Diamondback refers to as the "Sacred Book," which is kept in the Vice President of Accounting's locked office.

102.   Plaintiff is the owner of the trade secrets in the possession of the NCS Defendants, as the term "owner" is defined in 18 U.S.C. § 1839(4).

103.   The information in the NCS Defendants' possession as described herein derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, pursuant to 18 U.S.C. § 1839(3)(B).

104.   The NCS Defendants misappropriated Plaintiff's trade secrets, at least because the NCS Defendants used the trade secrets of Diamondback without any consent – express

or implied – and the Diamondback trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets *and limit the use of the trade secrets*, and, in the case of information obtained from T. Baker, was derived from or through a person who owed a duty to Diamondback to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

105.    The NCS Defendants, upon information and belief, remain in possession of Diamondback's trade secrets, and are attempting to use them in a way that is harmful to Diamondback and for the NCS Defendants' personal financial gain.

106.    The NCS Defendants acquired Plaintiff's trade secrets through theft, misrepresentation, and based at least upon their breach of their duty to maintain the secrecy of Plaintiff's trade secrets.  The NCS Defendants breached their duty under the July 25, 2018, Confidentiality Agreement and the Confidentiality Clause of the Patent Agreement at least by their use of the trade secret to contact Company A – Diamondback's largest customer – to attempt to enter into an exclusive distribution agreement with Company A to the exclusion of Diamondback.  This unauthorized contact was a use of Diamondback's trade secrets that was not authorized under either the Patent Agreement or the July 25, 2018, Confidentiality Agreement, and was therefore prohibited by both agreements.

107.    The NCS Defendants also, upon information and belief, misappropriated Plaintiff's trade secrets by  obtaining the trade secrets obtained by one or more of the R-P Defendants through the R-P Defendants paying T. Baker for information about Diamondback products after T. Baker's termination from Diamondback, because the trade secrets were obtained from a person (T. Baker) who either used improper means to acquire

the trade secrets, or owed a duty to the person (Diamondback) seeking relief to maintain the secrecy of the trade secrets or limit the use of the trade secret or both.

108.   Plaintiff has been harmed by the NCS Defendants' misappropriation of Plaintiff's trade secrets, and pursuant to law, is entitled both monetary and injunctive relief, including damages for actual loss by Plaintiff and damages for unjust enrichment – including disgorgement – caused by the misappropriation that is not included in a claim for actual loss, or at a minimum, a reasonable royalty for the NCS Defendants' misappropriation.

109.   The R-P Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious.  To the extent that the other Defendants have acted jointly and in concert with the R-P Defendants, they too are liable for misappropriation of trade secrets.

## CLAIM III – FRAUD BY THE R-P DEFENDANTS

110.   The allegations set forth in paragraphs 1 – 109 and the Summary of Action are incorporated herein.

111.   The R-P Defendants represented to Plaintiff that Defendants had the ability to purchase Plaintiff and all of its assets, including Plaintiff's trade secret setting tool technology.

112.   The R-P Defendants knew that Plaintiff would be unwilling to disclose its trade secret information unless it believed that Defendants were honest, good-faith potential purchasers of Plaintiff and its assets.

113.   The R-P Defendants falsely represented to Plaintiff that they intended to purchase Plaintiff in order to induce Plaintiff to enter into the Amended Patent Agreement first, and then disclose its trade secret as described above in Claim I.  This information was

material to Plaintiff because Plaintiff would not have entered into the Amended Patent Agreement or disclosed its sales, financial information, or technology to Defendants except to demonstrate its value in the marketplace. But for its belief that the R-P Defendants were evaluating Plaintiff with the intention of purchasing the entire company as a going concern, Plaintiff would not have disclosed its valuable confidential information to Defendants.

114.   Defendants' representation of its ability to purchase Plaintiff was a false statement merely designed to induce Plaintiff to disclose its valuable information. Defendant was, in fact, either not willing or not able to close on the purchase of Plaintiff because Defendants are an affiliate of NCS Multistage Holdings, Inc., a publicly traded company, and could therefore not acquire Plaintiffs on the timeline represented or without additional hurdles.

