## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 6:19-CV-00034-ADA** |
| | § | |
| **REPEAT PRECISION, LLC; NCS** | § | |
| **MULTISTAGE, LLC; NCS** | § | |
| **MULTISTAGE HOLDINGS, INC.;** | § | |
| **ROBERT NIPPER; GARY MARTIN;** | § | |
| **GRANT MARTIN; and,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## FIRST AMENDED COMPLAINT

TO THE HONORABLE COURT:

Now comes, Diamondback Industries, Inc. ("Plaintiff" or "Diamondback") and files this First Amended Complaint[1] against Repeat Precision, LLC ("RP"), NCS Multistage, LLC ("NCSM"), NCS Multistage Holdings, Inc. ("NCS M-H"), Robert Nipper ("Nipper"), Gary Martin ("Ga. Martin"), and Grant Martin ("Gr. Martin") (collectively, "Defendants"), and would show the Court as follows:

---

[1] All references to Exhibits in this First Amended Complaint are to the exhibits Plaintiff filed with its original complaint.

**FIRST AMENDED COMPLAINT - 1**
DM#393786

## I.      PARTIES

1.      Diamondback is a Texas corporation with its headquarters and principal place of business located at 3824 Williamson Road, Crowley, TX 76036.

2.      Defendant Repeat Precision, LLC is a Texas limited liability company with a principal place of business at 130 Northridge Road, Marble Falls, Texas, 78654, and may be served through its registered agent, NCS Multistage, LLC, c/o General Counsel, 19450 State Highway 249, Suite 200, Houston, Texas 77070. RP has now appeared and may also be served through its counsel of record.

3.      Defendant NCS Multistage Holdings, Inc. is a Delaware corporation with a principal place of business at 19450 State Highway 249, Suite 200, Houston, Texas 77070. NCS Multistage Holdings, Inc. does not have a registered agent for service in the State of Texas, and therefore may be served at its principal place of business pursuant to the Federal Rules of Civil Procedure, or by service on the Texas Secretary of State, pursuant to the Texas Long Arm Statute. NCS M-H has now appeared and may also be served through its counsel of record.

4.      Defendant NCS Multistage, LLC is a Texas limited liability company with a principal place of business at 19450 State Highway 249, Suite 200, Houston, Texas 77070, and may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. NCSM has now appeared and may also be served through its counsel of record.

5.      Defendant Robert Nipper is an individual residing, upon information and belief, in Houston, Harris County, Texas and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure. Nipper has now appeared and may also be served through his counsel of record.

6.      Defendant Gary Martin is an individual residing, upon information and belief, in Marble Falls, Burnet County, Texas, and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure. Ga. Martin has now appeared and may also be served through his counsel of record.

7.      Defendant Grant Martin is an individual residing, upon information and belief, in Marble Falls, Burnet County, Texas and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure. Gr. Martin has now appeared and may also be served through his counsel of record.

## II.     JURISDICTION AND VENUE

8.      This is an action for trade secret misappropriation arising under Title 18 of the United States Code, declaratory judgment of non-infringement of a patent under 35 U.S.C. § 1, *et seq.*, and 28 U.S.C., § 2201, as well as various claims under the laws of the State of Texas.

9.      This Court has original jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1338, and Supplemental Jurisdiction over Plaintiff's claims under Texas Law, pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), (d) and/or 1400(b).  On information and belief, Defendants conduct business in this District, at

least a portion of the claims alleged in this First Amended Complaint arise in this District, and at least some of the acts of misappropriation, fraud, fraudulent inducement, fraudulent concealment, breach of contract, and tortious interference have taken place and are continuing to take place in this District.

11.     Defendants are subject to this Court's general and specific personal jurisdiction because Defendants have sufficient minimum contacts within the State of Texas and this District, pursuant to due process and/or the Texas Long Arm Statute, because Defendants purposefully avail themselves of the privileges of conducting business in the State of Texas and in this District, because Defendants are in the process of establishing a competing enterprise, which is in the State of Texas, and based on fraudulent activities and breaches of contracts entered into in this District, and because Plaintiff's causes of action arise directly from Defendants' business transactions and other activities in the State of Texas and in this District.  Additionally, Defendants are subject to this Court's jurisdiction because the Patent License requires that it be construed under the laws of the State of Texas and was at least partially executed in this District.  Many or all of the claims herein are related to the claims asserted under 18 U.S.C. § 1836, *et seq.*, which are under the original jurisdiction of the Federal Courts of the United States and, specifically, are subject to the jurisdiction of the Western District of Texas.

12.     Additionally, the Parties have agreed that both jurisdiction and venue are proper in this District for the allegations asserted herein.

13.     The subjects of the misappropriation include confidential and trade secret customer sales and volume information, which were made available in the secure data room

under the LOI – an agreement that ultimately allowed Defendants to access the secure data room under false pretenses and/or as the result of fraudulent conduct by the Defendants. Additionally, other confidential and trade secret information obtained by Defendants from, upon information and belief, Plaintiff's former employee, Trea H. Baker, was misappropriated.  Additionally, the trade secrets Defendants have misappropriated relate directly to products sold by Plaintiff in interstate commerce.

**Summary of Action**

14.    This is an action for trade secret misappropriation under 18 U.S.C. § 1836, and includes additional claims, including claims for trade secret misappropriation under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*), violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), as well as common law claims for fraud, tortious interference with prospective business relations, breach of contract, and fraudulent inducement. Additionally, the Complaint includes a declaratory judgment claim of no patent infringement under the Declaratory Judgment Act (28 U.S.C. § 2201).

15.    Through a protracted and calculated effort that continues today, Defendants targeted Diamondback's business to raid its intellectual property, including patents and trade secrets, and now seek to exclude Diamondback from the disposable setting tool market altogether.  The "RP Defendants," which include RP, Ga. Martin, and Gr. Martin, and the "NCS Defendants," which include NCS M-H and NCSM, used deception, misrepresentation, and betrayal of trust to gain access to Diamondback's trade secrets and then used those trade secrets in violation of at least two confidentiality agreements -- to force Diamondback out of a market that it created through various innovations embodied in its intellectual property.

## Defendants Target Diamondback

16.     Diamondback, which is owned by its president and majority shareholder, Derrek Drury ("Drury"), was founded on July 12, 1999, and is a company engaged in the development, manufacture, and sale of oil and natural gas well-completion products, including, without limitation, setting tools, power charges, and igniters.  Diamondback is also the assignee and owner of U.S. Patent No. 9,810,035 (the "'035 Patent"), titled "Disposable Setting Tool," which issued on November 7, 2017. (Exh. 2), which names Drury as one of its inventors.

17.     In early 2018, shortly after the '035 Patent Issued, Diamondback was approached by Defendant Ga. Martin, purportedly as the owner of Defendant RP, to Discuss the possibility of RP licensing the '035 Patent from Diamondback. Clint Mickey ("Mickey"), RP's Product Line Manager, made the initial contact with T. Baker via telephone, to inquire as to whether Diamondback was interested in licensing the '035 Patent.  T. Baker followed up with an email to Diamondback's President, Derrek Drury ("Drury"), referencing the call, and inviting Drury to contact Ga. Martin directly.  (Email from T. Baker to Drury, Feb. 8, 2018, Exh. 13).

18.     Shortly after the '035 Patent issued, on February 7, 2018, Clint Mickey ("Mickey"), RP's Product Line Manager, contacted T. Baker via telephone, to inquire as to whether Diamondback was interested in licensing the '035 Patent.  T. Baker followed up with an email to T. Baker and Drury referencing the call and inviting Drury to contact Ga. Martin directly.  (Email from T. Baker to Drury, Feb. 8, 2018, Exh. 13).

19.     Upon information and belief, before Clint Mickey or anyone else from Defendants contacted Diamondback personnel, the RP Defendants and the NCS Defendants had determined that Diamondback was a target for acquisition and/or takeover.

20.     On February 8, 2018, Drury responded to a follow-up email from T. Baker, stating that Diamondback would "not be licensing the product," but was "thinking about" RP's proposal.  (*Id.*).

21.     Also, on February 8, 2018, Drury called Ga. Martin to discuss RP's proposal. During that call, Ga. Martin averred that he owned a company called "Repeat Precision," discussed RP's international manufacturing capabilities, and discussed his company's composite frac plugs, which are marketed under the name "Purple Seal."  Ga. Martin also stated that RP had begun development of its own short setting tool, and offered to come to Diamondback's facility in Crowley, Texas (an offer Drury accepted), ostensibly to discuss a mutually beneficial business arrangement.

22.     On February 16, Diamondback and RP entered into a Mutual Confidentiality and Non-Disclosure Agreement.  (Exh. 3).

23.     On February 19, 2018, Ga. Martin, Gr. Martin, and Mickey visited Diamondback's Crowley headquarters and met with Drury, T. Baker, and J. Baker.  At the meeting, Ga. Martin led off the meeting by explaining that RP had begun the development of a "short disposable setting tool" in November 2017, and immediately stopped development after he discovered that Diamondback was the assignee on the '035 Patent, which led to the emails and telephone calls on February 7th and 8th, respectively.

24.     Also, at the February 19, 2018, meeting, Ga. Martin proposed a deal through which RP would manufacture disposable setting tools in its Mexico facility and would label all sales materials and packaging with Diamondback's brand but promised that RP would not manufacture power charges (sometimes referred to as "energetics").  Upon information and belief, no Defendant currently holds sufficient licensing and approval to manufacture explosives of the type required to manufacture power charges for the Diamondback setting tools.  Yet, during this initial face-to-face meeting, Ga. Martin emphasized the benefit to Diamondback of partnering with RP to leverage RP's manufacturing capabilities.  Ga. Martin also represented to Drury that RP could easily design around Diamondback's '035 Patent.

25.     Ultimately, Drury committed to a license arrangement based on Ga. Martin's representations about his company's (RP's) manufacturing capabilities (which would allow both Diamondback and RP to sell disposable setting tools), RP's threat to design around the '035 Patent, RP's promise to promote Diamondback power charges and igniters, and the prospect of a substantial near-term market presence of Diamondback's patented setting tool with Diamondback's igniters and separately-patented power charges.

26.     The parties entered into a Mutual Confidentiality Agreement on February 16, 2018, in furtherance of Ga. Martin's discussions with Drury regarding licensing and potential acquisition of Diamondback. (Exh. 3). Unbeknownst to Diamondback, at the time Ga. Martin first approached Drury, RP was jointly owned by defendant RJ Machine Co., Inc. (Ga. Martin's company) and NCS M-H.  Upon information and belief, and also unbeknownst to Drury, at the time Ga. Martin first contacted Drury, Diamondback was on a list of target companies that the NCS Defendants had targeted for acquisition or takeover.

27.     Subsequently, and without revealing any of the foregoing information, RP sought and received a right and license to make, have made, use, offer to sell, import, and export products that fall within the scope of the claims of the '035 Patent (the "Patent License").[2]  (Exh. 4, § 2).  Ga. Martin initially proposed the Patent License as part of a promise to expand the production capacity for setting tools for both Diamondback and RP. Significantly, the Patent License includes a confidentiality clause. (*See id.*, § 8).

28.     In order to entice Diamondback to enter into the Patent License, RP and its owner, Ga. Martin, repeatedly promised Diamondback that RP's ultimate goal was to acquire Diamondback, and that the Patent License was a necessary step to help RP to secure the funding necessary for the acquisition. (Declaration of Derrek Drury in Support of Original Complaint ("Drury Decl."), Ex. 1, ¶ 4, Appx. 003).  Additionally, on March 9, 2018, Ga. Martin informed Drury, via text message, that Defendant Nipper (with no mention of NCSM or NCS M-H) "owns the other half of" Repeat Precision.  (Exh. 5, pp. 26/186 – 30/186 (redacted)). At this point, Ga. Martin had not disclosed that NCS M-H was an owner of RP and controlled RP.

