**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| DIAMONDBACK INDUSTRIES, INC., | |
| *Plaintiff*, | |
| v. | Lead Case: |
| | Civil Action No. 6:19-cv-00034-ADA |
| REPEAT PRECISION, LLC; NCS MULTISTAGE, LLC; NCS MULTISTAGE HOLDINGS, INC.; GARY MARTIN; GRANT MARTIN; and ROBERT NIPPER, | Consolidated Case: Civil Action No. 6:19-cv-00036-ADA |
| *Defendants*. | |

## DIAMONDBACK'S MOTION TO DISMISS REPEAT PRECISION'S PATENT INFRINGEMENT CLAIM FOR LACK OF SUBJECT MATTER JURISDICTION

**TABLE OF CONTENTS**

I.  INTRODUCTION. ................................................................................................... 1

    A.  Brief Factual Background. ...................................................................... 1

    B.  Brief Procedural Background. ................................................................. 4

        1.  The Ft. Worth and Houston Lawsuits. ......................................... 4

        2.  The Waco Litigation ................................................................... 4

II. APPLICABLE LEGAL STANDARDS. .............................................................. 4

    A.  Under Fed. R. Civ. P. 12(b)(1), Party Bringing Claim for Patent Infringement Bears Burden to Establish That Court Has Subject Matter Jurisdiction ................ 4

    B.  Dismissal of Patent Infringement Claim Required Where Plaintiff Fails to Establish Standing. ................................................................................... 6

    C.  The Patent License Must Be Construed In Accordance with Texas Law .............. 7

III. ARGUMENT. ...................................................................................................... 8

    A.  RP lacks standing because Diamondback retained substantial rights in the '035 Patent. ................................................................................................ 8

        1.  RP lacks standing because Diamondback expressly retained the right to sue alleged infringers ............................................................. 8

        2.  RP Lacks Standing because Diamondback, Who Does Not Sell "Licensed Products," Retained the Right to Practice Its Own Inventions .................... 10

        3.  The Patent License as a whole shows that Diamondback did not assign its '035 Patent to RP. ................................................................... 13

        4.  The *Luminara* "substantial rights" factors clearly favor Diamondback ........ 16

    B.  Diamondback Has Not Infringed the '035 Patent or Breached the Patent License. ................................................................................................ 19

CONCLUSION ............................................................................................................ 20

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Abbott Labs. v. Diamedix Corp.*
 47 F.3d 1128 (Fed. Cir. 1995)........................................................................... 9, 13

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*
 604 F.3d 1354 (Fed. Cir. 2010)........................................ 6, 8, 9, 10, 16, 17

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*
 434 F.3d 1336 (Fed. Cir. 2006)................................................................................. 11

*AsymmetRx, Inc. v. Biocare Med., LLC*
 582 F.3d 1314 (Fed. Cir. 2009)..................................................................................... 7

*Bender v. Williamsport Area Sch. Dist.*
 475 U.S. 534 (1986)...................................................................................................... 5

*Caterpillar Inc. v. Lewis*
 519 U.S. 61  (1996).......................................................................................................... 5

*Chair King, Inc. v. Houston Cellular Corp.*,
 131 F.3d 507 (5th Cir. 1997) .......................................................................................... 5

*Clark v. Tarrant Cty, Tx.*
 798 F.2d 736 (5th Cir. 1986) ....................................................................................... 6

*Clouding IP, LLC v. Google Inc.*
 61 F. Supp. 3d 421 (D. Del. 2014)..................................................................... 16, 17

*Gensetix, Inc. v. Baylor Coll. of Med.*
 354 F. Supp. 3d 759 (S.D. Tex. 2018) ............................................................ 16, 17, 19

*Gibson v. SmithSimmons PLLC*
 2018 U.S. Dist. LEXIS 218913 (N.D. Tex. Dec. 12, 2018), *adopted*, 2019 U.S. Dist. LEXIS
 4169 (Jan. 9, 2019)........................................................................................... 5, 6

*Grynberg v. BP P.L.C.*
 855 F. Supp. 2d 625 (S.D. Tex. 2012) ........................................................................ 6

*Howery v. Allstate Ins. Co.*
 243 F.3d 912 (5th Cir. 2001) .................................................................................... 5

*InternetAd Sys., LLC v. Opodo Ltd.*
 481 F. Supp. 2d 596 (N.D. Tex. 2007) .................................................................... 5

*Kokkonen v. Guardian Life Ins. Co. of Am.*
 511 U.S. 375 (1994)....................................................................................................... 5

*Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*
 814 F.3d 1343 (Fed. Cir. 2016)................................................................. 8, 16, 17

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*
 240 F.3d 1016 (Fed. Cir. 2001)............................................................................... 10

*Reo Indus., Inc. v. Natural Gas Pipeline Co.*
 932 F.2d 447 (5th Cir. 1991) ............................................................................... 7, 16

*Sullivan v. Abraham*
 488 S.W.3d 294 (Tex. 2016),.................................................................................... 11

*Textile Prods., Inc. v. Mead Corp.*
 134 F.3d at 1481 (Fed. Cir. 1998)................................................................................ 7

*Waterman v. MacKenzie*
  138 U.S. 252 (1891) ................................................................................... 11

*West v. City of Santa Fe*
  2018 U.S. Dist. LEXIS 144012 (S.D. Tex. Aug. 16, 2018), *adopted*, 2018 U.S. Dist. LEXIS
  161130 (Sept. 20, 2018) ............................................................................. 5

*WiAV Sols. LLC v. Motorola, Inc.*
  631 F.3d 1257 (Fed. Cir. 2010) ................................................................. 13

*Williamson v. Tucker*
  645 F.2d 404 (5th Cir. 1981) .................................................................... 6

