**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:19-CV-00034-ADA** |
| | § | **(Consolidated with 6:19-CV-00036-ADA)** |
| **REPEAT PRECISION, LLC; NCS** | § | |
| **MULTISTAGE, LLC; NCS** | § | |
| **MULTISTAGE HOLDINGS, INC.;** | § | |
| **GARY MARTIN; GRANT MARTIN;** | § | |
| **AND ROBERT NIPPER,** | § | |
| | § | |
| *Defendants*. | § | |

---

**RESPONSE IN OPPOSITION TO DIAMONDBACK'S MOTION TO DISMISS**
**REPEAT PRECISION'S PATENT INFRINGEMENT CLAIM FOR LACK OF**
**SUBJECT MATTER JURISDICTION**

---

W. Scott Hastings
   Texas State Bar No. 24002241
   *shastings@lockelord.com*
Charles E. Phipps
   Texas State Bar No. 00794457
   *cphipps@lockelord.com*
Susan E. Adams
   Texas State Bar No. 24059354
   *suadams@lockelord.com*
Anna K. Finger
   Texas State Bar No. 24105860
   *anna.k.finger@lockelord.com*

LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201
(214) 740-8000 Telephone
(214) 740-8800 Facsimile

**ATTORNEYS FOR REPEAT PRECISION, LLC,**
**NCS MULTISTAGE HOLDINGS, INC., NCS**
**MULTISTAGE, LLC AND ROBERT NIPPER**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

A.     Diamondback Granted Repeat Precision the Exclusive Right to Make a Combined Device Consisting of a Bridge Plug and Disposable Setting Tool in March 2018. ............ 2

B.     By an Amendment Effective May 30, 2018, the Parties Expanded Repeat Precision's Exclusive Rights to Include the Entirety of the '035 Patent. ........................... 3

C.     Diamondback Filed Suit in an Attempt to Renegotiate the License. .................................. 5

STANDARDS OF REVIEW ................................................................................................ 6

A.     The Legal Standard for Reviewing Diamondback's Motion to Dismiss. ........................... 6

B.     The Standing Requirements to Sue for Patent Infringement ............................................... 7

C.     Relevant Texas Contract Interpretation Principles. ........................................................... 8

ARGUMENT ..................................................................................................................... 10

A.     Repeat Precision Holds an Exclusive License Under the '035 Patent that Is Exclusive as to Diamondback Too Within the Licensed Territory. .................................. 10

        1.     The Granting Clause in Paragraph 2 Conveyed Broad Rights to Repeat Precision, as Reflected by the Use of the Word "Exclusive." ............................... 10

        2.     The Licensed Products Definition Covers the Disposable Setting Tool that Is the Invention in the '035 Patent, and Does Not Reserve Rights to Diamondback. ....................................................................................................... 11

        3.     Bryan Garner Cannot Alter the Plan Language of the License. ........................... 15

B.     As the Holder of an Exclusive License, Repeat Precision Has Constitutional Standing. ......................................................................................................................... 17

C.     Prudential Standing Requirements Are Also Satisfied. .................................................... 17

D.     Alternatively, the Question of Standing Should Be Deferred to the Trial on the Merits. ............................................................................................................................ 19

CONCLUSION .................................................................................................................. 20

CERTIFICATE OF SERVICE .......................................................................................... 22

## <u>INDEX OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abbott Labs. v. Diamedix Corp.*,
   47 F.3d 1128 (Fed. Cir. 1995)..................................................................................8, 18, 19

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*,
   604 F.3d 1354 (Fed. Cir. 2010)..........................................................................................18

*Apache Deepwater, LLC v. McDaniel Partners, Ltd.*,
   485 S.W.3d 900 (Tex. 2016)..................................................................................................8

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
   434 F.3d 1336 (Fed. Cir. 2006)..........................................................................................18

*AsymmetRx, Inc. v. Biocare Medical LLC*,
   582 F.3d 1314 (Fed. Cir. 2009)......................................................................................8, 19

*Clark v. Tarrant County, Texas*,
   798 F.2d 736 (5th Cir. 1986) .....................................................................................6, 7, 19

*David J. Sacks, P.C. v. Haden*,
   266 S.W.3d 447, 450 (Tex. 2008).........................................................................................9

*Dreamlite Holdings Ltd. v. Kraser*,
   705 F. Supp. 98, 102 (E.D.N.Y. 1988) ...............................................................................11

*Evident Corp. v. Church & Dwight Co., Inc.*,
   399 F.3d 1310 (Fed. Cir. 2005)....................................................................................7, 8, 18

*Gensetix, Inc. v. Baylor College of Medicine*,
   354 F. Supp. 3d 759 (S.D. Tex. 2018) .................................................................................8

*Independent Wireless Telegraph Co. v. Radio Corp. of America*,
   269 U.S. 459 (1926)...............................................................................................................8

*Intellectual Property Development, Inc. v. TCI Cablevision of California*,
   248 F.3d 1333 (Fed. Cir. 2001).................................................................................7, 17, 18

*InternetAd Systems LLC v. Opodo Ltd.*,
   481 F.Supp.2d 596 (N.D. Tex. 2007) ................................................................................11

*Kona Tech. Corp. v. S. Pac. Transp. Co.*,
   225 F.3d 595 (5th Cir. 2000) ...............................................................................................9

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)......................................................................................................7, 8

*Littlefield v. Perry*,
    88 U.S. 205 (1874).....................................................................................................11, 18

*M2 Tech. Inc. v. M2 Software Inc.*,
    589 Fed. Appx. 671 (5th Cir. 2014)..................................................................................19

*Morrow v. Microsoft Corp.*,
    499 F.3d 1332 (Fed. Cir. 2007).....................................................................................8, 18

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)......................................................................9, 10

*Prima Tek II LLC v. A-Roo Co.*,
    222 F.3d 1372 (Fed. Cir. 2000)........................................................................................19

