IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DIAMONDBACK INDUSTRIES, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| REPEAT PRECISION, LLC; NCS | § | CASE NO. 6:19-CV-00034-ADA |
| MULTISTAGE, LLC; NCS | § | |
| MULTISTAGE HOLDINGS, INC.; | § | |
| GARY MARTIN, GRANT MARTIN; | § | |
| and ROBERT NIPPER | § | |
| | § | |
| *Defendants.* | § | |

**Defendants' Joint Original Answer and Affirmative Defenses to Diamondback's
Second Amended Complaint, and Repeat Precision's Counterclaim**

Defendants Repeat Precision, LLC ("Repeat Precision"), NCS Multistage, LLC ("NCS Multistage"); NCS Multistage Holdings, Inc. ("NCS Holdings");[1] Gary Martin; Grant Martin; and Robert Nipper (collectively, "Defendants") answer Plaintiff Diamondback Industries, Inc.'s ("Diamondback") Second Amended Complaint (the "SAC," Dkt. 61) as follows:

**Introduction**

Diamondback fails—for the third time—to state a claim against Defendants over a potential acquisition that NCS decided against pursuing while conducting due diligence. Diamondback not only sues NCS Multistage, the potential buyer, but also its parent (NCS Holdings), subsidiary (Repeat Precision), and three individuals involved (Gary Martin, his son Grant Martin, and NCS's CEO Robert Nipper). Diamondback's SAC—as well as discovery—demonstrate that Diamondback lacks support for any of the 14 causes of action it brings:

---

[1] NCS Multistage and NCS Holdings may be referred to collectively herein as "NCS."

1.     <u>Fraud / Fraud by Nondisclosure / Fraudulent Inducement</u>.   Diamondback's fraud causes of action against Defendants are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  *See Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (holding that Rule 9(b) requires the plaintiff to "specify the statement contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent"); *see also Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) ("[S]imple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)."). Diamondback once again fails to satisfy the Rule 9(b) pleading requirements.

Diamondback's allegations focus on one speaker: Gary Martin.  SAC ¶¶ 107–121. Diamondback alleges that Gary Martin made false representations in a phone call on February 8, 2018, in person at Diamondback's facilities on February 19, 2018, and "on July 5, 2018 and continuing thereafter."  SAC ¶¶ 110-112.  With respect to the remaining individual defendants, Grant Martin and Nipper, whose actions form the bases for the companies' alleged liability, Diamondback points broadly to their "fail[ure] to disclose material facts."  SAC ¶¶ 119–121. Diamondback does not identify the material facts Grant Martin and Nipper failed to disclose, when they were supposed to disclose them (beyond a broad reference to interactions with Drury "between March and September, 2018"), or, most importantly, the source of this alleged duty to disclose.  Diamondback has no support for its fraud by nondisclosure claims.  *See Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1035 (5th Cir. 2010) ("A defendant's failure to disclose information will support a claim for fraud only where the defendant has a duty to disclose. . . . [T]here is no general duty to disclose."); *see also* Dkt. 44 at 9–10.

Regarding Gary Martin, Diamondback summarizes his alleged misrepresentations from February 2018 in SAC ¶ 110, alleging he misrepresented that "(1) he owned Repeat Precision, (2)

Repeat Precision was developing its own short setting tool, (3) Repeat Precision could design around [Diamondback's] patent, (4) Repeat Precision had international manufacturing capacity, (5) Repeat Precision would purchase and promote Diamondback's power charges, and (6) Repeat Precision intended to purchase Diamondback."  SAC ¶ 110.  In his deposition, however, Drury admitted that this initial call with Gary Martin was "very brief" and was "to set up a meeting" at Diamondback to discuss the disposable setting tools.  Drury Dep. at 111:12-112:10.  Before the call, Drury did not know who Gary Martin was.  *Id.* at 112:8-10.  And during the call, they did not discuss the possibility of licensing the tool.  *Id.* at 112:21-25.  Accordingly, Gary Martin's alleged misrepresentations (except perhaps his statements regarding an ownership interest in Repeat Precision) must have occurred, if at all, during the February 19, 2018 meeting.

There are many reasons why Diamondback cannot create a fraud claim based on Gary Martin's representations "on July 5, 2018 and continuing thereafter."  SAC ¶ 111.  First, there was a significant meeting between Diamondback, Repeat Precision, and NCS on July 5, 2018—*but Gary Martin was not there*.  Second, July 5, 2018 is *after* Diamondback had already entered into the original license, the amendment to the license, and the Letter of Intent with NCS.  *See* Exs. 1, 2, & 3.[2]  And (as will be explained further below), there were no trade secrets in the Diamondback data room set up in late July, so Gary Martin's alleged misrepresentations on unspecified dates beginning on July 5, 2018 could not possibly have induced Diamondback to disclose information that it had not already, voluntarily disclosed in furtherance of the license.

So, what happened at the February 19, 2018 meeting?  Gary Martin allegedly said he "owned Repeat Precision," SAC ¶ 110, which allegedly was "material to Diamondback." SAC ¶ 114.  This statement is the only one that Diamondback specifically pleads was "material" to its

---

[2] Unless otherwise stated, the exhibit references are to the deposition exhibits used by the parties to date.

decision-making process.[3]  Diamondback does not explain why this statement was fraudulent.  To the contrary, Diamondback states that Gary Martin owns half of Repeat Precision through a company he fully owns.   SAC ¶ 11.   Diamondback thus fails to set forth any actionable misrepresentation or the requisite fraudulent intent.  *See* Dkt. 43 at 11–17.  Indeed, Diamondback's own CEO, Derrek Drury, testified that he owns Diamondback, when in fact he is not the sole owner of Diamondback.  Drury Depo. at 25:4–9, 124:6–17; *see also* SAC ¶ 10.  Drury also testified that, despite his claim that Repeat Precision's ownership was material, he never asked Gary Martin (or any of the other Defendants) about it.  *Id.* at 112:16-20, 123:3–126:13.

But, even assuming Gary Martin's statements regarding the ownership of Repeat Precision could possibly qualify as a false statement, Repeat Precision disclosed NCS Holdings as an affiliate in the original license, *see* Ex. 1 at 1; information about Repeat Precision's ownership is publicly available in NCS Multistage's 10-Q reports and on the Internet, *see* Ex. 108; and Diamondback's advisors, Ryan Huey and Mark Russell, *shared some of this information with Drury*, *see* Exs. 146, 175.  In April of 2018, Drury sent an email to Ryan Huey acknowledging that Gary Martin's $100M proposal was "through Advent/NCS."  Ex. 176.  Diamondback cannot claim it was fraudulently induced into acting based on information it either knew or should have known, had it exercised reasonable diligence.  *See* Dkt. 38 at 10–18.  Diamondback has no viable claim for fraud based on Gary Martin's alleged failure to disclose publicly-known facts, especially where, as here, Diamondback conducted no diligence of its own.  *See JPMorgan Chase Bank, N.A. v. Orca Assets II, G.P.,* 546 S.W.3d 648, 654 (Tex. 2018).

Gary Martin's remaining representations from February 2018 were all true.   Repeat Precision was in the process of developing its own setting tool, including investigating how to

---

[3] In SAC ¶ 108, Diamondback makes a generic statement that "Gary Martin … made material representations to Diamondback that were false."  This type of conclusory assertion cannot meet Rule 9(b).

design around Diamondback's patents.  Repeat Precision does have international operations, and Gary Martin even flew Drury to Mexico to tour them *before* Diamondback entered into the License.    Drury  Dep.  at  121:24-124:5,  126:23-127:4.    Repeat  Precision  did  promote Diamondback's  power  charges—as  evidenced  by  the  flyer  Repeat  Precision  submitted  in connection with its request for a preliminary injunction.  *See* Dkt Nos. 3-2 at 72 & Dkt. No. 18 at 66-71  (Case:    19-CV-00034-ADA).    Repeat  Precision  also  had  an  interest  in  purchasing Diamondback, subject to due diligence, as evidenced by the Letter of Intent signed by one of Repeat Precision's owners, NCS.  Ex. 3.  Even Drury admits understanding that Gary Martin's proposals to purchase Diamondback (which Drury rejected) and the non-binding, written Letter of Intent created no obligation for any of Defendants to purchase Diamondback.  Drury Dep. at 159:13-160:11.

Diamondback's attempt to turn a failed corporate transaction into a multi-million dollar fraud case is half-baked, at best.  Diamondback was not misled.  Instead, it is attempting to use this litigation to rewrite history and to pressure Defendants into giving up valuable, exclusive rights regarding a product—the disposable setting tool—that Repeat Precision lawfully obtained by negotiation, and have since invested millions of dollars to develop.

2.    Breach of the February and July 2018 Confidentiality Agreements and the Patent License.  Diamondback's breach-of-confidentiality theory fares no better than its fraud claims. Diamondback  alleges  that  Repeat  Precision  and  NCS  used  Diamondback's  confidential information to compete with Diamondback and form a relationship with Diamondback's then-largest customer, "Company A," Hunting Energy Services, Titan Division ("Hunting-Titan"). SAC ¶¶ 123, 128, 139.  Diamondback fails, however, to explain what confidential information Repeat Precision and NCS allegedly used.  Diamondback thus fails to give notice of the claims

against Defendants.  *See* Fed. R. Civ. P. 8(a)(2); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that Rule 8(a)(2) requires "fair notice of what the claim is and the grounds").

To the extent that Diamondback contends that the allegedly-confidential information is the mere existence of Hunting-Titan as a Diamondback customer, this is not confidential.  It is publicly available on Diamondback's website.  *See* https://diamondbackindustries.com/distributors/; Drury Dep. at 165:3-6.  In any event, Repeat Precision knew about Hunting-Titan long before it allegedly had access to any Diamondback confidential information.  Moreover, it was Hunting-Titan that initiated discussions with Repeat Precision regarding disposable setting tools.  *See id.* at 230:10–20 (Drury admitting he did not know when Repeat Precision and Hunting-Titan started negotiations).  Drury even admits that there is nothing wrong with Hunting-Titan making its own decision on who it wants to do business with.  *Id.* at 231:2-12.  That point is particularly important here because Diamondback (a) has never sold a disposable setting tool to Hunting-Titan, and (b) rejected Hunting-Titan's request in early 2018 to discuss business opportunities.  *Id.* at 110:1-11, 164:14-19, 182:10-14.  Thus, Repeat Precision and NCS did not use Diamondback confidential information in any unauthorized way to contact Hunting-Titan.  To the contrary, as explained in Repeat Precision's counterclaim, Diamondback and Drury intentionally interfered with Repeat Precision's prospective business relationship with Hunting-Titan.  *Id.* at 226:9-13.

Nor did Repeat Precision develop a consulting relationship with former Diamondback employee Trea Baker, the only other method by which Repeat Precision allegedly breached its confidentiality agreements with Diamondback.  SAC ¶ 123.  Trea Baker never worked for Repeat Precision.  The remainder of Diamondback's breach allegations regarding the Patent License are currently before the Court in the briefing related to Diamondback's motion to dismiss.  *See* Dkts. 62 & 71.

     3.    <u>Trade-Secret Misappropriation (TUTSA and DTSA)</u>.  Diamondback wholly fails to give Defendants fair notice of the trade secrets at issue—that is, those that Defendants allegedly misappropriated.  *See* Fed. R. Civ. P. 8(a)(2).  In SAC ¶¶ 142-44 and 159-61, Diamondback lists trade secrets it allegedly owns.  *See* SAC ¶¶ 142–44, 159–61.  Diamondback also explains how Defendants allegedly acquired Diamondback trade secrets: through (1) the virtual data room set up for the potential acquisition of Diamondback, and (2) Trea Baker.  *See id.* ¶¶ 145–46, 152, 155–56, 167.  Diamondback does not explain, however, *what* trade secrets Defendants obtained.  The answer is none.

     As for the virtual data room, Diamondback ensured that it contained no trade secrets. Diamondback's and NCS's representatives expressly reached an agreement, as part of negotiations over the July 2018 confidentiality agreement, to exclude trade secrets from the data room.  *See* Exs. 131 & 132.  Diamondback's representative, Mark Russell, who personally and solely added Diamondback's documents to the data room, contemporaneously confirmed via email that trade secrets were being removed.  *See id.*  Russell further testified during his deposition that this process was completed before Diamondback gave access to Defendants.  Russell Dep. at 129:13–130:18. Thus, the data room contained no trade secrets for Defendants to misappropriate.

     Diamondback next fabricates a fallback theory of misappropriation based on an alleged consulting arrangement between Repeat Precision and former Diamondback employee Trea Baker. Diamondback has no evidence to support this allegation.  Drury admitted as much during his deposition.  Drury testified that Repeat Precision paid Trea Baker consulting fees and obtained from him Diamondback's power charge formula.  Drury Dep. At 216:23–217:2.  When asked if this was speculation, Drury responded, "That's right."  *Id.* at 217:5–12.  When asked to confirm that he personally did not know this information, Drury said, "That's true."  *Id.* at 217:13–14.