115.   The R-P Defendants made these false representations knowing them to be false and without any intention to perform as promised.

116.   Because of the R-P Defendants' fraud, Plaintiff has been injured in an amount of at least $100,000,000.00, and likely much more.

117.   Furthermore, Plaintiff's injury resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a). Moreover, Defendant violated Texas Business & Commerce Code Section 27.01 with actual awareness of the falsity of Defendant's representations, which is an additional basis for Plaintiff's recovery of exemplary damages. Accordingly, Plaintiff seeks to recover exemplary damages for Defendants' actual fraud and malice.

## CLAIM IV – FRAUD BY THE NCS DEFENDANTS

118.    The allegations set forth in paragraphs 1 – 117 and the Summary of Action are incorporated herein.

119.    The NCS Defendants represented to Plaintiff that Defendants had the ability to purchase Plaintiff and all of its assets.

120.    The NCS Defendants knew that Plaintiff would be unwilling to disclose its trade secret information unless it believed that Defendants were honest, good-faith potential purchasers of Plaintiff and its assets.

121.    The NCS Defendants falsely represented to Plaintiff that they intended to purchase Plaintiff in order to induce Plaintiff to disclose its trade secret as described above in Claim II.  This information was material to Plaintiff because Plaintiff would not have disclosed its sales, financial information, or technology to Defendants except to demonstrate the information's value in the marketplace.  But for its belief that the NCS Defendants were evaluating Plaintiff with the intention of purchasing the entire company as a going concern, Plaintiff would not have disclosed its valuable confidential information to the NCS Defendants.

122.    Defendants' representation of its ability to purchase Plaintiff was a false statement merely designed to induce Plaintiff to disclose its valuable information.  The NCS Defendants were, in fact, either not willing or not able to close on the purchase of Plaintiff and have yet to demonstrate that they had the approval for such a large acquisition by either their board of directors, their shareholders, or both, and could therefore not acquire Plaintiffs on the timeline represented or without additional hurdles, if at all.

123.    The NCS Defendants made these false representations knowing them to be false and without any intention to perform as promised.

124.    Upon information and belief, the NCS Defendants used the R-P Defendants, none of whom are publicly traded, as their agent to skirt one or more securities laws regarding acquisitions of other companies.

125.    Because of the R-P Defendants' fraud, Plaintiff has been injured in an amount of at least $100,000,000.00, and likely much more.

126.    Furthermore, Plaintiff's injury resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).   Moreover, Defendant violated Texas Business & Commerce Code Section 27.01 with actual awareness of the falsity of Defendant's representations, which is an additional basis for Plaintiff's recovery of exemplary damages.   Accordingly, Plaintiff seeks to recover exemplary damages for Defendants' actual fraud and malice.

## CLAIM V – FRAUDULENT INDUCEMENT RELATED TO THE PATENT LICENSE

127.    The allegations set forth in paragraphs 1 – 126 and the Summary of Action are incorporated herein.

128.    Defendant Ga. Martin, operating on behalf of the R-P Defendants and the NCS Defendants, represented to Diamondback that Ga. Martin owned R-P.   Then, on March 9, 2018, Ga. Martin, via text message, informed Drury that "Robert [Nipper] owns the other half of the repeat company."   (Exh. 5, p. 30/186).

129.    This misrepresentation of the actual ownership of R-P was material because Drury would have never entered into a patent license with R-P had he known that R-P was not only not owned by Ga. Martin and Nipper at all, but that, in fact, NCS M-H—a publicly traded company backed by an international fund—owned fifty percent (50%) of R-P and controlled the company by virtue of holding two of three seats on R-P's board of directors.

130.    The representations by Ga. Martin that Ga. Martin and Nipper each owned fifty percent (50%) of R-P were false, because the Amended and Restated Company Agreement of R-P shows that NCS M-H, as opposed to Nipper, owns 50% of R-P.