29.     On March 16, 2018, RP and Diamondback entered into the Patent License.  At the time of the Patent License, neither Ga. Martin, nor any other representative of RP had disclosed to Diamondback that anyone other than Ga. Martin and Robert Nipper were the **<u>owners</u>** of RP.  Had Drury known that RP was owned or controlled by NCS M-H, a publicly

---

[2] The license grant uses the word "exclusive." As detailed below, the Parties intended this to mean, and understood this to mean, that Diamondback would not license any other third party. At the same time, they mutually intended and shared an understanding that Diamondback at all times retained, among other things, the right to make, use, and sell disposable setting tools under its patents. Any reference herein to an "exclusive license" should be understood in this context.

traded holding company that is owned and controlled by Advent International Corporation by virtue of a 2012 buyout of NCS M-H, he would never have agreed to the terms of the Patent License. To be clear, the Patent License Agreement does *not* disclose that NCS Multistage Holdings, Inc. *controlled* RP and does not disclose the ownership interest of NCS M-H; to the contrary, it simply discloses NCS M-H as an "Affiliate" – the definition of which is broad enough to cover any number of possible corporate structures, including, for example, a scenario in which RP owns and controls NCS M-H, rather than the other way around. The representations and omissions of RP, Ga. Martin, Gr. Martin, and Robert Nipper on this point were material, and Diamondback justifiably relied on its understanding that RP was *not* owned or controlled by NCS M-H – an understanding that was erroneous due to the above-referenced representations and omissions. Even if Drury had knowledge, at some point, that one of the contracting parties had some association with NCS M-H, such knowledge would not equate to knowing that NCS M-H controlled RP – a fact that should have been fully and truthfully disclosed. Further, Drury was entitled to rely on Defendants' representations (which it did, to its detriment) and had no affirmative obligation to research the public filings of NCS M-H, as there were no "red flags" to alert Drury that defendants might be mischaracterizing their respective ownership interests in RP. Drury's subsequent decision to enter into a LOI listing NCS as an acquiring party is distinct from Drury's decision to enter into a license agreement with RP – two separate issues that RP seeks to conflate. In other words, Diamondback was willing to consider acquisition by a publicly traded corporate behemoth, such as NCS M-H, who might be willing to pay $200M+ to purchase Diamondback; but it was *not* willing to enter into a patent license– particularly on those

terms (e.g., up-front payment of only $55K) – with that same behemoth or with a company

owned or controlled by such a corporate giant.]

30.     The Patent License defines "Confidential Information: as follows:

> "**Confidential Information**" means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party.  Confidential Information shall not include Nonproprietary Information.

(Exh. 4, § 1).

31.     The Patent License also includes a confidentiality clause, which states as follows:

> 8.1    Confidentiality Obligations. The parties acknowledges that in connection with this Agreement it will gain access to Confidential Information of the other party. As a condition to being furnished with Confidential Information, parties agree, during the Term and for 1 years thereafter to:
>
> (a)    not use the Disclosing Party's Confidential Information other than as strictly necessary to exercise its rights and perform its obligations under this Agreement; and
>
> (b)    maintain the Disclosing Party's Confidential Information in strict confidence and, subject to the exceptions below, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent, provided, however, the Receiving Party may disclose the Confidential Information to its Representatives who:
>
> (i)    have a "need to know" for purposes of the Receiving Party's performance, or exercise of its rights with respect to such Confidential Information, under this Agreement;
>
> (ii)   are aware of this restriction; and
>
> (iii)  are themselves bound by confidentiality, provided further that the Receiving Party shall be responsible for ensuring its Representatives' compliance with, and shall be liable for any breach by its Representatives of, this section.
>
> The Receiving Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

(*Id.*, ¶ 8.1, Appx. 032 – 33).

32.     On March 28, 2018, Drury sent an email to the leadership of Diamondback, reminding them that it was unlawful to take any proprietary materials from Diamondback. J. Baker was included on that email:

From: Derrek Drury
Sent: Wednesday, March 28, 2018 12:49 PM
To: Tonya Cheek; Rob Andres; Ron Swiger; Justice Baker; Kim Bellah; Jeb Wright; Nichole Bucher; Kevin Carter; Taylor Davis
Subject: Notification

Please be advised that divulging or disseminating Diamondback Industries proprietary trade secrets, designs, prints, emails, sales numbers, or other such items to individuals or companies outside the approval of the Owner of Diamondback is expressly prohibit. Such behavior or actions could lead to that individual being terminated and or prosecuted by law.

Derrek Drury
President
Diamondback Industries, Inc.
3824 Williamson Road
Crowley, TX 76036
Office: 817-297-1059
Cell: 817-480-2139
derrek.drury@diamondbackindustries.com



(Email to Diamondback Personnel, March 28, 2018, Exh. 15).

33.     On or about April 12, 2018, Drury discovered that J. Baker was sending emails to T. Baker that included trade secrets. J. Baker was terminated immediately. (Termination Notice of J. Baker, April 12, 2018, Exh. 16).

34.     At the time of his termination, J. Baker admitted to "stealing" Diamondback's proprietary information and admitted that it was "wrong." Less than two weeks after J. Baker was terminated, Diamondback obtained a copy of a document created on April 22, 2018, called "Kingdom Downhole Tools – Executive Summary" (sometimes referred to as the "Kingdom Downhole Tools Prospectus"). This document states clearly that it "contains confidential, trade-secret information," and states that Kingdom has "expertise in automation of Power Charge manufacturing and perfecting the one-run tool design." (Exh. 20 (redacted)). Both J. Baker and T. Baker are listed as managing members of Kingdom Downhole Tools, LLC, an entity formed on June 18, 2018. Any trade secret information in the possession of Kingdom, J. Baker, and/or T. Baker is, upon information and belief, the trade secret and/or highly confidential information of Diamondback.

35.     On or about April 12, 2018, Ga. Martin offered, on behalf of RP, to purchase Diamondback for $100,000,000.00, which Ga. Martin stated he could "pay in cash." (Drury Decl., Exh. 1, ¶ 5). Upon information and belief, this offer to buy Diamondback was not genuine. Rather, this "offer," which was communicated by Ga. Martin on behalf of RP, was not one that RP could have acted on, because RP did not have the authority to make such an offer. Ga. Martin failed to disclose this fact and failed to disclose that any such offer (and certainly any such transaction) would require the approval of RP's controlling party, NCS M-H. This fraud was intended to further RP's and NCS M-H's plan to misappropriate Diamondback's intellectual property and assets.

36.     Drury rejected Ga. Martin's offer to purchase Diamondback, stating that he believed the value of the company to be well above $200,000,000.00.  At this point, Ga. Martin disclosed, for the first time, that Advent International and Robert Nipper were "investors" in RP, and that RP required their approval before entering into any further discussions regarding acquisition of Diamondback.  At this point, Ga. Martin still had not disclosed the corporate relationship between RP and Defendants NCSM or NCS M-H.  (*See* Drury Decl., Exh. 1, ¶ 7 (redacted)).

37.     Thereafter, in its continued, but what turned out be disingenuous, efforts to purchase or otherwise acquire Diamondback, RP sought an amendment to the Patent License that, among other things, amended the definition of "Licensed Products" and added a "Right of First Refusal" ("ROFR") in the event Diamondback entered into discussions with a third party regarding acquisition or an asset sale.

38.     Ga. Martin allegedly needed the ROFR to secure the needed funding for retooling and expansion of RP's manufacturing capabilities at its Mexico facility – expansion that would help both RP and Diamondback have greater sales capacity for the short setting tools.

39.     The Amended Patent License also changed the definition of "Licensed Products."  (Amended Patent License, Exh. 6). Nothing in the Amended Patent License indicates or suggests a change with respect to Diamondback's continuing right to practice its own inventions – a fact confirmed by the terms themselves, as well as by the Parties' course of dealing and course of conduct.

40.     The Amended Patent License, which includes the altered definition of "Licensed Products" and the ROFR, does not recite any consideration for the amendment.

41.     Ga. Martin presented the Amended Patent License to Drury at a lunch on or about May 28, 2018, and discouraged him from seeking legal counsel, stating words to the effect of "your lawyers will just mess this up," and encouraging Drury to sign it on the spot, with no review by Diamondback's legal counsel.

42.     After the rejection of the RP offer, Diamondback entered into negotiations with another company ("Company B") for the sale of Diamondback for approximately $170,000,000.00.  When Drury was about to sign a letter of intent with Company B, on May 23, 2018, Ga. Martin re-emerged, stating that the "hand cuffs were off" from his "investors," and that he had approval to offer $170,000,000.00 to $180,000,000.00 for the purchase of Diamondback – a number suspiciously similar to Company B's confidential offer. (Drury Decl., Ex. 1, ¶ 6, Exh. 4). Based on RP's ownership structure, these offers by Ga. Martin

were not possible, though Ga. Martin concealed this from Drury, holding himself out as the decision maker at RP, despite knowing full well that NCS M-H controlled RP at the time the offer was made.

43.     On May 25, 2018, Drury cut off negotiations with Company B because of the perceived trusted relationship with Ga. Martin and Ga. Martin's renewed interest in acquiring Diamondback for approximately the same amount Diamondback was discussing with Company B.

44.     Ga. Martin sought the "Amendment to Patent License Agreement and Right of First Refusal Agreement," which has an effective date as May 30, 2018, to prevent Drury from selling Diamondback to this other company. (Amended Patent License, Exh. 6).

45.     To obtain Diamondback's consent to amend the Patent License to include a different definition of "Licensed Products" and a "Right of First Refusal," Defendant Ga. Martin promised Diamondback that RP would ramp up tooling for the production of Licensed Products for broad distribution (by both Diamondback and RP) – an amendment Drury accepted in exchange for RP's promise to increase its offer to $170,000,000.00. (Drury Decl. Exh. 1, ¶6).

46.     During these continued discussions with RP regarding RP's stated intent to acquire Diamondback, RP concealed the fact that RP was jointly owned by RJ Machine Co. (Ga. Martin's Company) and Defendant NCS M-H.

47.     However, and to continue discussions, RP and Ga. Martin finally disclosed fully for the first time, on June 13, 2018, the extent of NCS M-H's involvement and its corporate relationship with RP, including that NCS M-H was actually the real-party in

interest for RP. This structure was referenced in a draft "Project 'Power' Term Sheet" (or "Letter of Intent") proffered by Ga. Martin, that listed NCSM as the acquiring party.  (Draft LOI, Exh. 7).

48.     On June 27, 2018, Diamondback and Defendant NCSM, a subsidiary of NCS M-H, agreed to a final version of the Letter of Intent for "Project Power" dated June 27, 2018, purportedly for the purpose of evaluating the purchase and/or acquisition of Diamondback. (Executed LOI, Exh. 17).

49.     As part of the due diligence process, two RP representatives (including Gr. Martin), along with several NCS personnel, came to Fort Worth to meet in person with Drury. Marty Stromquist from NCS attended via telephone.

50.     During that meeting, which all parties acknowledged was governed by the Confidentiality clause of the Patent License, the NCS and RP representatives questioned Drury extensively about Diamondback's customers, purportedly as part of the due diligence process.

51.     Thereafter, on July 12, 2018, Diamondback set up a virtual secure data room for "Project Power" that included highly confidential and trade secret information and materials that were to be provided to NCSM and RP for the purposes of evaluating the purchase and/or acquisition of Diamondback.  (Drury Decl., Ex. 1, ¶ 8, Appx. 005 – 6, Excel Spreadsheet, Project Power Project Report, Exh. 9).