**Statutes**

28 U.S.C. § 1919 ......................................................................................... 20

35 U.S.C. § 271(a) ...................................................................................... 12

**Other Authorities**

*Reading Law: The Interpretation of Legal Texts* (2012) ....................... 8, 11

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 12(b)(1) ........................................................................ 4, 5, 6

Fed. R. Civ. P. 12(b)(6) ................................................................................ 6

Fed. R. Civ. P. 12(h)(3) ................................................................................ 5

Fed. R. Civ. P. 56 .................................................................................... 6, 20

## EXHIBITS[1]

Exhibit A       March 16, 2018 Patent License Agreement *(appx. 1 - 17)*

Exhibit B       May 30, 2018 Amendment to Patent License Agreement and Right of First Refusal Agreement *(appx. 18 - 22)*

Exhibit C       Report of Bryan A. Garner (including Annex A, Annex B, and Annex C thereto) *(appx. 23 - 72)*

Exhibit D       Declaration of David A. Skeels *(appx. 73 - 87)*

Exhibit E       Declaration of Derrek Drury *(appx. 88 - 91)*

---

[1] These exhibits are incorporated by reference as if fully set forth below.

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Repeat Precision, LLC ("RP" or "Licensee") sued Diamondback Industries, Inc. ("Diamondback," "Licensor," or "Patent Owner") for infringement of Diamondback's own patent, U.S. Patent No. 9,810,035 (the "035 Patent"). When Diamondback licensed its '035 Patent to RP, Diamondback expressly retained substantial rights in and to the '035 Patent, including the right to sue alleged infringers. As a consequence, RP lacks standing for its patent infringement claim, and the Court lacks jurisdiction to adjudicate the claim.

## I.   INTRODUCTION.

### A.   Brief Factual Background.

Diamondback is the assignee and owner of the '035 Patent, entitled "Disposable Setting Tool," which issued on November 7, 2017. Dkt. 1-2.  Since that time, Diamondback has been selling its patented setting tools, such as the SS10 and SS20.  Declaration of Derrek Drury ("Drury Dec.," attached as Ex. E and incorporated by reference) ¶ 2. It is undisputed that those setting tools practice and embody one or more claims of the '035 Patent.  Drury Dec. ¶ 2.

In early 2018, shortly after the '035 Patent Issued, Diamondback was approached by RP representatives who expressed interest in obtaining from Diamondback a license to the '035 Patent. Drury Dec. ¶ 3. On March 16, 2018, Diamondback and Repeat Precision entered in to a Patent License Agreement. Ex. A. On May 30, 2018, the parties executed a document entitled Amendment to Patent License Agreement and Right of First Refusal Agreement. Ex. B. The Patent License Agreement and Amendment may be referred to collectively as the "Patent License."

At first glance, the license grant of Section 2 appears to be very broad. *See* Ex. C, Report

of Bryan A. Garner ("Garner Report") at ¶¶ 8-10.[2] However, the grant is restricted by the other terms and conditions of the Patent License: "***Subject to the terms and conditions of this Agreement***, Licensor hereby grants to Licensee and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory." Patent License § 2; *see also id.* § 6.3 (acknowledging "the restrictions on the Licensee set forth in Section 2.") (emphasis in original). The other "terms and conditions" of the Patent License include the seven (7) defined terms used in the grant clause. For example, the grant is limited to "Licensed Products," which are expressly defined in a way that can only apply to third parties' products and therefore exclude Diamondback's products from the scope of the license: "products … the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, *infringe* a valid Claim") (emphasis added). Patent License, Definition of Licensed Products.[3]

Diamondback's sales of its patented setting tools: began in 2017; continued without objection and with RP's knowledge after the parties executed the Patent License Agreement on March 16, 2018; and continued without objection and with RP's knowledge after the parties executed the Amendment on May 30, 2018. Drury Dec. ¶¶ 5-6.  At the time of the Amendment, Diamondback had patented setting tools in inventory and fully intended to continue selling those tools – facts that were known to RP. Drury Dec. ¶ 6.  RP never suggested that Diamondback should discontinue its sales or otherwise destroy (or "sell off") its existing inventory. Drury Dec. ¶ 10.  And RP never accused Diamondback of patent infringement. Drury Dec. ¶¶ 10-11.  RP certainly

---

[2] Mr. Garner is a noted grammarian, legal lexicographer, the author of more than 20 books, and Editor-in-Chief of *Black's Law Dictionary*.  Garner Report ¶ 2. His report is attached hereto as Exhibit C and incorporated by reference.

[3] As another example, the license grant does not convey worldwide rights; rather, it is expressly restricted to a defined "Territory" – a territory that includes, for example, North America, but excludes (or omits) Europe. *See* Patent License § 2 and Definition of "Territory".

did not provide "prompt written notice" of such alleged infringement – something RP was contractually obligated to do (*see* Patent License § 6.1) if it truly believed Diamondback was "infringing" the '035 Patent. Drury Dec. ¶ 11.  To the contrary, Diamondback's ongoing sales were made with RP's full knowledge, blessing, and even assistance. Drury Dec. ¶¶ 5-9.  For example, on June 27, 2018 (i.e., nearly a month after the Amendment was executed), Robert Nipper (RP's Chairman of the Board but acting in his capacity as President of NCS), executed a Letter of Intent (aka "LOI" or "Project 'Power' Term Sheet") in connection with a potential acquisition of Diamondback. Dkt. 1-18 at pages 1-2. The LOI contemplated Diamondback's ongoing manufacture of its patented setting tools. Specifically, NCS's valuation was calculated to be "equal to 6.8x Diamondback's trailing 12-months's EBITDA for calendar 2018, LESS the consideration paid at closing (the 'Closing Consideration')," a "valuation … based on several assumptions" – including the following:

> [Diamondback] continues to make the previously budgeted capital expenditures required to support the growth of the business through [the estimated September 2018] closing, including **anticipated investments … in adding capacity to manufacture setting tools**.