*Propat Intern. Corp. v. Rpost, In*c.,
    473 F.3d 1187 (Fed. Cir. 2007)..............................................................................8, 17, 18

*Research Frontiers, Inc. v Marks Polarized Corp.*,
    290 F. Supp. 725 (E.D.N.Y. 1968) ...................................................................................11

*Sanofi S.A. v. Med-Tech Veterinarian Prods., Inc.*,
    565 F. Supp. 931, 937 (D.N.J. 1983) ...............................................................................11

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*,
    137 S. Ct 954 (2017) .........................................................................................................6

*Spine Sol'ns, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
    620 F.3d 1305 (Fed. Cir. 2010)........................................................................................10

*Stem v. Gomez*,
    813 F.3d 205 (5th Cir. 2016) ...........................................................................................20

*Textile Productions, Inc. v. Mead Corp.*,
    134 F.3d 1481 (Fed. Cir. 1998)...............................................................................8, 10, 18

*U.S. Valves, Inc. v. Dray*,
    212 F.3d 1368 (Fed. Cir. 2000)........................................................................................11

*URI, Inc. v. Kleberg Cty.*,
    543 S.W.3d 755 (Tex. 2018).................................................................................9, 12, 13

*Warner-Lambert Co. v. Teva Pharm. USA, Inc.*,
    418 F.3d 1326 (Fed. Cir. 2005)........................................................................................14

*Waterman v. Mackenzie*,
    138 U.S. 252 (1891).....................................................................................................11, 18

iv

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ................................................................................................10

*WiAV Sol'ns LLC v. Motorola, Inc.*,
    631 F.3d 1257 (Fed. Cir. 2010)............................................................................7, 18

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ................................................................................19

## STATUTES AND RULES

35 U.S.C. §286........................................................................................................6

Fed. R. Civ. P. 12(b)(1)......................................................................................6, 19

Fed. R. Civ. P. 12(b)(6).........................................................................................20

Fed. R. Civ. P. 56..................................................................................................20

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY, *Exclusive* (11th ed. 2019)................................................11

BLACK'S LAW DICTIONARY, *License* (11th ed. 2019)..................................................11

BLACK'S LAW DICTIONARY, *Right* (11th ed. 2019) ....................................................11

D. Patrick O'Reilley and D. Brian Kacedon, DRAFTING PATENT LICENSE
    AGREEMENTS (8th ed. 2015) ................................................................................13

## INTRODUCTION

Repeat Precision, LLC ("Repeat Precision") sued Diamondback Industries, Inc. ("Diamondback") for patent infringement and for breach of the license under which Diamondback granted Repeat Precision the exclusive rights under U.S. Patent No. 9,810,035 B1 (the "'035 Patent") to make and sell disposable setting tools in the licensed territory, including the United States.  Diamondback's motion to dismiss challenges Repeat Precision's standing to sue for patent infringement, but embedded within that motion is a fundamental question regarding the scope of the rights granted to Repeat Precision under the license.  Contrary to what Diamondback argues, the license grants exactly what it says—exclusive rights to the "electric wireline setting tool," which Diamondback's CEO, Derrek Drury, admits is the invention covered by the '035 Patent. Drury Dep. 66:16-68:8.  Diamondback did not reserve the right to practice the '035 Patent.  Thus, Diamondback's motion is built on a faulty foundation and should be denied.

Diamondback's motion also fails because Repeat Precision easily satisfies the requirements for constitutional and prudential standing to assert patent infringement claims. Because Diamondback is acting in violation of Repeat Precision's exclusive rights under the '035 Patent, Repeat Precision has constitutional standing to seek redress for the injury it has suffered. Prudential standing requirements are also met because, among other things, Diamondback is a party to this case.  By focusing on whether Repeat Precision was granted "substantially all rights" under the '035 Patent, Diamondback is using the wrong analysis.  At a minimum, because of the overlap between Diamondback's standing challenge and the merits of the underlying claim, the issue Diamondback has raised is more appropriately addressed during the trial on the merits.

1

# BACKGROUND

**A.** **Diamondback Granted Repeat Precision the Exclusive Right to Make a Combined Device Consisting of a Bridge Plug and Disposable Setting Tool in March 2018.**

Diamondback and Repeat Precision entered into a Patent License Agreement on March 16, 2018 (the "Original License"), under which Diamondback granted Repeat Precision: "an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or expert Licensed Products in the Territory." Ex. A-1 at ¶2. "Licensed Patents" was defined to include the '035 Patent. Ex. A-1 at ¶1. The "Territory" means the United States, Mexico, Argentina, China, Russia, and any other territory agreed to by the parties. Ex. A-1 at ¶1. Accordingly, to understand the scope of Repeat Precision's rights under the granting clause, the focus quickly turns to the meaning of the words "Licensed Products." Because there are no other provisions in the Original License reserving any rights to Diamondback, to prevail, Diamondback must establish that it reserved rights in the '035 Patent in the definition of "Licensed Products."

The Original License defined the "Licensed Products" as:

> a bridge plug that is coupled with the Company or its Affiliates' isolation tool used for well completions and any other products that may be agreed upon in writing by Licensor and Licensee from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where a Valid Claim exists.

Ex. A-1 at ¶1. Frac plugs are a type of bridge plug. *See* Drury Dep. at 27:8-27:9. And all parties agree that the phrase "isolation tool used for well completions" refers to the disposable setting tool.

At the time that Diamondback entered into the Original License, Diamondback was not making or selling a product that combined a bridge plug with the disposable setting tool. Drury Dep. at 39:10-39:15, 118:22-118:25. Although Diamondback previously made frac plugs, it sold that line of business in 2017, under an agreement with a non-compete provision, and did not intend to reenter that line of business. Drury Dep. at 39:16-41:1; Ex. 18. And since entering into the

2

Original License, Diamondback has not even attempted to reenter the frac plug business.  Drury Dep. at 39:10-39:15.