Where Diamondback once set forth these allegations as "based upon information and belief," *see, e.g.*, Dkt. 34 at ¶¶ 115, 127, it now states them as fact, *see, e.g.*, SAC ¶¶ 145, 155.  Yet Diamondback still has no basis for them, even five months into discovery; and the allegation that Defendants obtained Diamondback trade secrets from Trea Baker is therefore insufficiently pleaded.  *See Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (holding a plaintiff can plead facts on information and belief "where the facts are peculiarly within the possession and control of the defendants or where the belief is based on factual information that makes the inference of culpability plausible"); Dkt. 43 at 8–11.

4.    <u>Declaratory Judgment (Right to Practice and ROFR)</u>.  Diamondback seeks an unnecessary and baseless declaratory judgment.  The language, including the language on exclusivity, in the Patent License is unambiguous, as explained in Repeat Precision's opposition papers to Diamondback's motion to dismiss.  *See* Dkt. 71.  There is no express reservation of the right to practice under the patent.  Moreover, under paragraph 13.12 of the license, the parties can only amend the license by agreement and in writing.  *See* Ex. 1.

Diamondback and Repeat Precision used the amendment process to add a right of first refusal ("ROFR"), effective May 30, 2018.  *See* Ex. 2.  It can now be removed only be amendment.  *See generally* Dkt. 38 at 22–24.  At Diamondback's request, Repeat Precision drafted and proposed an amendment to remove the ROFR.  *See* Ex. 80.  Yet Diamondback has refused to sign it.  Thus, Diamondback should not be allowed to obtain a unilateral termination of the ROFR through litigation when it expressly rejected the terms Repeat Precision requested as consideration for giving up its valuable ROFR rights outside of litigation.

5.    <u>Computer Fraud and Abuse Act ("CFAA") / Harmful Access by Computer</u>.  Diamondback alleges that Defendants unlawfully accessed the secure data room Diamondback set

up for Defendants, even though Defendants were expressly granted access to the data room during the due-diligence process for the potential acquisition of Diamondback.  Diamondback has no factual basis to support these computer-based causes of action.  *See* Dkt. 44 at 11–13.

Diamondback's first allegation is that "Gary Martin, Grant Martin, and/or Robert Nipper violated the [CFAA] . . . by fraudulently accessing data in the secure data room."  SAC ¶ 183.  But, based on Diamondback's own data-room session log, which Diamondback attached to its original complaint, Dkt. 1-19, Gary Martin and Robert Nipper *never accessed* the data room.  *See* Russell Dep. at 160:4–161:3; 221:17–222:17.  They therefore cannot be liable for unlawfully accessing it.

Diamondback then alleges that the NCS team (including Grant Martin—who accessed the data room for a total of one hour and five minutes) somehow exceeded their authorized access of the data room.  *See* SAC ¶¶ 183, 185.  But Diamondback does not explain *how* the NCS team exceeded authorization beyond vague allegations of an entire team's "intent to defraud."  *Id.* ¶ 188.

As a last-ditch attempt to save these causes of action, Diamondback added new allegations to the SAC about Defendants' alleged attempted access (but not actual access of documents) to the data room after Diamondback withdrew access.  *See* SAC ¶ 186.  To state a civil claim based on alleged attempted access, Diamondback has to have suffered damages based on the *attempt*.  *See* 18 U.S.C § 1030(g).  Diamondback has pleaded none.  *See* SAC ¶ 189 (stating Diamondback has been harmed by "the amounts spent on determining what data was *accessed*," "repairing its goodwill and business relationships damaged by the unauthorized use of the data Defendants unlawfully *obtained*," and generally "Defendant's unauthorized *access*" (emphasis added)).

Like the others, Diamondback's computer-based causes of action fail.

6.   <u>Tortious Interference</u>.  Diamondback repeatedly alleges that Defendants interfered with Diamondback's business relationships.  *See id.* ¶¶ 192–98.  Diamondback fails to give

Defendants fair notice, however, of *how* they allegedly interfered.   The closest Diamondback comes to an explanation is mentioning Hunting-Titan and alleging Diamondback was damaged "by diminished goodwill."  *Id.* ¶ 197.  This is not enough.  *See* Fed. R. Civ. P. 8(a)(2); *see also* Dkt. 38 at 19–20.

Moreover, Defendants have learned through discovery that the tortious interference was in fact the other way around.  Drury admitted during his deposition that Hunting-Titan gets to choose with whom it does business.  *See* Drury Dep. at 231:2–12.  When Diamondback offered Hunting-Titan the opportunity to be a distributor of its disposable setting tools in early 2018, it passed.  *Id.* at 110:1–11.  Thus, while Diamondback portrays Hunting-Titan as its once-largest customer, Diamondback has never actually sold a setting tool to Hunting-Titan, though Hunting-Titan is a distributor of other Diamondback products.  *Id.* at 164:14–16.

Later, when Hunting-Titan contacted Repeat Precision in May 2018 about Repeat Precision's disposable setting tools, Repeat Precision agreed to negotiate with Hunting-Titan regarding a distribution agreement.  Drury then interfered, and openly admits to having done so. *See id.* at 210:8–211:24, 214:10–215:6.  But before filing this lawsuit, Drury never told Repeat Precision what he had done—Drury put a positive spin on his meetings with Hunting, without even mentioning the false accusations he was making against Repeat Precision representatives behind their backs.  *Id.* at 227:2-229:16.  But for Drury's intentional acts of interference, there is a reasonable probability that Repeat Precision and Hunting-Titan would be doing business today.

Defendants did not interfere with Diamondback's business relationships; it is exactly the opposite—*Diamondback* interfered with *Repeat Precision's* prospective business relationship.

7.   Civil Conspiracy / Aiding and Abetting.  Diamondback's causes of action for civil conspiracy and aiding and abetting (the latter of which is new in the SAC) are derivative claims

that require an underlying tort.  *See Johns v. Kaelblein*, 644 F. App'x. 325, 327 (5th Cir. 2016)

(holding plaintiff's "inability to establish any of the . . . underlying torts doom[ed] his derivative

claims for conspiracy and aiding and abetting"); *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388,

402 (5th Cir. 2013) ("Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy

depends on participation in an underlying tort.  In order to adequately plead a claim for civil

conspiracy, a plaintiff must adequately plead the underlying tort.").  Diamondback has not

adequately pleaded a tort; thus, its derivative causes of action fail with the rest.

## Answer

With that context, Defendants answer Diamondback's SAC as follows:[4]

**I.      Parties**

1.      Defendants admit the allegations in Paragraph 1.

2.      Defendants admit the allegations in Paragraph 2.

**II.     Jurisdiction and Venue**

3.      Defendants admit that Diamondback's SAC purports to state claims relating to federal trade-secret and patent laws.

4.      Defendants admit that this Court has subject-matter jurisdiction over this matter.

5.      Defendants admit that venue is proper in this Court and that Defendants conduct business in this District.  Defendants deny the remaining allegations in Paragraph 5.

6.      Defendants admit that the parties have agreed that jurisdiction and venue are proper in this Court.

---

[4] Unless expressly stated otherwise, the paragraph numbers in this answer correspond to the same paragraph number in the SAC.

III.     **Summary of the Complaint**

7.     Defendants admit that Repeat Precision entered into a confidentiality agreement with Diamondback effective February 16, 2018. *See* Ex. 4. Defendants further admit that NCS Holdings entered into a confidentiality agreement with Diamondback effective July 25, 2018. *See* Ex. 5. Defendants deny that they have breached those agreements. Defendants further admit that Diamondback has sued Defendants for various claims but deny that there is any merit to the claims alleged. Defendants deny the remaining allegations in Paragraph 7.

8.     Defendants deny that they conspired to raid Diamondback's intellectual property. To the contrary, Repeat Precision entered into the patent license, Ex. 1, to develop disposable setting tools under a valid and binding contract with Diamondback. Defendants and Diamondback worked together, cooperatively, for months under that agreement. Diamondback freely provided Defendants with information regarding its disposable setting tools to assist Repeat Precision with developing its own products, pursuant to the license. In return, Repeat Precision increased the production of disposable setting tools, enabling Diamondback to earn revenues from royalties on Repeat Precision's sales and from selling power charges to Repeat Precision's customers. Defendants did not misappropriate any information regarding the disposable setting tools.

Defendants further admit that they entered into discussions regarding the potential acquisition of Diamondback, with NCS signing a non-binding term sheet with Diamondback on June 27, 2018 (the "Letter of Intent"). *See* Ex. 3. Defendants deny telling Diamondback that they had "identified it as an acquisition target," but Defendants' interest in Diamondback was genuine. After beginning the due-diligence process, however, Defendants identified several concerns regarding the proposed transaction, ultimately electing not to proceed with it. One of Defendants' concerns was that they learned that Hunting-Titan, one of Diamondback's then-largest customers

for power charges, was planning to enter the power-charge market, which would turn Hunting-Titan into a Diamondback competitor.  Upon Defendants learning this information, they promptly informed Drury of their concerns.  This is not the behavior of parties engaged in a "conspiracy."  Drury has admitted that Hunting-Titan did enter the power-charge market earlier this year, demonstrating that Defendants' concern was legitimate.  Drury Dep. at 62:6–24.  Under the Letter of Intent, Defendants had no obligation to complete a transaction.  The Letter of Intent clearly and unequivocally says that it is not binding.

Defendants acknowledge that Griffin Financial, on Diamondback's behalf, gave some employees of Repeat Precision and NCS access to a data room that was established as part of the due-diligence process.  Defendants deny that there were any trade secrets contained in the data room.  Defendants first gained access to the data room on July 27, 2018.  Before then, Defendants informed Diamondback that Defendants did not want or need access to anything Diamondback considered to be a trade secret.  Diamondback's representative and Griffin Financial employee, Mark Russell, confirmed in writing that all trade secrets had been removed from the data room before he gave Defendants access.  Exs. 131 & 132.  Drury also testified that he was aware of no trade secrets actually contained in the data room.  Drury Dep. at 282:24–288:14.  Defendants deny the remaining allegations in Paragraph 8.

9.      Defendants deny all of the allegations in Paragraph 9.  Repeat Precision obtained a patent license from Diamondback in March 2018—*before* Defendants made any proposals to purchase Diamondback.  The original license granted Repeat Precision an exclusive right and license under the '035 Patent to make a product that combined the disposable setting tool with a frac plug.  Later, Repeat Precision requested, and Diamondback agreed, to expand the scope of the license to cover the disposable setting tool as a stand-alone product.  *See* Ex. 2.  When amending

the license, however, the parties did not change the provisions to make the license under the '035 patent non-exclusive.  Nor did Diamondback reserve to itself the right to continue practicing the '035 patent.  Thus, this is not just a "limited license," as Diamondback contends.  Moreover, the parties at no time, including when they agreed to amend the license, had any deal requiring any Defendant to acquire Diamondback.  To the contrary, Diamondback rejected all of the proposals Defendants made before the amended license was signed, demanding more money for the company.  Defendants made these proposals in good faith and were at all times capable of completing the potential purchases.

Repeat Precision's license under the '035 patent resulted from arm's-length negotiations. Diamondback even had four lawyers assist it in negotiating the amended license.  After entering into the license and the amendment, Repeat Precision invested millions of dollars in manufacturing facilities and equipment, and hired new employees.  Repeat Precision has promoted its disposable setting tools, used the tools to serve customers, and built its business in reliance on the license.  It is far too late and wholly unfair to grant Diamondback's extraordinary request to go back in time and "put Diamondback in the same position it was in before ever meeting the Defendants."

This is a case about would-be-seller's remorse.  Although Drury dreamed of being paid hundreds of millions of dollars for his company, making him extraordinarily wealthy, Defendants had no obligation to do so.  And after conducting due diligence on the proposed transaction, Defendants declined to do so, as was their right.  The fact that Defendants are unwilling to pay Drury millions of dollars to buy his company provides no basis for Diamondback to take back the rights it knowingly and voluntarily conveyed to Repeat Precision, for which Diamondback received substantial consideration.

14

IV.   **Timeline of Events**

10.     Defendants admit the allegations in Paragraph 10.

11.     Defendants admit that Gary Martin initiated contact with Diamondback about licensing the '035 patent.  Defendants further admit that Gary Martin truthfully represented that he was an owner of Repeat Precision, as Gary Martin indirectly owns a 50% interest in Repeat Precision through RJ Machine.  As a result of that ownership interest, Gary Martin serves as one of three members of Repeat Precision's Board of Managers.  He is an owner of Repeat Precision in the same way Drury claims to be the owner of Diamondback, a company in which he is not the sole owner.  Drury Dep. at 25:4–9, 124:6–17; *see also* SAC ¶ 10.  Defendants further admit that Repeat Precision is a 50/50 joint venture between RJ Machine and a subsidiary of NCS Holdings, and that NCS holds the controlling vote in Repeat Precision through its representation on the Board of Managers and the terms of Repeat Precision's governing limited liability company agreement. Defendants deny that NCS Holdings is an affiliate of a chief competitor of Diamondback.  Indeed, when asked during his deposition, Drury could not even identify the alleged competitor.  Drury Dep. at 64:19–65:11.  Defendants deny the remaining allegations in Paragraph 11.