131.    Ga. Martin knew when he made the statement regarding Nipper's personal ownership that the statement was false.

132.    Ga. Martin made the representation with the intent that Drury act on the representation, because Ga. Martin knew that Drury was very selective about the persons and/or businesses with whom he did business, and he wanted Drury to believe that he was merely transacting with a friend, as opposed to a publicly traded company.

133.    Drury and Diamondback relied on the representation by entering into the Patent License with R-P.

134.    Drury's reliance on the representation caused Diamondback injury because it entered Diamondback into a purportedly binding agreement that granted the exclusive rights related to the '035 Patent to a company that Drury did not know was in control of R-P, to wit, NCS Multistage Holdings, Inc.

## CLAIM VI – FRAUDULENT INDUCEMENT RELATED TO THE AMENDED PATENT LICENSE

135.    The allegations set forth in paragraphs 1 – 134 and the Summary of Action are incorporated herein.

136.    After Diamondback and R-P entered into the Patent License, Defendant Ga. Martin, operating on behalf of the R-P Defendants and the NCS Defendants, represented to Diamondback that R-P needed to amend the Patent License to broaden the definition of "Licensed Products" from "bridge plugs" to "electric wireline setting tools" and to include a "Right of First Refusal" in the Patent License.  Ga. Martin represented that the amendment was needed because R-P intended to acquire Diamondback, so R-P needed the ability to match any terms proffered by a third party.

137.    This representation that R-P intended to acquire Diamondback was material because Drury would have never agreed to the Amended Patent License with R-P had he known that R-P did not have the ability to acquire Diamondback due to its control by a publicly traded company (Defendant NCS M-H), or that neither the R-P Defendants nor the NCS Defendants had any genuine interest in acquiring Diamondback at all.

138.    The representations by Ga. Martin that R-P intended to acquire Diamondback were false, at least because R-P did not have the ability to consummate a transaction to acquire Diamondback.  Per Ga. Martin, NCS M-H would have to be the acquiring entity—a fact only fully disclosed to Diamondback at the provision of the first draft of the LOI (June 13, 2018), which was only after the Amended Patent License was executed (May 30, 2018). (Exh. 7).

139.    Ga. Martin knew when he made the statement regarding R-P's acquisition Diamondback that the representation to that effect was false, and such act represents a false promise of future performance.

140.    Ga. Martin made the representation with the intent that Drury act on the representation, because Ga. Martin wanted to have an exclusive license not only on bridge plugs, but also on all electric wireline setting tools that would otherwise infringe the claims of the '035 Patent.

141.    Drury and Diamondback relied on the representation by entering into the Amended Patent License with R-P.

142.    Drury's reliance on the representation caused Diamondback injury because it induced Diamondback to enter into a purportedly binding agreement with R-P that granted the exclusive rights to R-P and NCS M-H (by virtue of affiliation) that diminish the value of Diamondback and foreclose Diamondback's ability to enter into other licenses with third parties for products within the scope of the claims of the '035 Patent.

## CLAIM VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS BY THE R-P DEFENDANTS AND NCS DEFENDANTS

143.    The allegations set forth in paragraphs 1 – 142 and the Summary of Action are incorporated herein.

144.    Plaintiff had an ongoing business relationship with Company A.

145.    Company A was Plaintiff's largest customer.

146.    The NCS and R-P Defendants were aware, through access to Plaintiff's trade secrets as described in the foregoing paragraphs, that Plaintiff had a substantial and ongoing business relationship with Company A.

147.    The R-P and NCS Defendants deliberately misled Plaintiff in order to procure Plaintiff's trade secrets and use the misappropriated information to attempt to prospect Company A for business and divert that business away from Plaintiff.