52.      NCS M-H also entered into a Mutual Confidentiality Agreement ("MCA") with Diamondback on July 25, 2018, which provided, *inter alia*, that NCSM and RP, would maintain as confidential all information and materials received or reviewed during the

evaluation. (Executed MCA, Exh. 8).   NCSM and RP personnel were granted access beginning on or about July 26, 2018, the day after the MCA was signed.

53.     Virtually all of the information and materials provided to NCS M-H, NCSM, and RP through access to the secure data room were trade secrets, including the sales numbers and contacts that Diamondback relied upon for its sales of well completion products to Diamondback's then-largest customer, "Company A." (Drury Decl., Ex. 1, ¶9, Appx. 006 – 7 (redacted)).

54.     It was clear from the initial meeting on July 5, 2018, that prior to that meeting, neither the RP Defendants nor the NCS Defendants were even aware that Company A was in the setting tool market as a customer, much less a large customer of Diamondback.

55.     After NCS M-H and its subsidiaries NCSM and RP accessed Diamondback's trade secret customer and sales information, NCS M-H informed Diamondback that it was no longer interested in acquiring Diamondback.

56.     NCS M-H's decision to cease its efforts to acquire Diamondback was memorialized in a letter from Diamondback's then-counsel, John Harenza, to NCS M-H's Chief Financial Officer, Ryan Hummer, on August 29, 2018.  (Exh. 10).

57.     After NCS M-H obtained Diamondback's trade secret customer and sales information, including sensitive information about Company A, NCS M-H contacted Company A's representatives directly, as evidenced by Ga. Martin's text message response



to Drury's text message on August 2, 2018:

(Exh. 11 (showing 842 messages between Drury and Ga. Martin between March 2, 2018 and October 7, 2018), p. 47/186 (redacted)).

58.     Upon learning of NCS M-H's unauthorized use of Diamondback's trade secrets, Diamondback met with Company A's representatives in person to ascertain the extent of NCS M-H's interference with Diamondback's business and NCS M-H's misuse of Diamondback's confidential information.  (Drury Decl. Ex. 1, ¶ 9).

59.     Thereafter, NCSM, through Nipper, sent written email confirmation "acknowledging the termination of [its] Right of First Refusal to buy Diamondback," and agreed that such termination would be further memorialized in a more formal document -- apparently believing that it could steal Diamondback's largest customer and force Diamondback out of the setting tool market.  (Email from Robert Nipper to Derrek Drury, Sept. 11, 2018, Exh. 12).

60.     After Diamondback met with Company A's representative, Company A ceased negotiations with NCS M-H, NCSM, and RP.   But thereafter, RP, believing it had stolen what it needed from Diamondback's secure data room regarding Diamondback's trade secrets, refused to execute a more formal document memorializing the Parties' agreement to terminate the ROFR.   (Drury Decl. ¶ 9).

### Involvement of Kingdom, Trea Baker and Justice Baker

61.     In March of 2018, Diamondback learned that one of its employees, Trea Baker ("T. Baker"), Vice President of Operations, had, without authorization, stolen trade secrets and highly confidential information in the form of technical specifications for Diamondback's setting tool technology in an effort to compete directly against Diamondback.

62.     Before T. Baker's termination, he had authorization to access Diamondback's confidential and trade secret information for the sole purpose of performing his duties and responsibilities to Diamondback, but not for his own personal benefit.   Drury informed Defendant Ga. Martin of T. Baker's dismissal on March 26, 2018, via text message:



(Exh. 5, (showing 842 messages between Drury and Ga. Martin between March 2, 2018 and October 7, 2018), p. 47/186 (redacted)).

63.     On April 12, 2018, Drury captured an email that Justice Baker ("J. Baker") mistakenly sent to T. Baker's Diamondback email account, which Drury was monitoring after T. Baker's termination for inappropriate workplace conduct.  In that email, J. Baker had attempted to send T. Baker detailed technical specifications of Diamondback tools and products.  When confronted, J. Baker admitted that he was "stealing" Diamondback's information.

64.     After the Bakers' termination, T. Baker and J. Baker formed Kingdom Downhole Tools LLC, and have created marketing materials utilizing Diamondback's proprietary trade secrets and highly confidential information.  Additionally, Ga. Martin admitted to Diamondback that RP and/or NCS M-H paid T. Baker and provided him with health insurance over a period of approximately six weeks, for what Ga. Martin called "consulting."

65.     Upon information and belief, Ga. Martin paid T. Baker for Diamondback's proprietary trade secret and confidential information and materials.

66.     On October 4, 2018, RP's representative, Ga. Martin, conducted a telephone conversation with Diamondback's Derrek Drury, during which RP informed Diamondback that it "owned" Diamondback by virtue of the Amended Patent License, that RP would never purchase or acquire Diamondback, and that there was nothing that Diamondback could do about it.  (Drury Decl., Ex. 1, ¶ 10, Appx. 007).

67.     Before the first contact between Ga. Martin and Drury, NCS M-H targeted Diamondback for acquisition and/or takeover.

68.     RP fraudulently induced Diamondback to enter into the Patent License without disclosing to Diamondback that it could not act without NCS M-H's approval and authority, much less that RP was owned and/or controlled by NCS M-H.

69.     RP promised to Diamondback that it would itself provide a more robust offer to acquire Diamondback in exchange for an altered definition of "Licensed Products" and the inclusion of the ROFR.

70.     Only after RP obtained the amendment to the Patent License did RP disclose to Diamondback that the approval and authority of its co-owner/parent company, NCS M-H, was necessary to pursue acquisition and/or purchase of Diamondback.

71.     NCS M-H entered into the Letter of Intent with the sole purpose of accessing Diamondback's trade secrets, including proprietary customer and sales information – a scheme that ultimately led to an effort by Defendants to steal Diamondback's largest customer and to force Diamondback out of the setting tool market.

72.     Defendants RP, NCSM, NCS M-H, Ga. Martin, Gr. Martin, and Nipper, with the assistance of T. Baker and J. Baker, have engaged in concerted activity to steal Diamondback's trade secrets, to perpetrate a fraud on Diamondback that induced Diamondback's agreement to the Patent License and the Amended Patent License, and to gain access to Diamondback's trade secrets under the false pretense of acquiring and/or purchasing Diamondback or performing due diligence related thereto.

73.     The RP Defendants and the NCS Defendants tortiously interfered with Diamondback's prospective business relationship with Company A.  RP's actions, in concert with its co-Defendants, breached the Patent License's "Confidentiality Provision" and the July 25, 2018, Confidentiality Agreement, and render the Patent License void and/or give rise to termination.

74.     After RP secured Diamondback's signature on the Amended Patent License on May 30, 2018, Ga. Martin continued to discuss the acquisition of Diamondback with Drury.

75.     On June 13, 2018, Ga. Martin sent Drury a first draft of the LOI, which for the first time listed NCSM, a direct subsidiary of NCS M-H (a publicly traded company, NASDAQ: NDSM), as the real party in interest to any transaction.  (Draft "Project 'Power' Term Sheet ("LOI"), June 13, 2018, Exh. 7).  Ga. Martin explained to Drury when the LOI was delivered that RJ Machine was his company and was 50% owner of RP, and that NCS M-H owned the other 50% of RP.  This was the first time that Ga. Martin, Gr. Martin, or RP disclosed any ownership relationship between RP and NCS M-H or NCSM.

76.     Gr. Martin, general manager of RP, then sent an edited copy of the LOI to Drury for execution.

77.     Despite concealing NCS M-H's role in the proposed acquisition of Diamondback, NCSM and RP continued to pursue the acquisition, so ultimately Drury signed the LOI on behalf of Diamondback, on June 27, 2018.  (Executed LOI, June 27, 2018, Exh. 17).

78.     Diamondback agreed to continue acquisition discussions because it perceived a relationship of trust and confidence with Ga. Martin – a relationship Ga. Martin had cultivated by promoting the idea of RP's acquisition of Diamondback and subsequent distribution of Diamondback's patented products with Diamondback's power charges and igniters.  Ga. Martin assured Drury that NCS M-H's involvement did not have any effect on the success of closing the deal.

79.     Shortly after the LOI was signed, on or about July 5, 2018, Diamondback set up a secure data room that included most of Diamondback's technical, financial, and sales data so that NCS M-H could conduct due diligence to complete the acquisition of Diamondback.  (Project Power Session Log, Exh. 18).

80.     None of the information regarding Diamondback's technical specifications for products, including diamondback's charge formula, igniter technology, automated charge manufacturers, single run setting tool technology manufacturing specifications, testing data, customer data, customer identity, sales volume, pricing, or sales contacts information was or is publicly available, as evidenced by the use of a secure data room to provide access to Defendant NCS M-H and its affiliates and representatives, including the RP Defendants and the NCS Defendants, for the alleged purpose of "due diligence" in connection with the stated (though disingenuous) "interest" in acquiring Diamondback, as expressed by RP and/or NCS M-H.

81.     On July 25, 2018, Diamondback and NCS M-H entered another Confidentiality Agreement ("Project Power Confidentiality Agreement," Exh. 8), which specifically named Defendants RP and NCSM as "subsidiaries" to be bound by the

provisions of that agreement.  This additional confidentiality agreement did not supersede the Patent License Agreement confidentiality clause. (Exh. 4, § 8.1).

82.     Diamondback's information in the secure data room was subject to strict confidentiality restrictions, as set forth in the Patent License and/or the Confidentiality Agreement, at all times from February 16, 2018, through the present.

83.     Neither Ernst & Young, nor Baker Botts, the two entities NCS M-H listed as their accounting and legal teams for the acquisition, ever contacted Diamondback to inquire about or to seek access to materials related to the acquisition, further indicating that Defendants proposed the LOI with fraudulent intent, to access Diamondback's trade secrets. In fact, between Ernst & Young and Baker Botts, the two companies spent only a combined sixteen (16) minutes in the secure data room.  (Session Log, Exh. 18).

84.     NCS M-H and its affiliates never intended to follow through with the acquisition of Diamondback.

85.     Rather, Ga. Martin, Nipper, and other representatives of NCS M-H, NCSM, and RP continually questioned Drury regarding his largest customers, sales volume, pricing, sales tactics, contacts, overhead, and technical information regarding power charges, igniters, and setting tools, none of which was publicly available.

86.     On or about August 3, 2018, after NCS M-H's representatives had access the secure data room, Ga. Martin and Nipper approached Drury to tell him that NCS M-H and NCSM intended to meet Company A (Diamondback's largest customer) on August 6, 2018, for the ostensible purpose of "due diligence." Defendants did not disclose to Drury that they had already met with Company A, in a manner that violated their contractual obligations.

87.     Drury refused to allow the meeting, because Ga. Martin and Nipper proposed to conduct the meeting without Drury or a Diamondback representative present.

88.     On August 10, 2018, Drury met with Company A's representatives in person. At the meeting, Company A confirmed that NCS M-H and NCSM had been in contact with some of Company A's representatives for the purpose of negotiating an exclusive contract whereby NCSM would, upon information and belief, supply power charges, setting tools, and igniters to Company A, to the exclusion of Diamondback. Even though Diamondback was still making and selling disposable setting tools, as it had a right to do, the NCS Defendants apparently believed that, by virtue of the manufacturing capabilities of its Affiliate, RP, the NCS Defendants could compete with Diamondback based on quality and manufacturing capacity.

89.     Upon information and belief, from August 10, 2018, until approximately mid-September 2018, Defendants NCS M-H, NCSM, and RP continued to attempt to negotiate with Company A in an effort to negotiate an exclusive distribution agreement in which Diamondback would be excluded.