Drury Dec. ¶ 8 (emphasis added). RP never accused Diamondback of infringement until November 26, 2018—six months after the Amendment was executed—when RP first sued Diamondback for infringement. Drury Dec. ¶ 10; *see also Repeat Precision, LLC v. Diamondback Industries, Inc.*, Case No. 4:18-cv-04456 (S.D. Tex.), Dkt. 1.

On April 8, 2019, Diamondback's counsel sent a letter to RP's counsel to provide formal written notice of RP's material breach of the Patent License. The letter specifies that RP is in breach by, among other things, suing Diamondback for infringement and failing to provide Diamondback with prompt and formal written notice, as required by the Patent License.  Letter from David Skeels to Scott Hastings, April 8, 2019 (Ex. D.1). In a responsive letter dated April

11, 2019, RP argues that RP is not in breach because the Patent License uses the word "exclusive" and because the Patent License (allegedly) fails to expressly articulate all of Diamondback's retained rights, including Diamondback's ongoing right to practice its own inventions. *See* Letter from Charles Phipps to David Skeels, April 11, 2019, p. 3 (Ex. D.2).

### B.    Brief Procedural Background.

#### 1.    The Ft. Worth and Houston Lawsuits.

On November 2, 2018, Diamondback sued various defendants in Ft. Worth. *Diamondback Industries, Inc. v. Repeat Precision, LLC et al.*, Case No. 4:18-cv-00902 (N.D. Tex.).   On November 26, 2018, and as referenced above, RP filed a retaliatory suit in Houston, alleging that Diamondback was somehow infringing its own '035 Patent.   *See Repeat Precision, LLC v. Diamondback Industries, Inc.*, Case No. 4:18-cv-04456 (S.D. Tex.).   Thereafter, the parties agreed to dismiss their claims against each other, without prejudice, and agreed that any re-filed suits would proceed in the Western District of Texas, Waco Division.

#### 2.    The Waco Litigation.

On February 3, 2019, Diamondback filed its Original Complaint in Waco, describing Defendants' fraudulent scheme and other unlawful conduct.  Case No. 6:19-cv-00034-ADA, Dkt. 1.[4]  On February 4, 2019, RP filed suit against Diamondback – alleging that Diamondback was infringing its own '035 Patent and had breached the Patent License by virtue of its sales of disposable setting tools.  Case No. 6:19-cv-00036-ADA.  These cases have now been consolidated.

## II.    APPLICABLE LEGAL STANDARDS.

### A.    Under Fed. R. Civ. P. 12(b)(1), Party Bringing Claim for Patent Infringement Bears Burden to Establish That Court Has Subject Matter Jurisdiction

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a federal

---

[4] Diamondback has now filed its Second Amended Complaint. Dkt. 61.

court's subject matter jurisdiction. *Gibson v. SmithSimmons PLLC*, 2018 U.S. Dist. LEXIS 218913, \*5-6 (N.D. Tex. Dec. 12, 2018), *adopted*, 2019 U.S. Dist. LEXIS 4169 (Jan. 9, 2019). Federal courts are courts of limited jurisdiction; without jurisdiction conferred by the Constitution and statute, they lack the power to adjudicate claims. *Id.*, citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They "'must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum.'" *Id.*, quoting *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *see also InternetAd Sys., LLC v. Opodo Ltd.*, 481 F. Supp. 2d 596, 604 (N.D. Tex. 2007) ("Standing is a threshold requirement to every federal action and must be proved by the party asserting the right to sue.").

Subject matter jurisdiction fails if the plaintiff lacks Article III standing. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541-42 (1986); *West v. City of Santa Fe*, 2018 U.S. Dist. LEXIS 144012, \*7 (S.D. Tex. Aug. 16, 2018), *adopted*, 2018 U.S. Dist. LEXIS 161130 (Sept. 20, 2018). When a plaintiff lacks standing to sue in federal court, it is appropriate to dismiss the action pursuant to Rule 12(b)(1) for want of subject matter jurisdiction. *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997). Where the court lacks jurisdiction, dismissal is mandatory and also promotes judicial economy, because "if, at the end of the day and case, a *jurisdictional* defect remains uncured, the judgment must be vacated." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 76-77 (1996) (emphasis in original), citing Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

Courts may dismiss for lack of subject matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts.  *Clark v. Tarrant Cty., Tx.*, 798 F.2d 736, 741 (5th Cir. 1986); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1986); *Grynberg v. BP P.L.C.*, 855 F. Supp. 2d 625, 638 (S.D. Tex. 2012); *Gibson*, 2018 U.S. Dist. LEXIS 218913, *6.  Unlike consideration of a Rule 12(b)(6) or Rule 56 motion, the Court has a "'unique power . . . to make factual findings which are decisive of [subject matter] jurisdiction' when considering a motion under Rule 12(b)(1) that raises questions of fact relevant to subject matter jurisdiction."  *Grynberg*, 855 F. Supp. 2d at 638 (brackets in original), quoting *Williamson*, 645 F.2d at 412-13.[5]

## B.    Dismissal of Patent Infringement Claim Required Where Plaintiff Fails to Establish Standing.

"A patent is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part. Thus, although all the various rights available under the patent are initially held by the named inventor or inventors, they may, as a result of licensing agreements and assignments, become separated and be held by multiple individuals."  *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (internal quotations and citation omitted).  The question of what was included or intended to be transferred via the grant is one of "the intention of the parties."  *Id.*

In order for a patent licensee to have a right to sue for patent infringement in that party's own name, the plaintiff must have standing, which requires that the licensee have, in effect, an assignment of the patent:

> The right to sue for infringement is ordinarily an incident of legal title to the patent. … [T]he critical determination regarding a party's ability to sue in its own name is whether an agreement transferring patent rights to that party is, in effect, an assignment or a mere license. To determine whether an assignment of patent rights was made, we must "examine whether the agreement transferred all substantial

---

[5] The Court can grant this Motion without having to resolve any disputed facts. Nevertheless, if the Court has any reservations whatsoever, Diamondback would welcome an evidentiary hearing.

rights" to the patents and "whether the surrounding circumstances indicated an intent to do so."

*AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009) (citations omitted). It does not matter that the party alleging infringement may be an "exclusive licensee"; if the licensee does not own all substantial rights, it lacks standing. *See Textile Prods., Inc. v. Mead Corp.*, 134 F.3d at 1481, 1485 (Fed. Cir. 1998) (affirming district court's dismissal of patent infringement claims where plaintiff was exclusive licensee, but not assignee, of patent-in-suit).

### C.     The Patent License Must Be Construed In Accordance with Texas Law.

This Court must determine whether the Patent License granted to RP "all substantial rights" in and to the '035 Patent and must decide whether RP has met its burden to show that the Patent License is tantamount to an "assignment." To do so, the Court must interpret and construe the Patent License – particularly Section 6.2, Section 2, and the Definition of "Licensed Products." The Patent License must be "construed in accordance with … the laws of the State of Texas." Patent License § 13.14(a).  The Fifth Circuit has held:

> Construing a contract under Texas law, the following principles apply: Interpretation of an unambiguous contract is a question of law, and the determination of whether a contract is ambiguous is also a question of law.  A contract is not ambiguous merely because the parties have a disagreement on the correct interpretation.  A contract is not ambiguous "when it is reasonably open to just one interpretation given the rules of construction and the surrounding circumstances."  Contracts are to be construed in their entirety to give effect to the intent of the parties, considering each provision with reference to the entire contract, so that every clause has some effect and no clause is rendered meaningless.  A contract is given its plain grammatical meaning unless that meaning would defeat the intent of the parties.  And, of course, the interpretation of the writing should be undertaken "in the light of the circumstances" at the time the contract was executed. … Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way.

*Reo Indus., Inc. v. Natural Gas Pipeline Co.*, 932 F.2d 447, 453-54 (5th Cir. 1991) (notes omitted); *see also* Garner Report ¶ 13 ("The provisions [of the Patent License] should be interpreted in a

way that renders them compatible, not contradictory."), citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 180.

## III.   ARGUMENT.

A review of the Patent License reveals that RP cannot establish the requisite standing, since Diamondback retained substantial rights in the '035 Patent, as described in Part III.A *infra*.

### A.   RP lacks standing because Diamondback retained substantial rights in the '035 Patent

RP cannot meet its burden to demonstrate standing because (1) Diamondback retained the right to sue alleged infringers; (2) Diamondback retained the right to practice its own inventions; (3) the Patent License as a whole shows that Diamondback did not assign its '035 Patent to RP; and (4) the *Luminara* "substantial rights" factors clearly favor Diamondback.

#### 1.   RP lacks standing because Diamondback expressly retained the right to sue alleged infringers

If the license grant cannot be characterized as an "assignment," and if Diamondback retained the "right to sue," then RP does not have standing. *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1359-60 (Fed. Cir. 2010) ("[T]he question is whether the license agreement transferred sufficient rights to the exclusive licensee to make the licensee the owner of the patents in question. If so, the licensee may sue but the licensor may not. If not, the licensor may sue, but the licensee alone may not."); *see also id.* at 1362-63 (holding that exclusive licensee lacked standing because it held "substantially less than the complete right to sue"). Here, Diamondback retained the right to sue alleged infringers of the '035 Patent:

> **Licensor may, at its sole option, choose to bring suit to stop infringement of the Licensed Patent** or defend a declaratory judgment action or other proceeding alleging noninfringement, invalidity, or unenforceability of the License Patent. If Licensor elects not to bring such suit or assert such defense within one month of such notice, then Licensee may bring such suit or assert such defense and may join Licensor in the proceeding as necessary. **The party bringing such suit** or asserting

such defense **may control the conduct of the prosecution** or defense **of any proceeding under this section, including settlement**, and the other party will provide assistance as necessary with reasonable out-of-pocket expenses to be timely reimbursed by the party controlling such proceeding. Licensee must obtain prior approval from Licensor of any settlement terms for other than monetary damages paid to Licensee.

§ 6.2 (emphasis added).

Under this language, Diamondback retained the unfettered right to sue infringers, to control the litigation, to control settlement, and to recover all infringement damages. Diamondback's "primary" right to sue is even stronger than cases in which the Federal Circuit has found that exclusive licensees with a primary right to sue lacked standing because the Licensor retained a "secondary" right to sue. *See, e.g.*, *Mann Foundation*, 604 F.3d at 1362 (explaining that Licensor's "secondary … right to choose to sue an infringer does not vest until [Licensee] chooses not to sue that infringer [but] is otherwise unfettered" and explaining that once that "right to sue an infringer activates, [Licensor] can decide whether or not to bring suit, when to bring suit, where to bring suit, what claims to assert, what damages to seek, whether to seek injunctive relief, whether to settle the litigation, … the terms on which the litigation will be settled … [and has] complete discretion to decide what trial strategy and tactics to employ" – "broad right[s that are] thoroughly inconsistent with an assignment of the patents-in-suit to [Licensee]"). Further, Section 6.2 makes clear that RP has no right to insist that Diamondback indulge (or tolerate or ignore) infringement – another factor that the Federal Circuit has found to be inconsistent with a conveyance of the right to sue. *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132-33 (Fed. Cir. 1995) ("Abbott … does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue").