In the Original License, Repeat Precision and Diamondback agreed on four things.  First, Repeat Precision had the exclusive right to make and sell the combined product consisting of a bridge plug coupled with the disposable setting tool.  Second, Diamondback did not have the right to make that combined product, nor did it intend to do so.  Third, Diamondback retained the right to make and sell its disposable setting tools as a standalone product.  This reservation of rights to Diamondback was accomplished by limiting the scope of the Licensed Products to "a bridge plug that is coupled with the Company or its Affiliates' isolation tool used for well competitions."  And fourth, Repeat Precision did not have the right to make or sell the disposable setting tool as a standalone product.  Accordingly, Diamondback had no need or reason to include express reservations of rights under the '035 Patent because it had granted Repeat Precision only limited rights under the '035 Patent to make and sell a product Diamondback had no interest or intent on selling—the combined bridge plug with the disposable setting tool.

## B.    By an Amendment Effective May 30, 2018, the Parties Expanded Repeat Precision's Exclusive Rights to Include the Entirety of the '035 Patent.

Soon after entering into the Original License, but prior to Repeat Precision investing millions to expand its manufacturing facilities to greatly ramp up production of disposable setting tools, the parties began discussions to expand the scope of exclusive rights granted to Repeat Precision, which in turn, gave Diamondback the right to receive more royalties and the opportunity to sell more of its Eliminator power charges. Power charges are used to operate the disposable setting tool, including when it is combined with a bridge plug.

On April 11, 2018, Repeat Precision sent its first proposal for an amended license to Derrek Drury, entitled the Amended and Restated Patent License Agreement (the "April 11 Draft").

3

Ex. 37.  In the April 11 Draft, Repeat Precision proposed changing the definition of "Licensed Products" by replacing the phrase "a bridge plug that is coupled with the Company or its Affiliates' isolation tool" with the phrase "an electric wireline setting tool."  Ex. A-37 at ¶2.  This change would expand the definition of "Licensed Products" to include the disposable setting tool itself, which encompasses the entirety of the '035 Patent.  The April 11 Draft did not propose changing any other language in the "Licensed Products" definition, nor did it propose any language reserving any rights to Diamondback to practice the '035 Patent.

Diamondback took its time when responding to the proposed April 11 Draft, enlisting assistance from four lawyers who have combined over 100 years of experience.  Exs. A-38, A-39, A-40, A-110, A-111; Drury Dep. at 140:2-142:8; Russell Dep. at 14:5-14:9, 71:16-74:3.  Almost a month later, on May 17, 2018, Diamondback submitted a counter-proposal, entitled Amended and Restated Patent and Know-How License Agreement (the "May 17 Draft"), that would have greatly re-written the Original License.  Ex. A-40.  Diamondback's May 17 Draft proposed, among other things, a completely re-written definition of "Licensed Products," a granting clause that eliminated the word "exclusive" (*see* ¶2.1), an express reservation to Diamondback of its right to practice the '035 Patent (*see* ¶2.2), and a detailed explanation of the "limited" exclusive rights granted to Repeat Precision (*see* ¶2.3).

Repeat Precision did not accept the May 17 Draft.  Instead, it presented Derrek Drury with a draft of the Amendment to Patent License Agreement and Right of First Refusal Agreement (the "Amended License") at a lunch in Fort Worth on May 22, 2018.  Ex. A-2; Drury Dep. at 143:14-144:9.[1]  (Hereinafter, "License" shall refer to the Original License, as amended by the Amended

---

[1]   Diamondback's Second Amended Complaint incorrectly alleges that this lunch occurred on May 28, 2018.  *See* ECF 61 at ¶47.

License).  The Amended License defined "Licensed Products" as:

> an electric wireline setting tool used for well competitions and any other products that may be agreed upon in writing by Licensor and Licensee from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where a Valid Claim exists.

Ex. A-2 at ¶2.1.  This definition of "Licensed Products" is identical to the one proposed in the April 11 Draft.  *Compare* Ex. A-37 at ¶2 *with* Ex. A-2 at ¶2.1.  The Amended License did not change the granting clause, nor did it add the reservation of rights proposed in the May 17 Draft.

Diamondback accepted the Amended License by returning a signed copy to Repeat Precision on June 4, 2018.[2]  Ex. A-41; Drury Dep. at 143:1-143:3.  Thus, Diamondback had almost two weeks to review the Amended License before Drury delivered the signed copy to Repeat Precision.  Moreover, Diamondback knew about Repeat Precision's proposed amendment to the "Licensed Products" definition for over 1.5 months before agreeing to it.  *See* Ex. A-37 at ¶2.

## C.     Diamondback Filed Suit in an Attempt to Renegotiate the License.

After entering into the Amended License, the parties continued discussions over an acquisition of Diamondback.  On June 27, 2018, one of Repeat Precision's owners, NCS Multistage, entered into a non-binding letter of intent to purchase Diamondback.  Ex. A-3.  In August 2018, however, NCS elected not to move forward with the transaction.  Drury Dep. at 152:1-152:8.  Thereafter, Drury tried to get other entities interested in purchasing Diamondback, including DMC Global and Hunting-Titan.  Drury Dep. at 208:19-208:25, 234:1-239:20.  When those entities declined, Drury turned his attention back to Repeat Precision, filing suit in Fort Worth on November 2, 2018 seeking to cancel the License it voluntarily granted to Repeat Precision.  Before filing suit, Drury never told Repeat Precision, Gary Martin, or the other

---

[2]     Diamondback's motion erroneously says that the Amended License was signed "six weeks" after the Original License.  *See* Motion at 12.

Defendants in this case that he thought (a) Diamondback had been lied to, (b) Defendants had misappropriated Diamondback's trade secrets, or that (c) the License was invalid.  Drury Dep. at 22:4-22:16, 152:1-152:11.  Instead, he just filed suit.  Drury Dep. at 22:4-22:16.