12.     Defendants admit the allegations in Paragraph 12.

13.     Defendants admit the allegations in Paragraph 13 insofar as Drury apparently sent an internal email to Trea Baker stating what is alleged in Paragraph 13.  Diamondback did not share this internal communication with Defendants before filing suit on November 2, 2018. Moreover, contrary to saying that Diamondback would not license the '035 patent, Diamondback, acting through Drury, expressly licensed interests under the '035 patent to Repeat Precision.

14.     Defendants admit that Gary Martin communicated with Drury and agreed to a meeting at Diamondback's facility.  Defendants deny that Gary Martin lied to Drury during this

conversation, including by saying that he owned Repeat Precision.  Defendants admit that Repeat Precision has international manufacturing facilities and deny that such a representation would be false.  Prior to entering into the license agreement, Gary Martin even took Drury to tour Repeat Precision's manufacturing facilities in Mexico, which Drury admits.  Drury Dep. at 120:19–24. Defendants admit that Repeat Precision manufactures a frac plug called the "PurpleSeal." Defendants deny that Repeat Precision had not begun the design of its own short setting tool as of the date of this first call between Gary Martin and Drury.  Defendants further deny the remaining allegations in Paragraph 14.

15.     Defendants admit that Diamondback entered into a Mutual Confidentiality and Non-Disclosure Agreement with Repeat Precision.  *See* Ex. 4.  Defendants deny that any lies formed the basis of this agreement and further deny the remaining allegations in Paragraph 15.

16.     Defendants admit that Gary Martin, Grant Martin, Clint Mickey, Derrek Drury, and Trea Baker met at Diamondback's headquarters in Crowley, Texas on February 19, 2018. Defendants deny that Justice Baker attended.  Before that meeting, Repeat Precision had already hired patent lawyers to analyze the '035 patent, as well as a consultant to design around the '035 patent.  Repeat Precision stopped its efforts to design around the patent when it reached an agreement on the preliminary terms for a license with Diamondback.  Defendants deny the remaining allegations in Paragraph 16.

17.     Defendants admit that Gary Martin proposed to have Repeat Precision manufacture disposable setting tools at Repeat Precision's facilities in Mexico.  Defendants also admit that Diamondback wanted Repeat Precision to market and promote Diamondback's power charges to be used with Repeat Precision's products using the disposable setting tools.  Defendants deny that Gary Martin lied by promising that Repeat Precision would not manufacture power charges.  In

16

fact, Repeat Precision has never manufactured power charges, and Defendants admit that Repeat Precision currently could not manufacture power charges as Repeat Precision does not have the required explosives license to do so.  Defendants deny the remaining allegations in Paragraph 17.

18.     Defendants admit the allegations in Paragraph 18.

19.     Defendants deny the allegations in Paragraph 19.  However, Defendants admit that Repeat Precision would have continued in its efforts to design around the '035 patent if Diamondback refused to grant it a license, and that Gary Martin conveyed this to Diamondback.

20.     Defendants deny the allegations in Paragraph 20 inasmuch as any expression by Gary Martin of an interest to arrange a purchase of Diamondback would have been a lie.  Each of Gary Martin's expressions of an interest in a potential acquisition of Diamondback was sincere.

21.     Defendants admit that Drury verbally committed to grant a license to Repeat Precision during the February 19, 2018 meeting, but that license would be limited to a product that combined the disposable setting tool with Repeat Precision's frac plug.  Defendants deny the remaining allegations in Paragraph 21.

22.     Defendants lack sufficient information to admit or deny what Drury knew about the exact ownership of Repeat Precision as of February 19, 2018.  NCS's ownership interest in Repeat Precision was a matter of public record, however, at that time.  For example, NCS (which was listed as an "affiliate" in the license) filed 10-Q reports with the SEC in 2017 (months before the original license) in which NCS disclosed that it purchased a 50% interest in Repeat Precision and that it had the controlling vote.  This information is also easily attainable through an Internet search.  *See, e.g.*. https://www.globenewswire.com/news-release/2017/05/15/985136/0/en/NCS-Multistage-Holdings-Inc-Announces-First-Quarter-2017-Results.html.  During his deposition, Drury admitted that he made no inquiries into Repeat Precision's ownership before formally

entering into the license on March 16, 2018.  Drury Dep. at 125:25–126:13.  On these grounds, Defendants deny that the ownership of Repeat Precision affected Drury's decision to enter into the license.  Defendants further deny that NCS was a Diamondback competitor at that time or that at any point there was "a plot to steal Diamondback's invention through deception."

      23.     Defendants admit the allegations in Paragraph 23.

      24.     Defendants admit the allegations in Paragraph 24.

      25.     Defendants admit that Gary Martin sent a text message to Drury on March 9, 2018 stating in full that "Robert owns the other half of the repeat company."  As this was just a short text in a long string of other short texts, Gary Martin was not purporting to provide Diamondback with a full corporate history or flow chart showing the ownership structure of Repeat Precision. At the time this text was sent, it was a matter of public record that Nipper was the CEO of NCS Holdings, and that one of NCS Holding's subsidiaries, NCS Multistage, owned a 50% interest in Repeat Precision.  Nipper was also the president and treasurer of Repeat Precision and one of NCS's representatives on Repeat Precision's Board of Managers.  Defendants deny that Gary Martin's statement in this text is a "lie" or misrepresentation.  Defendants further deny that they had any duty of disclosure to Diamondback.

Had the ownership structure of Repeat Precision truly been important to Diamondback, it had ample opportunity to gather this information.  Diamondback conducted no diligence on Repeat Precision's ownership structure and did not even ask Gary Martin (or any of the Defendants) for more information on Repeat Precision's ownership structure.  Drury Dep. at 126:4–13.  Moreover, even after Diamondback learned about the relationship between Repeat Precision and NCS, Diamondback did not object to entering into business with the companies until many months later

when NCS refused to pay over $170 million to buy Diamondback.  Diamondback's suggestion that it was lied to about the ownership of Repeat Precision is nothing but an after-the-fact story.

26.     Defendants admit that Repeat Precision and Diamondback entered into the patent license agreement on March 16, 2018.  Ex. 1.  Defendants further admit that the patent license did not prohibit Diamondback from making its own setting tools and did not grant Repeat Precision the right to exclude Diamondback from practicing the '035 patent.  To the contrary, the license signed on March 16 was limited to a specific product that combined a frac plug with a disposable setting tool.  For that product, the rights granted to Repeat Precision were exclusive, even as to Diamondback.  Indeed, at the time of the license, Diamondback was not making or selling the frac plugs necessary to make the combined product, as Diamondback sold its frac plug business in 2017 and had a noncompete that prevented Diamondback from reentering that business for several years. *See* Drury Dep. at 39:10–41:1.  Defendants deny that any encouragement by Gary Martin regarding Diamondback's business changes the language of the patent license.  At the time, Gary Martin was genuinely interested in arranging a potential acquisition of Diamondback and was therefore interested in Diamondback's success.  Defendants further deny the remaining allegations in Paragraph 26.

27.     Defendants deny the allegations in Paragraph 27.  Gary Martin took Drury to Mexico to tour Repeat Precision's manufacturing facilities on March 6, 2018—*before* Drury signed the March 16, 2018 patent license.  Thus, Drury had a chance to see the facilities for himself before entering into the license.  And at that time, as today, Repeat Precision had fully operational manufacturing facilities in Mexico that could manufacture disposable setting tools.  In reliance on the license, Repeat Precision has even now obtained a lease for additional manufacturing space in Mexico.

28.     Defendants admit that Trea Baker was their first contact person at Diamondback, and further admit that Diamondback terminated Trea Baker's employment on or about March 22, 2018.  Defendants lack sufficient information to admit or deny the reasons for the termination of his employment; accordingly, Defendants deny the remaining allegations in Paragraph 28.

29.     Defendants are without sufficient knowledge to either admit or deny what information Trea Baker accessed during his employment with Diamondback or what limitations Diamondback placed on any such access.  Defendants admit that, on March 26, 2018, Drury sent Gary Martin a text message that said:  "I need to let you know that Trea Baker is no longer employed at Diamondback."  Drury did not explain the circumstances regarding Trea Baker's departure from Diamondback, did not reference any confidential information taken by Trea Baker, and did not instruct Gary Martin not to contact Trea Baker.  In fact, during his deposition, Drury testified he voiced no objection to Gary Martin talking to Trea Baker because he "had no reason . . . to."  Drury Dep. at 23:25–25:3.  Defendants deny the remaining allegations in Paragraph 29.

30.     Defendants admit that Diamondback has produced what appears to be an internal email from Drury to Tonya Cheek, Rob Andres, Ron Swiger, Justice Baker, Kim Bellah, Jeb Wright, Nichole Bucher, Kevin Carter, and Taylor Davis that states: "Please be advised that divulging or disseminating Diamondback Industries proprietary trade secrets, designs, prints, emails, sales numbers, or other such items to individuals or companies outside the approval of the Owner of Diamondback is expressly prohibit [sic].  Such behavior or actions could lead to that individual being terminated and or prosecuted by law."  Defendants lack sufficient information to admit or deny whether these individuals constituted the entirety of Diamondback's leadership team at that time; accordingly, Defendants deny the remaining allegations in Paragraph 30.

31.     Defendants admit that Drury terminated Justice Baker's employment with Diamondback on or about April 12, 2008.  Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 31.

32.     It is Defendants' understanding that Justice Baker denies making the admissions stated in Paragraph 32 and denies taking information regarding Diamondback's designs. Defendants admit that Diamondback appears to have obtained a document purporting to be an executive summary for Kingdom Downhole Tools, L.L.C. ("Kingdom Downhole"), but Defendants lack sufficient information to form a belief about when that document was created, when Diamondback obtained a copy, or the circumstances under which Diamondback obtained it. After reviewing a copy of the alleged executive summary, Defendants deny that it contains any Diamondback trade secrets or confidential information.  Defendants further deny that Kingdom Downhole sells Diamondback's products.

Based on public information, Defendants admit that Justice Baker and Trea Baker are two of four managing members of Kingdom Downhole and that the original filing date for the entity is June 18, 2018.

33.     Defendants admit that Gary Martin issued three checks to Trea Baker from his personal account: (1) one for $5,000 on March 27, 2018; (2) one for $5,000 on April 5, 2018; and (3) one for $2,500 on April 20, 2018.  These checks were paid by Gary Martin personally to Trea Baker as gifts, as Trea Baker planned his next career move after Diamondback terminated his employment.  Defendants further admit that Gary Martin informed Drury that he was going to give money to Trea Baker and that Drury voiced no objection, as Drury himself admits.  Drury Dep. at 24:3–25:3.  Defendants deny that Gary Martin paid Trea Baker to provide him with confidential

Diamondback information and further deny that Trea Baker ever provided Gary Martin with any Diamondback trade-secret information.

34.     Defendants admit that Gary Martin made a verbal proposal to Drury to purchase Diamondback for $100 million.  This was a preliminary proposal before Defendants had an opportunity to conduct due diligence regarding Diamondback.  This proposal was also subject to the parties' ability to agree on the terms of a sale.  Accordingly, this was not a binding offer. Defendants deny the remaining allegations in Paragraph 34.

35.     Defendants admit that Gary Martin made this proposal in his capacity as a member of the Repeat Precision Board of Managers, and as the indirect owner of 50% of Repeat Precision. Defendants admit that Gary Martin had the authority to make this proposal to purchase Diamondback.  Defendants deny the remaining allegations in Paragraph 35.

36.     Defendants admit that Drury rejected Gary Martin's proposal and represented that Diamondback was worth more than $200 million.  Drury texted Gary Martin on April 12, 2018 that "my number is 260M."

37.     Defendants deny the allegations in Paragraph 37.  The patent license disclosed that NCS Holdings and its subsidiaries are "affiliates" of Repeat Precision.  This disclosure was made in writing at least as early as March 9, 2018, when Repeat Precision presented the draft license to Diamondback.  This draft license also disclosed, and expressly carved out, Advent International. During his deposition, Drury admitted to receiving the March 9 draft license.  *See* Drury Dep. at 127:22–128:1.  He further admitted to doing no diligence as to why NCS or Advent International were referenced therein.  *Id.* at 126:4–13.  Defendants deny the remaining allegations in Paragraph 37.

38.     Defendants admit that Gary Martin did not walk Drury through the full corporate structure and ownership of Repeat Precision, as those were publicly-known facts.  Drury admitted during his deposition that he never asked Gary Martin the details about Repeat Precision's corporate ownership, *id.*, nor did Drury disclose to Gary Martin that these details were important to Drury or Diamondback.