148.    Defendants' conduct was independently tortious because it constituted fraud, and violated the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Tex. Bus. & Comm. Code § 27.01, *et seq.*

149.    Defendants' interference attempted to divert sales that Plaintiff would have otherwise made, thus causing Plaintiff to suffer actual damages in the form of a damaged business relationship, loss of value caused by diminished good will.

150.    Plaintiff further seeks exemplary damages for Defendants' fraud and actual malice as it relates to Defendants' tortious interference between Plaintiff and Company A.

## CLAIM VIII – CIVIL VIOLATION OF THE COMPUTER FRAUD & ABUSE ACT 18 U.S.C. § 1030, BY THE R-P DEFENDANTS AND THE NCS DEFENDANTS

151.    The allegations set forth in paragraphs 1 – 150 and the Summary of Action are incorporated herein.

152.    The NCS Defendants, as well as their affiliates and representatives, including the R-P Defendants, exceeded the authorization granted under the July 25, 2018, Confidentiality Agreement and the Patent Agreement.

153.    The R-P and NCS Defendants were granted access to Plaintiff's Secure Data Room, which constitutes a "protected computer," in a manner that was unauthorized, or exceeded authorization, or both, by accessing the data with the intention to commit fraud, and/or the intention to harm Diamondback.

154.    Despite having authorization for the stated and limited purpose of evaluating the potential acquisition of Diamondback, the R-P and NCS Defendants, nonetheless, knowingly accessed the data with the intent to defraud Plaintiff, furthering the fraud by obtaining valuable customer sales, financial, and technical information, in violation of 18 U.S.C. § 1030.

155.    Plaintiff has been harmed in an amount exceeding $5,000.00, at least by the amounts spent on determining what data was accessed, as well as repairing its goodwill and business relationships damaged by the unauthorized use of the data Defendants unlawfully obtained.  Plaintiff estimates that the damage caused by Defendants' unauthorized access of Diamondback's data for the purpose other than the purpose contemplated by their being granted access – i.e., the acquisition of Diamondback as a going concern – is in excess of $25,000.00 in the previous year.

## CLAIM IX – BREACH OF THE JULY 25TH CONFIDENTIALITY AGREEMENT

156.    The allegations set forth in paragraphs 1 – 155 and the Summary of Action are incorporated herein.

157.    Defendant NCS M-H entered into the July 25, 2018 Confidentiality Agreement with Diamondback, which covered NCS M-H's subsidiaries, including, but not limited to,

NCSM and R-P, as evidenced by the signature of NCS M-H's Chief Financial Officer, Ryan Hummer.

158.   The Confidentiality Agreement restricts NCS M-H and its affiliates' and representatives' use of Diamondback's information "solely for the purpose of evaluating a Transaction involving [Diamondback] and [NCS M-H] or [NCS M-H's] affiliates."

159.   NCS M-H breached the Confidentiality Agreement by using Plaintiff's trade secret information in direct competition with Plaintiff for its own financial advantage, and to the exclusion of Plaintiff.

160.   NCS M-H used information related to Diamondback's largest customer, Company A, and attempted to obtain an exclusive distribution agreement with Company A, to the exclusion of Diamondback.

161.   As a direct and proximate effect of these breaches, Diamondback has been injured.  Plaintiffs therefore seek all remedies to which they may be entitled at law or in equity, including but not limited to injunctive relief and money damages.

## CLAIM X – BREACH OF THE PATENT AGREEMENT BY R-P

162.   The allegations set forth in paragraphs 1 – 161 and the Summary of Action are incorporated herein.

163.   Defendant NCS M-H, and/or one of its affiliates, R-P, used the trade secret information related to Diamondback's customers in an authorized manner, as described above with respect to Claim IX.  Because NCS M-H was (although unknown to Diamondback) an affiliate of R-P, who entered into the Patent Agreement with

Diamondback, the confidentiality clause of the Patent Agreement covers all of the NCS Defendants and the R-P Defendants.

164.    NCS M-H's and/or its affiliates' use of the information related to Company A to attempt to establish a business relationship with Company A represents a breach of the confidentiality clause of the Patent Agreement.