90.     Ga. Martin also admitted that from July 26, 2018, until Defendants NCS M-H and its affiliates (including NCSM and RP) had access to Diamondback's trade secrets, he paid six weeks of T. Baker's salary and added T. Baker to RP's company health insurance plan.

91.     Having effectively raided Diamondback's proprietary information through the guise of acquisition, on September 10, 2018, RP informed Diamondback that it was no longer pursuing the acquisition.  (Letter to Ryan Hummer, August 29, 2018, Exh. 10).

92.     NCS M-H did not fully disclose the relationship between NCS M-H, NCSM, Ga. Martin, and RP, as reflected in the Amended and Restated Company Agreement of Repeat Precision, LLC, February 1, 2017 ("RP Company Agreement"), Exh. 19, until June 2018.

93.     Upon information and belief, Ga. Martin was also paying T. Baker for Diamondback's proprietary information regarding Diamondback's setting tool, igniter, and power charge technology.

94.     In July 2018, Drury became aware that T. Baker had begun Kingdom Downhole Tools, LLC and was planning to enter the market as a competitor using the technology and materials stolen from Diamondback.  (Kingdom Downhole Tools Request for Financing ("Prospectus"), [undated], Exh. 20 (redacted)).  In fact, Kingdom Downhole Tools, LLC was formed on June 18, 2018, with filing number 803046167, listing both Justice Baker and Trea Baker as Managing Members.  (Kingdom Downhole Tools, LLC Certificate of Formation, June 18, 2018, Exh. 21).

95.     In this document, T. Baker seeks financing for his company, which states that Kingdom Downhole Tools intends to enter the market in each of the areas where Diamondback has an established market presence, in direct competition with Diamondback.

### Competition

**Power Charges**

There are currently only two major competitors with power charges one containing 60% of the market and the other at 30% of the market.

**Setting Tools**

There is only one setting tool manufacturer of the one run type of setting tools.

### Why Us?

We provide an extensive background in downhole tool manufacturing. We are the chief designer of the first ever one run setting tool the market has ever seen. We also have designed and approved for production the first automation system for Power Charge manufacturing. We operate under Christian principles and ethics.

*Id.*

96.     On September 11, 2018, Nipper provided written email confirmation to Drury that NCSM's ROFR had been terminated, and he indicated that his lawyers were working to draft a more formal written agreement to that effect, apparently believing that with RP's patent license (secured as part of Defendants' fraudulent scheme to "acquire" Diamondback) and an exclusive distribution deal with Company A, Defendants NCSM and NCS M-H could squeeze Diamondback out of the setting tool market and/or decrease the value of Diamondback so that it could be acquired for much less than its fair market value. (Exh. 12).

97.     Later, on September 26, 2018, Ori Lev, an NCSM employee confirmed to counsel for Diamondback that NCSM would terminate the ROFR, but he refused to revisit

the other terms of the Patent License. (Email from Ori Lev to Todd Blumenfeld, Sept. 26, 2018, Exh. 22).

98.     Once Company A realized that NCSM, NCS M-H, and RP were going behind Diamondback's back in attempting to negotiate with Company A, Company A refused to continue to negotiate with Defendants.   Subsequently, on October 4, 2018, Ga. Martin informed Drury that Defendants "owned Diamondback," or words to that effect, and refused to amend the Amended Patent License to remove the ROFR.

## IV. SUMMARY OF BACKGROUND FACTS

99.     The terms of the Patent License and Amended Patent License, as further confirmed by the Parties' course of dealing and course of performance, confirm the Parties' understanding and intent, to wit, that RP would be the only third party licensee under the '035 Patent, and that Diamondback would retain, among other things, the right to practice the inventions of the '035 Patent.

### a.     Gary Martin, Grant Martin, and RP

100.    Upon information and belief, Ga. Martin used terminated employees T. Baker and J. Baker to obtain Diamondback's proprietary trade secret information.

101.    Other than the initial meeting with Diamondback, during which Ga. Martin stated that RP had begun development of a single-run setting tool, RP has never shown that it performed any research and development on single-run setting tools.

102.    Defendants Ga. Martin, Gr. Martin, and RP orchestrated a scheme by which Drury was led to believe Diamondback was granting a license to RP to help facilitate

Diamondback's acquisition by RP, when in fact it was a publicly traded company (NCS M-H) that was behind the proposed acquisition.

103.   Upon information and belief, Ga. Martin and Nipper constructed the ruse of acquisition to obtain a license to Diamondback's '035 Patent.

104.   The deception continued after the original Patent License, when Ga. Martin sought to alter the definition of "Licensed Products" to permit RP to sell standalone wireline setting tools, rather than just "bridge plugs" – a proposal made under the guise of acquisition. Through this amendment, made without any consideration to Diamondback, the Parties contemplated a scenario in which Defendants would, among other things, help Diamondback increase production and sales of its disposable setting tools, so that Diamondback would be able to increase its earn-out under an acquisition by RP.

105.   After Diamondback terminated T. Baker and J. Baker, Ga. Martin paid T. Baker as a "consultant," which, on information and belief, was actually payment for the proprietary information that T. Baker and J. Baker stole from Diamondback in the wake of T. Baker's departure – information that T. Baker and J. Baker were also attempting to use to compete directly with Diamondback.

106.   Ga. Martin concealed the fact that he was an agent working on behalf of NCS M-H the entire time.

107.   Once NCS M-H, NCSM, and the RP Defendants had effectively raided the trade secret coffers of Diamondback, and believing his corporate raid was complete, Ga. Martin completely turned on Drury and Diamondback, telling Drury that he "owned" Diamondback – despite the fact Ga. Martin and RP were well aware of, and, in fact, actively

encouraged and supported, Diamondback's efforts to continue making, using, and selling disposable setting tools that practice the '035 Patent *after* the parties executed the Amended Patent License. Indeed, with Defendants' full knowledge and blessing, Diamondback remained active in the setting tool market after signing the Amended Patent License in May 2018, and Diamondback continued to manufacture and sell setting tools, with RP's full knowledge and blessing, from May 2018 until November 2018 – when RP first took the position that Diamondback had somehow signed away the right to practice its own inventions – a novel position it asserted by filing a patent infringement lawsuit against Diamondback in the Southern District of Texas, Houston Division. RP's erroneous and bad faith interpretation of the Patent License and Amended Patent License is belied by the fact that RP's Ga. Martin actively assisted Drury in ramping up production and manufacturing capabilities, so that Diamondback could continue to sell its disposable setting tools.

108.    Gr. Martin is the general manager of RP, and, as such, orchestrated the signing of, and made representations through, the Patent License and Amended Patent License. As described herein, he also made false representations (and/or failed to correct or clarify Ga. Martin's false representations when he had an obligation to do so), in connection with the so-called "acquisition,"

109.    Gr. Martin worked with Ga. Martin to secure confidential data from Diamondback regarding Company A and Diamondback's other customers, so that once NCS M-H, NCSM, and RP had acquired the only third party license to the disposable setting tool, as well as Diamondback's proprietary sales, financial, and technical data, Diamondback was (at least in Defendants' mind) no longer needed, and publicly-traded NCS M-H could pursue

new markets without public disclosure. Ga. Martin, Gr. Martin, and RP were willing and complicit partners in this attempt to destroy Diamondback and benefit Defendants.

**b.      NCS M-H and NCSM**

110.    At all times, starting with the first contact by Ga. Martin, the NCS Defendants were involved in this scheme to defraud Diamondback by using the RP Defendants as front men to obtain a license to the '035 Patent and to then secure access to Diamondback's trade secrets. After fraudulently inducing Diamondback to execute the Amended Patent License, Ga. Martin told Drury that he could not have made an offer over $100,000,000.00 without permission from Advent and NCS M-H. (According to public records, Advent owns 66.67% of NCS M-H stock, and Advent and NCS M-H share at least one common director).

111.    Yet, the NCS Defendants never intended to acquire Diamondback, as evidenced by the fact that neither Ernst & Young nor Baker Botts ever so much as contacted Diamondback, and they accessed the Secure Data Room for no more than sixteen minutes combined.

112.    The facts as a whole demonstrate that the NCS Defendants and RP Defendants worked in concert at every step to:

1)      Obtain a license to the '035 Patent;

2)      Amend the Patent License to permit RP to sell stand-alone setting tools;

3)      Under the ruse of acquisition to obtain Diamondback's technical specifications for manufacture, sale, and distribution of the licensed technology; then

4)      Unceremoniously cast Diamondback aside once NCS's Affiliate, RP, had secured the right to make and sell disposable setting tools and once all of Diamondback's useful technology and trade secrets were in the NCS Defendants' possession.

113.    The NCS Defendants' intent throughout its dealings with Diamondback appears to have been to take all information and trade secrets of value and attempt to supplant Diamondback in the marketplace, through deception, fraud, and, more recently, an utterly absurd interpretation of the Patent License and Amended Patent License that contradicts the terms of those agreements and contradicts the Parties' understanding, intent, course of dealing, and course of performance with respect to those agreements.

## CLAIM I – THE RP DEFENDANTS' MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836, *et seq.*

114.    The allegations set forth in paragraphs 1 – 113 and the Summary of Action are incorporated herein.

115.    Ga. Martin and Gr. Martin specifically acquired by improper means, used, and/or disclosed Diamondback's trade secrets. For example, upon information and belief, Ga. Martin, either individually or on behalf of RP, paid terminated Diamondback employee T. Baker for Diamondback's trade secrets immediately after T. Baker's termination by Diamondback, in violation of 18 U.S.C. § 1836, *et seq.*, through misappropriation as defined in § 1839 (5)(A), when he knew or had reason to know that Baker acquired Diamondback's trade secrets by improper means.

116.    Additionally, Gr. Martin, either individually or on behalf of RP, accessed Diamondback's secure data room, and, upon information and belief, used and/or disclosed

trade secrets learned through such access, in a manner that constitutes misappropriation as defined in § 1839(B).  Alternatively, one or more of Gr. Martin, Ga. Martin, and/or RP, obtained access to Diamondback's trade secrets through false pretenses of the Patent License and the Letter of Intent by NCS M-H, by which Defendants led Diamondback to believe they were genuinely interested in acquiring Diamondback.

117.   Upon information and belief, Ga. Martin, Gr. Martin, and/or Repeat Precision personnel used or disclosed Diamondback's trade secrets in communications with Company A, through which the RP Defendants sought to obtain an exclusive distribution agreement and to solicit an agreement from Company A to make power charges that work with Diamondback's patented short setting tool.

118.   On information and belief, Gr. Martin, general manager of RP, knew or had reason to know that one or more of the representations by Ga. Martin about RP's financial wherewithal and/or intentions were insincere.

119.   Plaintiff's trade secrets include the proprietary technical, sales, and financial information that Diamondback uses to build and sell its products in the marketplace.

120.   Plaintiff's trade secrets include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, charge formula, and Plaintiff's methods, techniques, processes, and procedures, pursuant to 18 U.S.C. § 1839(3) among others.

121.    Plaintiff has taken reasonable measures to protect the secrecy of its trade secrets, including, but not limited to, limiting access to financial information, technical specifications for the manufacture of Diamondback's products, sales volume and information, and the formula for Diamondback's power charge.  Access was limited for each of the above categories to the officers of the company and to selected employees in each area of the business that had a "need to know."  Diamondback's measures surpassed "reasonable," as evidenced by the establishment of the secure data room, which prohibited any download or electronic copying of the information contained therein.  Officers of Diamondback and the select employees with a "need to know" had to sign "hard-copy" materials in- and out- of locked files and could only access electronic versions of the proprietary information with their own specific passwords.  Additionally, Diamondback maintains the trade secrets, including, but not limited to, the power charge formula, in a secure share file with access restricted to officers of the company and specific individuals with a "need to know."  The power charge formula is also kept in what Diamondback refers to as the "Sacred Book," which is kept in the Vice President of Accounting's locked office.