In correspondence to Diamondback (*see* Ex. D.2), RP has suggested that Section 6.2 only applies to *third-party* infringers. In support, RP points to the heading of Section 6: "Third-Party

Infringement." In so doing, RP ignores Section 13.8, which states: "The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement." Even if Section 6.2 only applies to third-party infringers, it confirms that (a) the only "infringement" contemplated by the Patent License is infringement by a third party, and (b) the Patent License does not grant to RP any right to sue Diamondback (the Licensor) for patent infringement.[6] Either way, RP does not have any right to sue Diamondback for infringement of its own patent. RP's proposed interpretation, whereby Diamondback retained the right to sue third party infringers but granted to RP the right to sue Diamondback for infringement, cannot withstand scrutiny. *See* Garner Report, ¶¶ 11-13.

RP also points out that it has a secondary right to sue. Ex. D.2 at 2. This confirms that Diamondback is still the owner of the patent and retained substantial rights to the patent. *See Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001) ("[Patent Owner] has the first obligation to sue parties for infringement …. [Exclusive Licensee] only can sue for infringement in the event [Patent Owner] fails to do so. …. Here, in light of [Patent Owner's] substantial retained rights, particularly its initial right and obligation to sue for infringement, we conclude that [Exclusive Licensee] did not receive all substantial rights in the patent.").

　　　　2.　　RP Lacks Standing because Diamondback, Who Does Not Sell "Licensed Products," Retained the Right to Practice Its Own Inventions

Section 2 of the Patent License contains language that appears at first to be a broad grant:

---

[6] In that same letter, RP argues that if Diamondback wanted to retain the right to practice its own invention, it was required to say so explicitly. *See* Ex. D.2. This argument turns the applicable case law on its head. Courts have consistently held that a Patent Owner/Licensor who owns the entire "bundle of sticks" retains all of the sticks that he does not otherwise transfer away. *See, e.g., Alfred E. Mann Foundation*, 604 F.3d at 1360. RP's letter – which fails to identify any provision whereby Licensor granted to Licensee an exclusive right to "practice the Licensed Patents" or an exclusive right to "sell the patented setting tools" – also contradicts the agreement's integration clause. *See* Patent License § 13.9 ("[t]his Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein").

> Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee and its Affiliates during the Term **an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export *Licensed Products*** in the Territory.

(emphasis added). The right and license, as far as they go, are *exclusive*.  They include whatever qualifies as a Licensed Product under the Licensed Patents. *See* Garner Report ¶ 8. The grant gives RP certain exclusive rights to sell "Licensed Products"; it does *not* give RP an exclusive right "to practice the Licensed Patents" or the exclusive right "to make, use, and sell the patented products." *See* Patent License § 2. Even if it the Patent License had granted such broad rights (it does not), such a grant might, but would not necessarily, give RP standing to sue. *See Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1341-42 (Fed. Cir. 2006) (holding that exclusive licensee did *not* own all substantial rights and did *not* have standing to sue, even though licensee had received "the exclusive right to make, use, and sell products covered by the patent"), citing *Waterman v. MacKenzie*, 138 U.S. 252, 255-56 (1891) (holding that a transfer of patent rights, which included the "exclusive right to make, use, and sell … ***the patented machines*** [or the] ***patented articles***," gave assignee standing to bring suit) (emphasis added).

Given the use of seven defined terms within the grant, including "Licensed Products," its scope cannot be properly understood until the definitions are understood.[7] The original Patent License Agreement defined "Licensed Products" as follows:

> **"Licensed Products"** means a bridge plug that is coupled with the Company or its Affiliates' solution tool used for well completions and any other **products** that may be agreed upon in writing by Licensor and Licensee from time to time, **the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, *infringe* a valid Claim** in a jurisdiction in the Territory where such a Valid Claim exists.

---

[7] Garner Report ¶ 9 n.1, citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 225 (2012) (stating that, under the interpretive-direction canon, "[d]efinition sections and interpretation clauses are to be carefully followed"); *see also Sullivan v. Abraham*, 488 S.W.3d 294, 297-99 (Tex. 2016) (citing Scalia & Garner for various canons of construction).

(emphasis added). Six weeks later, that definition was replaced by an amended definition in the Amendment:

> **"Licensed Products"** means an electric wireline setting tool used for well completions and any other **products** that may be agreed upon in writing by Licensor and Licensee from time to time, **the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement,** *infringe* **a Valid Claim** in a jurisdiction in the Territory where such a Valid Claim exists.

(emphasis added). Both definitions include an identical clause that modifies and limits the scope of the described products: "the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, *infringe* a Valid Claim" (emphasis added).

To determine whether the Licensor retained the right to practice its own inventions, the Court must consider the interplay between (a) the grant and (b) the definition of Licensed Products. Garner Report ¶ 10.  Something qualifies as a Licensed Product only if its "manufacture, use, offer for sale, sale, or importation . . . would, but for this Agreement, infringe a Valid Claim"—that is, infringe a claim of the '035 Patent. Stated another way, "Licensed Products" are those products for which the would-be seller must obtain a license from the patent holder to make such sales – sales that would otherwise (i.e., in the absence of a license) *infringe* the '035 Patent.  *See, e.g.*, 35 U.S.C. § 271(a) ("**whoever** *without authority* **makes, uses, offers to sell, or sells any patent invention**, within the United States or imports into the United States any patented invention during the term of the patent therefor, *infringes* the patent") (emphasis added).