On November 25, 2018, Repeat Precision filed its patent infringement and breach of contract claims against Diamondback, seeking to enforce the plain language of the License. Although Diamondback complains that Repeat Precision waited six months before filing suit, *see* Motion at 2-3, Diamondback ignores the fact that Repeat Precision asserted its claim well within the six-year statute of limitations for patent infringement claims.  *See* 35 U.S.C. §286; *see also SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct 954 (2017) (rejecting attempt to shorten limitations period by invoking equitable defense of laches).  Moreover, the License expressly provides that "no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof." Ex. A-1 at ¶13.12.  Diamondback's reliance on post-contracting events cannot alter the party's rights under the plain language of the License.  Ex. A-1 at ¶13.12 ("This Agreement may only be amended, modified, or supplemented by agreement in writing signed by each party hereto.").

## STANDARDS OF REVIEW

### A.    The Legal Standard for Reviewing Diamondback's Motion to Dismiss.

Diamondback filed its current motion under Fed. R. Civ. P. 12(b)(1).  Courts may review a motion to dismiss for lack of subject matter jurisdiction on any one of three grounds:  1) the complaint alone; 2) the complaint supplemented by undisputed facts in the record; or 3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.  *Clark v. Tarrant County, Texas*, 798 F.2d 736, 741 (5th Cir. 1986).  The Court is not required to look beyond the complaint or resolve disputed facts unless it chooses to do so.

However, "where the basis of the federal jurisdiction is also an element of the plaintiff's

federal cause of action, the United States Supreme Court has set forth a strict standard for dismissal for lack of subject matter jurisdiction." *Id*. "Where the factual findings regarding subject matter jurisdiction are intertwined with the merits…the case should not be dismissed for lack of subject matter jurisdiction unless the alleged claim is immaterial or is wholly insubstantial and frivolous." *Id*. at 741-42. "The questions of subject matter jurisdiction and the merits will normally be considered intertwined where the statute provides both the basis of federal court subject matter jurisdiction and the cause of action." *Id*.

**B.    The Standing Requirements to Sue for Patent Infringement**

Although Diamondback has moved to dismiss Repeat Precision's patent infringement claim for lack of standing, Diamondback devotes little attention to the legal requirements to have standing to sue for patent infringement. *See* Motion at 6-7. The doctrine of standing has a constitutional as well as a prudential component. *Evident Corp. v. Church & Dwight Co., Inc*., 399 F.3d 1310, 1313 (Fed. Cir. 2005). "Constitutional standing requires only that a plaintiff must have suffered an injury in fact, that there be a causal connection between the injury and the defendant's conduct, and that the injury be redressable by a favorable court decision." *Id*.; *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). Under the patent laws, the legally protected interests in patents are the exclusionary rights. *WiAV Sol'ns LLC v. Motorola, Inc.,* 631 F.3d 1257, 164 (Fed. Cir. 2010). As a result, "a party holding one or more of those exclusionary rights—such as an exclusive licensee" can be said to suffer a legally cognizable injury from the act of infringement and therefore has standing to sue. *Id*. at 1264-65; *See also Evident Corp*., 399 F.3d at 1314; *Intellectual Property Development, Inc. v. TCI Cablevision of California*, 248 F.3d 1333, 1346-47 (Fed. Cir. 2001).

Prudential standing prevents a party from raising generalized grievances best left to the representative branch, the assertion of another party's rights, or claims where the plaintiff does not

come within the zone of interest to be protected by the statute in question. *Gensetix, Inc. v. Baylor College of Medicine*, 354 F. Supp. 3d 759, 767 (S.D. Tex. 2018); *Lexmark Int'l*, 572 U.S. at 126 & 128.  Under patent law, prudential standing requires that an exclusive licensee that is not the transferee of all substantial rights in the patent must normally join the patent owner. *Propat Intern. Corp. v. Rpost, I*nc., 473 F.3d 1187, 1193 (Fed. Cir. 2007); *See also, Evident Corp.* 399 F.3d at 1314.  However, "[w]hen the patentee is the infringer, or the prudential concerns are not at play in a particular case, joinder of the patentee is not necessary." *Morrow v. Microsoft Corp*., 499 F.3d 1332, 1340 (Fed. Cir. 2007); *Textile Productions, Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) (an exclusive licensee can sue in his own name when "necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself.").

Further, as long as the patent owner is a party to the case, the prudential standing requirement has been satisfied. *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 468 (1926) (if the patentee refuses to join as a co-plaintiff it can be made a party defendant by process); *Evident Corp.*, 399 F.3d at 1314 (patent owner brought in as a third party defendant); *AsymmetRx, Inc. v. Biocare Medical LLC,* 582 F.3d 1314, 1322 (Fed. Cir. 2009) (patentee that does not voluntarily join an action by its exclusive licensee can be joined as a defendant to allow the action to go forward); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995) (allowing patentee to be joined as intervening party).

## C.   Relevant Texas Contract Interpretation Principles.

Texas law governs the interpretation of the License to determine whether it is exclusive. *See* Ex. A-1 at ¶13,14.  Repeat Precision and Diamondback agree that the relevant language in the License is unambiguous.  *See* Motion at 13.  The Texas Supreme Court explains:  "When a contract's meaning is unambiguous, [the Court's] task is to determine the parties' intentions as expressed in the written instrument."  *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*,

485 S.W.3d 900, 906 (Tex. 2016).   The objective intention of the parties as expressed in the contract controls.  *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764 (Tex. 2018).  Contract language should be interpreted according to its "plain, ordinary, and generally accepted meaning."  *Id.* at 765.  A parties' subjective intent, which is unexpressed in the contract's language, is irrelevant. *Id.*

It is well-established that extrinsic evidence should not be considered when construing an unambiguous agreement.  *See, e.g., David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam) ("[P]arol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.").  However, the words used in an agreement must be construed in the context in which they are used:

> [w]ords are simply implements of communication, and imperfect ones at that. Oftentimes they cannot be assigned a rigid meaning, inherent in themselves.  Rather, their meaning turns upon use, adaptation and context as they are employed to fit various and varying situations.  Even a single word can carry subtle—and significant—differences in meaning when applied in different situations.