39.     Defendants admit that Diamondback entered into negotiations with "Company B," Dynamic Materials Corporation ("DMC"), regarding a potential acquisition of Diamondback. Defendants are without sufficient information to either admit or deny when DMC first discussed this topic with Diamondback.  Based on the information disclosed so far, Defendants have seen no evidence that DMC ever made a written offer to purchase Diamondback.  In fact, Drury admitted during his deposition that DMC never provided Diamondback with a written offer to purchase the company.  *Id.* at 194:15–18.  Defendants deny the remaining allegations in Paragraph 39.

40.     Defendants deny the allegations in Paragraph 40.

41.     Defendants deny the allegations in Paragraph 41.

42.     Defendants deny the allegations in Paragraph 42.   In direct contradiction of Diamondback's allegations, Diamondback has produced correspondence between Diamondback and DMC *after* May 25, 2018.  *See* Ex. 62.  As late as May 30, 2018, those parties were still discussing setting up meetings in June to continue their business discussions.  Drury Dep. at 201:14–207:25.  After NCS declined to move forward with an acquisition of Diamondback, Drury continued to engage with DMC about an acquisition.  *Id.* at 208:19–22.  DMC was not interested. *Id.* at 208:23–25.

43.     Defendants admit that Repeat Precision wanted to expand the scope of "Licensed Products" in the patent license and to add a ROFR, should any other entities try to acquire

Diamondback because of Defendants' genuine interest in acquiring Diamondback. Back on April 11, 2018, Repeat Precision proposed an expansion of the "Licensed Products" definition in an email from Grant Martin to Drury that attached a draft amended agreement. Drury sent this draft to his advisors (including four lawyers) to review. Diamondback submitted a counter-proposal with significant revisions to the language of the license, including its definitions. Ultimately, the parties agreed on the final amended license and ROFR. *See* Ex. 2. That amendment is effective as of May 30, 2018 but was not returned by Drury until June 4, 2018. Defendants deny the remaining allegations in Paragraph 43.

44.     Defendants deny that Gary Martin expressed that he "needed the ROFR" to expand Repeat Precision's manufacturing capabilities in Mexico. Defendants admit that, with the amended license, an expansion would have benefitted both Repeat Precision and Diamondback. Defendants deny the remaining allegations in Paragraph 44.

45.     Defendants admit that the amended patent license broadened the scope of products that Repeat Precision could make. The amendment did not change the fact that the License was "exclusive" as to the products covered under the license. Repeat Precision has explained its interpretation of its exclusive rights under the license—both the original and the amended patent license, as the relevant language was unchanged—on pages 2–4 and 10–16 of its response in opposition to Diamondback's motion to dismiss, which is incorporated herein by reference. *See* Dkt. 71. Defendants deny that Gary Martin's alleged conduct changes the language of the agreement or is contrary to it in any way, as Gary Martin was working toward the goal of arranging a potential acquisition of Diamondback and was interested in the company's success. Defendants deny the remaining allegations in Paragraph 45.

46.     Defendants deny the allegations in Paragraph 46.  The amended license expressly states that it is supported by valuable consideration. Ex. 2 at 1.  Moreover, when Diamondback expanded the scope of the license to allow Repeat Precision to make and sell an additional product—the stand-alone disposable setting tool—Diamondback was entitled to receive additional royalty payments on these products.  Moreover, Diamondback hoped to gain power charge sales based on the expanded definition of "Licensed Products."  After receiving the amended license, Repeat Precision invested millions to expand its manufacturing facilities.  Repeat Precision also marketed and sold disposable setting tools to customers who purchased power charges for those tools from Diamondback.  Repeat has also tendered payment of all royalties due to Diamondback.  Defendants deny the remaining allegations in Paragraph 46.

47.     Defendants deny the allegations in Paragraph 47.  Defendants admit that Gary Martin, Grant Martin, and Nipper provided Drury with a draft proposed license amendment at a lunch in Fort Worth, but it was on May 22, 2018, not May 28, 2018.  Even Drury admits that this lunch did not occur on May 28.  Drury Dep. at 143:14–144:9.  The draft that Gary Martin, Grant Martin, and Nipper presented to Drury at the lunch was not the first draft of the proposed amended license.  Grant Martin sent Drury a draft amended license as early as April 11, 2018 by email.  Moreover, Drury did not accept, sign, and return the amendment license until June 4, 2018, several weeks later.  During this time, Diamondback consulted with multiple lawyers, who proposed revisions of their own, on the draft amendment.  *See, e.g.*, Ex. 40.  Defendants deny that Gary Martin discouraged Drury from seeking legal counsel, and even if he did, Drury has admitted that he received legal counsel with respect to the amendment.  Drury Dep. at 139:7–142:8.

48.     Defendants deny that any statements made by Gary Martin along the lines of what is described in Paragraph 48 would have been false.  Contrary to Diamondback's allegations, the

evidence is undisputed that Repeat Precision *did* ramp up tool production after Diamondback signed the amendment.  And, Repeat Precision *did* increase its verbal, non-binding proposed purchase price for Diamondback to $170 million, as Drury admits.  *Id*. at 328:22–329:2.  Of course, all proposals to acquire Diamondback were subject to due diligence and an agreement on definitive terms.  The parties never reached such an agreement.  Indeed, Drury rejected the verbal $170 million proposal.

49.     Defendants admit that Repeat Precision and Diamondback entered into the amended license and ROFR agreement effective May 30, 2018.  Defendants deny the remaining allegations in Paragraph 49.  Although the amendment is effective as of May 30, Diamondback did not tender a signed copy of the amendment to Repeat Precision until June 4.  Moreover, there is no evidence that Diamondback had the opportunity to sell to DMC.  During his deposition, Drury admitted that DMC never made a formal offer to purchase Diamondback.  *Id*. at 194:15–18.  Indeed, when Diamondback and DMC ended their discussions about a potential acquisition, DMC was still pressing Diamondback for information regarding its operations.  *See* Ex. 62.

50.     Defendants deny the allegations in Paragraph 50, except that Defendants admit that public records show the ownership interests held by Advent International in NCS Multistage and by NCS in Repeat Precision, and that the Letter of Intent lists NCS Multistage as the buying party.  There was nothing stopping Diamondback from doing its diligence on this ownership information back in early 2018 before entering into any agreements with Repeat Precision, diligence Drury admits to not having done.  Drury Dep. at 126:4–13.  Defendants specifically deny that Gary Martin was not allowed to propose a purchase price of over $100 million without permission from Advent International and NCS, or that he fraudulently induced Diamondback in any way.

51.     Defendants admit that NCS and Diamondback entered into the Letter of Intent on June 27, 2018 for a proposed transaction that the parties labeled "Project Power."  Defendants deny the remaining allegations in Paragraph 51, including the allegation that the representation that NCS was evaluating Diamondback for potential purchase was a "guise."  Defendants were seriously evaluating a potential acquisition of Diamondback, which is the reason NCS went to the effort of preparing a Letter of Intent, hiring counsel and consultants to assist with due diligence, setting up meetings (internal and external) involving many Repeat Precision and NCS employees, etc.

52.     Defendants admit that Diamondback, NCS, and Repeat Precision representatives met in Fort Worth on July 5, 2018, as part of the due-diligence process.  Defendants admit that many NCS representatives attended, and that Marty Stromquist participated by telephone.  Defendants further admit that three Repeat Precision representatives attended the meeting, including Nipper and Grant Martin.  Gary Martin did not attend.

53.     Defendants admit that NCS and Repeat Precision representatives asked Drury many questions about Diamondback's business, some of which related to customers and customer relationships.  The questioning that occurred at this meeting was standard due diligence for a potential acquisition.  Defendants acknowledge that this July 5, 2018 meeting was covered by the confidentiality agreement entered into between NCS and Diamondback regarding Project Power, and Defendants accordingly maintained confidentiality.  Defendants deny that the July 5, 2018 meeting falls within the scope of the confidentiality agreement in the patent license.

54.     Paragraph 54 is filled with objectively false allegations.  Here is the truth: Defendants admit that Diamondback set up a data room in connection with the due-diligence process for "Project Power."  The site used for the data room had multiple folders, only one of

which—the "Project Power Data Room"—was ever made available to Defendants' representatives for review.  Russell Dep. at 140:14–141:22.  Defendants understand that the site hosting the data room may have been first set up for internal use by Griffin Financial, acting on behalf of Diamondback, on or about July 12, 2018.  Thereafter, Diamondback and Griffin Financial continued to load materials onto the site for their internal use.  Prior to moving any materials into the Project Power Data Room, however, Mark Russell of Griffin Financial reviewed the materials to confirm that no Diamondback trade secrets were placed in the Project Power Data Room that was available for Defendants' review, as was the agreement expressly reached by the parties.  *See id.* at 130:3–18, 228:18–25; Le Dep. at 35:18–22.  This process was memorialized in emails between Mark Russell and NCS's Ryan Sheppard on July 20 and 23, 2018.  Exs. 131 & 132.

During his deposition, Russell confirmed that there were no Diamondback trade secrets contained in the Project Power Data Room.  Russell Dep. at 129:13–130:18.  Diamondback has also answered an interrogatory under oath listing all of the documents by Bates number that were available for Defendants' representatives to review.  The information alleged in Paragraph 54 is not in the documents made available to Defendants' representatives to review.  Defendants deny having had access to any Diamondback trade secrets through the data room.

55.  Defendants admit that NCS Multistage and Diamondback entered into a Mutual Confidentiality Agreement on or about July 25, 2018.  Ex. 5.  The document discloses its terms.

56.  Defendants admit that Griffin Financial representatives, on behalf of Diamondback, invited certain NCS and Repeat Precision personnel to access the Project Power Data Room on July 26, 2018.  The identity of the representatives who received invitations to access the Project Power Data Room are reflected on Exhibit 44.  To the extent Diamondback is suggesting that any additional NCS or Repeat Precision personnel were given access to the Project Power Data Room,

that allegation is denied.  Neither Gary Martin nor Nipper is on this list.  Indeed, neither individual ever accessed the data room.

57.     Defendants deny the allegations in Paragraph 57.  Defendants admit that certain representatives of NCS Multistage and Repeat Precision had a meeting on July 5, 2018 with Diamondback representatives in Fort Worth as part of the due-diligence process for Project Power. NCS and Repeat Precision discussed some of Diamondback's customers, as is standard in a due-diligence meeting.  Defendants deny that this questioning was inappropriately invasive. Defendants further deny that Gary Martin participated in the meeting.  He did not attend.

Defendants were aware of "Company A" and its involvement in the setting-tool market before the meeting.  In fact, as set forth in Repeat Precision's counterclaim below, Hunting-Titan had contacted Repeat Precision regarding the purchase and distribution of Repeat Precision's setting tools before July 5, 2018.  Hunting-Titan's representatives initiated the contact.  Moreover, in his deposition, Drury testified that Diamondback has *never sold* a setting tool to Hunting-Titan. Drury Dep. at 164:14–16.  Hunting-Titan also declined Diamondback's invitation to discuss distribution of disposable setting tools in early 2018.  *Id.* at 110:1–11.

58.     Defendants deny the allegations in Paragraph 58.  The text messages speak for themselves.  Dkt. 1–12.  Drury was aware of communications between Defendants and Hunting-Titan.  Drury worked with Defendants on the appropriate messaging and thanked them for their cooperation.  Defendants deny that this constituted a breach of any confidentiality agreement.

59.     Defendants deny the allegations in Paragraph 59.

60.     Defendants deny the allegations in Paragraph 60.

61.     Defendants admit that Diamondback contacted Hunting-Titan.  Defendants specifically deny that they misused any of Diamondback's confidential information.  To the

contrary, Hunting-Titan contacted Repeat Precision about its products.  During his deposition, Drury admitted that he had no right to control who Hunting-Titan did business with, and that there would be nothing wrong with Hunting-Titan affirmatively contacting Repeat Precision about business opportunities.  *See* Drury Dep. at 231:2–12.

62.     Defendants admit that Drury met with Hunting-Titan representatives on or about August 10, 2018.  Defendants lack sufficient information to admit or deny what exactly was discussed at the meeting.  Drury admitted during his deposition, however, that one of his goals in the meeting was to stop Hunting-Titan from doing business with Repeat Precision.  *See id.* at 210:8–211:24, 214:10–215:6.  Drury's efforts were successful, and Drury tortiously interfered with Repeat Precision's prospective business relationship with Hunting-Titan.  Defendants further admit that Repeat Precision does not have an explosives license and does not make—and has never made—power charges.  Defendants deny the remaining allegations in Paragraph 62.