165.    Clause 8.1 acknowledges that "in connection with this Agreement it will gain access to confidential Information of the other Party," where "Confidential Information" is defined as:

> **"Confidential Information"** means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party. Confidential Information shall not include Nonproprietary Information.

166.    The confidential information includes "information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party…," which includes information related to Company A.

167.    The confidentiality clause further states that the receiving party (R-P or its affiliates) agrees not to "use the Disclosing Party's Confidential Information other than is strictly necessary to exercise [R-P's] rights and perform [R-P's] obligations under this Agreement."

168.     At the time R-P and its affiliates used the trade secrets to approach Company A, Diamondback had not sold any patented products to Company A (as opposed to other, non-patented protducts), so nothing regarding Company A, could be conceivably construed as "strictly necessary to exercise its rights and perform its obligations under the Patent Agreement.

169.     As a direct and proximate effect of R-P's breach, Plaintiffs have been injured. Plaintiffs therefore seek all remedies to which they may be entitled at law or in equity, including but not limited to injunctive relief, setting aside the Patent Agreement, and money damages.

## CLAIM XI - DECLARATORY JUDGMENT THAT THE PATENT AGREEMENT IS VOID

170.     The allegations set forth in paragraphs 1 – 169 and the Summary of Action are incorporated herein, specifically the facts of Claim XII regarding R-P's breach of the Patent Agreement.  Additionally, R-P is fifty percent (50%) owned by NCS M-H, a fact that was not fully disclosed prior to R-P entering into the Patent License with Diamondback. Moreover, Ga. Martin, while a Managing Member of R-P, did not have the authority to enter into the Patent License.

171.     R-P's breach of the Patent Agreement is incapable of cure, at least because it represents a violation of the trust between Diamondback on the one hand, and R-P and its affiliates on the other hand.

172.     Under Section 12.2(b) of the Patent Agreement, "Either [Party] may terminate this Agreement on written notice to other party if the other party materially breaches this Agreement and such breach: (i) is incapably of cure."

173.     Therefore, because (1) R-P breached the Patent Agreement, and such breach is incapable of cure, (2) Ga. Martin did not have the authority to enter into any agreement on behalf of R-P, and (3) the nature and extent of NCS M-H's involvement in R-P was never disclosed to Diamondback, an actual controversy exists within this Court's jurisdiction that necessitates the Court to declare the rights and other legal relations of Diamondback as related to the Patent Agreement, pursuant to 28 U.S.C. § 2201, including, without limitation, that Diamondback is entitled to terminate the Patent Agreement and that the Patent Agreement is itself void based on fraud by the R-P Defendantsa c.

## CLAIM XII – DECLARATION THAT THE AMENDED PATENT LICENSE IS VOID

174.     The allegations set forth in paragraphs 1 - 173 and the Summary of Action are incorporated herein.

175.     In addition the allegations of breach of the Patent Agreement as set forth in Claim XI, the Amended Patent License is void for a lack of consideration.

176.     Whereas Diamondback provided a right of first refusal and amended and expanded the definition of the licensed products, R-P provided no consideration whatsoever.

177.     In contrast to valuable consideration, the R-P and NCS defendants offered only a contingent promise of future consideration, which is no consideration.

178.    Therefore, because (1) the R-P Defendants breached the Amended Patent License through breach of the same terms of the Patent Agreement, and such breach is incapable of cure, (2) Ga. Martin did not have the authority to enter into any agreement on behalf of R-P, (3) the nature and extent of NCS Defendants' and Advent's involvement in R-P was never disclosed to Diamondback prior to execution of the Amended Patent License, and (4) the complete lack of consideration on the part of R-P in exchange for the amendments, an actual controversy exists within this Court's jurisdiction that necessitates the Court to declare the rights and other legal relations of Diamondback as related to the Amended Patent License, pursuant to 28 U.S.C. § 2201, including, without limitation, that the Amended Patent License agreement is void because of fraud by the R-P Defendants and the failure of consideration.