122.    Plaintiff is the owner, as the term "owner" is defined in 18 U.S.C. § 1839(4), of the trade secrets now in the possession of the RP Defendants.

123.    The information in the RP Defendants' possession as described herein derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, pursuant to 18 U.S.C. § 1839(3)(B).

124.    The RP Defendants misappropriated Plaintiff's trade secrets, at least because the RP Defendants used the trade secrets of Diamondback without any consent – express or implied – and the Diamondback trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets *and to limit the use of the trade secrets*, and, in the case of information obtained from T. Baker, was derived from or through a person who owed a duty to Diamondback to maintain the secrecy of the trade secrets and to limit the use of the trade secrets.

125.    On information and belief, the RP Defendants remain in possession of Diamondback's trade secrets and are attempting to use them in a way that is harmful to Diamondback and for the financial gain of the RP Defendants.

126.    The RP Defendants acquired Plaintiff's trade secrets through improper means and/or under false pretenses, and they breached their duty to maintain the secrecy of Plaintiff's trade secrets.  The RP Defendants breached their duty under the July 25, 2018, Confidentiality Agreement and the Confidentiality Clause of the Patent License, at least by their use of the trade secrets to learn confidential information about, and to solicit, Company A – Diamondback's largest customer – and to attempt to enter into an exclusive distribution agreement with Company A to the exclusion of Diamondback.  This unauthorized contact was a use of Diamondback's trade secrets that was not authorized under either the Patent Agreement or the July 25, 2018, Confidentiality Agreement, because the trade secrets misappropriated were not necessary to practice the '035 Patent.

127.    The RP Defendants also, upon information and belief, misappropriated Plaintiff's trade secrets by paying T. Baker for information about Diamondback products

and trade secret technology and information after T. Baker's termination from Diamondback, because the trade secrets were obtained from a person (T. Baker) who either used improper means to acquire the trade secret, or owed a duty to the person (Diamondback) seeking relief to maintain the secrecy of the trade secrets or to limit the use of the trade secrets or both.

128.   Plaintiff has been harmed by the RP Defendants' misappropriation of Plaintiff's trade secrets, and, pursuant to law, is entitled to both monetary and injunctive relief, including damages for actual loss by Plaintiff, damages – including disgorgement – for unjust enrichment caused by the misappropriation that is not included in a claim for actual loss, or, at a minimum, a reasonable royalty for the RP Defendants' misappropriation.

129.   The RP Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious.  To the extent that the other Defendants have acted jointly and in concert with the RP Defendants, they too are liable for misappropriation of trade secrets.

## CLAIM II – MISAPPROPRIATION OF TRADE SECRETS AGAINST THE NCS DEFENDANTS AND NIPPER UNDER 18 U.S.C. § 1836, *et seq.*

130.   The allegations set forth in paragraphs 1 – 129 and the Summary of Action are incorporated herein.

131.   The NCS Defendants and Nipper obtained access to Diamondback's trade secrets through the false pretenses of pretending to be in pursuit of acquiring Diamondback, a ruse perpetrated by, among other things, entering into the Patent License and the Letter of Intent by NCS M-H to acquire Diamondback.  Upon information and belief, the NCS Defendants and Nipper were fully aware of Ga. Martin's and the other RP Defendants' efforts and misrepresentations from the earliest contact that RP made with Diamondback. At

the time of this earliest contact, Nipper was the Chairman of the Board of Managers, President, and Treasurer of RP, and NCS M-H, Nipper's company, had two directors in RP's management structure.  Upon information and belief, the NCS Defendants had, at all times, knowledge of, and were complicit in, the actions of RP, Ga. Martin, and Gr. Martin by virtue of NCS M-H's authority over, and Nipper's frequent interaction with, RP.  Despite NCS M-H's status as a publicly traded company, neither Nipper, NCS M-H, nor NCSM, disclosed to Plaintiff that RP did not have the authority or resources to acquire Diamondback – a material omission that caused Diamondback to enter into the Patent License and Amended Patent License.

132.    The NCS Defendants, through Nipper, contacted Company A based on the NCS Defendants' access to Plaintiff's trade secrets in the secure data room.  The unauthorized contact with Company A was confirmed through a text message from Ga. Martin to Drury on August 2, 2018, stating "your *[sic]* a little late. We haven't been setting *[sic]* around."  Ex. 11, p. 1.  At the time Ga. Martin informed Drury that, Nipper and Gr. Martin later sought a waiver from Plaintiff for RP and NCS M-H to contact Company A directly about the proposed sale of Diamondback and a power charge manufacturing proposal – even though the NCS Defendants (through Nipper) and the RP Defendants (through Ga. Martin) had already contacted Company A in violation of the July 25, 2018, Confidentiality Agreement.

133.    Upon information and belief, the NCS Defendants had knowledge of the scope of the business relationship between Plaintiff and Company A solely by virtue of the NCS Defendants' access to the secure data room.  Additionally, the fact that the NCS Defendants

and Nipper sought to discuss a power charge manufacturing proposal without Plaintiff's involvement suggests that the NCS Defendants, as well as the RP Defendants, may have been in possession of Diamondback's power charge formula, which is not only a trade secret, but (a) was not included in the data in the secure data room, and (b) in an effort to support RP's claim of antitrust tying, was characterized by RP at the preliminary injunction hearing as technology only known to Diamondback and necessary for manufacturing power charges for use with the short setting tool.   Plaintiff does not necessarily agree with RP's characterization.   Nevertheless, RP's statements and actions lead to a reasonable inference that not only did the RP Defendants and NCS Defendants violate their confidentiality obligations by exceeding the limits of the use of Diamondback's trade secrets, but also that the NCS Defendants were in possession of the trade secret formula for Diamondback's power charges (both of which constitute misappropriation under 18 U.S.C. § 1839(5)(B)).

134.   Plaintiff's trade secrets include the proprietary technical, sales, and financial information that Diamondback uses to manufacture and sell its products in the marketplace.

135.   Plaintiff's trade secrets explicitly include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, and charge formula, and Plaintiff's methods, techniques, processes, and procedures, pursuant to 18 U.S.C. § 1839(3), among others.

136.   Plaintiff has taken reasonable measures to protect the secrecy of its trade secrets, including, but not limited to, limiting access to financial information, technical

specifications for the manufacture of Diamondback's products, sales volume and information, and the formula for Diamondback's power charge. Access was limited for each of the above categories to the officers of the company and selected employees in each area of the business that had a "need to know." Diamondback's measures surpassed "reasonable," as evidenced by the establishment of the secure data room, which prohibited any download or electronic copying of the information contained therein. Officers of Diamondback and the select employees with a "need to know" had to sign "hard-copy" materials in- and out-of locked files and could only access electronic versions of the proprietary information with their own specific passwords. Additionally, the trade secrets, including the power charge formula, are kept in a secure share file with access restricted to officers of the company and specific individuals with a "need to know." The power charge formula is also kept in what Diamondback refers to as the "Sacred Book," which is kept in the Vice President of Accounting's locked office.

137.   Plaintiff is the owner of the trade secrets now in the possession of the NCS Defendants and Nipper, as the term "owner" is defined in 18 U.S.C. § 1839(4).

138.   The information in the possession of the NCS Defendants and Nipper, as described herein, derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, pursuant to 18 U.S.C. § 1839(3)(B).

139.   The NCS Defendants and Nipper misappropriated Plaintiff's trade secrets, at least because the NCS Defendants used the trade secrets of Diamondback without any

consent – express or implied – and the Diamondback trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets *and to limit the use of the trade secrets*, and, in the case of information obtained from T. Baker, was derived from or through a person who owed a duty to Diamondback to maintain the secrecy of the trade secrets and to limit the use of the trade secrets.

140.    The NCS Defendants, upon information and belief, remain in possession of Diamondback's trade secrets, and are attempting to use them in a way that is harmful to Diamondback and for the NCS Defendants' personal financial gain.

141.    The NCS Defendants and Nipper acquired Plaintiff's trade secrets through misrepresentation and/or under false pretenses, and they breached their duty to maintain the secrecy of Plaintiff's trade secrets.  The NCS Defendants and Nipper breached their duty under the July 25, 2018, Confidentiality Agreement, at least by their use of the trade secrets to learn the identity of and to contact Company A –Diamondback's largest customer – to attempt to enter into an exclusive distribution agreement and/or a power charge manufacturing agreement with Company A to the exclusion of Diamondback.   This unauthorized contact was a use of Diamondback's trade secrets that was not authorized by the July 25, 2018, Confidentiality Agreement, and was therefore prohibited by both agreements.

142.    The NCS Defendants and Nipper also, upon information and belief, misappropriated Plaintiff's trade secrets by obtaining the trade secrets obtained by one or more of the RP Defendants through the RP Defendants paying T. Baker for information about Diamondback products after T. Baker's termination from Diamondback, because the

trade secrets were obtained from a person (T. Baker) who either used improper means to acquire the trade secrets, or owed a duty to the person (Diamondback) seeking relief to maintain the secrecy of the trade secrets or to limit the use of the trade secret or both.

143.    Plaintiff has been harmed by the NCS Defendants' misappropriation of Plaintiff's trade secrets and, pursuant to law, is entitled to both monetary and injunctive relief, including damages for actual loss by Plaintiff and damages for unjust enrichment – including disgorgement – caused by the misappropriation that is not included in a claim for actual loss or, at a minimum, a reasonable royalty for the NCS Defendants' misappropriation.

144.    The misappropriation of Plaintiff's trade secrets by the NCS Defendants and Nipper was willful and malicious.  To the extent that the other Defendants have acted jointly and in concert with the NCS Defendants and Nipper, they too are liable for misappropriation of trade secrets.

## CLAIM III – FRAUD BY THE RP DEFENDANTS

145.    The allegations set forth in paragraphs 1 – 144 and the Summary of Action are incorporated herein.

146.    The RP Defendants represented to Plaintiff each of the following:

   a.  Ga. Martin represented, either on behalf of himself or RP, that Ga. Martin had the authority to enter into the Patent License;

   b.  Ga. Martin, either on behalf of himself or RP, concealed the fact that RP was controlled by NCS M-H until both the Patent License and the Amended License were executed;

    c.  Ga. Martin represented, either on behalf of himself or RP, that he would buy Diamondback for $100,000,000.00, while concealing that only NCS M-H had the authority under RP's restated company agreement;

    d.  Ga. Martin represented, either on behalf of himself or RP, that he had the ability to purchase Plaintiff and all of its assets, including Plaintiff's trade secret setting tool technology.

147.   Each of the representations and/or concealments in the previous paragraph were made between February and May of 2018, in various locations in the State of Texas, including Marble Falls, Fort Worth, and over the telephone during conversations and text messages.

148.   In addition to representations and or concealments attributable to Ga. Martin, who at all times was either acting on his own behalf, or, alternatively on behalf of himself, RP, and/or NCS M-H, Gr. Martin and Nipper on multiple occasions interacted with Diamondback between March and September, 2018 (including at least two meetings at Spinks Airport in south Fort Worth in which Gr. Martin was present), and were aware of Ga. Martin's representations, actions and omissions with respect to RP and Plaintiff. As such, they had a duty to disclose or correct the inaccurate statements, actions, and/or omissions made by Ga. Martin, or the misleading impressions created thereby, which Ga. Martin made to secure the Patent License, the Amended Patent License, and the LOI. At all times, Gr. Martin and Nipper were acting on their own behalf, or, alternatively on behalf of RP and/or NCS M-H.

149.    The RP Defendants knew that Plaintiff would be unwilling to disclose its trade secret information unless it believed that Defendants were honest, good-faith potential purchasers of Plaintiff and its assets.