This begs the question: Would Diamondback's manufacture, use, offer for sale, sale, or importation constitute infringement *but for* (i.e., in the absence of) the license agreement?  The clear answer is: No. Garner Report ¶ 10. Diamondback's right to practice the '035 Patent pre-dated the execution of the Patent License. Since Diamondback owns the '035 Patent, it never needed a license to practice the patent. Diamondback's lawful and authorized manufacture and sale of its

patented setting tools do not infringe (and have never infringed) the '035 Patent. Therefore, Diamondback does not sell "Licensed Products," and RP has no right to exclude Diamondback from practicing the invention and no standing to sue Diamondback for infringement. The operative language is unambiguous and must be given effect. Garner Report, ¶ 14.[8]

In view of Diamondback's right to practice its own inventions, RP lacks standing to sue Diamondback for patent infringement. *See WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010) (an "exclusive licensee" lacks standing to sue a party for infringement if that party holds a preexisting and ongoing right under the patent to engage in the allegedly infringing activity); *Abbott Labs.*, 47 F.3d at 1132-33 (Diamedix did not "transfer[] all substantial rights under the patents to Abbott" where "Diamedix retained the right to make and use, for its own benefit, products embodying the inventions claimed in the patents, as well as the right to sell such products to end users").

       3.     The Patent License as a whole shows that Diamondback did not assign its '035 Patent to RP.

Despite RP's claims to an exceedingly broad grant, the Patent License itself emphasizes "the restrictions on the Licensee set forth in <u>Section 2</u>" (Section 6.3) (emphasis in original). Further, the license grant of Section 2 is expressly made "[s]ubject to the terms and conditions of" the Patent License (Patent License § 2). A survey of those other "terms and conditions" supports the plain meaning interpretation presented above and confirms that Diamondback retained

---

[8] Diamondback does not suggest that every provision in the Patent License is crystal clear. For example, the "Improvement" provisions of Sections 3.1 and 3.2 are difficult to understand and reconcile. Further, the original definition of "Licensed Products," which references an undefined "Company" and an undefined "isolation tool," may require further discussion at some point in the future. Nevertheless, assuming for the sake of this Motion that the Amendment is valid and that the amended definition of "Licensed Products" is the operative definition, this Motion focuses on that amended definition. Diamondback reserves all rights to argue that other portions of the Patent License may be ambiguous. Diamondback further reserves the right to maintain that the Patent License (whether the original or as amended) was fraudulently induced, is or should be declared void, and/or has been terminated or should be terminated because of RP's incurable or uncured material breaches.

substantial rights, including the unfettered right to sue alleged infringers and the right to practice its own inventions. Garner Report ¶ 11.

(a)     First, the Patent License as a whole confirms that Diamondback owns the '035 Patent, will continue to own the patent, and has not assigned the patent to RP. *See, e.g.*, Patent License §§ 9.2(b) and (c) ("Licensor … is the legal and beneficial owner of the entire right, title, and interest in and to the Licensed Patents" and "has, and throughout the Term will retain, the unconditional and irrevocable right, power, and authority to grant the license hereunder"); *see also id.* § 9.2(h)(ii) (acknowledging "Licensor's ownership of [and] right to practice … any Licensed Patent"); *id.* § 5.2 (patent has not been assigned but could be assigned in the future: "Licensor shall assign to Licensee any such … patent Licensor wishes to abandon"). Further, Diamondback owns reversionary rights in the patent, such that all rights granted to RP will revert to Diamondback if the Patent License is terminated. *See id.* § 12.2 ("Either [party] may terminate this Agreement … if the other party materially breaches this Agreement and such breach: (i) is incapable of cure; or (ii) being capable of cure, remains uncured 180 days after the breaching party receives written notice thereof").

(b)     Second, the Patent License as a whole confirms Diamondback retained substantial rights to monetize, maintain, control, and enforce the Licensed Patent. *See, e.g.*, Patent License § 4.2 ("Licensee shall pay to Licensor … a royalty of $20 for each Licensed Product"); *id.* §§ 3.1 and 3.2 (Licensee must make "Earned Royalty Payments for the sale of [improved versions] of the Licensed Products [if] the sale of [such] Licensed Product … would infringe on the ['035 Patent"); *id.* § 5.1 ("For each patent application and patent under the Licensed Patents, Licensor shall: (a) prepare, file, and prosecute such patent application; (b) maintain such patent; [and] (c) pay all fees and expenses associated with such activities"); *id.* § 5.2 (Licensor may abandon a Licensed Patent

and, upon Licensee's request, shall assign to Licensee any such patent); *id.* § 6.2 (Licensor retained rights to sue infringers, to control the prosecution of such lawsuits, to control the terms of settlements, to collect damages, and to defend attacks on the validity of the '035 Patent).

(c)     Third, the Patent License as a whole confirms that Diamondback's patented setting tools are not "Licensed Products," as that term is expressly defined.  The only products that qualify as "Licensed Products" are those whose manufacture or sale would *infringe* a valid patent; in other words, the mere fact that a product (such as Diamondback's products) might *practice* the '035 Patent is not sufficient to convert that product in to a "Licensed Product." *See, e.g.*, Patent License § 12.4 (confirming that "all products that were previously Licensed Products" during the patent term will no longer be considered "Licensed Products" after the patents expire); *id.* § 12.5 (contemplates an authorized "Sell-Off Period" – for RP's products only – if Patent License is terminated; no "Sell-Off Period" is necessary for Diamondback, because Diamondback does not have any "Licensed Products," and its sales of patented setting tools would not infringe the '035 Patent – even in the absence of, or after termination of, the Patent License); Amendment § 3.1 (contemplates that the "assets of Licensor" – presumably including its then-existing inventory of patented setting tools – could be the subject of a "sale to … a bona fide third-party," without any suggestion that such a sale would constitute patent infringement).