*URI, Inc.*, 543 S.W.3d at 764 (internal citations and quotations omitted).  "Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass 'the circumstances present when the contract was entered.'"  *Id.* (internal citations omitted).  The "quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean."  *Id.*

When construing terms in an agreement that have an accepted term in the industry and context in which they are used, those terms should be construed according to that established meaning.  *See Kona Tech. Corp. v. S. Pac. Transp. Co.,* 225 F.3d 595, 611 (5th Cir. 2000).  The Federal Circuit similarly recognizes that patents must also be read in context, focusing on the ordinary meaning of the claim terms used by persons skilled in the art of the invention.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  Accordingly, to read a patent

license in context, the Court should focus on the wording of the document as used in reference to patents, and not just how someone might interpret those words in a different context based on selective reliance on dictionary definitions. *See id.* at 1321.

## ARGUMENT

**A.    Repeat Precision Holds an Exclusive License Under the '035 Patent that Is Exclusive as to Diamondback Too Within the Licensed Territory.**

Diamondback's interpretation of the License asks the Court to find the proverbial elephant hidden in a mousehole[3]—here, a reservation of rights to Diamondback in standard form language contained within the "Licensed Products" definition, which serves no such purpose. Rather than trying to find some implicit reservation of rights, however, the proper analysis should focus on the explicit, plain language of the License.[4]

> *1.    The Granting Clause in Paragraph 2 Conveyed Broad Rights to Repeat Precision, as Reflected by the Use of the Word "Exclusive."*

The proper starting point to analyze the scope of Repeat Precision's rights under the License is with the granting clause in Paragraph 2:  "Licensor hereby grants to Licensee and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory."  Ex. A-1 at ¶2. As an exclusive licensee, Repeat Precision received a right to use the invention, "accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave."  *Textile Productions, Inc.*, 134 F.3d at 1484; *Spine Sol'ns, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010).

---

[3]    *See Whitman v. American Trucking Associations,* 531 U.S. 457, 468 (2001).

[4]    Diamondback's expert, Bryan Garner, should not be allowed to testify on the contract interpretation issues currently before the Court for the reasons stated in Repeat Precision's motion to strike.  Nevertheless, even Garner agreed that there is no explicit reservation of rights to Diamondback under the '035 Patent. *See* Garner Dep. at 21:4-21:16 (describing the alleged reservation as being "implicit" based on the interplay between the granting clause and the definition of Licensed Products).

Diamondback concedes that Paragraph 2 appears to be a broad grant of rights to Repeat Precision.  Motion at 1 ("At first glance, the license grant of Section 2 appears to be very broad.").  After all, the meaning of an "exclusive license" like this one is well established:

> A license that gives the licensee the sole right to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else, esp., such a license of a copyright, patent, or trademark right.

BLACK'S LAW DICTIONARY, *License, exclusive license* (11th ed. 2019).[5]  Many judicial decisions support this broad, plain meaning, definition of "exclusive."  *See, e.g., Waterman v. Mackenzie,* 138 U.S. 252, 256 (1891) (finding that an exclusive license to two specific patented machines "excludes all other persons, *even the patentee*, from making, using or vending like machines within the district") (emphasis added); *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1370 (Fed. Cir. 2000) (upholding licensors' liability on a claim asserted by licensee).[6]  As a result, Repeat Precision can exclude Diamondback from engaging in any activity that falls within its exclusive license.

> 2.      *The Licensed Products Definition Covers the Disposable Setting Tool that Is the Invention in the '035 Patent, and Does Not Reserve Rights to Diamondback.*

To determine the full scope of Repeat Precision's license, it is also necessary to review the definition of the Licensed Products subject to the grant of exclusive rights in Paragraph 2.  Repeat Precision received the exclusive right to "an electric wireline setting tool for well completions."

---

[5]     *See also* BLACK'S LAW DICTIONARY, *Exclusive* (11th ed. 2019) ("Limited to a particular, person, group, entity or thing" and "whole; undivided"); BLACK'S LAW DICTIONARY, *Right, exclusive right* (11th ed. 2019) ("A right vested in one person, entity, or body to do something or be protected from something").

[6]     District courts have also recognized that the "patentee has no more right to practice his patent in a field of use where an exclusive license has been given, than does a stranger."  *Sanofi S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 937 (D.N.J. 1983), citing, *Littlefield v. Perry*, 88 U.S. 205, 223 (1874); *InternetAd Systems LLC v. Opodo Ltd.*, 481 F.Supp.2d 596, 606 (N.D. Tex. 2007) (finding the license was exclusive despite lack of use of the term exclusive in the grant language and therefore the licensor "retains no right to personally make, use, offer, or sell the patented invention."); *Dreamlite Holdings Ltd. v. Kraser*, 705 F. Supp. 98, 102 (E.D.N.Y. 1988) (exclusive licensee can sue patentee for infringement within the area of the license); *Research Frontiers, Inc. v Marks Polarized Corp.*, 290 F. Supp. 725, 726 (E.D.N.Y. 1968).

Ex. A-1 at ¶1.  All parties agree that this is the invention that is the subject of the '035 Patent.  *See* Drury Dep. at 66:16-68:8.  Because there is no express reservation of rights to Diamondback to make and sell disposable setting tools, the focus turns to whether the phrase "which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where a Valid Claim exists" creates an implied reservation of rights to Diamondback.  There are many reasons why this is not a reservation of rights to Diamondback.