63.     Defendants admit that Diamondback successfully interfered with Repeat Precision's prospective business relationship with Hunting-Titan, causing the negotiations between Repeat Precision and Hunting-Titan to come to an abrupt stop.  Defendants deny that they stole any trade secrets from the Project Power Data Room.  That data room had no trade secrets.  As explained more fully in response to Paragraph 54, and as admitted by Russell, who oversaw the data room, Diamondback took steps to ensure that none of its trade secrets were in the data room when Defendants' representatives accessed it.  *See* Russell Dep. at 130:3–18, 228:18–25.

Regarding the ROFR, Defendants admit that Repeat Precision offered to terminate the ROFR, and consistent with the provisions of the license, proposed doing so through an amendment.  Repeat Precision drafted an amendment that would have terminated the ROFR, while keeping the remaining terms of the license in effect.  *See* Ex. 80.  Diamondback refused to sign it.  Instead,

Diamondback's counsel wanted to re-write the entire license, which Repeat Precision refused to do.  Defendants deny the remaining allegations in Paragraph 63.

64.    Although Defendants admit that NCS elected not to proceed with the potential acquisition of Diamondback, Defendants deny the allegations in Paragraph 64.  Even after NCS gave Diamondback notice of its decision not to proceed with the transaction under the Letter of Intent, the parties continued less formal discussions about alternative business opportunities.

65.    Defendants admit that NCS retained both Baker Botts and Ernst & Young to assist NCS in connection with Project Power.  Defendants further admit that neither Baker Botts nor Ernst & Young communicated with Diamondback directly during the due-diligence process (outside of data-room access), as NCS handled most of the due-diligence tasks with its internal staff, before NCS elected not to proceed with the transaction.  Defendants deny that the "only reasonable conclusion" based on the time Baker Botts and Ernst & Young spent in the data room is that "Defendants used acquisition of Diamondback as a pretext to obtain its trade secrets."  To the contrary, it was unnecessary for these representatives to spend extended time in the data room based on Defendants' discoveries that ultimately led to NCS's decision not to pursue the potential acquisition further.  Defendants deny the remaining allegations in Paragraph 65.

66.    Defendants admit that John Harenza, Diamondback's counsel, wrote a letter to Ryan Hummer, NCS Multistage's Chief Financial Officer, on August 29, 2018.  Harenza sent the August 29 letter after NCS elected not to proceed with the potential acquisition of Diamondback. This letter is Diamondback's letter and does not reflect NCS's decision-making process or reasons for declining to proceed with the purchase.  Defendants deny the remaining allegations in Paragraph 66.

67.     Defendants deny the allegations in Paragraph 67.  Nipper's September 11, 2018 email to Drury clearly and unequivocally told Drury that Repeat Precision's lawyers would draft a formal proposal to terminate the ROFR.  Under the license, any modifications (which would include termination of the ROFR) have to be in writing and signed by the parties.  The September 11 email did not terminate the ROFR.  When Repeat Precision presented Drury with a proposal to remove the ROFR, Diamondback refused to sign it, wanting a broader amendment to the license. Defendants deny the remaining allegations in Paragraph 67.

68.     Defendants admit that Ori Lev, counsel for NCS, sent an email on September 26, 2018, to Diamondback transmitting a proposed amendment to the license that would have removed the ROFR.  *See* Ex. 80.  Lev's email also informed Diamondback that NCS and Repeat Precision were not willing to revisit all of the terms of the license, as Diamondback requested.  Diamondback did not sign the proposed license amendment attached to Lev's September 26 email.  Accordingly, the ROFR was not terminated.

69.     Defendants admit that Diamondback is manufacturing and selling disposable setting tools today.  Before May 30, 2018, the effective date of the amended license, Diamondback held rights under the '035 Patent to make and sell disposable setting tools as a stand-alone product. When Diamondback entered into the amended license, however, it conveyed to Repeat Precision the exclusive rights to make and sell disposable setting tools under the '035 Patent in the licensed territory (including the United States).  Repeat Precision provided notice to Diamondback of its infringing activity on November 26, 2018.  Still, Diamondback has continued willfully infringing Repeat Precision's rights under the '035 Patent.  Defendants' actions do not affect the language of the license or amendment.  Defendants deny the remaining allegations in Paragraph 69.

70.     Defendants admit the first sentence of Paragraph 70.   Regarding the second sentence in Paragraph 70, Defendants (including Gary Martin) admit that they helped ramp up production of disposable setting tools, enabling Diamondback to earn additional revenues from the sale of its power charges.  Defendants were considering a potential acquisition of Diamondback. Defendants deny the remaining allegations in Paragraph 70.

71.     Defendants admit that both Clint Mickey and Gary Martin visited Diamondback's facilities on more than one occasion.  One of those visits in which both Mickey and Gary Martin participated occurred in March 2018.  However, on other occasions, Mickey visited Diamondback facilities without Gary Martin (but sometimes with other Repeat Precision personnel).  Defendants admit that Gary Martin had an opportunity to see Diamondback's disposable-setting-tool-manufacturing operations.  Defendants deny the remaining allegations in Paragraph 71.

72.     Paragraph 72 is vague and ambiguous regarding the time period covered by this allegation, as well as regarding the identity of the people associated with Diamondback and Repeat Precision who allegedly developed a business relationship.   Defendants therefore deny the allegations in Paragraph 72.

73.     Paragraph 73 is vague and ambiguous regarding the time period covered by this allegation; nevertheless, Defendants admit that Diamondback advertised its disposable setting tools on its website in 2018.  Defendants deny the remaining allegations in Paragraph 73.

74.     Paragraph 74 is vague and ambiguous regarding the time period covered by this allegation; nevertheless, Defendants admit that Diamondback advertised its disposable setting tools at trade shows in 2018 and Repeat Precision personnel may have attended some of those shows.  Defendants deny the remaining allegations in Paragraph 74.

75.     Paragraph 75 is vague and ambiguous regarding the time period covered by this allegation, as well as regarding the identity of the people associated with Diamondback and Repeat Precision who allegedly exchanged text messages on the topics referenced in Paragraph 75; nevertheless, Defendants admit that some Diamondback representatives exchanged text messages with some Repeat Precision representatives about disposable setting tools in 2018.  Defendants deny the remaining allegations in Paragraph 75.

76.     Paragraph 76 is vague and ambiguous regarding the time period covered by this allegation; nevertheless, Defendants admit that Gary Martin shared information and ideas with Diamondback regarding manufacturing in 2018.  Defendants deny the remaining allegations in Paragraph 76.

77.     Defendants deny the allegations in Paragraph 77.

78.     Paragraph 78 is vague and ambiguous regarding the time period covered by this allegation; nevertheless, Defendants admit that Gary Martin shared information and ideas with Diamondback regarding product issues and manufacturing in 2018.   Defendants deny the remaining allegations in Paragraph 78.

79.     Defendants deny the allegations in Paragraph 79.

80.     Defendants admit that Diamondback is manufacturing and selling disposable setting tools today.  Defendants deny that this knowledge affects the legality of Diamondback's willful infringement, as explained more fully in response to Paragraph 69.  Defendants further deny the remaining allegations in Paragraph 80.

## V.     <u>Causes of Action</u>

81.     Defendants acknowledge that Diamondback purports to incorporate its prior allegations.  Defendants deny each of Diamondback's causes of action.

82.     Defendants admit that (a) Gary Martin is a member of the Board of Managers of Repeat Precision, (b) Nipper is the CEO of NCS, (c) Nipper is the President and a member of the Board of Managers of Repeat Precision, and (d) Grant Martin is the general manager of Repeat Precision.   Defendants further acknowledge that the corporate entities theoretically could be vicariously liable for the actions of their representatives that were undertaken during the course and scope of their employment.   Defendants deny the remaining allegations in Paragraph 82.

83.     Paragraph 83 is too vague, ambiguous, and conclusory to be able to be answered as written; nonetheless, Defendants admit that Gary Martin, Grant Martin, and Nipper were acting in the course and scope of their employment with Repeat Precision and/or NCS in connection with obtaining the license from Diamondback, making and selling disposable setting tools, and pursuing a potential acquisition of Diamondback.   Defendants deny the remaining allegations in Paragraph 83.

84.     Paragraph 84 is too vague, ambiguous, and conclusory to be able to be answered as written; nonetheless, Defendants repeat their response to Paragraph 83.   Defendants deny the remaining allegations in Paragraph 84.

85.     Paragraph 85 is too vague, ambiguous, and conclusory to be able to be answered as written; nonetheless, Defendants repeat their response to Paragraph 83.   Defendants deny the remaining allegations in Paragraph 85.

86.     Defendants deny the allegations in Paragraph 86.

87.     Defendants admit that Repeat Precision and NCS theoretically could be vicariously liable for the actions of their representatives that were undertaken during the course and scope of their employment.   Defendants, however, specifically deny that their representatives, including Gary Martin, Grant Martin, and/or Nipper, committed any acts that would give rise to liability in

Diamondback's favor on this or any other basis.  Defendants deny the remaining allegations in Paragraph 87.

88.     Paragraph 88 is too vague, ambiguous, and conclusory to be able to be answered as written; nonetheless, Defendants repeat their response to Paragraph 83.  Defendants deny the remaining allegations in Paragraph 88.

89.     Defendants repeat their response to Paragraph 87.  Defendants deny the remaining allegations in Paragraph 89.

90.     Paragraph 90 is too vague, ambiguous, and conclusory to be able to be answered as written; nonetheless, Defendants repeat their response to Paragraph 83.  Defendants deny the remaining allegations in Paragraph 90.

91.     Defendants repeat their response to Paragraph 87.  Defendants deny the remaining allegations in Paragraph 91.

92.     Defendants deny the allegations in Paragraph 92.

93.     Defendants repeat their response to Paragraph 87.  Defendants deny the remaining allegations in Paragraph 94.

94.     Paragraph 94 is too vague, ambiguous, and conclusory to be able to be answered as written; nonetheless, Defendants admit that it was reasonable for Diamondback to believe that Gary Martin, Grant Martin, and Nipper were acting in the course and scope of their employment with Repeat Precision and/or NCS in connection with obtaining the license from Diamondback, making and selling disposable setting tools, and pursuing a potential acquisition of Diamondback. Defendants deny the remaining allegations in Paragraph 94.

95.     Paragraph 95 is too vague, ambiguous, and conclusory to be able to be answered as written; Defendants therefore deny the allegations in Paragraph 95.

96.     Defendants deny the allegations in Paragraph 96.

97.     Defendants repeat the descriptions of each individual defendants' positions set forth in response to Paragraph 82.  Defendants deny the remaining allegations in Paragraph 97.

98.     Defendants deny the allegations in Paragraph 98.

99.     Defendants admit the allegations in Paragraph 99.

100.    Defendants deny the allegations in Paragraph 100.

101.    Defendants deny the allegations in Paragraph 101.

102.    Defendants deny the allegations in Paragraph 102 to the extent they refer to allegedly tortious acts committed by Gary Martin, Grant Martin, and/or Nipper.

103.    Defendants deny the allegations in Paragraph 103 to the extent they refer to allegedly tortious acts committed by Gary Martin, Grant Martin, and/or Nipper.

104.    Defendants deny the allegations in Paragraph 104.

105.    Defendants repeat the descriptions of each individual defendants' positions set forth in response to Paragraph 82.  In those capacities, Defendants further admit that Gary Martin, Grant Martin, and Nipper have some management responsibilities.  Defendants deny the remaining allegations in Paragraph 105.

106.    Defendants deny the allegations in Paragraph 106 to the extent they refer to allegedly tortious acts committed by Gary Martin, Grant Martin, and/or Nipper.

107.    Defendants deny the allegations in Paragraph 107.

108.    Defendants deny the allegations in Paragraph 108.

109.    Defendants deny the allegations in Paragraph 109.

110.    Defendants deny that Gary Martin discussed all of the listed topics during either his initial phone call with Drury or in their first in-person meeting on or about February 19, 2018, and

deny that any of these statements would have been misrepresentations.  *See* Dkt. 43 at 11–17.  As Drury admitted during his deposition, his initial call with Gary Martin was very brief.  Drury Dep. at 112:1–7.  Gary Martin and Drury discussed Martin's interest in visiting Diamondback and learning more about the disposable setting tool.  *Id.*  According to Drury, the call actually took place on February 12, 2018, not February 8, as stated in the complaint.  *Id.* at 111:12–21.  The parties set a meeting for February 19, 2018.  Clint Mickey and Grant Martin also attended.

During their in-person meeting, Gary Martin truthfully told Diamondback that he had an ownership interest in Repeat Precision, just like Drury has an ownership interest in Diamondback (and is not the sole owner) and represents himself as Diamondback's owner.  *Id.* at 25:4–9, 124:6–17; *see also* SAC ¶ 10.  Drury never asked for the details of Repeat Precision's ownership structure, including whether there were other owners of Repeat Precision.  *See* Drury Dep. at 123:3–126:13.  Gary Martin also expressed an interest in licensing the disposable setting tool, and also truthfully told Drury that Repeat Precision had started the process of designing around the '035 Patent.  But Repeat Precision's preference was to obtain a license.  Gary Martin also truthfully told Drury that Repeat Precision had international manufacturing facilities and experience manufacturing parts for the completion of oil and gas wells.  Thus, Repeat Precision wanted a chance to expand the number of disposable setting tools being sold and used in the market.  Gary Martin even took Drury to tour Repeat Precision's facilities in Mexico before entering into the license.  *Id.* at 120:19–24.