## CLAIM XIII – EMPLOYMENT OF MANIPULATIVE AND DECEPTIVE DEVICES IN VIOLATION OF 15 U.S.C. § 78j AND 17 C.F.R. § 240.10b-5

179.    The allegations set forth in paragraphs 1 – 178 and the Summary of Action are incorporated herein.

180.    Defendants made untrue statements and omitted material facts to Drury beginning with the representation by Ga. Martin that he owned R-P and was authorized to cause R-P to enter into the Patent License and the Amended Patent License with Diamondback, that Ga. Martin could personally purchase Diamondback, knowing that he could not act in any manner that would violate the R-P Company Agreement, and that NCS M-H was a publicly-traded company that was an owner of and controlled R-P.

181.    The failure to disclose to Drury that NCS M-H was an owner of and controlled R-P was a material omission and designed to hide the fact that NCS M-H, a publicly traded company, was the true party behind the Patent License and the Amended Patent License.

182.    NCSM entered into the Letter of Intent to acquire the equity interests of Diamondback in yet another effort to obscure the ownership interest of R-P by NCS M-H as a publicly traded company, and to provide Defendants with access to Diamondback's trade secrets for purposes that contravened the Patent License, the Amended Patent License and the Letter of Intent.

183.    The statements made or omitted by Ga. Martin and NCS M-H were material because they caused Drury in his capacity as President of Diamondback to rely on them to the detriment of Diamondback, to wit:

    a.    Agreeing to the Patent License, under false pretense that R-P was seeking to purchase Diamondback;

    b.    Agreeing to the Amended Patent License, which further expanded the definition of "Licensed Products" under false pretense that R-P was seeking to purchase Diamondback;

    c.    Agreeing to the Letter of Intent with NCSM, which allowed Defendants access to Diamondback's trade secrets for the purpose of competing with Diamondback rather than for a proper purpose of evaluating the acquisition of Diamondback.

184.    But for Defendants' deliberate and calculated concealment of the involvement of the NCS Defendants—from the very outset of Ga. Martin's initial contact with Diamondback—Diamondback would never have given R-P a license to Diamondback's

patented setting tool technology, or Diamondback's trade secrets related to Diamondbacks setting tool technology.

185.    Diamondback has been harmed by the material misrepresentations and omissions made by Defendants under the ruse of acquiring Diamondback's securities because Diamondback's net value has been diminished due to the existence of the Patent License and the Amended Patent License as well as the fact that Defendants now possess, and, upon information and belief, are contacting Diamondback's customers and competing against Diamondback, using Diamondback's own trade secrets.

186.    Defendants' conduct has caused Diamondback damages in excess of $100,000,000.00.

### CLAIM XIV – CONSPIRACY BETWEEN T. BAKER, J. BAKER AND THE R-P DEFENDANTS

187.    The allegations set forth in paragraphs 1 – 186 and the Summary of Action are incorporated herein.

188.    The R-P Defendants, T. Baker and J. Baker, upon information and belief, entered into an agreement whereby R-P paid T. Baker as a "consultant."

189.    Kingdom Downhole Tool, LLC's prospectus document (Exh. 20 (redacted)), states "we are the chief designer [*sic*] of the first ever one run setting tool the market has ever seen.  We also have designed and approved for production the first automation system for Power Charge manufacturing."  The "we" of Kingdom includes T. Baker and J. Baker, the latter of whom admitted to stealing Diamondback trade secrets and transmitting them to the former. (See Exh. 21 (Kingdom Cert. of Form)).

190.    The Kingdom business plan states that it contains "confidential, trade-secret information," (Exh. 20, *passim* (redacted)), but was created on April 22, 2018, only ten days from the date of J. Baker's termination from Diamondback.  It also states that the goal of Kingdom is to bring "[Kingdom's] expertise in automation of Power Charge manufacturing and perfecting the one-run tool design to make it more user friendly." (*Id.*).  Any "expertise" regarding the automation of power charge manufacturing or perfecting the one-run tool design necessarily includes the trade secret information of Diamondback, because all information and knowledge regarding power charge manufacturing and one-run setting tools was proprietary information owned by Diamondback.