150.    The RP Defendants falsely represented to Plaintiff that they intended to purchase Plaintiff in order to induce Plaintiff to enter into the Amended Patent License first, and then to disclose its trade secrets as described above in Claim I.  This belief (that RP was intending to acquire Diamondback) was material to Plaintiff, because Plaintiff would not have entered into the Amended Patent License or disclosed its sales, financial information, or technology to Defendants except to demonstrate its value in the marketplace.  But for its belief that the RP Defendants were evaluating Plaintiff with the intention of purchasing the entire company as a going concern, Plaintiff would not have disclosed its valuable confidential information to Defendants.

151.    The RP Defendants' representation of RP's ability to purchase Plaintiff was a false statement merely designed to induce Plaintiff to enter into the Patent License and to disclose its valuable information.  RP was, in fact, either not willing or not able to close on the purchase of Plaintiff, because RP is an affiliate of and controlled by NCS Multistage Holdings, Inc., a publicly traded company, and could therefore not acquire Plaintiff on the timeline represented or without additional consent.

152.    The RP Defendants made (or failed to correct) these false representations knowing them to be false and without any intention to perform as promised.

153.    Because of the RP Defendants' fraud, Plaintiff has been injured in an amount of at least $100,000,000.00, and likely much more.

154.    Furthermore, Plaintiff's injury resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).    Accordingly, Plaintiff seeks to recover exemplary damages for Defendants' actual fraud and malice.

## CLAIM IV – FRAUD BY THE NCS DEFENDANTS AND NIPPER

155.    The allegations set forth in paragraphs 1 – 154 and the Summary of Action are incorporated herein. The actions, statements, and omissions committed by Ga. Martin, Gr. Martin, and Nipper, as described above in Count III, are specifically incorporated by reference.  Alternatively, upon information and belief, that conduct was perpetrated at the direction of, and on behalf of, Defendants NCSM and NCS M-H by virtue of NCS M-H's and Nipper's control over NCSM, RP, Ga. Martin, and Gr. Martin as the managing director and controlling owner of RP.

156.    Additionally, Nipper's and the NCS Defendants' actions were part of a scheme to obtain Diamondback's trade secrets and technology.  On information and belief, NCS M-H had targeted Plaintiff for acquisition prior to Ga. Martin's first contact with Plaintiff in February 2018.  Once the NCS Defendants realized that they could not acquire Plaintiff for just $100,000,000.00, the NCS Defendants sought to acquire Diamondback's trade secrets to pair with its fraudulently-induced license agreement to effectively take over Plaintiff's setting tool business.

157.    For example, on information and belief, NCSM NCS M-H's wholly-owned subsidiary (and under common control by Nipper), entered into the LOI (signed by Nipper) with Diamondback at a purported sale price of $200,000,000.00, despite never having any

intention of purchasing Diamondback at that price.  The LOI was, therefore, an instrument of fraud, intended as a subterfuge to gain access to Plaintiff's trade secrets.

158.    The fraudulent intent of the Defendants, as evidenced by the LOI, is further supported by Nipper's and the NCS Defendants' actions in trying to meet with Plaintiff's largest customer to establish a distribution agreement for setting tools and a manufacturing agreement for power charges behind Plaintiff's back.

159.    The NCS Defendants, through the actions and inactions of Ga. Martin, Gr. Martin, and Nipper caused and/or allowed Plaintiff to believe that RP had the ability to purchase Plaintiff and all of its assets for $100,000,000.00.  In May of 2018, the NCS Defendants became aware that Company B had offered to purchase Plaintiff for $170,000,000.00, and only then sought to alter the definition of "Licensed Products" and add a Right of First Refusal.  Because of NCS M-H's control over RP, Ga. Martin could not have negotiated the Patent License Amendment without the NCS Defendants' and Nipper's approval and consent, and Gr. Martin could not have signed the Patent License Amendment without the authorization and approval of the NCS Defendants and Nipper, as further evidenced by the fact that Ga. Martin only made the offer to purchase Plaintiff for $170,000,000.00 after stating to Drury that "the cuffs are off.".

160.    The NCS Defendants knew that Plaintiff would be unwilling to disclose its trade secret information unless it believed that RP was an honest, good-faith, bona fide potential purchaser of Plaintiff and its assets.  Upon information and belief, the NCS Defendants exploited and encouraged Ga. Martin's relationship with Drury as the means to engender such a belief about RP.

161.   This fraudulent scheme was initially perpetrated in the name of RP. However, after securing the Amended Patent License, the Defendants then continued to perpetrate the scheme in the name of NCS. The NCS Defendants falsely represented to Plaintiff that they intended to purchase Plaintiff in order to induce Plaintiff to disclose its trade secrets as described above in Claim II.  This belief (that NCSM had a bona fide interest in acquiring Diamondback) was material to Plaintiff, because Plaintiff would not have disclosed its sales, financial information, or technology to Defendants except to demonstrate the company's value in the marketplace.  But for its belief that the NCS Defendants were evaluating Plaintiff with the intention of purchasing the entire company as a going concern, Plaintiff would not have disclosed its valuable confidential information to the NCS Defendants.

162.   Defendants' representation of its ability to purchase Plaintiff was a false statement merely designed to induce Plaintiff to disclose its valuable information.   On information and belief, the NCS Defendants never intended to close on the purchase of Plaintiff.

163.   The NCS Defendants and Nipper made (or failed to correct) these false representations knowing them to be false and without any intention to perform as promised.

164.   Upon information and belief, the NCS M-H used the RP Defendants and NCSM, none of whom are publicly traded, as their agents to conceal its fraud to prevent public awareness that could interfere with its acquisitions of other companies.

165.   Because of Nipper's and the NCS Defendants' fraud, Plaintiff has been injured in an amount of at least $100,000,000.00, and likely much more.

166.    Furthermore, Plaintiff's injury resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).    Accordingly, Plaintiff seeks to recover exemplary damages for Defendants' actual fraud and malice. Further, Diamondback's fraud and fraudulent inducement claims are not barred by the economic loss doctrine.

## CLAIM V – FRAUDULENT INDUCEMENT RELATED TO THE PATENT LICENSE

167.    The allegations set forth in paragraphs 1 – 166 and the Summary of Action are incorporated herein.

168.    Defendant Ga. Martin, operating on behalf of the RP Defendants and/or the NCS Defendants, represented to Diamondback that Ga. Martin owned RP, knowing that NCS M-H owned fifty percent (50%) of RP, and the NCS M-H controlled RP through a two-thirds majority of managers of RP, including the chairman of the board of managers.  Ga. Martin made this material misrepresentation knowing that it was material, and with the intent to conceal from Plaintiff that RP was controlled by a publicly-traded entity.

169.    Then, on March 9, 2018, Ga. Martin, via text message, informed Drury that "Robert [Nipper] owns the other half of the repeat company."  (Exh. 5, p. 30/186).

170.    This misrepresentation of the actual ownership of RP was material, because Drury would have never entered into a patent license with RP had he known that RP was not only not owned by Ga. Martin and Nipper at all, but that, in fact, NCS M-H—a publicly traded company backed by an international fund—owned fifty percent (50%) of RP and controlled the company by virtue of holding two of three seats on RP's board of directors.

171.    The representations by Ga. Martin that Ga. Martin and Nipper each owned fifty percent (50%) of RP were false, because the Amended and Restated Company Agreement of RP shows that NCS M-H, as opposed to Nipper, owns 50% of RP.

172.    Ga. Martin knew when he made the statement regarding Nipper's personal ownership that the statement was false.

173.    Ga. Martin made the representation with the intent that Drury act on the representation, because Ga. Martin knew that Drury was very selective about the persons and/or businesses with whom he did business, and he wanted Drury to believe that he was merely transacting with a friend, as opposed to a publicly traded company.

174.    Drury and Diamondback relied on the representation by entering into the Patent License with RP.

175.    Drury's reliance on the representation caused Diamondback injury because it caused Diamondback to enter into a purportedly binding agreement that granted certain rights related to the '035 Patent to a company that Drury did not know was in control of RP, to wit, NCS Multistage Holdings, Inc. To be clear, the Patent License Agreement does *not* disclose that NCS Multistage Holdings, Inc. *controlled* RP and does not disclose the ownership interest of NCS M-H; to the contrary, it simply disclosed NCS M-H as an "Affiliate" – the definition of which is broad enough to cover any number of possible corporate structures, including, for example, a scenario in which RP owns and controls NCS M-H, rather than the other way around. The representations and omissions of RP, Ga. Martin, Gr. Martin (as signatory to the Patent License Agreement and Amended License Agreement ) on this point were material, and Diamondback justifiably relied on its understanding that

RP was *not* owned or controlled by NCS M-H – an understanding that was erroneous due to the representations and omissions of the above-specified defendants.

176.    Even if Drury had knowledge, at some point, that one of the contracting parties had some association with NCS M-H, that is *not* the same thing as knowing that NCS M-H controlled RP – a fact that should have been fully and truthfully disclosed. Further, Plaintiff was entitled to rely on Defendants' representations (which it did, to its detriment) and had no affirmative obligation to research the public filings of NCS M-H, as there were no "red flags" to alert Plaintiff that defendants might be mischaracterizing their respective ownership interests in RP. And Plaintiff's decision to enter into a LOI listing NCS as an acquiring party is distinct from Plaintiff's decision to enter into a license agreement with RP – two separate issues that RP seeks to conflate. In other words, Diamondback was willing to consider acquisition by a publicly traded corporate behemoth, such as NCS M-H, who might be willing to pay $200M+ to purchase Diamondback; but it was *not* willing to enter into a patent license agreement – particularly on those terms (e.g., up-front payment of only $55K) – with that same behemoth or with a company owned or controlled by such a corporate giant.

## CLAIM VI – FRAUDULENT INDUCEMENT RELATED TO THE AMENDED PATENT LICENSE

177.    The allegations set forth in paragraphs 1 – 176 and the Summary of Action are incorporated herein, specifically including the above-described behavior of Ga. Martin, Gr. Martin, and Nipper.  In addition, NCS M-H was at all relevant times throughout the NCS Defendants' and the RP Defendants' fraudulent inducement, the controlling entity of RP, and, upon information and belief, controlled and directed the actions of the RP Defendants

in connection with securing Plaintiff's signature on the Patent License and the Amended Patent License.

178.   With specific regard to the Amended Patent License, RP, who was, on information and belief, acting under the control of and at the direction of NCS M-H, perpetrated a scheme to secure the Amended Patent License. As a pretext, RP stated that it required a change to the definition of Licensed Products so that it would have the right to sell standalone setting tools and thereby justify an investment in building additional manufacturing capability and to help RP justify paying Diamondback's asking price to entice Diamondback to enter into the Amended Patent License. RP also secured a right of first refusal. In reality, RP knew that it could not, and did not intend to, acquire Diamondback at anything near its fair market value, if at all. Rather, the real purpose of the scheme was to secure a broader license and a right of first refusal – to drive down the value of Plaintiff so that NCS M-H could acquire Diamondback at a reduced price. Ga. Martin confirmed the scheme in September 2018, when he told Drury in reference to RP's right to sell standalone setting tools and RP's right of first refusal: "You should have taken the $100M I offered you. We own you now," or words to that effect.

179.   After Diamondback and RP entered into the Patent License, Defendant Ga. Martin, operating on behalf of the RP Defendants and the NCS Defendants, represented to Diamondback that RP needed to amend the Patent License to broaden the definition of "Licensed Products" from "bridge plugs" to "electric wireline setting tools" and to include a "Right of First Refusal" in the Patent License.  Ga. Martin represented that the amendment was needed because RP intended to acquire Diamondback, so RP needed the ability to match

any terms proffered by a third party. Neither the Patent License nor the Amended Patent License ever contemplated that RP had the right to practice the '035 Patent to the exclusion of Diamondback.