(d)     Fourth, the Patent License as a whole confirms that Diamondback never conveyed to RP an exclusive right to practice the '035 Patent or the right to exclude Diamondback from practicing the '035 Patent. *See, e.g.*, Amendment, First Recital (describing "*the right* to use certain patents in connection with the Licensed Products on the terms and conditions set forth in the Prior Agreement," but making no reference to "*an exclusive right* to use certain patents" – because no such right exists); Amendment § 2.2 (referencing "the license granted to Licensee in Section 2 [of

the original patent license]" but making no reference to an "exclusive license"); *see also* Patent License § 13.9 (integration clause confirms that if Licensor had granted to Licensee the right to sue the Licensor or the exclusive right to practice the '035 Patent, then that grant would be spelled out in the Patent License).

In accordance with sound principles of textual interpretation, particularly with respect to the license grant and the definition of Licensed Products, the Patent License unambiguously reserves to Diamondback rights of manufacture, use, and sale under the '035 Patent.[9]

4.      The *Luminara* "substantial rights" factors clearly favor Diamondback

Because Diamondback (as Licensor) retained substantial rights, RP lacks standing to sue Diamondback, regardless of whatever "exclusive" rights RP may have or may claim to have. *Gensetix, Inc. v. Baylor Coll. of Med.*, 354 F. Supp. 3d 759, 767-68 (S.D. Tex. 2018) (explaining that "[i]If the licensor retains substantial rights, then the licensee does not have standing to sue for infringement of the licensed patent," and holding that Gensetix, even as "an exclusive licensee" of the asserted patents, did "not have standing to sue for infringement"); *Clouding IP, LLC v. Google Inc.*, 61 F. Supp. 3d 421, 428-36 (D. Del. 2014) (despite an express "assignment" and "conveyance" from Seller to Clouding IP, whereby "Seller agree[d] to sell, assign, transfer and convey to Purchaser, *subject to the terms of this Agreement*, including the License set forth in Section 4.5 of this Agreement, all of Seller's right, title, and interest in and to the Assigned Patent Rights," the court found that Clouding IP lacked standing to bring suit with respect to those patents

---

[9] Garner Report ¶ 13. The interpretation proposed here (and supported by Bryan Garner) is also consistent with Texas law regarding forfeiture, and confirms that Diamondback did not, by virtue of entering into the Patent License, "forfeit" the right to practice its own inventions. "Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way." *Reo Indus.*, 932 F.2d at 454. *See also Alfred E. Mann Found.*, *supra*, 604 F.3d at 1363 ("the district court should have held that, although the agreement between AMF and AB was an exclusive license agreement, it was not a virtual assignment of the patents-in-suit").

because the transfer of rights was made with various restrictions) (emphasis in original).[10]

In *Gensetix*, the court enumerated and analyzed the nine *Luminara* factors, which must be considered when deciding whether a licensor retained "substantial rights" in a patent, such that a licensee does not have standing to sue; the first factor ("right to sue") is "the most critical factor." 354 F. Supp. 3d at 768, citing *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343 and *Alfred E. Mann*, 604 F.3d at 1360-61. The *Luminara* factors are summarized below, and, for each factor, the chart indicates whether that factor favors Diamondback or RP:

| Factor | Patent License (favored party) |
|---|---|
| (1) whether the licensor retained the right to sue | "Licensor may, at its sole option, choose to bring suit to stop infringement of the Licensed Patent [and when] bringing such suit … may control the conduct of the prosecution … of any proceeding under this section, including settlement"<br><br>Patent License § 6.2.<br><br>**This factor favors: Diamondback** |
| (2) if the licensor retained the right to freely license the patent | "Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory."<br><br>Patent License § 2; *see also id.* § 9.2(e).<br><br>**This factor favors: RP** |
| (3) the scope of the licensee's right to sublicense | Diamondback did not grant to RP a right to sub-license the Licensed Patents.<br><br>*See generally* Patent License.<br><br>**This factor favors: Diamondback** |

---

[10] The conveyance in *Clouding IP* includes language that is similar to the language at issue here. *Compare* the quoted language from the conveyance to Clouding IP *with* the Patent License, First Recital ("WHEREAS, Licensee wishes to practice the Licensed Patents … in connection with the Licensed Products (as defined below) and Licensor is willing to grant to Licensee a license to the Licensed Patents **on the terms and conditions set out in this Agreement**") (emphasis added); *see also* Patent License § 2 ("**Subject to the terms and conditions of this Agreement**, Licensor hereby grants to Licensee …") (emphasis added).