*First,* the most natural reading of the "Licensed Products" definition is as an identification of the product rights being granted to the Licensee.  The phrasing of this definition would be an awkward way to reserve rights to Diamondback, as the Licensor.  The phrase "which would, but for this Agreement, infringe a Valid Claim" says nothing about reserving rights.  To read an implicit reservation of rights into this phrasing directly conflicts with the plain meaning of the "exclusive" rights that were granted.  If Diamondback wanted to reserve rights to itself in the '035 Patent, it needed to do so expressly, such as it proposed in the May 17 Draft.  And after agreeing to grant "exclusive" rights to Repeat Precision, if Diamondback wanted to reserve rights, it should have negotiated for an express reservation or limitation on the grant.  It defies the plain language of the contract to try to find a significant reservation of rights to Diamondback hidden in a product definition saying nothing at all about reserved rights.

*Second,* when viewed in context when this phrase was adopted in March 2018, *see URI Inc.*, 543 S.W.3d at 764, it is clear that Diamondback was not intending for it to create a reservation of the right to practice the '035 Patent for the products otherwise included within the definition of Licensed Products.  At that time, Diamondback was not making frac plugs, had no intention of making frac plugs, and even had a non-compete preventing it from reentering that business.  Thus, Diamondback had no basis for reserving any rights from the Licensed Products definition in the

Original License.  Given that this phrase was not changed when the Amended License was signed, the only reasonable interpretation is to conclude that the parties did not intend to change its meaning.  Diamondback's arguments seeking to turn this phrase into a reservation of rights are nothing but after-the-fact attempts by lawyers to try to avoid the plain language of the contract their client voluntarily signed.[7]

*Third,* the phrase "which would, but for this Agreement, infringe a Valid Claim" is commonly used in patent licenses, and it has nothing to do with reserving rights to the licensor. *See* D. Patrick O'Reilley and D. Brian Kacedon, DRAFTING PATENT LICENSE AGREEMENTS §12.02 (p. 186) (8th ed. 2015).[8]  That phraseology has the same meaning as a clause stating: "Licensed Products means any and all products that employ or are produced by the practice of inventions claimed in the Licensed Patents." *Id.*  The phrase is broad and "clearly exhausts the scope of the licensed monopoly." *Id.* (p.185).  When drafting exclusive patent licenses, the licensor must create an express reservation of its right to practice because, "in the absence of an express contractual reservation, it does not exist, either by implication or otherwise." *Id.* at §4.03(D) (p.68-69); *see also id.* at §13.00(A) (p. 190) (explaining that "No such [reservation] rights are implied in an unequivocal exclusive grant, and they must therefore be expressed.").

Further illustrating this point, the phrasing "which would, but for this Agreement, infringe a Valid Claim" also appears in the Practical Law Intellectual Property & Technology standard "pro-licensee" form contract available on Westlaw.  *See* Ex. E-2 at ¶1.  The drafters of that form explain that this language represents a "common approach" to patent licensing, which "is to define

---

[7]   Instead of focusing on the circumstances existing at the time when the parties agreed on the language at issue, Diamondback offers extrinsic evidence of Derrek Drury's subjective intent regarding the License, as well as evidence of subsequent events.  That evidence is inadmissible for purposes of interpreting what the parties agreed upon when their language was adopted.  *See URI, Inc.*, 543 S.W.3d at 757-58, 763-64.  Accordingly, Repeat Precision is filing a motion to strike Diamondback's inadmissible extrinsic evidence.

[8]   Excerpts from DRAFTING PATENT LICENSE AGREEMENTS are included as Exhibit 1 to the Hastings Declaration.

the licensed product by the scope of the valid claims in the licensed patents."  Ex. E-3 at ¶1
(drafting note on "Licensed Products").  This phrasing "logically" defines the products in a way
that correlates with the obligation to pay royalties.  *Id.*  This language has nothing to do with
reserving rights to the licensor.  Indeed, the Practical Law form license addresses "exclusivity,"
"exclusive licenses," "sole licenses" and "reservations" in a different section of the form—the
granting clause in Paragraph 2.  Ex. E-3 at ¶2 (drafting notes).[9]

*Fourth,* many universities, including Harvard, Yale, Cornell, Rochester, U.C. Davis, and
the University of Michigan, use similar phrasing in their form technology licenses, which are
published on the Internet.  *See* Exs. E-4 – E-9.  In each instance, the university proposes a Licensed
Products definition with similar phrasing defining the products by reference to the valid claims of
the licensed patent.  But unlike what Diamondback did here, the universities continue by expressly
reserving certain rights to practice the patents.  *See* Exs. E-4 – E=9.  The U.S. Department of
Veterans Affairs has also used a similar form.  *See* Ex. E-10.  This is further evidence of the
practices and customs of patent licenses, illustrating how to create reservations if that was
intended.

*Finally*, Diamondback is reading far too much into the "infringe a Valid Claim" language
in the Licensed Product definition.  To determine whether a product would "infringe a Valid
Claim," simply means to compare the product to the properly construed claims to determine if the
product contains each and every limitation of a claim, either literally or under the doctrine of
equivalents.  *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir.
2005).  The most natural reading of this language in terms of the License as a whole is as a means

---

[9]    Notably, the Practical Law form explains that an "exclusive license" "grants the rights to the licensee to the
exclusion of all others, including the licensor." Ex. E-3 at ¶2 (drafting notes). The drafters continue by explaining
that, if a *licensor* wants to reserve rights to itself, it creates a "sole license." *Id.* The way to do this is "by
specifically reserving rights for itself under the licensed patents." *Id.*

to identify the products subject to Repeat Precision's obligations to pay royalties, given that the royalty obligation under Paragraph 4.2 applies only to Licensed Products sold by the Licensee. Without this limiting phrase, Repeat Precision arguably would be required to pay royalties on all electric wireline setting tools it sells (now or in the future), including the conventional-style tools or new innovative tools in the future that operate via electric wireline.  With this limiting phrase, by contrast, Diamondback is paid royalties only on disposable setting tools practicing the claims of the '035 Patent.  Thus, this phrase ensures that Diamondback is paid value for its invention, but does not get paid for other people's inventions.  This phrasing would be a very awkward and unusual way to reserve rights to make and sell products by the Licensors out of an otherwise exclusive grant.