Defendants lack sufficient information to either admit or deny whether Gary Martin discussed promotion of Diamondback's power charges or an interest in purchasing Diamondback during these conversations.  These representations, however, would not have been false.  Repeat Precision has in fact promoted Diamondback's power charges in the past and Defendants did have

an interest in purchasing Diamondback, as evidenced by the Letter of Intent and months of negotiations.  Defendants deny the remaining allegations in Paragraph 110.

111.    Defendants deny the allegations in Paragraph 111.  Gary Martin's expressions of Defendants' interest in purchasing Diamondback were genuine at all times made.

112.    Defendants deny the allegations in Paragraph 112.

113.    Defendants deny the allegations in Paragraph 113.

114.    Defendants deny the allegations in Paragraph 114.  Diamondback's position on the materiality of Repeat Precision's precise ownership structure to Drury and Diamondback is contradicted by Drury's own testimony.  *See* Drury Dep. at 123:3–126:13.

115.    Defendants deny the allegations in Paragraph 115.

116.    Defendants deny the allegations in Paragraph 116.

117.    Defendants deny the allegations in Paragraph 117.

118.    Defendants deny the allegations in Paragraph 118.  Grant Martin and Nipper had no duty to disclose.  "A defendant's failure to disclose information will support a claim for fraud only where the defendant has a duty to disclose."  *Shandong*, 607 F.3d at 1035.  There is no general duty to disclose.  *Id.*  The Fifth Circuit has articulated three situations in which a duty to disclose may arise.  *Shaver v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, 593 F. App'x 265, 271 (5th Cir. 2014).  None of those are present here, where the alleged misrepresentations were made by someone other than Grant Martin and Nipper.  *See* Dkt. 44 at 9–10.

119.    Defendants admit that Grant Martin and Nipper had meetings with Drury at Spinks Airport.  Defendants deny the remaining allegations in Paragraph 119, including the allegations that they had any duty to disclose, as explained in response to Paragraph 118, and that Gary Martin

made any misrepresentations, as explained in response to Paragraph 117.  Defendants deny the remaining allegations in Paragraph 119.

120.    Defendants deny the allegations in Paragraph 120.  Defendants had no duty to disclose, as explained in response to Paragraph 118.  Grant Martin's and Nipper's roles with Repeat Precision and NCS, respectively, are explained in response to Paragraphs 82 and 83.

121.    Defendants deny the allegations in Paragraph 121.

122.    Defendants admit the allegations in Paragraph 122.

123.    Defendants deny the allegations in Paragraph 123.

124.    Defendants deny the allegations in Paragraph 124.

125.    Defendants admit the allegations in Paragraph 125.

126.    Defendants deny the allegations in Paragraph 126.

127.    Defendants respond that the agreement speaks for itself.

128.    Defendants deny the allegations in Paragraph 128.

129.    Defendants deny the allegations in Paragraph 129.

130.    Defendants admit that Repeat Precision sued Diamondback for patent infringement on November 26, 2018 in the Southern District of Texas and that Repeat Precision did not provide notice of its patent-infringement claims before then.  Similarly, as Drury admitted in his deposition, Diamondback filed its lawsuit against Defendants on November 2, 2018 in the Northern District of Texas, without giving Defendants notice of Diamondback's allegations or claims.  Drury Dep. at 22:4–19.  Defendants deny that Repeat Precision's position is contrary to the terms of the license and amended license.  Indeed, Repeat Precision's position is directly supported by the terms of the license and amended license. Defendants deny the remaining allegations in Paragraph 130.

131.    Defendants deny the allegations in Paragraph 131, as explained more fully in Repeat Precision's opposition papers to Diamondback's motion to dismiss.  *See* Dkt. 71. Defendants further deny that Repeat Precision has made any public statements about the exclusive nature of the license beyond those made in the context of this litigation, which are protected.

132.    Defendants deny the allegations in Paragraph 132.

133.    Defendants deny the allegations in Paragraph 133.

134.    Defendants deny the allegations in Paragraph 134.

135.    Defendants deny the allegations in Paragraph 135.

136.    Defendants admit that NCS was pursuing a potential acquisition of Diamondback after signing the Letter of Intent, and in connection with that potential acquisition, Diamondback and NCS entered into a confidentiality agreement dated July 25, 2018.  The confidentiality agreement was negotiated by Mark Russell, on behalf of Diamondback, and Ryan Sheppard, on behalf of NCS.  As part of the negotiations, Diamondback expressly agreed that it would not put its trade secrets in the Project Power Data Room.  *See* Exs. 131 & 132.  The parties further agreed that, if it became necessary for NCS to receive or review any Diamondback trade secrets, the parties would enter into an additional confidentiality agreement to address that potential occurrence.  Defendants admit that the July 25, 2018 confidentiality agreement is signed by Ryan Hummer, on behalf of NCS.  Defendants deny the remaining allegations in Paragraph 136.

137.    Defendants respond that the agreement speaks for itself.

138.    Defendants deny the allegations in Paragraph 138.

139.    Defendants deny the allegations in Paragraph 139.

140.    Defendants deny the allegations in Paragraph 140.

141.    Defendants admit the allegations in Paragraph 141.

142.    Defendants deny the allegations in Paragraph 142.   Diamondback does not adequately identify in the SAC the trade secrets it claims are at issue.  Moreover, many of the items Diamondback alleges are trade secrets are not, in fact, trade secrets.

143.    Defendants deny the allegations in Paragraph 143.

144.    Defendants deny the allegations in Paragraph 144.  Diamondback has failed to take reasonable steps to protect the confidentiality of the information it now claims as trade secrets. In a related litigation, a former Diamondback employee, Ron Swiger, provided a declaration describing Diamondback's lack of protection of the very information at issue.  *See* Ex. E.  Before March 2018, Diamondback did not require its employees to sign non-disclosure or confidentiality agreements.  *Id.* ¶ 4.  Before April 2018, Diamondback employees "regularly had access to and worked with Diamondback's business information including product cost information, employee and salary wage information, pricing information for products sold by Diamondback, product design information, and the Diamondback power charge formulas."  *Id.* ¶ 5.  In Swiger's experience, this information was not maintained as confidential.  *Id.*  Before summer 2018, Swiger had access to "most of Diamondback's computer shared drive, including those areas for engineering, quality control, ballistics, sales, vendors, personnel, and costs."  *Id.*  Diamondback's power charge formulas and product designs were maintained on that shared drive.  *Id.* ¶¶ 6–7.

145.    Defendants deny the allegations in Paragraph 145.  As explained in response to Paragraph 33, Gary Martin issued three checks to Trea Baker from his personal account: (1) one for $5,000 on March 27, 2018; (2) one for $5,000 on April 5, 2018; and (3) one for $2,500 on April 20, 2018.  These checks were paid by Gary Martin personally to Trea Baker as gifts.  Defendants further admit that Gary Martin informed Drury that he was going to give money to Trea Baker and that Drury voiced no objection, as Drury himself admits.  Drury Dep. at 24:3–25:3.

Defendants deny that Gary Martin paid Trea Baker to provide him with confidential Diamondback information, that he ever provided Gary Martin with any Diamondback trade-secret information, and that Gary Martin would have had reason to know that any information provided to him was allegedly acquired by improper means.  In fact, Drury admitted in his deposition that this allegation regarding Gary Martin's acquisition of trade secrets through Trea Baker is based purely on speculation.  *Id.* at 216:23–217:14.  Diamondback improperly alleges that Gary Martin acquired Diamondback trade-secret information from Trea Baker despite having no factual basis for this claim.  *See* Dkt. 43 at 8–11; *see also Innova Hosp*, 892 F.3d at 730 (explaining when a plaintiff can plead facts "on information and belief"); *see also U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) (holding that this exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations").

146.    Defendants deny the allegations in Paragraph 146.  Gary Martin never accessed the Project Power Data Room, as evidenced by Diamondback's own session log that was attached to its original complaint in this Court.  Dkt. 1-19; *see also* Russell Dep. at 160:4–161:3; 221:17–222:17.  And Grant Martin could not have accessed any trade secrets in the data room because any Diamondback trade secrets were removed.  *See* Exs. 131 & 132.  In fact, Drury confirmed that many of the documents Grant Martin reviewed were *not* trade secrets.  *See* Drury Dep. at 293:16–297:9.  Because Gary Martin and Grant Martin did not access any trade secrets through the data room, Defendants specifically deny that Gary Martin and Grant Martin "used and disclosed trade secrets learned through such access in a manner that constitutes misappropriation."  Defendants further deny that their expressed interest in acquiring Diamondback was in any way disingenuous.

147.    Defendants deny the allegations in Paragraph 147.

148.    Defendants deny the allegations in Paragraph 148.

149.    Defendants deny the allegations in Paragraph 149.  Defendants further repeat their responses to Paragraphs 145 and 146.

150.    Defendants deny the allegations in Paragraph 150.  Defendants further repeat their responses to Paragraphs 145 and 146.

151.    Defendants deny the allegations in Paragraph 151.  Defendants further repeat their responses to Paragraphs 57, 145, and 146.

152.    Defendants deny the allegations in SAC Paragraph 152.  Defendants further repeat their response to Paragraph 145.

153.    Defendants deny the allegations in Paragraph 153.

154.    Defendants deny the allegations in Paragraph 154.  Defendants further repeat their responses to Paragraphs 145 and 146.

155.    Defendants deny the allegations in Paragraph 155.  Defendants further repeat their response to Paragraph 145.

156.    Defendants deny the allegations in Paragraph 156.  Defendants further repeat their response to Paragraph 146.

157.    Defendants deny the allegations in Paragraph 157.  Defendants further repeat their responses to Paragraphs 145 and 146.

158.    Paragraph 158 is vague and ambiguous regarding what "representations by Gary Martin about Repeat Precision's financial wherewithal" Diamondback is referencing.  Defendants deny the allegations in Paragraph 158.

159.    Defendants deny the allegations in Paragraph 159.

160.    Defendants deny the allegations in Paragraph 160.

161.    Defendants deny the allegations in Paragraph 161. Defendants further repeat their response to Paragraph 144.

162.    Defendants deny the allegations in Paragraph 162.  Defendants further repeat their responses to Paragraphs 145 and 146.

163.    Defendants deny the allegations in Paragraph 163.  Defendants further repeat their responses to Paragraphs 145 and 146.

164.    Defendants deny the allegations in Paragraph 164.  Defendants further repeat their responses to Paragraphs 145 and 146.

165.    Defendants deny the allegations in Paragraph 165.  Defendants further repeat their responses to Paragraphs 145 and 146.

166.    Defendants deny the allegations in Paragraph 166.  Defendants further repeat their responses to Paragraphs 145 and 146.

167.    Defendants deny the allegations in Paragraph 167.  Defendants further repeat their response to Paragraphs 145.

168.    Defendants deny the allegations in Paragraph 168.

169.    Defendants deny the allegations in Paragraph 169.

170.    Defendants admit the allegations in Paragraph 170.

171.    Defendants admit the allegations in Paragraph 171.

172.    Defendants admit the allegations in Paragraph 172.

173.    Defendants admit the allegations in Paragraph 173.

174.    Defendants deny the allegations in Paragraph 174.  Repeat Precision has already explained the basis on which it holds the exclusive rights under the '035 Patents in its response in

opposition to Diamondback's motion to dismiss, Dkt. 71, which is incorporated herein by reference.

175.     Defendants deny the allegations in Paragraph 175.  Defendants further repeat their response to Paragraph 174.

176.     Defendants deny the allegations in Paragraph 176.  Defendants further repeat their response to Paragraph 174.

177.     Defendants deny the allegations in Paragraph 177.

178.     Defendants deny the allegations in Paragraph 178.

179.     Defendants deny the allegations in Paragraph 179.

180.     Defendants deny the allegations in Paragraph 180.

181.     Defendants admit that Nipper and Drury exchanged communications about the possibility of Repeat Precision releasing the ROFR.  Repeat Precision even drafted an amendment to the license that would have removed the ROFR.  Diamondback refused to sign the amendment. Accordingly, the ROFR has not been terminated.  This is explained more fully in response to Paragraphs 63, 67, and 68.  *See also* Dkt. 38 at 22–24.  Defendants deny the remaining allegations in Paragraph 181.