191.    Upon information and belief, the "consulting" performed by T. Baker for R-P constituted the misappropriation of Diamondback's trade secrets, because the technical information possessed by T. Baker was Diamondback's trade secrets.

192.    Upon information and belief, R-P has used and is using the trade secrets obtained from T. Baker, J. Baker, and Kingdom to compete with Diamondback.

193.    Diamondback has been injured by the unlawful overt act of R-P's misappropriation and use of Diamondback's trade secrets that were obtained illegally from T. Baker and J. Baker under the guise of employing T. Baker as a consultant.

194.    The unlawful overt act was performed pursuant to, and in furtherance of, the R-P Defendants to benefit financially to Diamondback's detriment.

195.    The R-P Defendants acted willfully, with malice, and for the purpose of benefitting financially at Diamondback's expense.

196.    Plaintiff is entitled to monetary relief, injunctive relief, and any combination thereof in law or equity to prevent further harm as a result of the R-P Defendants' unlawful overt acts and schemes.

## CLAIM XV – DECLARATION OF NON-INFRINGEMENT OF THE '035 PATENT

197.    The allegations set forth in paragraphs 1 - 196 and the Summary of Action are incorporated herein.

198.    The '035 Patent was issued on November 7, 2017, listing Jimmy L. Carr (deceased), Derrek Drury, and Trea H. Baker as inventors.

199.    By virtue of the Amended Patent License, R-P has claimed in Civil Action No. 4:18-cv-04456, filed in the Southern District of Texas, Houston Division, R-P has made clearly indicated that it intends assert a patent infringement claim against Diamondback. Therefore, a case or controversy exists under 28 U.S.C. § 2201.

200.    No party has asserted that any claim of the '035 Patent is invalid, and indeed every issued claim in the '035 is presumptively valid.

201.    In order for R-P or any other party to claim infringement, it must aver that the asserted claims are valid.

202.    Based on Claims XI and XII, *supra*, and the fact that the parties never intended to exclude Diamondback from practicing its own invention, Diamondback seeks a declaratory judgment that its practice of the claims of the '035 Patent does not infringe its own '035 Patent.

## **PRAYER**

For the foregoing reasons and circumstances, created wholly by the conduct of Defendants, Plaintiff respectfully requests that the Court enter judgment against Defendants for all of the following:

a) Injunctive relief;

b) Actual damages;

c) Exemplary Damages;

d) Disgorgement;

e) Prejudgment and post judgment interest;

f) Costs;

g) Declaration of breach;

h) Rescission of the Patent License;

i) Rescission of the Amended Patent License;

j) Declaration that Diamondback does not infringe its own '035 Patent;

k) Attorneys' fees; and/or

l) Such other relief, both at law and in equity, as the Court deems just and right given the nature of Defendants' actions.

Dated: February 3, 2019

Respectfully submitted,

 */s/ Decker A. Cammack*
Decker A. Cammack (Lead Counsel)
Texas Bar No. 24036311
dcammack@whitakerchalk.com

Mack Ed Swindle
Texas Bar No. 19587500
mswindle@whitakerchalk.com

David A. Skeels
Texas Bar No. 24041925
dskeels@whitakerchalk.com

**WHITAKER CHALK SWINDLE
   & SCHWARTZ PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Phone: (817) 878-0500
Fax: (817) 878-0501

John P. Palmer
Teas Bar No. 15430600
palmer@namanhowell.com
**NAMAN, HOWELL, SMITH & LEE, PLLC**
400 Austin Ave., Suite 800
P.O. Box 1470
Waco, Texas 76703
Phone: (254) 755-4100
Fax: (254) 754-6331

*Counsel for Plaintiff Diamondback Industries,
Inc.*