180.   This representation that RP intended to acquire Diamondback was material, because Drury would have never agreed to the Amended Patent License with RP had he known that RP did not have the ability to acquire Diamondback due to its control by a publicly traded company (Defendant NCS M-H), or that neither the RP Defendants nor the NCS Defendants had any genuine interest in acquiring Diamondback at all.

181.   The representations by Ga. Martin, to the effect that RP intended to acquire Diamondback, were false, at least because RP did not have the ability to consummate a transaction to acquire Diamondback. Per Ga. Martin, NCS M-H (using NCSM as its proxy) would have to be the acquiring entity—a fact only fully disclosed to Diamondback upon the provision of the first draft of the LOI (June 13, 2018), which was *after* the Amended Patent License was executed on May 30, 2018.  (Exh. 7).

182.   Ga. Martin knew when he made the statement regarding RP's acquisition of Diamondback that the representation to that effect was false, and such act represents a false promise of future performance.

183.   Ga. Martin made the representation with the intent that Drury act on the representation, because Ga. Martin wanted to have a license to sell setting tools with bridge plugs, but also a license to sell stand-alone electric wireline setting tools that would otherwise infringe the claims of the '035 Patent.

184.    Diamondback relied on these representations by entering into the Amended Patent License with RP.

185.    Diamondback's reliance on the representations caused Diamondback injury because it induced Diamondback to enter into a purportedly binding agreement with RP that granted rights to RP and NCS M-H (by virtue of NCS M-H's ownership and control of RP) that diminish the value of Diamondback by foreclosing Diamondback's ability to enter into other licenses with third parties for products within the scope of the claims of the '035 Patent.

**CLAIM VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS BY THE RP DEFENDANTS AND NCS DEFENDANTS**

186.    The allegations set forth in paragraphs 1 – 185 and the Summary of Action are incorporated herein. The RP Defendants and the NCS Defendants  and Nipper committed underlying torts or other unlawful acts, including fraud and misappropriation of trade secrets, as alleged above, each of which support a claim for tortious interference with the continuing business relationship and prospective business relationship that Diamondback had with Company A. the existence of an actual contract with Customer A that was the subject of interference [or that] the interference proximately caused the plaintiff injury [or that] plaintiff suffered actual damage or loss [or] a viable injury or harm as a result of the alleged interference.]

187.    Plaintiff had an ongoing business relationship, and reasonably anticipated a prospective relationship, with Company A.

188.    Company A was Plaintiff's largest customer.

189.    The NCS Defendants, Nipper, and RP Defendants were aware, through access to Plaintiff's trade secrets as described in the foregoing paragraphs, that Plaintiff had a substantial and ongoing business relationship with Company A.

190.    The RP and NCS Defendants and Nipper deliberately misled Plaintiff in order to procure Plaintiff's trade secrets and use the misappropriated information to attempt to solicit Company A for business and divert that business away from Plaintiff. The allegations above describe the roles played by the various defendants (including their respective roles in improperly using Diamondback's trade secrets in an attempt to contact and secure business from Company A) and are specifically incorporated by reference.

191.    Defendants' conduct was independently tortious because it constituted, at a minimum, fraud, fraudulent inducement, and violated the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

192.    Defendants' interference attempted to divert sales that Plaintiff would have otherwise made, thus causing Plaintiff to suffer actual damages in the form of a damaged business relationship and loss of value caused by diminished good will. In addition, to the extent Defendants' wrongful conduct has caused Diamondback to lose Company A sales – to RP or otherwise – then Plaintiff is entitled to recover damages and other appropriate remedies, including Plaintiff's lost profits and/or disgorgement of Defendants' profits, associated with such sales.

193.    Plaintiff further seeks exemplary damages for Defendants' fraud and actual malice as it relates to Defendants' tortious interference with the relationship between Plaintiff and Company A.

## CLAIM VIII – CIVIL VIOLATION OF THE COMPUTER FRAUD & ABUSE ACT, 18 U.S.C. § 1030, BY THE RP DEFENDANTS AND THE NCS DEFENDANTS

194.   The allegations set forth in paragraphs 1 – 193 and the Summary of Action are incorporated herein. The RP Defendants, through Gr. Martin and numerous other personnel, and the NCS Defendants, through numerous personnel and at the direction of Nipper, violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly and with intent to defraud Plaintiff, accessing a protected computer without out authorization, to wit, the secure data room, by fraudulently accessing data in the secure data room in a manner that exceeded authorized access by using the data accessed for an unauthorized purpose, and attempting to access the secure data room after access had been terminated, in violation of 18 U.S.C. § 1030 (a)(4) and (b), and conspiring with each other to access said protected computer without authorization, as described below.

195.   Personnel from both the NCS Defendants and the RP Defendants accessed the secure data room, all of whom were designated as the "NCS Team" in the data room.  The NCS Team also included technical personnel from ERM, attorneys from Baker Botts, and accountants from Ernst & Young.  Although the secure data room was accessible to NCS Defendants' personnel and RP Defendants' personnel from July 26, 2018 – August 24, 2018, Based on the log entries from the session report, the NCS Defendants and RP Defendants conspired together to gain as much of Diamondback's trade secret information as possible, in order to further their fraudulent scheme as described above in Counts III and IV and fully incorporated herein.  In fact, the session log (Exh. 22) shows that from July 26, 2018 through August 2, 2018, the "NCS Team" spent four hundred forty-four (444) *minutes* in the secure

data room.  During the remaining twenty-two days the secure data room was active, from August 3, 2018 through August 24, 2018, the "NCS Team" spent forty-nine (49) *minutes*, for a total time spent reviewing due diligence, by the entire forty-seven (47) members of the NCS Team with authorized access to the secure data room – including attorneys and accountants – of 7.4 hours.  The only three individuals who spent more than an hour of time in the secure data room were Gr. Martin (1 hour, 5 minutes), and Michael Whittenberg, (1 hour, 6 minutes), and Ryan Sheppard (2 hours, 53 minutes).  The other 44 members of the NCS Team spent less than a combined 3.5 hours in the secure data room – for a proposed deal that was worth $200,000,000.00.

196.    It was on August 2, 2018, that Ga. Martin informed Diamondback that "we" – presumably referring to Ga. Martin, Gr. Martin, and Nipper -- had already contacted Company A.  After Diamondback refused permission to waive the restrictions in the July 25, 2018 Confidentiality Agreement to allow the RP Defendants and the NCS Defendants to contact Company A outside of the presence of Plaintiff, only Mike Whittenberg spent more than four minutes in the secure data room, and he only spent thirty-eight minutes.

197.    The NCS Defendants, as well as their affiliates and representatives, including the RP Defendants, exceeded the authorization granted under the July 25. 2018, Confidentiality Agreement and the Patent License (and the Amended Patent License). This access was performed by the NCS Team, upon information and belief, under the direction of the NCS Defendants and RP Defendants, who conspired to access Plaintiff's technical sales, and marketing data for a purpose for which the access was not granted – i.e., furthering the fraud of trying to obtain a distribution and manufacturing arrangement with Company A,

Plaintiff's largest customer, who Defendants were not aware was Plaintiff's largest customer, as well as the detailed sales volumes and information describing the nature of Company A's and Plaintiff's relationship, without accessing the secure data room for their fraudulent purpose. This access by the RP Defendants and the NCS Defendants exceed[ed] authorized access, because Diamondback only granted access for a limited purpose, and/or the Defendants used the information gained through its access in an unauthorized manner and in a manner beyond the scope of its authorization.

198.   The NCS Defendants further violated 18 U.S.C. § 1030 (b) by attempting to access the secure data room after access was withdrawn by Plaintiff. Specifically, on September 5, 14, and 28, and October 3, and 17, 2018, Ryan Sheppard (9/5/18) and members of Ernst & Young (all other dates) attempted to log into the secure data room, after access being withdrawn, and the LOI cancelled by the NCS Defendants.

199.   The RP and NCS Defendants were granted access to Plaintiff's Secure Data Room, which constitutes a "protected computer," in a manner that was unauthorized, or exceeded authorization, and attempted access after the authorization had expired, or all of the above, by accessing (or attempting to access) the data with the intention to commit fraud, and/or the intention to harm Diamondback.

200.   Despite having authorization for the stated and limited purpose of evaluating the potential acquisition of Diamondback, the RP and NCS Defendants knowingly accessed the data, conspired amongst themselves to access the data, and attempted to access the data after authorization was withdrawn, all with the intent to defraud Plaintiff, furthering the fraud

by obtaining valuable customer sales, financial, and technical information, in violation of 18 U.S.C. § 1030 (a)(4), (b).

201.    Plaintiff has been harmed in an amount exceeding $5,000.00, at least by the amounts spent on determining what data was accessed, as well as repairing its goodwill and business relationships damaged by the unauthorized use of the data Defendants unlawfully obtained.  Plaintiff estimates that the damage caused by Defendants' unauthorized access of Diamondback's data for a purpose other than the purpose contemplated by their being granted access – i.e., the acquisition of Diamondback as a going concern – is in excess of $25,000.00 in the previous year.

## CLAIM IX – BREACH OF THE JULY 25TH CONFIDENTIALITY AGREEMENT

202.    The allegations set forth in paragraphs 1 – 201 and the Summary of Action are incorporated herein.

203.    Defendant NCS M-H entered into the July 25, 2018 Confidentiality Agreement with Diamondback, which covered NCS M-H's subsidiaries, including, but not limited to, NCSM and RP, as evidenced by the signature of NCS M-H's Chief Financial Officer, Ryan Hummer.

204.    The Confidentiality Agreement restricts NCS M-H and its affiliates' and representatives' use of Diamondback's information "solely for the purpose of evaluating a Transaction involving [Diamondback] and [NCS M-H] or [NCS M-H's] affiliates."

205.   NCS M-H, NCSM, and RP breached the Confidentiality Agreement by using Plaintiff's trade secret information in direct competition with Plaintiff for its own financial advantage, and to the exclusion of Plaintiff.

206.   NCS M-H, NCSM, and RP used information related to Diamondback's largest customer, Company A, and attempted to obtain an exclusive distribution agreement with Company A, to the exclusion of Diamondback.

207.   As a direct and proximate effect of these breaches, Diamondback has been injured.  Plaintiffs therefore seek all remedies to which they may be entitled at law or in equity, including but not limited to injunctive relief and money damages.

## <u>CLAIM X – BREACH OF THE PATENT LICENSE BY RP</u>

208.   The allegations set forth in paragraphs 1 – 207 and the Summary of Action are incorporated herein.

209.   Defendant NCS M-H, and/or one of its affiliates, RP, used the trade secret information related to Diamondback's customers in an unauthorized manner, as described above with respect to Claims III, IV, VIII, and IX.  Because NCS M-H was an affiliate of RP, who entered into the Patent License with Diamondback, the confidentiality clause of the Patent License covers all of the NCS Defendants and RP, and this claim is asserted against each of them.

210.   NCS M-H's and its affiliates' use of the information related to Company A to attempt to establish a business relationship with Company A represents a breach of the confidentiality clause of the Patent Agreement.

211.   Clause 8.1 acknowledges that "in connection with this Agreement it will gain access to confidential Information of the other Party," where "Confidential Information" is defined as:

> "**Confidential Information**" means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party. Confidential Information shall not include Nonproprietary Information.

212.   The confidential information includes "information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party…," which includes information related to Company A.

213.   The confidentiality clause further states that the receiving party (RP or its affiliates) agrees not to "use the Disclosing Party's Confidential Information other than as strictly necessary to exercise [RP's] rights and perform [RP's] obligations under this Agreement."