| (4) the nature of the license provisions regarding the reversion of rights to the licensor following breaches of the license agreement | "Either [Party] may terminate this Agreement on written notice to the other party if the other party materially breaches this Agreement and such breach: (i) is incapable of cure; or (ii) being capable of cure, remains uncured 180 days after the breaching party receives written notice thereof."<br><br>Patent License § 12.2(b); *see also* Part III.A.3(a) *supra*.<br><br>**This factor favors: Diamondback** |
|---|---|
| (5) the right of the licensor to receive a portion of the recovery in infringement suits | "Licensor may, at its sole option, choose to bring suit to stop infringement of the Licensed Patent [and when] bringing such suit … may control the conduct of the prosecution … of any proceeding under this section, including settlement"<br><br>Patent License § 6.2; *see also id.* (contemplates that settlement proceeds, which Licensor may control and direct, will typically be in the nature of "monetary damages").<br><br>**This factor favors: Diamondback** |
| (6) the duration of the license | "Licensor hereby grants to Licensee and its Affiliates during the Term …"<br><br>Patent License § 2; *see also id.* § 12.1 (defining "Term" to extend "until the expiration of the last Valid Claim to expire of the Licensed Patents covering such Licensed Product[s]."<br><br>**This factor favors: RP** |
| (7) the ability of the licensor to supervise and control the licensee's activities | "Licensee shall pay to Licensor on or before the last Business Day of each Quarterly Period during the Term a royalty of $20 for each Licensed Product sold by Licensee in the Territory during the respective preceding Quarterly Period"<br><br>Patent License § 4.2; *see also id.* § 6.2 (even in limited instances where Licensee has conditional right of enforcement, Licensor retained right to approve, or reject, Licensee's attempts to settle for non-monetary damages); *id.* §§ 8.1 and 13.15 (Licensor retained right to insist upon RP's non-use and nondisclosure of Diamondback's confidential information and to seek injunctive relief for any violation of Section 8.1); *id.* § 9.1(b) (Licensor retained right to insist that RP maintain at all times "the full right, power, and authority … to perform its obligations" under the Patent License); *id.* § 12.2(b) (Licensor retained right to terminate Agreement for incurable or uncured material breach); *id.* § 12.4 (Licensor retained right to collect royalty payments during any "Sell-Off Period"); *id.* § 13.5 (Licensor retained right to prevent Licensee from "issu[ing] or releas[ing] any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement" and from "us[ing] [its] trademarks, service marks, trade names, logos, domain names, or other indicia of |

|  | source, association, or sponsorship … without the prior written consent of" Licensor); Part III.A.3(b) *supra*.<br><br>**This factor favors: Diamondback** |
|---|---|
| (8) the obligation of the licensor to continue paying patent maintenance fees | "For each patent application and patent under the Licensed Patents, Licensor shall … maintain such patent [and] pay all fees and expenses associated with such activities."<br><br>Patent License § 5.1(b) and (c).<br><br>**This factor favors: Diamondback** |
| (9) the nature of any limits on the licensee's right to assign its interests in the patent | "Licensee may freely assign … its rights"<br><br>*See* Amendment § 2.2, which sets forth replacement language for § 13.10 of the Patent License; *but see id.* ("this Agreement [including any obligations of, or duties owed by, Licensee] will be binding upon … permitted assigns") *and* Patent License § 6.3 (assignees bound by "the restrictions on the Licensee set forth in [the license grant of] Section 2").<br><br>**This factor favors: RP** |

In summary, six factors weigh in favor of Diamondback having retained "substantial rights," while three factors weigh in favor of RP. **Significantly, the "most critical factor" of "right to sue" rests firmly in favor of Diamondbac**k. *See Gensetix*, 354 F. Supp. 3d at 768-69. The Patent License does not provide, or even contemplate, that any party (particularly the Licensee) could ever sue the Licensor for infringement of Licensor's own '035 Patent. Therefore, RP does not have standing to sue Diamondback for infringement, and the infringement claim must be dismissed for lack of subject matter jurisdiction.

**B.  Diamondback Has Not Infringed the '035 Patent or Breached the Patent License.**

Even if RP had standing to sue alleged infringers, Diamondback does not infringe, has never infringed, and could not possibly infringe the '035 Patent, because Diamondback retained the right to practice its own patents – a fact made clear by the only faithful and reasonable interpretation of the Patent License, including, in particular, the license grant of Section 2 and the

definition of "Licensed Products." Further, Diamondback has never needed a license to manufacture or sell products that practice its own patents, does not sell Licensed Products (as expressly defined), and has never manufactured or sold Licensed Products. Accordingly, Diamondback's ongoing manufacture and sale of its patented setting tools, which predated the Patent License and continued without complaint for many months after the execution of the Patent License (including the Amendment), do not constitute a breach of the Patent License. Diamondback therefore reserves the right to move for summary judgment on RP's claims for patent infringement and for breach of the Patent License, pursuant to Federal Rule of Civil Procedure 56(a). Alternatively, the Court may convert this Motion into a motion for summary judgment and thereby enter judgment as a matter of law that Diamondback does not infringe the '035 Patent and has not breached (indeed, cannot breach) the Patent License by the manufacture or sale of its patented setting tools. Diamondback also reserves all rights with respect to its various defenses to RP's claims for patent infringement and for breach of the Patent License, including its affirmative defenses of waiver and estoppel.

## **<u>CONCLUSION</u>**

This Court must grant the Motion to Dismiss, because it has no jurisdiction to adjudicate a patent infringement claim brought by a party who has no standing to assert such a claim. In addition, since Diamondback does not sell and has never sold "Licensed Products" (as expressly defined), the Court may wish to consider whether to convert this Motion into a motion for summary judgment and to enter judgment in favor of Diamondback on RP's claims for patent infringement and for breach of the Patent License. Diamondback also requests such other relief as this Court may deem just and proper, including an award of costs under 28 U.S.C. § 1919.

Dated: June 5, 2019

Respectfully submitted,

 */s/ David A. Skeels*

Decker A. Cammack (Lead Counsel)
Texas Bar No. 24036311
dcammack@whitakerchalk.com

David A. Skeels
Texas Bar No. 24041925
dskeels@whitakerchalk.com

**WHITAKER CHALK SWINDLE
   & SCHWARTZ PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Phone: (817) 878-0500
Fax: (817) 878-0501

John P. Palmer
Teas Bar No. 15430600
palmer@namanhowell.com
**NAMAN, HOWELL, SMITH & LEE, PLLC**
400 Austin Ave., Suite 800
P.O. Box 1470
Waco, Texas 76703
Phone: (254) 755-4100
Fax: (254) 754-6331

*Counsel for Diamondback Industries, Inc.*

## CERTIFICATE OF SERVICE

I certify that on June 5, 2019, I served the foregoing document on all counsel of record via the Court's ECF system and /or via email.

/s/ *David A. Skeels*
David A. Skeels

DM#404535

---