        3.       *Bryan Garner Cannot Alter the Plan Language of the License.*

Diamondback has retained Bryan Garner to interpret the plain language of the License. Garner's testimony should excluded because it improperly invades the role of the Court to construe the unambiguous language of the License.  *See* Garner Dep. at 24:8-26:10 (admitting that the disputed language is unambiguous).  Garner has had his opinion testimony excluded on this basis at least three or four times before.  *Id.* at 45:8-46:30, 47:13-48:4.  But even if Garner's testimony were allowed, there are several reasons why it does not help Diamondback's position.

First, Garner admitted that contract language is fixed when adopted and must be interpreted as of the date when agreed upon by the parties.  *Id.* at 26:15-27:18.  Garner also admitted that, for purposes of his analysis, he drew no opinions based on the differences between the Licensed Products definitions in the Original License and the Amended License.  *Id.* at 92:5-93:12.  Thus, the proper time period to analyze is March 16, 2018, when the License was signed.

Second, Garner formed his opinion without an understanding regarding the underlying products at issue, such as a "bridge plug," "wireline device," or "setting tool."  *Id.* at 57:3-58:8.

And when Diamondback asked Garner to assume facts for purposes of his opinion, Diamondback did not disclose that it was no longer in the plug business, and had a non-compete precluding it from reentering that market.  *See id.* at 93:13-94:7 (confirming the list of factual assumptions provided to him).  Without a full understanding of the context, Garner rendered an opinion that had Diamondback reserving a right under the Original License that it had previously conveyed away—the right to make a product including a frac plug.  This alone is a strong indicator of an error in the analysis.  Indeed, Garner admitted that contemporaneous facts could be relevant to buttress his interpretation, *id.* at 60:7-61:16, yet Diamondback did not share the actual contemporaneous facts with Garner at the time the License was signed in March 2018.

Third, Garner admitted that he is not a patent lawyer, and had not conducted any analysis of whether the disputed language in the Licensed Products definition was standard form language in patent licenses.  *Id.* at 68:1-68:3, 69:8-70:11, 72:24-73:10.  Thus, he rendered his opinions without an understanding as to whether the phrase "which would, but for this Agreement, infringe a Valid Claim" had acquired a standard usage or meaning for patent licenses.  *Id.*

Fourth, Garner concluded that, because of the wording of the Licensed Products definition in the License, it was unnecessary for Diamondback to seek any additional language reserving rights to practice the '035 Patent.  *Id.* at 19:23-21:3.  Such a reservation would be redundant.  *Id.* Garner formed this conclusion without having the benefit of the parties' negotiations and drafts over the expansion of the Licensed Products definition, during which Diamondback unsuccessfully requested significant changes to the language of the License to expressly reserve rights to Diamondback.  *See Id.* at 37:1-39:1, 98:3-98:24; *see, e.g.,* Ex. A-40.  Garner also formed his opinions without the benefit of industry guidance, including the form documents showing that parties regularly request express reservations when using Licensed Products definitions similar to

the one contained in the License.  *See* Exs. E-1 – E-7.

Finally, although Garner agreed with the general proposition that it is inappropriate to add words into a contract that are not there when interpreting it, *see* Garner Dep. 29:8-29:13, Garner also admitted that the alleged reservation of rights to Diamondback was only "implicit" in the interplay between the granting clause and definition of Licensed Products.  *Id.* at 21:4-21:16.  In contrast to what Garner believes is implicit in the contractual language, the License conveyed express, broad rights by granting "exclusive" rights to Repeat Precision.  *Id.* at 12:14-14:2.  Garner recognizes the breadth and meaning of the grant of exclusive rights.  *Id.* at 14:4-18:14.  He also recognized that the License appeared at first glance to convey "very broad," exclusive rights to Repeat Precision.  *See* Motion at 1-2 (citing Garner).  This should have been the beginning and end of the analysis.  This is the plain, natural, and generally understood meaning of the language used in the License.[10]

**B.    As the Holder of an Exclusive License, Repeat Precision Has Constitutional Standing.**

Although Diamondback's motion challenges whether Repeat Precision has standing to sue, Diamondback glosses over the standard for determining whether constitutional standing exists.  There is no question that Repeat Precision has constitutional standing to sue to protect its exclusive rights under the '035 Patent.  *See Intellectual Property Development,* 248 F.3d at 1347; *see also Propat. Intern. Corp.*, 473 F.3d at 1193 ("exclusive licensee has a sufficient interest in the patent to have standing to sue under Article III of the Constitution.").

**C.    Prudential Standing Requirements Are Also Satisfied.**

Rather than addressing constitutional standing to sue, Diamondback's motion is actually a

---

[10]    Although Garner admitted that he has never researched the issue of whether a licensee may sue a patent holder for infringement, Garner's opinions may have been influenced by his belief that it would be absurd to recognize such a right.  Garner Dep. at 114:3-114:24.

challenge to whether Repeat Precision meets the requirements for prudential standing.  Prudential standing generally requires the licensee to join the patent owner as a party.[11]  This is to avoid "the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer."  *Morrow*, 499 F.3d at 1340.[12]  There is an exception to this requirement to join the patent owner in cases where the exclusive licensee can show that it received a transfer of "all substantial rights" to a patent, such that it is an assignee of the patent with the sole right to sue for infringement.  *See Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1358-59 (Fed. Cir. 2010); *Propat Intern. Corp.*, 473 F.3d at 1193.

The United States Supreme Court has also found an exception to the prudential standing requirement in cases where (as here) the patent owner is the infringer.  *Waterman*, 138 U.S. at 255; *Littlefield*, 88 U.S. at 223.  The Federal Circuit has similarly found that when "the patentee is the infringer, or the prudential concerns are not at play in the particular case, joinder of the patentee is not necessary."  *Morrow*, 499 F.3d at 1340; *Intellectual Property Development, Inc.*, 248 F.3d at 1348; *Textile Productions, Inc.*, 134 F.3d at 1484. Thus, because Repeat Precision is suing the owner of the '035 patent for infringement of that patent, it satisfies this exception to the prudential standing requirement.