182.     Defendants deny the allegations in Paragraph 182.  Defendants further repeat their response to Paragraph 181.

183.     Defendants deny the allegations in Paragraph 183.  Defendants further note that, as explained more fully in response to Paragraph 146, Diamondback's allegations are objectively false. The Project Power Data Room session logs produced by Diamondback confirm that Gary Martin and Nipper never accessed Diamondback's data room.  Dkt. 1-19; *see also* Russell Dep. at 160:4–161:3; 221:17–222:17.  Grant Martin's access to the Project Power Data Room was granted

to him by Griffin Financial, which set up the data room for Diamondback.  Russell Dep. at 114:3–115:18.  Diamondback has not explained how Grant Martin exceeded his authorized access beyond a vague and conclusory reference to "an intent to defraud," an allegation that does not alone support a CFAA violation and for which there is also no factual support.  *See* Dkt. 44 at 11–13; *see also United States v. John*, 597 F.3d 263, 272 (5th Cir. 2010) (holding that an employee exceeded authorized access where she knew that the access violated company policy and served as part of an illegal scheme).  Nor has Diamondback set forth sufficient facts to state a claim for conspiracy to violate the CFAA, which requires specific allegations of an agreement and "meeting of the minds."  *See Hovanec v. Miller*, 2018 WL 1221486, at *8–9 (W.D. Tex. Mar. 7, 2018).

184.    Defendants admit that several representatives of NCS and Repeat Precision, including personnel with Baker Botts, ERM, and Ernst & Young, accessed the Project Power Data Room.  Gary Martin and Nipper, however, definitively did not access the data room.  Dkt. 1-19; Russell Dep. at 160:4–161:3; 221:17–222:17; *see also* Dkt. 43 at 18–19.  Defendants deny that there were any trade secrets contained in the data room, per the instructions of Diamondback's representatives.  *See* Exs. 131 & 132.  Defendants further repeat their response to Paragraph 183.  Defendants deny the remaining allegations in Paragraph 184.

185.    Defendants deny the allegations in Paragraph 185.

186.    Defendants deny the allegations in Paragraph 186.  Defendants further note that Diamondback's access logs affirmatively show that none of Defendants' representatives accessed any files in the Diamondback data room after NCS gave notice that it would not proceed with Project Power.  *See* Ex. 138; *see also* SAC ¶ 66; Russell Dep. at 232:19–233:4.  Furthermore, Diamondback wrongly includes the individual defendants—Gary Martin, Grant Martin, and

Nipper—in this allegation despite the fact that none of those individuals is alleged to have accessed the data room after NCS gave its notice.

187.    Defendants deny the allegations in Paragraph 187.  Defendants further repeat their responses to Paragraphs 183 and 186.

188.    Defendants deny the allegations in Paragraph 188.  Defendants further repeat their responses to Paragraphs 183 and 186.

189.    Defendants deny the allegations in Paragraph 189.  Defendants have no factual support for their allegation that the access Diamondback granted to certain Repeat Precision and NCS personnel has resulted in damages in excess of $25,000 spent last year.  Diamondback claims that it has been harmed in an amount exceeding $5,000 "at least by the amount spent determining what was accessed."  But Diamondback has already produced a report of exactly what documents were accessed and by whom.  *See* Ex. 138.  And a Griffin Financial employee tasked with assisting Russell, Richard Le, testified that it is easy for administrators to create these spreadsheets.  Le Dep. at 45:1–22.  Defendants also allege in a conclusory fashion that it has spent money on "repairing its goodwill," but has not connected this damage to the alleged access that exceeded authorization in any way.  Defendants finally note that Diamondback cannot support a claim for attempted access of its data room because no damages have been claimed as a result of an attempt.

190.    Paragraph 190 is vague and ambiguous regarding its reference to Defendants not having Diamondback's "effective consent."  Defendants deny the allegations in Paragraph 190 and repeat their response to Paragraph 183 regarding the Defendants' access of the data room.

191.    Defendants deny the allegations in Paragraph 191.

192.    Defendants deny the allegations in Paragraph 192.  Defendants further repeat their responses to Paragraphs 8, 57–58, and 61–63 regarding Defendants' contact with Hunting-Titan.

48

193.    Defendants deny the allegations in Paragraph 193.

194.    Defendants deny the allegations in Paragraph 194.

195.    Defendants deny the allegations in Paragraph 195.

196.    Defendants lack sufficient information to admit or deny the allegations in Paragraph 196.

197.    Defendants deny the allegations in Paragraph 197.

198.    Defendants deny the allegations in Paragraph 198.

199.    Defendants deny the allegations in Paragraph 199.  Defendants further note that Diamondback has not pleaded an underlying tort to support its civil conspiracy cause of action. *See Johns*, 644 F. App'x. at 327 (holding that the plaintiff's "inability to establish any of the . . . underlying torts doom[ed] his derivative claims for conspiracy and aiding and abetting"); *see also* Dkt. 43 at 17–18.

200.    Defendants deny the allegations in Paragraph 200.

201.    Defendants deny the allegations in Paragraph 201.

202.    Defendants deny the allegations in Paragraph 202.

203.    Defendants deny the allegations in Paragraph 203.

204.    Defendants deny the allegations in Paragraph 204.

205.    Defendants deny the allegations in Paragraph 205.

206.    Defendants deny the allegations in Paragraph 206.  Defendants further note that Diamondback has not pleaded an underlying tort to support its aiding and abetting cause of action. *See Johns*, 644 F. App'x. at 327 (holding that the plaintiff's "inability to establish any of the . . . underlying torts doom[ed] his derivative claims for conspiracy and aiding and abetting").

207.    Defendants deny the allegations in Paragraph 207.

208.     Defendants deny the allegations in Paragraph 208.

209.     Defendants deny the allegations in Paragraph 209.

210.     Defendants deny the allegations in Paragraph 210.

211.     Defendants deny that Diamondback is entitled to its attorneys' fees.

212.     Defendants deny that Diamondback has satisfied the conditions for recovery.

## VI.    **Prayer for Relief**

Defendants deny that Diamondback is entitled to any of the relief requested.

## **Affirmative Defenses**

In addition to the denials set forth above, Defendants assert the following affirmative defenses, and reserve the right to assert additional affirmative defenses as they become known through discovery in this matter:

1.      Failure to State a Claim – Diamondback has failed to state a claim against any of the Defendants upon which relief can be granted.

2.      Ratification – Diamondback's fraud and fraudulent-inducement claims challenging the patent license dated March 16, 2018 are barred by the doctrine of ratification. After unequivocally learning about the relationship between NCS and Repeat Precision, and knowing that neither Repeat Precision nor NCS had any obligation to purchase Diamondback, Plaintiff entered into the amended license effective May 30, 2018, which expressly ratifies and confirms the validity of the license. Ex. 2.

Diamondback's fraud and fraudulent-inducement claims challenging the patent license dated March 16, 2018 and the amended agreement dated May 30, 2018, are also barred by the doctrine of ratification because, after unequivocally learning about the relationship between NCS and Repeat Precision and knowing that neither Repeat Precision nor NCS had any obligation to

purchase Diamondback, Diamondback continued working with Defendants under the license for many months, including entering into the Letter of Intent with NCS, without raising objections. Diamondback also received benefits as a result of the license, including the ability to earn profits from selling its power charges and, on at least one occasion, the acceptance of royalties under the license.  These actions show Diamondback's acceptance and ratification of the license.

3.      Equitable Defenses – Diamondback's challenge to the validity of the license is barred by waiver, estoppel, and acquiescence.  Not only is wavier supported by the same facts that support Defendants' ratification defenses, Diamondback has waived its right to challenge the validity of the license by encouraging Defendants to invest millions in manufacturing facilities to build and sell products in reliance on the license.  Diamondback received a direct benefit as a result of Defendants' investments, including by being able to earn additional revenues from selling power charges to be used with the products Defendants produced with their new facilities and equipment.  Having encouraged such behavior and accepting its benefits (including in terms of royalties and increased revenues from the sale of power charges), Diamondback is barred from changing course and attacking the validity of the license.

4.      Implied License – Even if there was a technical defect affecting the validity of the license (which Defendants deny), Repeat Precision and Defendants are still entitled to an implied license to Diamondback's patents, including the '035 patent, based on the totality of the parties' relationship, including Diamondback allowing and encouraging Defendants to move forward with developing and manufacturing their own disposable setting tools.

5.      Diamondback's Fraud and Unclean Hands – Diamondback's fraud and fraudulent-inducement claims are also barred by Diamondback's own false and negligent misrepresentations and omissions.  In its fraud-based claims, Diamondback is seeking to impose a heightened duty of

disclosure beyond what is recognized under Texas law, even accusing Defendants of fraud by failing to disclose publicly-available facts regarding the relationship between Repeat Precision and NCS.  If such a heightened standard is applied, this compels rejection of Diamondback's claims. Diamondback possessed material, non-public information regarding the value of the company. Despite having expert valuation opinions establishing the value of Diamondback, Drury (acting on behalf of Diamondback) made representations to Defendants that greatly inflated the alleged value of the company.  Drury made these representations to induce Defendants to increase the amount they were proposing to pay for Diamondback, which succeeded in getting Defendants to increase the amount of their non-binding proposals.  Having made these false representations and omissions regarding material, non-public information, Diamondback is barred from claiming fraud or fraudulent inducement by Defendants.  These false representations are also a basis to deny Diamondback relief under the doctrine of unclean hands.

6. <u>License Language on Damages</u> – Diamondback's claims for lost profits, lost revenues, injury to its goodwill and reputation, lost business opportunities, and other forms of consequential damages are barred under Paragraph 10 of the license, which provides:

> To the fullest extent permitted by Law, Licensee shall not be liable to Licensor for any injury to or loss of goodwill, reputation, business production, revenues, profits, anticipated profits, contracts, or opportunities (irrespective of how these are classified as damages), or for any consequential, incidental, indirect, exemplary, special, punitive, or enhanced damages, whether arising out of breach of contract, tort (including negligence), or otherwise (including the entry into, performance or breach of this Agreement), regardless of whether such damage was foreseeable and whether or not the other party has been advised of the possibility of such damages.

Ex. 1 at ¶ 10.

7. <u>License Language on Merger</u> – Diamondback's claims are barred, in whole or in part, by merger. Diamondback seeks to recover from Defendants based upon an alleged oral promise regarding a potential acquisition of Diamondback.  However, any discussions about the

license or amended license, were merged into and extinguished—by operation of law and by the explicit terms of the written agreements—by the written agreements of the parties, including the patent license dated March 16, 2018 and the amended agreement dated May 30, 2018. Paragraph 13.9 of the patent license specifically provides, in relevant part: "This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter, which includes but is not limited to that certain Mutual Confidentiality and Non-Disclosure Agreement dated as of February 16, 2018." Ex. 1.  Thus, to the extent that any alleged prior oral representation differed from the written agreement of the parties, Defendants are not obligated to honor it and cannot be held liable because of it.

8.     Independent Development – Diamondback is barred from claiming trade-secret misappropriation as to any item of information that was independently developed by Defendants.

9.     Lack of Confidentiality – Diamondback is barred from claiming trade-secret misappropriation as to any item of information that was available in the public domain or the subject of a patent or license application.

10.     Failure to Take Reasonable Secrecy Measures – Diamondback is barred from claiming trade-secret misappropriation because Diamondback failed to take sufficient measures to protect the secrecy of the information alleged to be confidential and/or alleged to be a trade secret.

11.     Ownership and License – Diamondback is barred from claiming trade-secret misappropriation of any trade secrets, know-how, or other intellectual property acquired through the patent license dated March 16, 2018 and the amended agreement dated May 30, 2018 as Repeat Precision is entitled to the benefits granted under the license.

12.     <u>Consent</u> – Diamondback's claims are barred, in whole or in part, as a result of Diamondback's authorization, permission, and/or consent.  Diamondback authorized, permitted, and/or consented to Defendants' use and disclosure of Diamondback's alleged confidential information in the manner that such information was used and disclosed by Defendants, if at all.

13.     <u>Justification and Excuse</u> – Diamondback's claims for tortious interference and breach of confidentiality relating to Defendants' contacts with Hunting-Titan are barred by the doctrines of justification and excuse.  Among other things, Defendants had a right and business justification to have discussions with Hunting-Titan as part of the due-diligence process for a potential acquisition of Diamondback.

14.     <u>Breach of Contract</u> – Diamondback's claims are barred, in whole or in part, by Diamondback's own breach of the parties' various contracts.

15.     <u>Lack of Damages</u> – Diamondback's claims are barred, in whole or in part, by Diamondback's lack of injury and/or damages.

17.     <u>Limitations on Damages</u> – Any recovery by Diamondback is limited, in whole or in part, by the failure of Diamondback to mitigate damages.  Diamondback failed to mitigate damages, including, but not limited to, Diamondback's failure to take appropriate steps to prevent its employees or former employees from communicating alleged trade secrets to others, including Defendants.  Nor did Diamondback inform Defendants that they should not discuss certain topics with Diamondback employees or former employees.