214.   No information pertaining to Diamondback's relationship with Company A could conceivably be construed as "strictly necessary to exercise its rights and perform its obligations under" the Patent License. The actions of the RP Defendants and its affiliates the NCS Defendants constitutes a breach, regardless of whether or not RP or its affiliates actually completed a deal with Company A. This breach is incurable because, among other reasons, RP and/or its affiliates have now established a relationship with Company A based,

at least in part, on RP's improper use of Plaintiff's confidential information and/or trade secrets; this "genie" cannot be "put back in the bottle."

215.    In addition, RP has breached the Patent License by, among other things, failing to provide prompt notice of infringement to Diamondback – if, in fact, RP truly believed Diamondback was infringing its own patents. In reality, RP did not notify Diamondback that it believed Diamondback's own sales of short setting tools infringe the '035 Patent until at least November 2018, when RP filed its action for patent infringement in the Southern District of Texas (approximately six months after the Parties executed the Amended Patent License) to advance its misguided theory that Diamondback had somehow signed away its rights to practice its own patent.  Such a theory is contrary to the terms of the Patent License and Amended Patent License, and contrary to the Parties' mutual understanding, mutual intent, course of dealing, and course of performance with respect to those agreements.

216.    RP has also breached the Patent License by initiating infringement litigation against an alleged infringer (i.e. Diamondback), in direct violation of the express terms of the Patent License and despite the fact it has no standing to do so. RP's actions, as described above, violate at least Sections 6.1 and 6.2 of the Patent License.

217.    Alternatively, or in addition thereto, Diamondback has an implied license and/or a grant-back license from RP, and RP has breached that license by failing to recognize and honor Diamondback's rights to practice the '035 Patent and by asserting claims of patent infringement against Diamondback – in direct violation of those rights and that agreement.

218.    Alternatively, or in addition thereto, RP is estopped from taking a contrary position, because RP was at all times between the execution of the Amended Patent License

and the filing of its first patent infringement lawsuit against RP, aware of, encouraged, and facilitated Diamondback's manufacture and sale of Diamondback's short setting tools that practice the revolutionary inventions of the '035 Patent.

219.    As a direct and proximate effect of RP's breaches, which are not curable, Plaintiff has been injured.  Plaintiff therefore seeks all remedies to which it may be entitled at law or in equity, including but not limited to injunctive relief, setting aside, voiding, terminating, or reforming the Patent License, and money damages.

## CLAIM XI – DECLARATION THAT THE AMENDED PATENT LICENSE'S ROFR WAS TERMINATED

220.    The allegations set forth in paragraphs 1 - 219 and the Summary of Action are incorporated herein.

221.    As described above, NCSM, through Nipper, sent written email confirmation "acknowledging the termination of [its] Right of First Refusal to buy Diamondback." Nevertheless, NCSM has since refused to acknowledge and affirm that the ROFR has been terminated.

222.    Therefore, because the ROFR was terminated by written agreement, and because NCSM has since taken a contrary position, Plaintiff seeks a declaration that the ROFR was terminated. An actual controversy exists within this Court's jurisdiction that authorizes the Court to declare the rights and other legal relations of Diamondback vis-à-vis the Amended Patent License, pursuant to 28 U.S.C. § 2201, that the ROFR was terminated, and/or the Amended Patent License should be reformed to more clearly articulate and reflect the agreement of the Parties, their mutual understanding, and their shared intent, as

evidenced, at least in part, by the terms of the Patent License and Amended Patent License and by the Parties' course of dealing and course of performance relative to those agreements.

## CLAIM XII – CONSPIRACY BETWEEN T. BAKER, J. BAKER AND Ga. MARTIN AND/OR RP

223.   The allegations set forth in paragraphs 1 – 222 and the Summary of Action are incorporated herein.

224.   The RP Defendants, T. Baker and J. Baker, upon information and belief, entered into an agreement whereby Ga. Martin, individually or on behalf of RP, paid T. Baker as a "consultant."

225.   Kingdom Downhole Tool, LLC's prospectus document (Exh. 20 (redacted)), states "we are the chief designer [*sic*] of the first ever one run setting tool the market has ever seen.  We also have designed and approved for production the first automation system for Power Charge manufacturing."  The "we" of Kingdom includes T. Baker and J. Baker, the latter of whom admitted to stealing Diamondback trade secrets and transmitting them to the former. (See Exh. 21 (Kingdom Cert. of Form)).

226.   The Kingdom business plan states that it contains "confidential, trade-secret information" (Exh. 20, *passim* (redacted)) and was created on April 22, 2018, only ten days from the date of J. Baker's termination from Diamondback.  It also states that the goal of Kingdom is to bring "[Kingdom's] expertise in automation of Power Charge manufacturing and perfecting the one-run tool design to make it more user friendly." (*Id*.).  Any "expertise" regarding the automation of power charge manufacturing or perfecting the one-run tool design necessarily includes the trade secret information of Diamondback, because all

information and knowledge regarding power charge manufacturing and one-run setting tools was proprietary information owned by Diamondback.

227.   Upon information and belief, the "consulting" performed by T. Baker for Ga. Martin or RP involved the misappropriation of Diamondback's trade secrets, because the technical information possessed by T. Baker was Diamondback's trade secret information.

228.   Upon information and belief, Ga. Martin and/or RP have used and are using the trade secrets obtained from T. Baker, J. Baker, and Kingdom to compete with Diamondback.

229.   Diamondback has been injured by the unlawful, overt act of Ga. Martin's and/or RP's misappropriation and misuse of Diamondback's trade secrets that were obtained illegally from T. Baker and J. Baker under the guise of employing T. Baker as a consultant.

230.   The unlawful, overt act was performed pursuant to, and in furtherance of, Ga. Martin's and/or RP's desire to benefit financially -- to Diamondback's detriment.

231.   Ga. Martin and/or RP acted willfully, with malice, and for the purpose of benefitting financially at Diamondback's expense.

232.   Plaintiff is entitled to monetary relief, injunctive relief, and any combination thereof, at law or in equity, to prevent further harm as a result of Ga. Martin's and RP's unlawful overt acts and schemes.

## CLAIM XIII – DECLARATION OF NON-INFRINGEMENT OF THE '035 PATENT

233.   The allegations set forth in paragraphs 1 - 232 and the Summary of Action are incorporated herein.

234.   The '035 Patent was issued on November 7, 2017, listing Jimmy L. Carr (deceased), Derrek Drury, and Trea H. Baker as inventors.

235.   By reference to the Amended Patent License, RP has asserted in this consolidated action a patent infringement claim against Diamondback.  Therefore, a case or controversy exists under 28 U.S.C. § 2201.

236.   No party has asserted that any claim of the '035 Patent is invalid, and indeed every issued claim in the '035 is presumptively valid.

237.   In order for RP or any other party to claim infringement, it must aver that the asserted claims are valid.

238.   Based on Claim XI, *supra*, and the fact that the parties never excluded, and never intended to exclude, Diamondback from practicing its own invention, Diamondback seeks a declaratory judgment that its practice of the claims of the '035 Patent does not infringe its own '035 Patent. To the extent the Patent License and/or Amended License (collectively, "License") is not declared void, then its terms, as well as the Parties' course of dealing and course of performance, reflect that Diamondback at all times retained the right to practice its own inventions and retained the right to decide whether or not to bring an infringement suit, and/or the License is vague and ambiguous with respect to the allegedly "exclusive" nature of the License or the meaning of "exclusive," when read in context (including the context of the document itself, as well as the factual and chronological context before, during, and after the License was executed).

239.   The intention of the Parties and their mutual understanding, as evidenced by, for example, the terms of the License and as further evidenced by the Parties' course of

dealing and their course of performance, reflects that the intent of the Parties and the understanding of the Parties was that the License permitted only RP and Diamondback to practice the '035 Patent, to the exclusion of any other third parties. In other words, the Parties agreed, by way of the Patent License and the Amended Patent License, that Diamondback would not license any third party other than RP. On this point, Diamondback incorporates by reference all of the defenses and affirmative defenses asserted in its Answer to Repeat Precision's Complaint (Dkt. No. 25 in Case No. 6:19-cv-00036-ADA, as may be amended from time to time).

240.   Diamondback always retained the right to practice its own inventions; alternatively, it had a "grant-back" license or implied license from RP, and RP is estopped from arguing otherwise.

241.   RP's position is also barred by the doctrines of bad faith and unclean hands. In addition, RP acquiesced to, and knowingly encouraged, facilitated and promoted, Diamondback's manufacture and sale of disposable setting tools that practice one or more claims of the '035 Patent.

242.   Alternatively, or in addition thereto, RP waived any claim to an "exclusive" license of the type it now claims to have – a claim based on an interpretation contrary to the terms of the Patent License and the Parties' initial shared intent and mutual understanding, as reflected by, for example, the terms of the agreements, and the Parties' course of dealing and course of performance leading up to, during, and subsequent to the execution of the License (for example, March 2018 through November 2018).

243.   Alternatively, or in addition thereto, the License is either void or is not "exclusive" in the way proposed by RP, under the doctrine of mutual mistake, and, to the extent necessary, the License should be voided or reformed to more clearly articulate the Parties' mutual understanding and intent, i.e., that RP would be the exclusive third party provider of disposable setting tools, but *not* to the exclusion of the patent owner, Diamondback.

244.   To the extent necessary, the parties' course of dealing and course of performance confirms that Plaintiff retained the right to practice the '035 Patent.  RP has relied extensively on parol evidence and did so, almost exclusively, in the preliminary injunction hearing and in its filings related thereto. RP is therefore estopped from relying upon or invoking any sort of merger or integration clause or has otherwise waived the right to rely upon same.

## **PRAYER**

For the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment against Defendants for all of the following:

a)  Injunctive relief;

b)  Actual damages;

c)  Exemplary Damages;

d)  Disgorgement;

e)  Prejudgment and post judgment interest;

f)  Costs;

g)  Rescission, termination, or reformation of the Patent License;

h)  Rescission, termination, or reformation of the Amended Patent License;

i)  Declaration that Diamondback does not infringe its own '035 Patent and declaration that Diamondback has, and has always maintained, the right to practice its own '035 Patent;

j)  Attorneys' fees; and/or

k)  Such other relief, both at law and in equity, as the Court deems just and right given the nature of Defendants' actions.

Dated: March 22, 2019                    Respectfully submitted,

                                         _/s/ Decker A. Cammack_
                                         Decker A. Cammack (Lead Counsel)
                                         Texas Bar No. 24036311
                                         dcammack@whitakerchalk.com

                                         David A. Skeels
                                         Texas Bar No. 24041925
                                         dskeels@whitakerchalk.com

                                         Mack Ed Swindle
                                         Texas Bar No. 19587500
                                         mswindle@whitakerchalk.com


                                         **WHITAKER CHALK SWINDLE**
                                         **  & SCHWARTZ PLLC**
                                         301 Commerce Street, Suite 3500
                                         Fort Worth, Texas 76102
                                         Phone: (817) 878-0500
                                         Fax: (817) 878-0501

                                         John P. Palmer
                                         Teas Bar No. 15430600
                                         palmer@namanhowell.com
                                         **NAMAN, HOWELL, SMITH & LEE, PLLC**
                                         400 Austin Ave., Suite 800
                                         P.O. Box 1470
                                         Waco, Texas 76703
                                         Phone: (254) 755-4100
                                         Fax: (254) 754-6331

                                         _Counsel for Plaintiff Diamondback Industries,_
                                         _Inc._

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of this document is being served through e-filing and via email on this 22nd day of March, 2019 to all counsel who have appeared in this matter.

*/s/Decker A. Cammack*
Decker A. Cammack