Moreover, as long as the patentee is a party to the suit, it does not matter whether they are a plaintiff, defendant, intervener or third party defendant.  *Intellectual Property Development, Inc.*, 248 F.3d at 1347 (patentee joined as a plaintiff); *Abbott*, 47 F.3d at 1131 & 1133 (patentee allowed to intervene in the suit); *Evident Corp.*, 399 F.3d at 1314 (patentee brought in as a third party defendant); *WiAv Sol'ns LLC*, 631 F.3d at 1265 n.1 (patentee brought into the case as the

---

[11]   Paragraph 6.2 of the License is consistent with this rule in that Repeat Precision had the right to sue third party infringers, including the right to join Diamondback as a party when necessary.  *See* Ex. A-1 at ¶6.2.

[12]   Similarly, an exclusive licensee is a necessary party that must be joined in an infringement suit instituted by the patentee.  *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1344 (Fed. Cir. 2006).

"defendant patent owner").  Here, there is no dispute that the patentee Diamondback is a party to this suit.  Thus, even if Repeat Precision did not acquire all substantial rights under the '035 patent, it has still satisfied the prudential standing requirement by joining Diamondback as a party.[13]

**D.      Alternatively, the Question of Standing Should Be Deferred to the Trial on the Merits.**

Although Repeat Precision believes the plain language of the License and the undisputed facts developed to date are sufficient for the Court to hold that Repeat Precision has established its standing to sue for patent infringement, the Court may also choose to defer this issue to the trial on the merits.  A dismissal for lack of standing would be improper at this stage of the proceeding. *See M2 Tech. Inc. v. M2 Software Inc.*, 589 Fed. Appx. 671, 676 (5th Cir. 2014) (holding that question whether a party was entitled to sue for trademark infringement was a question to be decide on the merits, and not as a question of subject matter jurisdiction).

In cases "where the basis of the federal jurisdiction is also an element of the plaintiff's federal cause of action, the United States Supreme Court has set forth a strict standard for dismissal for lack of subject matter jurisdiction." *Clark*, 798 F.2d at 741.   "Where the factual findings regarding subject matter jurisdiction are intertwined with the merits…the case should not be dismissed for lack of subject matter jurisdiction unless the alleged claim is immaterial or is wholly insubstantial and frivolous." *Id*. at 741-42.  "This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of its claim." *Williamson v. Tucker*, 645 F.2d 404, 415-16 (5th Cir. 1981).

---

[13]   "As a general rule [the Federal Circuit] continues to adhere to the principle set forth in *Independent Wireless* that a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee." *Prima Tek II LLC v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000); *AsymmetRx, Inc.*, 582 F.3d at 1319 (noting the action could still proceed even if the patentee does not voluntarily join it); *Abbott Labs.*, 47 F.3d at 1131 & 1133 (license may make the patentee a party defendant by process).

The proper way to challenge jurisdiction under such circumstances is by a Rule 12(b)(6) motion (where the court must take the plaintiff's allegations as true) or on a summary judgment motion under Rule 56 (where the court must determine that no genuine issue of material fact exists). *Id.* Diamondback has not filed its challenge under either of the proper procedures because, when the allegations and facts are viewed in Repeat Precision's favor (as they must be in connection with a motion under Rule 12(b)(6) or Rule 56, respectively), Diamondback's challenge is doomed to failure.

Here, the issue of standing and the merits of Repeat Precision's patent infringement claims are intertwined. Indeed, after arguing why Diamondback believes that Repeat Precision lacks standing to sue, *see* Motion at 10-13, Diamondback continues by arguing that the patent infringement claims fail on the merits too for the exact same reasons, *see id.* at 19-20. Diamondback's argument that the Court could rule either that there is a lack of standing or that there is no infringement based on the same factual argument evidences that the factual findings regarding standing and the merits are clearly intertwined. This is precisely the type of situation that should be resolved at the merits stage of the case, and not on a preliminary motion challenging jurisdiction. *See Stem v. Gomez*, 813 F.3d 205, 210 (5th Cir. 2016).

## **CONCLUSION**

For the foregoing reasons, Diamondback's motion to dismiss should be denied.

Respectfully Submitted,

*/s/ W. Scott Hastings*
W. Scott Hastings
  Texas State Bar No. 24002241
  *shastings@lockelord.com*
Charles E. Phipps
  Texas State Bar No. 00794457
  *cphipps@lockelord.com*
Susan E. Adams
  Texas State Bar No. 24059354
  *suadams@lockelord.com*
Anna K. Finger
  Texas State Bar No. 24105860
  *anna.k.finger@lockelord.com*

LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 Telephone
(214) 740-8800 Facsimile

**ATTORNEYS FOR REPEAT PRECISION, LLC, NCS MULTISTAGE, LLC, NCS MULTISTAGE HOLDINGS, INC., AND ROBERT NIPPER**

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2019, I served the foregoing notice on all counsel of record

via the Court's ECF system.

Decker A. Cammack
Mack Ed Swindle
David A. Skeels
Whitaker Chalk Swindle & Sawyer
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0500

John P. Palmer
Naman Howell Smith & Lee
P.O. Box 1470
Waco, Texas 76703-1470
Telephone: (254) 755-4100

J. Hoke Peacock, III
Shawn L. Raymond
Krisina J. Zuniga
Susman Godfrey L.L.P.
1000 Louisiana, Suite 1000
Houston, Texas 77002
Telephone: (713) 653-7808

J. Mitchell Little
Scheef & Stone, L.L.P.
2600 Network Blvd., Ste. 400
Frisco, Texas 75034
Telephone: (214) 472-2100

*/s/ W. Scott Hastings*
W. Scott Hastings