## **Repeat Precision's Counterclaim**

In addition to the claims already asserted in its Original Complaint filed on February 4, 2019, which are hereby incorporated by reference, Repeat Precision, LLC ("Repeat Precision") asserts the following counterclaim against Diamondback Industries, Inc. ("Diamondback") for tortious interference with prospective business relationships as follows:

## I.      Parties

1.      Counterclaim-Plaintiff is Repeat Precision, a Texas limited liability company that has already appeared in this matter.

2.      Counterclaim-Defendant is Diamondback, a Texas corporation that has also already appeared in this matter.

## II.     Jurisdiction and Venue

3.      This Court has subject matter jurisdiction over this case under at least 28 U.S.C. §§ 1331, 1337, 1338, and 1367.  More specifically, Diamondback sued Repeat Precision and others for many claims, including under the federal Defend Trade Secrets Act, 18 U.S.C. §1836, and the Computer Fraud & Abuse Act, 18 U.S.C. §1030.  This case has also been consolidated with the lawsuit Repeat Precision filed against Diamondback alleging federal claims under patent and antitrust laws.  Accordingly, this Court has supplemental jurisdiction over the counterclaim asserted herein, which arises out of the same events, facts, and transactions at issue in the affirmative claims previously asserted by Diamondback and Repeat Precision.  18 U.S.C. §1367.

4.      This Court has venue over Repeat Precision's counterclaim for the same reasons that venue is proper in this Court for the affirmative claims previously asserted by the parties. Moreover, Repeat Precision and Diamondback consented to this venue for resolution of the disputes between them.

## III.    Factual Background

5.      Diamondback and Repeat Precision entered into a Patent License Agreement on March 16, 2018 (the "Original License"), under which Repeat Precision acquired the exclusive right to make and sell a product that combined the disposable setting tool covered by the '035 Patent with a frac plug.  A copy of the Original License is attached as Exhibit 4 to Diamondback's

Original Complaint.   Soon thereafter, Repeat Precision prepared marketing and promotional material for its combined product, called the PurpleSeal Express.   Diamondback's Derrek Drury reviewed and commented on Repeat Precision's promotional materials before they were finalized. *See* Dkt Nos. 3-2 at 72 & Dkt. No. 18 at 66-71 (Case:   19-CV-00034-ADA).   Drury is Diamondback's chief executive officer and controlling shareholder.   Accordingly, Drury's actions are attributable to Diamondback.

6.   Less than a month after obtaining the Original License, Repeat Precision and Diamondback started discussing amendments to the Original License, including an amendment to the "Licensed Products" definition to expand it to include the disposable setting tool as a stand-alone product too.   *See* Ex. 37.   After several draft amendments were exchanged between the parties, they agreed on the Amendment to Patent License Agreement and Right of First Refusal Agreement dated effective May 30, 2018, a copy of which is attached as Exhibit 6 to Diamondback's Original Complaint in this case.

7.   Not long after Repeat Precision began to promote the PurpleSeal Express, Repeat Precision's Grant Martin was contacted via email dated May 23, 2018, by Josh Howk, the Director of Sales and Distribution for Hunting Energy Services, Titan Division ("Hunting-Titan"), wanting to set up a meeting to discuss Repeat Precision's product.   Hunting-Titan soon clarified that it wanted to discuss Repeat Precision's PurpleSeal Express.

8.   By the time Hunting-Titan approached Repeat Precision, Diamondback had already turned down the opportunity to distribute its disposable setting tools through Hunting-Titan.   Drury confirmed in his deposition that Hunting-Titan never purchased disposable setting tools from Diamondback.

9.      In June 2018, Repeat Precision and Hunting-Titan negotiated and reached an agreement on the terms of a non-disclosure agreement to cover the terms of their discussions.

10.     Repeat Precision and Hunting-Titan had several telephone calls and in person meetings as the parties were discussing the opportunity for Hunting-Titan to purchase and distribute the PurpleSeal Express, as well as Repeat Precision's stand-alone disposable setting tools.  As the conversation continued, the parties even discussed the possibility that Hunting-Titan would purchase and distribute a toe-sleeve product that was manufactured by Repeat Precision and sold by NCS Multistage (the owner of a 50% interest in Repeat Precision).

11.     Although Repeat Precision and Hunting-Titan did not enter into a formal purchase and sale agreement for Hunting-Titan to buy products from Repeat Precision, by August 2018, Repeat Precision and Hunting-Titan had reached an understanding on the pricing of the products, as well as the anticipated quantities that Hunting-Titan would purchase.  There was a strong probability that Repeat Precision and Hunting-Titan would have entered into a formal business relationship, but for Diamondback's acts of interference.

12.     In mid-August 2018, the discussions between Hunting-Titan and Repeat Precision abruptly stopped.  Repeat Precision has since learned that Drury was the reason those discussions ended.

13.     Drury knew that Repeat Precision and Hunting-Titan were discussing business opportunities relating to Repeat Precision's disposable setting tools.  In his mid-August 2018 meeting with Hunting-Titan, Drury told Hunting-Titan that Repeat Precision and NCS had "violated" Diamondback's rights, "stole" information from Diamondback's data room, misrepresented factual information to Diamondback, and improperly used Diamondback's trade-secret information (including its power-charge formulations) against Diamondback.  Drury admits

that he and Diamondback intended to stop Hunting-Titan from doing business with Repeat Precision.  Drury also admits that he was responsible for causing Hunting-Titan to cease its negotiations with Repeat Precision.

14.     Although Drury now admits what he did, Drury did not tell Repeat Precision the truth back in August 2018.  To the contrary, Drury put a very positive spin on his interactions with Hunting-Titan.  Of course, at that time, Drury was still hoping that NCS and Repeat Precision would have paid him $200 million to buy Diamondback.

15.     Drury's statements to Hunting-Titan about Repeat Precision were false.  For example, the information Repeat Precision allegedly stole from the data room was never even in the data room.  Drury knew this before he spoke to Hunting-Titan, as Drury had specific discussions with his advisor for that transaction, Mark Russell of Griffin Financial, in which they agreed that Diamondback was not going to place any of its trade secrets in the data room.

16.     As a direct result of Drury's actions on behalf of Diamondback, Repeat Precision has been unable to sell any products to Hunting-Titan.  Repeat Precision has thus suffered significant damage and economic loss as a result of this lost business opportunity.

17.     Diamondback has also interfered with other Repeat Precision customer relationships.  For example, in late 2018, Repeat Precision was in advanced negotiations with Schlumberger to sell a substantial volume of disposable setting tools for distribution to Schlumberger's customers.  Drury admits that he knew Repeat Precision and Schlumberger were having discussions about business opportunities.  He further admits that he was in contact with a Schlumberger representative about this, during which Drury told this representative that Schlumberger could either do business with Repeat Precision or continue to do business with

Diamondback..  Drury's actions on behalf of Diamondback were the reason that Schlumberger ceased its business discussions with Repeat Precision regarding disposable setting tools.

## IV.    Counterclaim – Tortious Interference with Prospective Business Relationships

18.    Repeat Precision incorporates the foregoing paragraphs as if fully set forth herein.

19.    As explained above, Repeat Precision and Hunting-Titan were having negotiations over a prospective business relationship under which Hunting-Titan would purchase a substantial volume of disposable setting tools from Repeat Precision to distribute to Hunting-Titan's customers.  There was a reasonable probability that Repeat Precision would have entered into a business relationship with Hunting-Titan, but for Diamondback's interference.  Indeed, the parties had many telephone and in person discussions about their proposed business relationship, and were close to finalizing an agreement on pricing, volumes, and other terms of their relationship at the time of Diamondback's interference.

20.    Diamondback, through Derrek Drury, acted with a conscious desire to prevent Repeat Precision and Hunting-Titan from consummating their business relationship. Diamondback, through Derrek Drury, also knew that the termination of the negotiations between Repeat Precision and Hunting-Titan was the substantially-certain result of his actions when he contacted Hunting-Titan in mid-August 2018.

21.    Diamondback's conduct to interfere with Repeat Precision's business relationship with Hunting-Titan involved independently-tortious acts, as Derrek Drury, acting on Diamondback's behalf, made knowingly and/or negligently false statements of material fact to Hunting-Titan with the intent of interfering with Repeat Precision's prospective business relationship with Hunting-Titan.

22.     Diamondback's actions were the proximate cause of injury to Repeat Precision. Indeed, Drury admits that his interference was successful, and that he was the proximate cause of the termination of the discussions between Repeat Precision and Hunting-Titan.

23.     Repeat Precision has suffered actual damages in the form of lost sales opportunities to Hunting-Titan as a direct result of Diamondback's actions.

24.     Repeat Precision seeks recovery of its actual damages as a result of Diamondback's interference.  Diamondback should also be ordered to pay exemplary damages because (a) Diamondback's acts of interference were performed intentionally and with malice, (b) Diamondback's interference included false and fraudulent statements by Drury, made with an intent to interfere with Repeat Precision's prospective business relationship, and (c) at a minimum, Diamondback's interference was the result of grossly-negligent conduct.

25.     Diamondback also tortiously interfered with other prospective business opportunities for Repeat Precision, including with Schlumberger.  Given the advanced nature of Repeat Precision's discussions with Schlumberger, there was a reasonable probability that Repeat Precision would have entered into a business relationship with Schlumberger, but for Diamondback's interference.  Drury admits knowing that Repeat Precision was having discussions with Schlumberger, and he has admitted having a conscious desire to prevent Repeat Precision from doing business with entities that he viewed as his customers.  Drury engaged in tortious acts that were the direct and proximate cause of the termination of negotiations between Repeat Precision and Schlumberger.  Accordingly, Repeat Precision seeks recovery of its actual damages and lost revenues as a result of Diamondback's interference, as well as exemplary damages.

## **Prayer**

Defendants pray that (a) Diamondback be awarded no relief on the allegations asserted in their Second Amended Complaint; (b) the Court dismisses Diamondback's claims with prejudice; (c) Defendants be awarded recovery of their attorneys' fees and costs, pursuant to 35 U.S.C. § 285 (because this is an exceptional case related to patent infringement), Chapter 38 of the Texas Civil Practice and Remedies Code (because of Diamondback's baseless breach-of-contract claims), Section 134A.005 of the Texas Civil Practice and Remedies Code (because Diamondback brought its trade-secret-misappropriation claims in bad faith), including interest, as well as all other relief prayed for in Repeat Precision's original complaint filed on February 4, 2018; and (d) the Court grant Defendants any additional relief to which it may be entitled.

Counterclaim Plaintiff Repeat Precision, LLC further prays for a judgment in its favor and against Counterclaim Defendant Diamondback Industries, Inc. awarding Repeat Precision (a) its actual damages, (b) exemplary damages, (c) pre- and post-judgment interest, (d) attorneys' fees, and (e) such other and further relief to which Repeat Precision may be entitled.

Date:  July 9, 2019                    Respectfully submitted,


                                       */s/ W. Scott Hastings*
                                       W. Scott Hastings
                                           Texas State Bar No. 24002241
                                           shastings@lockelord.com
                                       Charles E. Phipps
                                           Texas State Bar No. 00794457
                                           cphipps@lockelord.com
                                       Susan E. Adams
                                           Texas State Bar No. 24059354
                                           suadams@lockelord.com
                                       Anna K. Finger
                                           Texas State Bar No. 24105860
                                           anna.k.finger@lockelord.com

                                       Locke Lord LLP
                                       2200 Ross Avenue, Suite 2800
                                       Dallas, Texas  75201
                                       (214) 740-8000 Telephone
                                       (214) 740-8800 Facsimile

                                       Attorneys for Repeat Precision, LLC, NCS
                                       Multistage, LLC, NCS Multistage Holdings, Inc.,
                                       and Robert Nipper

                                       J. Hoke Peacock III
                                           Texas State Bar No. 15673980
                                           tpeacock@susmangodfrey.com
                                       Shawn L. Raymond
                                           Texas State Bar No. 24009236
                                           sraymond@susmangodfrey.com
                                       Krisina J. Zuniga
                                           Texas State Bar No. 24098864
                                           kzuniga@susmangodfrey.com

                                       Susman Godfrey LLP
                                       1000 Louisiana Street, Suite 5100
                                       Houston, Texas 77002-5096
                                       (713) 651-9366 Telephone
                                       (713) 654-6666 Facsimile

                                       Attorneys for Gary Martin and Grant Martin

<u>Certificate of Service</u>

I hereby certify that on July 9, 2019, I served the foregoing answer on all counsel of record via the Court's ECF system and/or via email.

Decker A. Cammack
Mack Ed Swindle
David Skeels
Whitaker Chalk Swindle & Sawyer
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0500

John P. Palmer
Naman Howell Smith & Lee
P.O. Box 1470
Waco, Texas 76703-1470
Telephone: (254) 755-4100

J. Mitch Little
Scheef & Stone LLP
2600 Network Blvd., Ste. 400
Frisco, Texas 75034
Telephone: (214) 472-2100

*/s/ W. Scott Hastings*
W. Scott Hastings