## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:19-CV-00034-ADA** |
| | § | **(Consolidated with 6:19-CV-00036-ADA)** |
| **REPEAT PRECISION, LLC; NCS** | § | |
| **MULTISTAGE, LLC; and NCS** | § | |
| **MULTISTAGE HOLDINGS, INC.,** | § | |
| | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Repeat Precision, LLC ("Repeat Precision"), NCS Multistage, LLC ("NCSM"), and NCS Multistage Holdings, LLC ("NCSM-H") (collectively, "Defendants") file these proposed findings of fact and conclusions of law. NCSM and NCSM-H shall be referred to collectively as "NCS."

## INTRODUCTION

1. The Court heard this case as a bench trial from January 27, 2020 through January 29, 2020, and the parties gave closing arguments on February 25, 2020. The findings of fact and conclusions of law detailed below are entered based on the Court's assessment of the evidence, testimony, and argument presented at trial. Any finding of fact that constitutes a conclusion of law or any conclusion of law that constitutes a finding of fact shall be deemed the other as appropriate.

2. This case presents a dispute regarding a product known as a "disposable setting tool," which is covered by U.S. Patent No. 9,810,035 ("the '035 Patent"). Ex. 290.

Diamondback Industries, Inc. ("Diamondback") has granted an exclusive right under the '035 Patent to Repeat Precision, which was amended effective May 30, 2018. *See* Exs. 1, 2.

3.     In this lawsuit, Diamondback asserts essentially two causes of action and seeks damages for:  (a) fraud and fraudulent inducement seeking to cancel or void the amended license it granted to Repeat Precision, and (b) breach of contract.

4.     Repeat Precision seeks to enforce its rights under its license, including by seeking injunctive relief to stop Diamondback from infringing on Repeat Precision's exclusive rights to make and sell disposable setting tools and to compel Diamondback to continue selling power charges to customers using Repeat Precision's disposable setting tools.  Repeat Precision also seeks damages for Diamondback's (a) breach of the license, (b) patent infringement, (c) tortious interference with existing and prospective business relationships, and (d) antitrust violations. Repeat Precision also seeks declaratory relief regarding its ability to practice Diamondback's power charge patents, and injunctive relief to prevent Diamondback from pursuing a reissue application relating to the '035 Patent.

5.     As the trial unfolded, Diamondback's factual claims became increasingly a moving target.  As soon as Repeat disproved one factual claim, Diamondback—particularly it's CEO Derrek Drury—came up with another take on the same claim.  Diamondback's story at trial was sometimes so internally inconsistent or implausible on its face as to key factual elements that it strained credulity to believe any of it.  Diamondback's live pleadings did not track with Diamondback's pre-trial findings of fact and conclusions of law, which did not track with the evidence and testimony Diamondback offered during trial.  Indeed, Diamondback abandoned the bases for many of its legal theories.  Conversely, Defendants' Answer and Repeat Precision's Counterclaims synced with the testimony and exhibits introduced at trial.  As detailed below,

many key findings of fact turn on the credibility of the witnesses and whether the testimony was supported by objective evidence.

6.     To an overwhelming degree, the credibility and evidence stacked up in favor of Repeat Precision and all-but-crumbled against Diamondback. Mr. Drury's credibility, in particular, was shredded on cross-examination.

## FINDINGS OF FACT

### A.     THE PARTIES.

7.     Repeat Precision is a Texas limited liability company that is a jointly owned by NCS and R.J. Machine Company ("R.J. Machine").  Ex. 108 at RP0005309; ECF152 (the Pre-Trial Order, Stipulation of Fact ("Stipulation")) #3.[1]  Robert Nipper serves as Repeat Precision's CEO and was formerly its president and treasurer.  Tr. 556-57 (Nipper).  Grant Martin serves as the president of Repeat Precision—formerly the general manager—and runs Repeat Precision's day-to-day operations.  Tr. 361-62 (Gr. Martin).  Gary Martin and Robert Nipper both serve on Repeat Precision's Board of Managers.  Tr. 557-58 (Nipper).

8.     The ultimate parent of NCS is NCSM-H, which is a Delaware corporation that is publicly-traded on the NASDAQ under the symbol NCSM. Tr. 561 (Nipper).

9.     Diamondback is a Texas corporation that is controlled by its CEO, Derrek Drury. Stipulation #2.  Diamondback's primary facility is located in Crowley, Texas.  Ex. 470 at 6. Diamondback manufactures explosive devices, including power charges, as well as setting tools.

### B.     DERREK DRURY'S LACK OF CREDIBILITY

10.     Before delving further into the findings of fact, the Court first addresses the credibility of Diamondback's CEO, Derrek Drury, who was Diamondback's primary (and on

---

[1] All references to "ECF#" are to the filings in Case No. 6:19-cv-00034-ADA, unless otherwise noted.

many topics only) witness at trial.  For the reasons provided below, the Court finds the testimony of Mr. Drury to be wholly lacking in credibility as it relates to issues central to Diamondback's live causes of actions and affirmative and other defenses.

11.     The Court begins by discussing one of the most important issues in this case—the negotiations surrounding the Amended License that was the subject of several of this Court's Orders.  *See* ECF89 & ECF137. The parties now agree that two discussions occurred with Mr. Drury about a proposed amended license, one on April 11, 2018, and a second on May 22, 2018. But Mr. Drury's testimony on what happened during those discussions constantly changed, regardless of the fact that he was testifying under oath each time.

> 1.     *Mr. Drury's Contradictory Story about What Happened on April 11, 2018*

12.     On April 11, 2018, there is no question that Derrek Drury and Gary Martin met in Marble Falls, Texas.  Tr. 45, 100, 104-05, 117 (Drury), 500 (Ga. Martin).  Defendants have consistently maintained that Drury also spoke to Robert Nipper on this day.  Tr. 500 (Ga. Martin), 521-24, 573 (Nipper).  Defendants also have consistently maintained that no agreements were reached between the parties about the terms of an amended license on April 11, Tr. 500 (Ga. Martin), 523-24 (Nipper), which was a critical factual point relating to the mutual mistake theory Diamondback asserted in this case.

13.     One week before trial (but after the Court rejected Diamondback's mutual mistake theory because, in part, of the lack of evidence of an agreement between the parties on April 11, *see* ECF137 at 11-12), Diamondback submitted proposed pre-trial findings of fact and conclusions of law explaining (for the first time) the fraud theory it intended to pursue at trial:

> On April 11, 2018, Derrek Drury and Gary Martin met at Gary Martin's house in Marble Falls, Texas.  Robert Nipper attended by telephone.  Derrek Drury (authorized agent of Diamondback) and Gary Martin (authorized agent of Repeat) and/or Robert Nipper (Chairman of the Board of Managers of Repeat) entered

4

> into an agreement to permit Repeat to manufacture and sell standalone disposable short setting tool. <u>Repeat represented that Diamondback would continue its manufacture of disposable short setting tools under the agreement.</u>

ECF157, ¶18 (emphasis added); Tr. 93:24–94:6, 106:18-106:20 (Drury). Mr. Drury reviewed and approved this proposed finding, Tr. 1 at 106:21-106:24 (Drury), even though it was an entirely new story. Previously, Mr. Drury told the Court under oath that Mr. Nipper had nothing to do with the negotiations over the amendment. ECF123 (Diamondback Appendix in Response to Motion for Partial Summary Judgment on Mutual Mistake at 424, ¶2 ("Nipper did not participate in the negotiation")).

14.     Drury admits he changed his sworn story:

Q:      But you just told me that Robert Nipper was part of the negotiations that led to what you believe was the agreement that was amended on April 11, 2018, correct?

A:      Correct.

Q:      And that's not what you put in your affidavit to the Court in November, right?

A:      Correct.

Q:      But now after the Court has ruled on the mutual mistake issue, you're testifying that Robert Nipper in fact participated in the April 11, 2018, meeting, right?

A:      Correct.

*Id.* at 109:11-24.

15.     Drury's flip-flop on sworn testimony regarding the April 11, 2018 discussion is actually worse. When he gave his deposition back in June 2019, Drury claimed that the proposed amended license (Ex. 37) came out of the blue with no prior discussions, yet now he has a full story (albeit a changing one) of what happened at the beginning of the negotiations over the amendment:

> Q:     So six months ago at your deposition you didn't remember any discussion with Gary, Grant, or anybody at Repeat, which would include Robert, about amending the license, right?
>
> A:     That's right.
>
> Q:     And less than three months ago in your affidavit you said Robert Nipper had nothing to do with the negotiations of the amended license, right?
>
> A:     Right.
>
> Q:     But today you claim you did in fact negotiate with Robert [Nipper] and Gary [Martin] and that they did make representations about the amended license not preventing Diamondback from manufacturing and selling disposable setting tools, right?
>
> A:     Right.

*Id.* at 111:2-14.

16.    Although Mr. Drury now tries to claim that he reached an agreement with Repeat Precision to amend the license on April 11, 2018 that included the right for Diamondback to continue making disposable setting tools, Drury contradicted himself there too, later admitting that the parties had not reached such an agreement.  Tr. 122:20-122:23 (Drury) (admitting "there was no agreement between Repeat and Diamondback on the amended license" even as of April 17, 2018).  Drury later acknowledged that there was no agreement even as of May 17, 2018, as the lawyers were going back and forth on drafts of the proposed amendment.  Tr. 126:8-126:23, 127:19-127:22 (Drury).

> ### 2.    *Mr. Drury's Made-for-Trial Story about the Lunch on May 22, 2018*

17.    Drury also changed the story regarding what happened on May 22, 2018.  In its pre-trial findings of fact and conclusions of law that Mr. Drury personally approved, Diamondback alleges that at a May 22, 2018 lunch in Fort Worth:

> Mr. Nipper, on behalf of Repeat, represented that the amendment [to the license agreement, Exhibit 2] would allow Repeat to help Diamondback with its backlog

of orders and <u>that Diamondback's manufacture [of disposable short setting tools]
would continue under the amended agreement</u>.

ECF157, ¶ 27 (emphasis added); Tr. 94:20-95:12 (Drury). Mr. Drury confirmed that this factual

allegation formed a basis for Diamondback's fraud-based claims:

> <u>Repeat, through Robert Nipper, committed fraud, fraudulent inducement by</u> (1)
> <u>representing that</u> they would help Diamondback meet its demand for disposable
> setting tools and that, (2) <u>Diamondback would continue making the tool as well</u>.

Tr. 95:16-20 (Drury); ECF157, ¶15 at 12 (emphasis added).

18.     Mr. Drury admitted, however, that Diamondback's amended answer to an

Interrogatory (that Mr. Drury himself verified), which asked Diamondback:

> to identify each false statement that forms the basis of your fraud and/or
> fraudulent inducement claim, and for each false statement, identify the speaker,
> the recipient of the statement, the date when it was made, where and how it was
> made, the substance of the statement, why you believe it's false and each act you
> took on reliance on that statement,

does *not* mention "anything about Mr. Nipper representing at the Fort Worth lunch (or

elsewhere) that Diamondback would continue to make disposable short setting tools under the

amended license." Tr. 97:19-98:13 (Drury). Indeed, Diamondback's amended answer to this

interrogatory did not mention *anything* at all about the May 22, 2018 lunch in Fort Worth. Tr.

100:6-100:9 (Drury).

19.     Further impacting Mr. Drury's credibility  was his admission that he did not

testify at his deposition about Mr. Nipper misrepresenting anything to him at the Fort Worth

lunch. Tr. 101:17-20; 102:7-11 (Drury). Yet, now, Diamondback wants the Court to believe that

Mr. Nipper's alleged statements should be the basis for voiding the amended license agreement.

20.     Mr. Drury has told a similar new story about Gary and Grant Martin, too.

Diamondback's pre-trial findings of fact and conclusions of law assert that at the same May 22,

2018 lunch in Fort Worth:

Mr. Grant Martin and Mr. Gary Martin likewise represented that the amendment would not prevent Diamondback from manufacturing and selling disposable setting tools practicing the '035 Patent.

ECF157, ¶ 27; Tr. 102:12-102:16 (Drury). Mr. Drury testified that he stood behind that statement. Tr. 102:17-102:19 (Drury). But then he admitted that he didn't mention at his deposition that Mr. Gary Martin made such a representation. Tr. 103:13-18 (Drury). Nor were these alleged representations in Diamondback's amended interrogatory responses. Tr. 100:6-100:9 (Drury).

21. Mr. Drury's wildly inconsistent testimony on this subject was encapsulated in the following exchange:

Q: And six months ago at your deposition you didn't testify that Gary [Martin] represented to you at the May 22nd Fort Worth lunch that the amended license wouldn't prevent Diamondback from manufacturing and selling disposable setting tools, right?

A: That's correct.

Q: And six months ago in your interrogatory answers that you swore when you were asked to identify all misrepresentations, you didn't mention anything about Robert Nipper saying that Diamondback's manufacture would continue under the amended license agreement, right?

A: I didn't think it was necessary.

Q: But today you say you did in fact negotiate with Robert and Gary and they made representations about the amended license not preventing Diamondback from manufacturing and selling setting tools, right?

A: That's right.

Q: That's a lot of gray area there, isn't there?

A: I can't answer that question. That's for you.

Q: Well, it's actually for the Court, right?

Tr. 111:15–112:8 (Drury).

22.     It is for the Court to assess whether the "gray area" surrounding Mr. Drury's shifting testimony amounts to the truth.  The Court does not believe Mr. Drury's testimony in this regard.  The misrepresentations allegedly made by Mr. Nipper, Mr. Gary Martin, and Mr. Grant Martin at the lunch in Fort Worth on May 22, 2018, were raised for the first time less than a week before trial—long after fact discovery closed.

### 3.     Mr. Drury Testified Inconsistently on Many Topics at Trial.

23.     Mr. Drury's inconsistent testimony was not limited to the events of April 11 and May 22, 2018.  Mr. Drury provided false and inaccurate testimony on many subjects at trial, including (a) the timing and scope of Diamondback's backorder issues, (b) when he learned Hunting Oilfield Services, Titan Division ("Hunting-Titan") was entering the power charge market, (c) when he learned that Repeat Precision was having discussions with Hunting-Titan, (d) when the negotiations over a proposed transaction between Diamondback and Repeat Precision ended, and (e) whether Repeat Precision was intended to be able to sell setting tools to anyone other than Diamondback.

24.     Mr. Drury testified at trial that Diamondback did not have a backorder issue on disposable setting tools until March or April 2018.  Tr. 45:10-45:12, 112:19-112:22 (Drury).  Mr. Drury also verified an interrogatory answer during discovery allegedly disclosing the extent of the backorder issue, starting with March 2018.  *See* Ex. 2038.  But both were wrong.  Exhibit 216 (from February 2018) shows that the backorder problem started much earlier than Mr. Drury said.  Tr. 113:10-113:18 (Drury).  And Diamondback's head of accounting testified that Mr. Drury's sworn interrogatory answer was not even close to being accurate in terms of the volume of backordered tools.  Tr. 693-94 (T. Check); Ex. 270.

25.     Mr. Drury testified at trial that he first learned that Hunting-Titan (his largest customer for power charges) was entering the power charge business in July 2018 when Mr.

Nipper reported that to him.  Tr. 70:7-70:11, 138:19-138:24, 142:11-142:14 (Drury).  However, multiple documents conclusively show that Mr. Drury was informed of Hunting-Titan's entry into the power charge market much earlier, and weeks before Mr. Drury signed a letter of intent to try to sell his business to the Defendants.  *See* Ex. 284 (June 1, 2018 email); Ex. 319 (June 7, 2018 text).  And Diamondback's longest serving employee, Rob Andres, testified that he told Mr. Drury about Hunting-Titan's plans in early 2018.  Tr. 664-65 (Andres).  Of course, Mr. Drury did not disclose this information about Diamondback's biggest power charge customer going into competition against it to Defendants when he was trying to sell his business to them.

26.     Mr. Drury testified on direct that he did not learn that Repeat Precision was in discussions with Hunting-Titan until August 2, 2018.  Tr. 91:24-92:2 (Drury).  But on cross-examination, Mr. Drury backtracked, admitting he knew this fact earlier.  Tr. 143:8-143:11, 150:4-150:7, 161:1-161:4 (Drury) (admitting his testimony on direct was "untrue").

27.     Mr. Drury testified on direct that a potential deal with Repeat Precision or NCS was "dead" and "non-existent" as of August 29, 2018.  Tr. 74:5-74:12 (Drury).  On cross-examination, however, Drury admitted this testimony was "not true testimony."  Tr. at 167:2-167:8 (Drury).  Contrary to what Mr. Drury said on direct, the parties met on August 30, 2018 to discuss a proposed offer from NCS, and they continued to discuss a proposed transaction in September and October 2018.  Tr. 167:9-168:1, 169:9-170:20, 178:7-180:8 Drury); Ex. 2199 (entries 602, 626, 780, 792); Ex. 431.

28.     In support of Diamondback's allegations that Repeat Precision had improper contact with Hunting-Titan that harmed Diamondback, Mr. Drury had this exchange on cross examination:

> Q: Mr. Drury, you testified on direct examination, I believe, that Diamondback was Repeat's only intended customer for setting tools, is that right?
>
> A: Yes.

*Id.* at 173:6-9. Moments later this exchange took place:

> Q: You testified earlier on direct and just a minute ago that Diamondback was Repeat's only intended customer for setting tools, right?
>
> A: No.

*Id.* at 174:1-4.

29. This type of "yes means no" approach to testifying about material issues caused the Court to discount the truthfulness of Mr. Drury's testimony.

> **4.** *Mr. Drury Was Repeatedly Caught Testifying Contrary to What He Said Under Oath in His June 2019 Deposition.*

30. While being cross examined, Mr. Drury was impeached multiple times with his own deposition testimony.

31. Deposition Impeachment No. 1. In connection with Mr. Drury's meeting with Hunting-Titan on August 17, 2018 at which Mr. Drury told Hunting-Titan he thought Repeat Precision had committed fraud, Mr. Drury was impeached as follows:

| Mr. Drury's Trial Testimony<br>Tr. 161:14-161:20 | Mr. Drury's Deposition Testimony<br>Dep. 225:25-226:3 |
|---|---|
| Q: And as a result of your April 17, 2018 meeting, I want you to tell the Court, were you able to convince Hunting-Titan to stop communications with Repeat and NCS? You were, right? | Q: As a result of this meeting, you were able to convince Titan to – Hunting Titan to stop their communications with Repeat and NCS. Right? |
| A: No. I was not. | A: That's correct. |

32. Deposition Impeachment No. 2. Immediately following the first impeachment described above, Mr. Drury was impeached again.

11

| Mr. Drury's Trial Testimony<br>Tr. 161:25-162:4 | Mr. Drury's Deposition Testimony<br>Dep. 226:9-226:30 |
|---|---|
| Q: And that was one of your objectives when you went to see Hunting-Titan was to stop those communications, correct? | Q: And when you went to go see the Hunting-Titan representatives, that was your goal was to stop the communications and negotiations between Hunting Titan and the Repeat and NCS representatives? |
| A: That's incorrect. | A: That was one of the objectives, sure. |

33.    Deposition Impeachment No. 3: The second impeachment described above

quickly led to a third impeachment of Mr. Drury.

| Mr. Drury's Trial Testimony<br>Tr. 162:19-162:25 | Mr. Drury's Deposition Testimony<br>Dep. 232:7-232:12 |
|---|---|
| Q: You successfully convinced Hunting-Titan to stop negotiations with Repeat and NCS on disposable setting tools owned by Diamondback on the '035 Patent, yes? | Q: But you are aware of the fact that you successfully convinced Hunting Titan to stop negotiating with Repeat and NCS. Right?<br><br>MR. LITTLE: Objection. Form. |
| A: I believe they chose that own on their own. So no. I would not answer that, that I -- | A: On the disposable setting tool owned by Diamondback in the 035 patent, yes. |

34.    Deposition Impeachment No. 4: The fourth impeachment relates to the propriety

of Hunting-Titan reaching out to Repeat Precision and goes to the heart of Diamondback's claim

that Repeat Precision had improper contacts with Hunting-Titan.

| Mr. Drury's Trial Testimony<br>Tr. 171:16-171:22 | Mr. Drury's Deposition Testimony<br>Dep. 231:7-231:12 |
|---|---|
| Q: And if Hunting-Titan reached out to Repeat and asked Repeat to meet with them to discuss products, that would be perfectly okay, correct? | Q: And if Hunting Titan reached out to Repeat Precision and asked Repeat Precision to meet with them to discuss products, that would be perfectly okay, wouldn't it?<br><br>MR. LITTLE: Objection. Form. |
| A: No. It wouldn't be. | A: Yes, you could say that. |

35.    Deposition Impeachment No. 5: The next impeachment relates to a phone call

Mr. Drury had with Mr. Gary Martin on October 2, 2018 in which he claims Mr. Gary Martin

said, "we own you." To bolster the fact that Mr. Gary Martin said this (Mr. Martin denies saying it), Mr. Drury claimed two other people were on the call. That lead to the following impeachment:

| Mr. Drury's Trial Testimony<br>Tr. 184:20-184:24 | Mr. Drury's Deposition Testimony<br>Dep. 303:5-303:10 |
|---|---|
| Q: You believe that both Reif Chron and Mark Russell both spoke during that call, right? | Q: So the three of you were on. Did Mark speak during the conversation? |
| A: No. They did not. | A: Yes, I believe so. |
| | Q: All right. Did Reif speak during that conversation? |
| | A: I believe so. |

36. <u>Deposition Impeachment No. 6</u>: While testifying about the intentional boycott of Diamondback power charges directed at Repeat Precision customers in November 2018 done "to kind of spite Repeat Precision," Tr. 208:8–209:8 (Drury), Mr. Drury was impeached over what he told Kevin Ward at Altitude (one of Repeat Precision's customers) about the boycott.

| Mr. Drury's Trial Testimony<br>Tr. 211:4-211:9 | Mr. Drury's Deposition Testimony<br>Dep. 257:19-257:24 |
|---|---|
| Q: Because Altitude's customer Mewbourne was using a Repeat disposable tool, you were telling him Diamondback wasn't going to sell power charges to him, correct? | Q: So because Mr. Ward's customer or his client, Mewbourne, was using a Repeat Precision disposable tool, you were explaining to Mr. Ward that you were not and Diamondback was not going to sell power charges to him. Right? |
| A: No. That's incorrect. | A: That's right. |

37. <u>Deposition Impeachment No. 7</u>: Two minutes after Impeachment No. 6, Mr. Drury was impeached again about what he told Kevin Ward at Altitude about the boycott Mr. Drury had Diamondback impose on Repeat Precision's customers.

| Mr. Drury's Trial Testimony | Mr. Drury's Deposition Testimony |
|---|---|

| Tr. 212:23–213:2 | Dep. 250:2-250:4 |
|---|---|
| Q: You discussed with him, that's Kevin Ward, how Altitude should not be using Repeat Precision tools but instead should buy from you? | Q: When you talked to Kevin Ward, did you have any discussions about how they should not be using Repeat Precision disposable tools but instead should buy from you? |
| A: No. I didn't say that specifically. | A: Yes. |

38. The Court finds that the cumulative effect of Mr. Drury's impeached testimony, his changed testimony, and his testimony inconsistent with Diamondback's representations in its filings to the Court that he himself approved, crippled his overall credibility as a witness.

39. In stark contrast to Mr. Drury's credibility problems and flexible version of the truth, the Court did not find any credibility issues or problems with the other witnesses who testified at trial.

### C. OVERVIEW OF THE RELEVANT PRODUCTS AND MARKETS.

#### 1. Setting Tools Are Used to Set Frac Plugs for Well Completions.

40. Frac plugs are used during the completion of oil and gas wells to isolate specific zones within a well, particularly when the operator is perforating various zones within the well. Tr. 362-63 (Gr. Martin); *see, e.g.,* Ex. 2089. A frac plug is used to enable the operator to focus on a particular zone for completion, without adversely impacting the work that has already been performed further down the well (*i.e.* towards its "toe"). *Compare* Repeat Precision's Complaint ("RP Compl.")[2] ¶14 with Diamondback's Original Answer ("ECF25") ¶14 (admitting allegations).

---

[2] Repeat Precision's Complaint is ECF1 in Case No. 6:19-cv-00036-ADA.

41.     Setting tools are used to place the frac plug in the desired location within the wellbore.  Tr. 364 (Gr. Martin).  That assembly (*i.e.* the setting tool and frac plug) usually includes additional equipment, such as perforation guns that are used to shoot holes into the well casing and surrounding structure to enable sand and water to be injected into the reservoir and allow hydrocarbons to subsequently flow into the well.  *See* Tr. 364–65 (Gr. Martin).  When inserted into the wellbore, the frac plug goes first, followed by the setting tool that is attached to the frac plug, followed by the perforation guns attached to the tool.  *Compare* RP Compl. ¶15 *with* ECF25 ¶15 (admitting allegations).

42.     When a frac plug reaches its correct location within the wellbore, the setting tool is activated to set the plug.  Tr. 364-65 (Gr. Martin).  This is done using a power charge installed within the setting tool, which is operated by an electric signal transmitted down to the tool and creates a gas expansion.  *Id*.  Once the power charge activates, the explosive force applied to the setting tool forces the plug into place within the wellbore, blocking off the lower zones in the wellbore.  *Compare* RP Compl. ¶17 *with* ECF25 ¶17 (admitting most of the allegations).

43.     Conventional setting tools have been used in the well completion process for more than 40 years.  Tr. 29 (Drury), *see, e.g.*, Exs. 2049, 2173.  Conventional setting tools are designed to be reassembled and used multiple times.  *Compare* RP Compl. ¶19 *with* ECF25 ¶19 (admitting allegations); *see also* Tr. 365–66 (Drury).  In contrast, a disposable setting tool is a setting tool that is intended to be used only once.  Tr. 365-66 (Drury).

44.     The disposable setting tool is "transformative," "innovative," and "unique."  Ex. 470 at 16; Tr.570–71 (Nipper), 786 (Benoit); *see also* Atherton Dep. at 89:17–90:6, 113:13–21 (explaining that the tool descriptions in Exhibit 470 came from Diamondback).  It performs the same function as a conventional setting tool—*i.e.* setting frac plugs in place.  But it is

significantly different. It is shorter, lighter, and less expensive. Exs. 15, 432, 2207; *See* Tr. 366 (Gr. Martin), 559–60 (Nipper). For example, whereas a conventional setting tool can be more than 72 inches long and weigh up to 153 pounds, a disposable setting tool is typically only 26–27 inches long and weighs 25–27 pounds. *See* Exs 15, 2149, 2173; *see also* Tr. 367 (Gr. Martin). Exhibit 2149 shows a side-by-side comparison of a disposable setting tool next to an example of a conventional tool:



45.     Other benefits of disposable setting tools include (1) reduced opportunities for human error, because of its factory assembly; (2) the elimination of a manual pressure bleed-off at the surface, which removes a safety hazard; (3) greater efficiency on-site, because of the labor costs associated with reassembly; and (4) a shorter gun string length, which allows for fewer stages of perforations. *See* Exs. 15, 432, & 2207; *see also* Tr. 32 (Drury), 369–70 (Gr. Martin), 559–60 (Nipper), 649, 655–57 (Andres), 786 (Benoit).

46.     The disposable setting tool also presents a significantly lower risk of failure during the setting process. In particular, one significant type of failure—soft sets—is more common with conventional setting tools than disposable setting tools. *See* Exs. 16 & 2007; Tr. 434–35 (Gr. Martin). A soft set occurs when a tool only partially strokes, such that the setting tool does not fully detach from the frac plug. *Id.* As a result, wireline operators must engage in a "fishing" operation, which involves sending specialty tools downhole to retrieve the setting tool. *Id.* Each attempt at fishing can cost up to $90,000, and often more than one attempt is

necessary. *Id.* In the worst cases, the consequence of a soft set is temporary abandonment of the well altogether. *Id.*

47.    Because of the significant difference between conventional and disposable setting tools, those products have completely different pricing structures. Tr. 201 (Drury), 560 (Nipper). Disposable setting tools generally cost a few hundred dollars, whereas conventional tools cost thousands of dollars. Tr. 31 (Drury).

48.    Diamondback had explained in writing that the disposable setting tool "is rapidly becoming the industry standard." Ex. 470 at 6. "The industry has begun to shift away from the traditional method of setting frac plugs towards a safer, cheaper, and more efficient method." *Id.* at 18. In light of its benefits, customers generally do not return to conventional setting tools after switching to disposable setting tools. Tr. 560 (Nipper). The Court finds that disposable setting tools are a significant innovation and advancement and that consumers of such products are benefitted by these products.

49.    On November 7, 2017, the United States Patent and Trademark Office issued the '035 Patent, titled "Disposable Setting Tool," which listed as the inventors Derrek D. Drury, Jimmy L. Carr, and Trea H. Baker. Ex. 290. The '035 Patent was assigned by the listed inventors to Diamondback. Ex. 291. The '035 Patent is currently in full force and effect. *Compare* RP Compl. ¶25 *with* ECF25 ¶25 (admitting these allegations).

### 2.    *The Power Charge Market for Disposable Setting Tools.*

50.    The disposable setting tools use the Diamondback Eliminator™ power charge. Tr. 205 (Drury); Exs. 432 & 2044 at 10. The Eliminator™ power charges are made using a proprietary formula that is different than the charges made by other manufacturers. Tr. 205 (Drury). The Eliminator™ charges are also a different size than the charges sold by other power charge manufacturers. *Id.* Diamondback explained to potential investors:

- The new SS Tool [Diamondback's name for its disposable setting tool] requires the specifically designed diamondback energetics for correct operation.

- For every SS Tool sold, Diamondback also sells its proprietary energetics (igniter and power charge).

Ex. 316 at 15. Diamondback generates a very high profit margin on its sales of the Eliminator™ power charges. Tr. 595 (Nipper), 661 (Andres).

51. From the beginning of its relationship with Repeat Precision, Diamondback repeatedly told Repeat Precision that the Eliminator™ power charge was the only one that worked with the disposable setting tools. After Diamondback cut off the supply for that charge (*see* section J below), Repeat Precision investigated further and discovered that Diamondback was telling the truth. Tr. 595 (Nipper). There were no commercially-available charges that were substitutes for the Eliminator™ power charge for disposable setting tools. Tr. 661, 677 (Andres).

52. The Court finds that power charges for disposable setting tools and conventional setting tools are not substitutes for each other, and the product market for power charges for disposable setting tools is different from the product market for power charges for conventional setting tools.

53. Diamondback maintained a 100% market share for power charges that work with disposable setting tools well into 2019. *See* Tr. 206 (Drury), 605 (Nipper), 677 (Andres).

54. Given Diamondback's actions to cut off the power charge supply in November-December 2018, and its threats to do so again, Repeat Precision worked with alternative power charge manufacturers to develop a replacement source of charges for the disposable setting tools. Mecano-Tech was the only power charge manufacturer that was willing to try. Tr. 601-05 (Nipper). Mecano-Tech is a very small player in the overall power charge market that does not

18

sell to end users, such as the wireline companies that operate disposable setting tools. Tr. 606, 609 (Nipper). Mecano-Tech began its efforts to develop a power charge for the disposable setting tools in February 2019, but the process has gone very slowly. Tr. 604-05 (Nipper). It took months before Mecano-Tech developed a product that it believed would work with the disposable setting tool, and fully tested that product to be used in the field. Tr. 605 (Nipper). The first Mecano-Tech power charges for disposable setting tools were field tested in mid-2019. Tr. 605 (Nipper).

55.     Although Mecano-Tech has successfully developed a power charge that can act as a substitute for the Diamondback Eliminator™ charge, Mecano-Tech does not have the ability to manufacture its charges on a large-scale basis. Tr. 609 (Nipper) (explaining that Mecano's capacity to make charges is only "dozens of power charges a day"). Mecano's ability to make charges is less than ▇▇▇ of what would be needed to supply Repeat Precision's current customers. Tr. 610 (Nipper). Less than 1,000 of Mecano's power charges have been sold to end users for use in the field. Tr. 607-08 (Nipper). Market acceptance of the Mecano power charges has been much slower that Repeat Precision had hoped. Tr. 605 (Nipper). Customers have been unwilling to take the risk of running a power charge from a supplier not known for making these types of explosive devices. Tr. 607-09 (Nipper).

56.     As of the date of trial, Diamondback still holds well in excess of a 99% market share for power charges that operate disposable setting tools. *See* Tr. 207 (Drury) (admitting Diamondback "has nearly 100 percent of the market share for power charges that could be used for the disposable setting tool"); 607-08 (Nipper) (less than 1,000 Mecano charges have been sold compared to the tens of thousands of tools that have been sold in the market). And Mecano-

Tech and Diamondback are the only two entities selling power charges that can operate the disposable setting tools.

57.     Diamondback's market position in the power charge market for disposable setting tools is protected by significant barriers to entry, including numerous governmental licenses, approvals, and regulations relating to the manufacture, sale, and distribution of explosive devices.  Exs. 316 at 15 (admitting strong barriers to entry into energetics business); 470 at 17 (admitting strong moat protecting the market); Atherton Dep. at 90:1–22, 113:13–21 (explaining that the description of "strong moat" came from Diamondback); Tr. 593-94 (Nipper) (explaining how it took NCS about a year to get an ATF license); Tr. 871 (House).

58.     Diamondback is one of the two largest manufacturers of power charges for all setting tools, not just disposable setting tools.  Ex. 20; Ex. 470 at 17; Tr. 205 (Drury).  Baker Hughes is the other large power charge manufacturer, but it only sells charges for conventional setting tools.  Ex. 20; Tr. 205 (Drury).  There are a handful of other power charge manufacturers, but they each hold a very small percentage of the market.

59.     Diamondback has market power in the overall power charge market. Diamondback has a market share of over 40% of the entire power charge market.  Ex. 470 at 17 (Diamondback admitting its total market share is approximately 45%); Atherton Dep. at 29:12–30:4, 113:13–21 (explaining that Exhibit 470 was prepared with Diamondback's input), 92:24–93:11; Tr. 205 (Drury), 871 (House).

60.     The Court finds that at all relevant times to this case, Diamondback has had both market power and monopoly power in the market for power charges for disposable setting tools.

20

61.     Even with Mecano-Tech's entry into the power charge market for disposable setting tools, Diamondback still maintains both market power and monopoly power in that market.

62.     Diamondback has never experienced any issues meeting the demand for its power charge products, including the power charges for disposable setting tools.  Tr. 207 (Drury), 694 (T. Cheek) (including impeachment clip:  T. Cheek Dep. 190:19-190:22).

63.     Diamondback's Eliminator™ power charges are not patented.   Tr. 205-06 (Drury).

64.     However, Diamondback has obtained patents relating to its power charge products.   On September 27, 2016, the United States Patent and Trademark Office ("PTO") issued Patent No. 9,453,382 B2 ("the '382 Patent"), titled "Power Charge Igniter Having a Retainer Protrusion" to the listed inventors:  Derrek D. Drury, Jimmy L. Carr, Robert Andres, and Trea H. Baker.  Ex. 292.  On October 23, 2018, the PTO issued Patent No. 10,107,054 B2 ("the '054 Patent"), entitled "Power Charge Having a Combustible Sleeve" to the listed inventors:  Derrek D. Drury, Jimmy L. Carr, Robert Andres, and Trea H. Baker.  Ex. 293.  The listed inventors assigned the '382 and '054 patents to Diamondback.

65.     Diamondback's '382 and '054 patents could be used to make a power charge for disposable setting tools.  Tr. 661-63 (Andres).  They are also useful to someone wanting to be able to use a disposable setting tool that practices the '035 Patent.  Tr. 661-63 (Andres).

        3.      *The Disposable Setting Tool Market.*

66.     When this lawsuit was filed and through mid-2019, there were only two companies making and selling disposable setting tools:  Diamondback and Repeat Precision.  Tr. 567 (Nipper); *see also* Tr. 204 (Drury) (admitting no competitors for disposable setting tool in 2018).  Indeed, the expert witnesses on both sides of this case appear to agree that the disposable

setting tool market is a two-supplier market.  *See, e.g.,* Tr. 770 (Benoit), 899, 929 (House).  And when seeking to sell Diamondback to potential investors, Diamondback's investment bankers explained that "[Diamondback's] disposable short setting tool is patented and has no direct competitors."  *See* Exs 316 at 7 & 470 at 6; Atherton Dep. at 29:12–30:4, 113:13–21 (explaining that Exhibit 470 was prepared with Diamondback's input); *see also* Ex. 20 (Diamondback statement to NCS that there are no competitors for disposable setting tools); Tr. 567 (Nipper).

67.     Diamondback's disposable setting tools are standalone tools, which allow customers to pair those tools with their choice of frac plugs.  *See* Ex. 2207; Tr. 456–57 (Gr. Martin), 759 (Mickey) (confirming that some customers run a Diamondback disposable setting tool with a Repeat Precision frac plug).  The frac plug market is very competitive, with more than 20 different frac plug manufacturers.  Tr. 470 (Gr. Martin), 566-67 (Nipper).

68.     The disposable setting tools that are manufactured and sold by both Diamondback and Repeat Precision practice the claims of the '035 Patent.  *See* Stipulations #7 & 8.

69.     Diamondback manufactures the majority of its disposable setting tools at its facility in Crowley, Texas.  Tr. 36 (Drury).  For a period of time, Diamondback also obtained mandrels and barrel pistons from a supplier in China for use in making disposable setting tools. Tr. 47-48 (Drury).  When these component parts for the disposable setting tools were obtained from China, however, they were imported into the United States, shipped to Diamondback's facilities in Texas, and then assembled and packaged in Texas.  Tr. 690-91 (T. Cheek).  All Diamondback disposable setting tools pass through Texas, regardless of the ultimate destination where they are sold.  Tr. 690-91 (T. Cheek).

70.     Repeat Precision sells both standalone disposable setting tools and the PurpleSeal Express™ system—a streamlined frac plug installation tool that combines Repeat Precision's

PurpleSeal™ frac plug with an improved version of the disposable setting tool. Tr. 362 (Gr. Martin).

71.    For any Repeat Precision customers who prefer to use another manufacturer's frac plugs, they can purchase the standalone tool, which can be paired with the customer's choice of frac plug. *See* Tr. 396 (Gr. Martin), 760-61 (Mickey).

72.    Diamondback has admitted that there are strong barriers to entry into the disposable setting tool market. Ex. 470 at 17 ("Developing a setting tool requires a strong grasp of setting tool mechanics as well as the ability to tailor an energetic to meet the specific requirement of the new tool."). Atherton Dep. at 29:12–30:4, 113:13–21 (explaining that Exhibit 470 was prepared with Diamondback's input). Its expert has as well. Tr. 788–89 (Benoit).

73.    At some point in 2019, a third party, Kingdom Downhole Tools, tried to enter the disposable setting tool market. Tr. 787-88 (Benoit). Kingdom Downhole was founded and is run by Trea Baker, a former Diamondback employee who helped develop the disposable setting tool and who is listed as an inventor on the '035 Patent. Ex. 290; Tr. 240-41 (Drury). There is no evidence that Kingdom Downhole has been able to make any meaningful sales of its disposable setting tools. Tr. 567 (Nipper), 787 (Benoit). Moreover, according to Diamondback, Kingdom Downhole is an unauthorized participant in the disposable setting tool market that is infringing the '035 Patent. Tr. 244 (Drury), 659 (Andres). Diamondback even sued Kingdom Downhole for patent infringement. *See* Case No. 4:18-cv-00902-A, in the U.S. District Court for the Northern District of Texas, Fort Worth Division. Ex. 2055; Tr. 244 (Drury), 659 (Andres), 788 (Benoit).

74.    Since being introduced to the oil and gas industry, disposable setting tools— including Repeat Precision's PurpleSeal Express™ and the standalone SS disposable setting

tools Repeat Precision makes—have rapidly gained market acceptance for well completions.  Tr. 470 at 6, 18.

75.     The Court concludes that there is a unique and separate market for disposable setting tools.  The disposable setting tool is a "transformative" product, *see* Ex. 470 at 17, much like the color television was when first introduced as competitors were making and selling black and white TVs.  *See* Tr. 872 (House).  The disposable setting tool is "rapidly becoming the industry standard."  Ex. 316 at 7; Tr. 571 (Nipper).  The Court finds that conventional setting tools are not in the same market and should be excluded from any such market analysis for, among other reasons, disparately different prices and significantly different characteristics.

### D.    THE RELATIONSHIP BETWEEN REPEAT PRECISION AND DIAMONDBACK IS GOVERNED BY THE LICENSE.

*1.    The Original License—Diamondback Granted Repeat Precision the Exclusive Right to Make and Sell a Product that Combined the Disposable Setting Tool with a Frac Plug.*

76.     Repeat Precision first learned about the disposable setting tool in late 2017 or early 2018.  Exs. 325 & 378; Tr. 381-82 (Gr. Martin), 568 (Nipper), 732-33 (Mickey).  Soon after learning about that product, Repeat Precision hired patent lawyers to review the '035 Patent claims and whether they were valid.  Tr. 478 (Ga. Martin), 569 (Nipper).  Repeat Precision also hired a consultant, Kevin Trahan, to work on potential designs for Repeat Precision to make its own disposable setting tools.  Tr. 382 (Gr. Martin), 478 (Ga. Martin), 569 (Nipper).

77.     Repeat Precision contacted Diamondback in early February 2018 to see whether Diamondback would license rights under the '035 Patent.  Ex. 29; Tr. 734-35 (Mickey).  The first contact between Repeat Precision and Diamondback occurred on February 7, 2018.  Ex. 29; Tr. 734-35 (Mickey).  Prior to that date,  Mr. Drury had never met Gary Martin, Grant Martin,

Robert Nipper, Repeat Precision, or NCS. *See* Tr. 35 (Drury); 573 (Nipper) (first contact on April 11, 2018).

78.     Representatives from Repeat Precision and Diamondback met at Diamondback's Crowley facility on February 16, 2018 to discuss a potential license to Repeat Precision. Tr. 382 (Gr. Martin). Repeat Precision was represented by Gary Martin, Grant Martin, and Clint Mickey. *Id.* Diamondback was represented by Derrek Drury, Trea Baker, and Justice Baker. *Id.*

79.     Although Robert Nipper was not present at the February 16 meeting, he gave his approval to Gary Martin to attempt to negotiate a license from Diamondback. Tr. 571-72 (Nipper).

80.     During the February 16, 2018 meeting, Repeat Precision and Diamondback reached a preliminary understanding for a license. Tr. 384-85 (Gr. Martin). Repeat Precision agreed to pay a $55,000 upfront royalty, as well as a per-tool royalty of $20. Tr. 384-85 (Gr. Martin). In return, Repeat Precision received the exclusive right to make a combined product that coupled the disposable setting tool covered by the '035 Patent with Repeat Precision's frac plugs. Tr. 384-85 (Gr. Martin).

81.     Prior to negotiating the terms of a license with Repeat Precision, Diamondback had already sold off its frac plug manufacturing business to Oso Perf, and was bound by a multi-year non-compete agreement that prevented Diamondback from reentering the frac plug business. Ex. 18. Mr. Drury admitted that Diamondback had no intent on reentering the frac plug business. Ex. 203 (Drury).

82.     The parties reached agreement on the Patent License Agreement, which was executed and effective on March 16, 2018 (the "Original License"). *See* Ex. 1. Mr. Drury reviewed the draft Original License that Repeat Precision prepared and did not request any

25

changes be made before signing.  *See* Exs. 31 & 33.  Mr. Drury also visited Repeat Precision's facilities in Mexico before he signed the Original License.  *See* Exs. 428 & 2199 (message 36).

83.    Although Diamondback previously challenged the Original License on several grounds, including fraud and lack of consideration, Diamondback withdrew those challenges after resting its case at trial.  Tr. 801-02.

84.    After entering into the Original License, Repeat Precision prepared marketing materials to promote its PurpleSeal Express™ products.  Tr. 390 (Gr. Martin).  Those materials promoted the use of the Diamondback Eliminator™ charges.  Ex. 2016.  Those materials also made clear that Repeat Precision had a license to manufacture and sell the PurpleSeal Express™ products.  *Id*.  Diamondback reviewed and approved Repeat Precision's marketing materials promoting the Eliminator™ charges and disclosing the license agreement before those materials were distributed to potential Repeat Precision customers.  Exs. 2011, 2012, 2014, & 2015; Tr. 176-77 (Drury); 391-94 (Gr. Martin).

85.    Repeat Precision and Diamondback personnel also met on several occasions at Diamondback's Crowley facility to discuss the disposable setting tools, how to build them, and how they worked.  Ex. 2004; Tr. 389-40 (Gr. Martin), 736-38 (Mickey).  Diamondback never objected to its employees working with Repeat Precision to help it learn how to make disposable setting tools.  *See* Tr. 736-38 (Mickey).

86.    Diamondback has received substantial benefits under the Original License.  *See* Ex. 2050 (summarizing royalty payments made by Repeat Precision); Atherton Dep. at 51:23–52:2 ("Q:  Diamondback benefits when Repeat Precision sells a short setting tools is that what you're saying?  A:  Yeah.  They get paid $20 a tool."). It has not returned the benefits it received.

26

Diamondback has never offered to return any of the benefits it received under the Original License.

> 2. *The Amended License—The Parties Expanded the Scope of Repeat Precision's Exclusive Rights Under the '035 Patent.*

87.    A few days after Diamondback entered into the Original License, Gary Martin took Mr. Drury to Mexico for a second visit to Repeat Precision's manufacturing facilities. Ex. 428; Tr. 44-45 (Drury), 479 (Ga. Martin). During their discussions, Mr. Drury informed Martin that Diamondback was having significant troubles meeting the market demand for its standalone disposable setting tools. *See* Ex. 531; Tr. 484 (Ga. Martin); *see also* Tr. 395-96 (Gr. Martin), 516 (Nipper). The record in this case establishes that Diamondback had thousands of back orders for disposable setting tools through the first eight to nine months of 2018. Ex. 270; *see also* Tr. 692-94 (T. Cheek) (admitting that Diamondback's sworn interrogatory answer on backorders (Ex. 2038) greatly understated the problem).

88.    On April 11, 2018, Drury visited Gary Martin in Marble Falls, Texas. Tr. 500 (Ga. Martin). While there, Mr. Drury also spoke with Nipper by phone. Tr. 500 (Ga. Martin), 516, 573-74 (Nipper). Mr. Drury asked whether Repeat Precision would be willing to make disposable setting tools to help Diamondback catch up on its backorders. Tr. 480 (Ga. Martin), 516-17 (Nipper). Gary Martin and Mr. Nipper informed Drury that Repeat Precision could not do so under the Original License. Tr. 480 (Ga. Martin), 517 (Nipper). The Original License did not allow Repeat Precision to make or sell standalone disposable setting tools, which was what Mr. Drury was requesting. *See generally* Ex. 1. Mr. Drury said that they could change to the license. Tr. 517 (Nipper). In response to questions about why Mr. Drury would be willing to expand the Original License, Mr. Drury said the royalty he earned under the license was about the same as the profit he earned from selling disposable setting tools. Tr. 574 (Nipper). Mr.

27

Drury also emphasized that he wanted to focus on selling power charges, which earned him a very high profit margin. Tr. 574 (Nipper).

89.     During the April 11, 2018 meeting and telephone call, Diamondback and Repeat Precision did not reach any agreements on the terms of an amended license. Tr. 500 (Ga. Martin), 574 (Nipper). Instead, their conversation was the beginning of the negotiation over an amendment.

90.     After talking to Mr. Drury, Mr. Nipper instructed Repeat Precision's lawyers to draft an amended license that would expand the definition of "Licensed Products" so that Repeat Precision could make and sell standalone disposable setting tools. Exs. 37 & 531; Tr. 520-21, 574 (Nipper).

91.     On April 11, 2018, Repeat Precision prepared a draft Amended and Restated Patent License Agreement to send to Diamondback for its consideration. Ex. 37 (the "April 11 Draft"). The April 11 Draft kept all of the exclusivity provisions that were contained in the Original License. Ex. 3; Tr. 521, 576 (Nipper). Nipper approved this draft. Tr. 576 (Nipper).

92.     Diamondback referred the April 11 Draft to its lawyers for review. *See* Ex. 40; Tr. 120-21 (Drury), 525-26 (Nipper).

93.     On May 17, 2018, Diamondback sent a counter-proposal for an amended license to Repeat Precision that was prepared by Diamondback's lawyers. Ex. 40 (the "May 17 Draft"); *see also* Tr. 396-99 (Gr. Martin). It would have greatly changed the terms of the Original License, altering its exclusivity language. Ex. 40.

94.     Repeat Precision did not accept the May 17 Draft. Tr. 530-31, 577-78 (Nipper); *see also* Tr. 396-99 (Gr. Martin).

95.     On May 22, 2018, Drury, Nipper, Gary Martin, and Grant Martin met for a brief lunch in Fort Worth.  Tr. 399 (Gr. Martin); Tr. 578 (Nipper).  Mr. Nipper delivered another draft amended license to Drury at this lunch—the "May 22 Draft."  Tr. 579 (Nipper); Ex. 2.  The May 22 Draft was shorter, but it included the same "Licensed Products" definition as the April 11 Draft.  *See* Ex. 2.  It further kept in place the exclusivity provisions from the Original License.  *Id.*; *see also* Tr. 129 (Drury).

96.     There was little discussion of the May 22 Draft at the lunch.  Tr. 399-400 (Gr. Martin).  Mr. Drury took a copy of it with him at the end of the lunch.  Tr. 580 (Nipper).  He did not sign it in the presence of Repeat Precision's representatives.  Tr. 128-29 (Drury), 580 (Nipper).

97.     After the May 22 lunch, Mr. Drury had a full and fair opportunity to review the May 22 Draft with his lawyers, if he wanted to do so.  Tr. 128-31 (Drury).  Mr. Drury was also free to reject the May 22 Draft.  *Id.*  He could have also proposed further changes to the proposed amendment if he did not agree with the proposed terms.  *Id.*

98.     In early June 2018, Mr. Drury executed the May 22 Draft and returned it to Repeat Precision.  *See* Ex. 2 (the "Amended License"); Ex. 41; Tr. 129-31 (Drury), 400-01 (Gr. Martin), 581 (Nipper).  Collectively, the Original License, as amended by the Amended License, will simply be referred to as the "License."

99.     Diamondback and Mr. Drury entered into the Amended License freely and voluntarily.  Tr. 128-31 (Drury).

100.    Diamondback understood the terms of the Amended License when Mr. Drury signed it, and were not operating under either a mistake of fact or mistake of law when they

entered into the Amended License. *See* ECF137 (granting summary judgment rejecting Diamondback's mutual mistake argument).

101. The Amended License was negotiated between sophisticated parties in an arms' length negotiation. Tr. 129 (Drury).

102. The Amended License grants Repeat Precision the exclusive right and license to make disposable setting tools under the '035 Patent, with no reservation of rights to Diamondback to make or sell products practicing the '035 Patent. Ex. 2.

103. The Amended License accurately reflects the terms of the parties' agreement.

104. Diamondback and Drury were not acting under duress, pressure, or compulsion when Drury signed the Amended License. Tr. 129, 131 (Drury).

105. The Amended License was not conditioned upon any other agreements or terms that are not reflected in the Amended License.

106. The Amended License was not tied to or conditioned upon any offers or agreements for Repeat Precision to purchase Diamondback.

107. There is no evidence of any false or misleading statements made to Diamondback by Repeat Precision or its representatives prior to Diamondback entering into the Amended License. There is also no evidence that Diamondback relied upon any false or misleading representations by Repeat Precision or its representatives. There is also no evidence of any material omissions of fact by Repeat Precision or its representatives prior to the date when Diamondback executed the Amended License.

108. At the time when Diamondback entered into the Amended License, Diamondback and Drury knew that Repeat Precision was going to make a substantial investment in

manufacturing facilities and equipment in Mexico to enable Repeat Precision to expand the capacity of disposable setting tools that it could make and sell.  Tr. 131-32 (Drury).

>   3.   *Project Power—For a Short Period of Time, Repeat Precision and NCS Considering Acquiring Diamondback under a Non-Binding Letter of Intent, but Ultimately Passed Because of Information that Diamondback Had Concealed.*

109.    In June 2018, after the Amended License was signed, Diamondback and the Defendants negotiated a term sheet (*i.e.*, letter of intent) (the "LOI") regarding a potential acquisition of Diamondback, which was code-named "Project Power."  *See* Ex. 3; Tr. 856-87 (Nipper), 806-07 (Sheppard).

110.    Ryan Sheppard of NCS prepared the initial draft.  Ex. 532; Tr. 806-807 (Sheppard).  After several exchanges of proposed revisions, NCS and Diamondback executed the final non-binding LOI for Project Power on June 27, 2018.  Exs. 3 115, & 117; Tr. 403-04 (Gr. Martin), 807-08 (Sheppard).

111.    Diamondback claims that the LOI "called for Diamondback to increase its current manufacturing capacity for the disposable short setting tools that practice the '035 Patent." ECF157, ¶48.  This is not correct.  The LOI imposed no binding obligations on Diamondback. Ex. 3 at 2 ("The parties hereto acknowledge that the execution and delivery of this term sheet does not create any legally binding obligations between the parties or their affiliates, other than the exclusivity set forth below").  Moreover, the term Diamondback referenced in the LOI was inserted by Diamondback, not Repeat Precision.  Ex. 116; Tr. 403-04 (Gr. Martin), 808 (Sheppard).  But most notably it provided for Diamondback to make its "previously budgeted" capital expenditures, Ex. 3 at 2, but there were no such budgeted expenditures when Diamondback entered into the LOI.  Tr. 698-99 (T. Cheek) (including impeachment clip T. Cheek Dep. at 47:11-47:15).

31

112.    At trial, Mr. Drury tried to point to some evidence of capital expenditures in 2018 to support Diamondback's version of events by referencing Diamondback's acquisition of Roden in 2017, which he claimed took nine months to transition—through October 2018, Tr. 47 (Drury), but on cross-examination, Mr. Drury admitted this was not true. Tr. 133 (Drury). The Roden transition was complete as of March 2018—before the LOI. Tr. 133 (Drury).

113.    Diamondback also notes an internal discussion at Repeat Precision about buying disposable setting tools from Diamondback. ECF157, ¶49. However, Diamondback fails to tell the rest of the story. This discussion was a question from Clint Mickey. Repeat Precision said "no," and never purchased any tools from Diamondback. *See* Ex. 255 (listing all items Repeat Precision purchased from Diamondback, which includes no disposable setting tools); *see also* Tr. 696 (T. Cheek).

114.    After entering into the LOI, NCS began its due diligence process, starting with an internal kick-off meeting on July 2, 2018 to provide NCS with an overview of Diamondback and delegate responsibility for the various due-diligence work streams to the executives and employees on NCS's working group list. Ex. 406; Tr. 808-09 (Sheppard).

115.    At the time of the kick-off meeting, Ryan Sheppard had very limited knowledge of Diamondback's business, most of which he learned from an Internet search. Tr. 811-12 (Sheppard). To learn more about Diamondback's business, and in accordance with NCS's ordinary due-diligence process, Mr. Sheppard held a commercial diligence session with Diamondback and the NCS due-diligence team on July 5, 2018. Ex. 122; Tr. 812-13 (Sheppard). During the commercial diligence session, NCS learned from Drury—among other things—that Hunting-Titan was a material customer for Diamondback's primary product, the power charge. Ex. 414; Tr. 813 (Sheppard).

116.    After the commercial diligence session, NCS sent Diamondback an extensive due-diligence request list that included requests from Environmental Resources Management ("ERM"), a third-party environmental consultant that NCS retains for every potential acquisition. Exs. 123 & 127; Tr. 809-10, 813-14 (Sheppard).   Among other things, NCS's due-diligence request list sought:

      a.  "All information and correspondence regarding compliance with federal, state, local or foreign environmental, health, safety and explosive laws and regulations;"

      b.  "All information and correspondence regarding generation, treatment, storage and disposition of hazardous substances;"

      c.  "All internal Company reports concerning environmental matters relating to current or former Company properties or properties formerly owned or operated;" and,

      d.  "Locations of any on-site hazardous waste disposal sites."

Ex. 127.

117.    To share documents in response to certain items on the due-diligence request list, Diamondback created a virtual data room and granted access to the employees and executives on NCS's working group list.  Ex. 126; Tr. 810-11, 814-15 (Sheppard).

118.    Prior to creating the data room, Diamondback and NCS negotiated a non-disclosure agreement and separately agreed that the data room was not to include any information that Diamondback considered to be a trade secret.  Ex. 131; Tr. 815-17 (Sheppard). To the extent Diamondback uploaded any trade secrets to the data room, they were to be removed before granting access to NCS's working group.   Ex. 132; Tr. 817 (Sheppard). Diamondback's lawyer Mark Russell went through the data room to ensure there were no trade secrets included.  Tr. 155 (Drury).  The final non-disclosure agreement for Project Power was executed on July 25, 2018. Ex. 5; Tr. 818 (Sheppard).

33

119.     On July 19, 2019, representatives of Repeat Precision and Hunting-Titan held an in person meeting to discuss Repeat Precision's products. Ex. 419; Tr. 440 (Gr. Martin).  During that meeting, Hunting-Titan disclosed that it was seriously considering developing and selling its own power charges.  Exs. 409 & 535; Tr. 442 (Gr. Martin); Tr. 818-19 (Sheppard).

120.     NCS spent several weeks vetting Hunting-Titan's plan to enter the power charge market.   Tr. 819 (Sheppard).  During that time, NCS asked its third-party consultants to briefly pause their due diligence efforts, but did not ask its internal team to stand down.  Ex. 420; Tr. 820 (Sheppard).

121.     Upon confirming the seriousness of Hunting-Titan's plan to enter the power charge market, NCS decided that Project Power was no longer viable under the terms expressed in the LOI for a number of factors.  Tr. 818-19 (Sheppard); Tr. 503 (Ga. Martin).

122.     Hunting-Titan's plan was significant because, if successful, Hunting-Titan would move from being one of Diamondback's largest customers to being a direct competitor in Diamondback's primary market—power charges.  Tr. 818-19 (Sheppard).  Diamondback would suffer a large decrease in revenue from its power charge sales to Hunting Titan and face higher competition in the power charge space, which was historically dominated by Diamondback and Baker Hughes.  Tr. 818 (Sheppard).

123.     On August 24, 2018, Gary Martin, Grant Martin, and Nipper flew to Burleson, Texas, to advise Drury in person that NCS was no longer willing to purchase Diamondback under the terms of the LOI. Ex. 181; Tr. 177-78 (Drury).  Accordingly, Mr. Drury's lawyers sent a notice to NCS terminating the LOI on August 29, 2018.  Ex. 1069; Tr. 72-73 (Drury), 818 (Sheppard).

124.     Although Project Power had been terminated, the deal was not yet dead.  Tr. 167-
68 (Drury), 317 (Gr. Martin), 825 (Sheppard).  Negotiations for NCS's potential acquisition of
Diamondback continued into mid-September 2018.  Exs. 431 & 2199; Tr. 167-68, 178-80 (D.
Drury).  Repeat Precision and NCS remained open to some agreement to acquire Diamondback
until Diamondback filed its lawsuit in November, 2018.  Tr. 317, 616 (Gr. Martin).

**E.     AFTER ENTERING INTO THE AMENDED LICENSE, REPEAT PRECISION
        GREATLY EXPANDED ITS MANUFACTURING FACILITIES IN MEXICO.**

125.     While Project Power was getting underway, Repeat Precision proceeded on a
separate and independent track to develop its manufacturing capabilities for disposable setting
tools.  Tr. 419 (Gr. Martin).  After entering into the Amended License, Repeat Precision began to
expand its manufacturing facilities in Mexico, as Repeat Precision said it would do.  Tr. 422 (Gr.
Martin).

126.     Repeat Precision entered into a long-term lease for an additional 40,000 square
feet of manufacturing space on June 8, 2018.  Ex. 2176; Tr. 422 (Gr. Martin).  The initial term
for that lease is 10 years.  Ex. 2176; Tr. 423 (Gr. Martin).  Repeat Precision took possession of
this new facility in September 2018.  *See* Tr. 423-24 (Gr. Martin).  Then, Repeat Precision
moved a significant part of its then-existing operations from Ojinaga, Mexico, to the newly-
leased facility, which enabled Repeat Precision to dedicate its facility in Ojinaga to making
disposable setting tools, PurpleSeal™ frac plugs, and the PurpleSeal Express™.  Tr. 423-24 (Gr.
Martin).

127.     Repeat Precision purchased 24 new CNC lathes and mills for use in
manufacturing the disposable setting tools.  Tr. 2174; Tr. 425-26 (Gr. Martin).  The cost of these
machines and additional equipment exceeded $4 million.  Ex. 2174; Tr. 426 (Gr. Martin), 585
(Nipper).  Because this equipment was specially-ordered from overseas, it took a few months for

it to be delivered. Repeat Precision's new equipment began to arrive in Ojinaga in September 2018. Tr. 427 (Gr. Martin).

128.     Repeat Precision invested in substantial improvements to the Ojinaga facility to upgrade its infrastructure to be able to handle the new equipment. Tr. 426, 428 (Gr. Martin). Repeat Precision also hired and trained additional personnel to work in this facility.

129.     Repeat Precision received its final shipment of the new equipment for Ojinaga in October or November 2018, and had it up and running soon thereafter. Tr. 428 (Gr. Martin). Prior to the expansion, Repeat Precision had the manufacturing capacity to make approximately 1,200 tools per month, or approximately 14,400 tools per year. After expanding its facilities, Repeat Precision was able to expand its standard operating capacity to 6,200 tools per month, or 74,400 tools per year. Tr. 428 (Gr. Martin), 887-88 (House). Repeat Precision also has made arrangements with a Chinese manufacturer who was prepared to produce up to 10,500 disposable setting tools per month. Exs. 2058, 2071, & 2074; Tr. 430-33 (Gr. Martin), 888-89 (House).

130.     Repeat Precision specifically set up the new equipment at the Ojinaga facility to make disposable setting tools. Tr. 426-28 (Gr. Martin). Accordingly, Repeat Precision's capacity for making disposable setting tools does not fluctuate depending on the quantities of other products that Repeat Precision manufactures. *See id.*

131.     Repeat Precision would not have leased a new manufacturing facility, purchased new equipment, or hired and trained additional employees to run that facility without the expanded terms of the Amended License. Tr. 422 (Gr. Martin), 585 (Nipper). Because the expanded rights under the Amended License were a prerequisite for Repeat Precision to make its investments to expand operations in Mexico, Repeat Precision did not immediately exercise its right to exclude Diamondback from making or selling its own disposable setting tools. Instead,

Repeat Precision wanted the chance to bring its new equipment online so that the market for disposable setting tools would not be harmed or restricted during the time period while Repeat Precision was expanding its operations.  Tr. 540 (Nipper).

132.    When Repeat Precision invested to increase its manufacturing capacity, it relied upon Diamondback to sell power charges to Repeat Precision's customers.  Tr. 586, 595 (Nipper).   When investing in the new manufacturing facilities and equipment in Mexico, Diamondback was the only supplier of the power charges needed to operate the disposable setting tools.  Tr. 206 (Drury).   Repeat Precision would not have made its investments in additional facilities in Mexico if it believed that Diamondback had the right to withhold or refuse to sell power charges to Repeat Precision's customers.  Tr. 586 (Nipper).

**F.    REPEAT PRECISION PERFORMED ITS OBLIGATIONS UNDER THE LICENSE.**

133.    Repeat Precision has performed all of its obligations under the License.

134.    In addition to paying the $55,000 up-front royalty required by the License, Repeat Precision has tendered all royalty payments that are due to Diamondback under Paragraph 4.2 of the License.  Diamondback did not return any of the checks that it received from Repeat Precision.  *See* Exs. 261, 2050–2054.

135.    Repeat Precision paid the $55,000 up-front payment.  Tr. 388 (Gr. Martin).  Diamondback also deposited and accepted Repeat Precision's March 2019 royalty payment in the amount of ▮▮▮.  Tr. 116 (Drury), 789-90 (Benoit).  Diamondback has never returned those funds to Repeat Precision, nor has it even offered to return those funds.  Exs. 262, 263, & 2050; Tr. 116-17 (Drury).

136.    In September 2018, Diamondback also set up Repeat Precision as a vendor in Diamondback's system so that Repeat Precision could buy firing heads.  Ex. 258; Tr. 695-96 (T.

37

Cheek). Firing heads are used to set off the power charges that operate the disposable setting tools. Diamondback even sold a firing head to Repeat Precision in September 2018 for use in testing Repeat Precision's products. Ex. 255. If, as Diamondback now contends, Repeat Precision had no rights to make disposable setting tools, it would have been unnecessary for Repeat Precision to acquire the firing head. Tr. 592-93 (Nipper). Thus, by selling a firing head to Repeat Precision, Diamondback was acknowledging that even at that time Repeat Precision had rights to make disposable setting tools.

137. At all relevant times prior to this lawsuit, Repeat Precision promoted the Diamondback Eliminator™ power charges for use with Repeat Precision's disposable setting tools. Those promotions included product flyers, field manuals instructing how to use the products, and website pages, all of which instructed Repeat Precision customers to use the Diamondback Eliminator™. Exs. 2011, 2012, 2014, 2016, 2044. Prior to this lawsuit, Repeat Precision did not promote any other power charges. *See* Tr. 602 (Nipper).

## G. DIAMONDBACK MONITORED AND INTERFERED WITH REPEAT PRECISION'S CUSTOMERS AND POTENTIAL CUSTOMERS.

138. Although Repeat Precision had the right (but not the obligation) to exclude Diamondback from making and selling disposable setting tools as of June 4, 2018, Repeat Precision did not exercise its right to exclude Diamondback until November 26, 2018. Prior to November 26, 2018, Repeat Precision allowed Diamondback to continue selling disposable setting tools. Tr. 616-17 (Nipper) (explaining why). Since November 26, 2018, Diamondback has continued to sell disposable setting tools, despite Repeat Precision's objections.

139. Diamondback has had a competitive advantage over Repeat Precision in the market because Repeat Precision's customers (or their wireline contractors) needed to obtain power charges from Diamondback. Tr. 699-700 (T. Cheek); C. Bellah Dep. at 30:19-32:2.

Thus, Diamondback has been able to identify and monitor Repeat Precision's sales activities and customers.  Exs. 275, 277, & 280; Tr. 191-92, 194 (Drury), 699-700 (T. Cheek).

140.    Diamondback made false and misleading accusations against Repeat Precision to secure or try to secure customers when engaged in direct competition with Repeat Precision. Deposition of Isaac Aviles ("Aviles Dep.") at 91:5–91:16; 96:24–97:5.  Diamondback's misbehavior and false statements directly cost Repeat Precision the opportunity to enter into lucrative business arrangements with Hunting-Titan and Schlumberger Completions ("Schlumberger"), two of the largest oilfield service companies in the world.

141.    For example, on August 17, 2018, Diamondback falsely told representatives of Hunting-Titan that Repeat Precision had stolen and misappropriated Diamondback's proprietary information regarding its disposable setting tools and power charges, and that Defendants had committed fraud against Diamondback.  Tr. 152-53 (Drury) (and Drury Dep. at 215:2-215:6 (impeachment clip)), Tr. 161 (Drury); *see also* Tr. 153-57 (Drury) (admitting the lack of a basis to make misappropriation allegations).  And Mr.Drury never retracted his statements to Hunting-Titan.  Tr. 157 (Drury).  To compound the situation, Mr. Drury lied to Defendants, never telling them what he had done when he visited Hunting-Titan:

MR. RAYMOND:  This is Exhibit 537, Your Honor, entry 15.

BY MR. RAYMOND:

Q:    This is how you describe the meeting that you had with Hunting-Titan where you told Hunting-Titan that the company's represented by Gary, Grant and Robert had committed fraud and had stolen trade secrets.  You write, the meeting went very well, right?

A:    Yes.  That's what I wrote.

Tr. 163-64 (Drury); Ex. 537 (entry 15).  Mr. Drury never told the Defendants that he was accusing them of fraud or misappropriating Diamondback trade secrets.  Tr. 166 (Drury).

142. Prior to Diamondback's false statements, Repeat Precision and Hunting-Titan were very close to entering into a distribution agreement under which Hunting-Titan anticipated purchasing about ███████ tools per month at a price of ████ per tool. Ex. 482; Deposition of Ryan Rowell ("Rowell Dep.") at 48:10–48:19; 49:2–49:4; Tr. 445-46 (Gr. Martin), 846-47 (House). Drury's goal in meeting with Hunting-Titan was to prevent Hunting-Titan from doing a deal together, and Drury admits he succeeded. Tr. 161-63 (Drury) (and Drury Dep. at 225:25–226:3, 226:9-226:13, 232:7-232:12 (impeachment clips)). But for Diamondback's false statements, Repeat Precision and Hunting-Titan would have entered into that distribution agreement. Rowell Dep. at 44:3–44:13; *see*. As a direct result of Diamondback's false statements, Repeat Precision lost this valuable business opportunity to distribute products through Hunting-Titan.

143. Diamondback engaged in similar misbehavior with Schlumberger. In September, October, and November 2018, Schlumberger was in active negotiations with both Repeat Precision and Diamondback about distributing disposable setting tools. Exs. 494 & 507; Aviles Dep. at 36:1–36:6; 49:2–49:22; 60:5–60:17; Tr. 450-56 (Gr. Martin). On November 21, 2018, Schlumberger's Isaac Aviles, the North American Sales Manager for Schlumberger, recommended that Schlumberger enter into a long term agreement with Repeat Precision. Ex. 507; Aviles Dep. at 67:13–68:5. By December 3, 2018, however, Schlumberger elected to do business with Diamondback instead of Repeat Precision, calling it the "safest play." Ex. 509; Aviles Dep. at 73:8–73:18; *see also* Tr. 455-56 (Gr. Martin).

144. Schlumberger declined to do business with Repeat Precision after Drury falsely told Schlumberger that Repeat Precision had misappropriated Diamondback's trade secrets, engaged in fraud, and did not have a valid license to make or sell disposable setting tools. Ex.

518; Aviles Dep. at 103:14–104:6. Mr. Drury admits that he shared his allegations against Defendants with Schlumberger in October 2018, before he filed this lawsuit and before he even told Defendants of his complaints. Tr. 221-22 (Drury); Ex. 2025. He followed up with Schlumberger on November 27, 2018 by sending a copy of his complaint, which was the same day Drury ordered the power charge boycott. Tr. 219-20 (Drury). Although Drury shared Diamondback's complaints against Repeat Precision with Schlumberger, Drury never told the rest of the story, which was that Repeat Precision had already filed suit against Diamondback based on its exclusive rights to make and sell disposable setting tools under the License. Tr. 219-20 (Drury); Aviles Dep. at 91:5–91:16; 101:16–101:23. When deciding to do business with Diamondback instead of Repeat Precision. Schlumberger cited the litigation risks that Repeat Precision was facing as a result of the allegations that Diamondback had made. Ex. 509.

145.     As a direct result of Drury's actions, Diamondback partnered with Schlumberger to supply disposable setting tools for use in a new Schlumberger product, called the FracXion Unity, which is a combined setting tool and frac plug that competes directly against Repeat Precision's PurpleSeal Express™. Ex. 520; Aviles Dep. at 107:6–107:24; Tr. 222 (Drury). Diamondback also secured a distribution agreement with Schlumberger in Canada. Exs. 527 & 528; Tr. 222-23 (Drury). But for Diamondback's false statements and misconduct, these were business opportunities that Repeat Precision most likely would have secured for its own benefit. Aviles Dep. at 68:6–68:22; *see also* Tr. 454-57 (Gr. Martin). Of course, Diamondback would have received royalties on any such sales by Repeat Precision through Schlumberger, and would have earned substantial profits from selling power charges to Schlumberger's customers.

146.    Other direct examples of where Diamondback was able to get Repeat Precision customers to switch to Diamondback include Mewbourne Oil Company ("Mewbourne") (which will be discussed in Section K below), and Concho Oil & Gas.  Ex. 75; Tr. 879-81 (House).

**H.    REPEAT PRECISION REJECTED DIAMONDBACK'S ATTEMPTS TO RENEGOTIATE THE LICENSE; THEN DIAMONDBACK SUED.**

147.    Not only was Diamondback actively trying to prevent Repeat Precision from selling disposable setting tools, Diamondback also requested to renegotiate the License.

148.    Among other terms, the Amended License added a right-of-first refusal ("ROFR") operating in favor of Repeat Precision, which would be triggered if Diamondback received a bona fide third party offer for 50% or more of Diamondback's business.  Ex. 2 at §3.

149.    In early September 2018, Mr. Drury contacted Repeat Precision to see whether it would be willing to release the ROFR.  Exs. 80 & 2023. Mr.  Nipper responded on behalf of Repeat Precision saying that Repeat Precision was willing to drop the ROFR, but that it needed to be handled formally by the lawyers.  Exs. 80 & 2023; Tr. 621-22 (Nipper).  Diamondback replied on September 21, 2018 with a proposal to rewrite the License, including changing many of the key terms on exclusivity.  Ex. 2024; Tr. 182-83 (Drury).

150.    Diamondback's proposal to re-write the License's exclusivity provisions confirms that, as of September 2018, Diamondback understood that it had already granted the exclusive rights under '035 Patent to Repeat Precision.

151.    Repeat Precision was not willing to re-write the License to change the exclusivity provisions.  Ex. 80; Tr. 624 (Nipper).

152.    On September 26, 2018, Repeat Precision proposed a formal amendment of the License that would have deleted the ROFR, but also would require Diamondback to reaffirm the

remaining terms of the License.  Ex. 80; Tr. 625 (Nipper).  Diamondback rejected that proposal.
Tr. 625-26 (Nipper).

153.    Instead of reaffirming the License, Diamondback filed suit against Repeat
Precision seeking to cancel the License in its entirety.  *See* Case No. 4:18-cv-00902-A,
*Diamondback Industries, Inc. v. Repeat Precision, LLC et al.*, in the U.S. District Court for the
Northern District of Texas, Fort Worth Division.  Stipulation #9; Tr. 626 (Nipper).

154.    Diamondback has never tendered or offered to return the benefits it received
under the License.

### I.    REPEAT PRECISION EXERCISED ITS EXCLUSIVE RIGHTS UNDER THE LICENSE, BUT DIAMONDBACK HAS CONTINUED TO MAKE AND SELL DISPOSABLE SETTING TOOLS, WILLFULLY INFRINGING REPEAT PRECISION'S EXCLUSIVE RIGHTS UNDER THE '035 PATENT.

155.    On November 26, 2018, Repeat Precision exercised its right under the License to
exclude Diamondback from making and selling disposable setting tools that practice the claims
of the '035 Patent.  Tr. 616-17 (Nipper).  Repeat Precision gave notice of that election by filing
suit against Diamondback in Houston, and serving a copy of that notice on Diamondback.  *See*
Case No. 4:18-cv-04456, *Repeat Precision, LLC v. Diamondback Industries, Inc.*, in the United
States District Court for the Southern District of Texas.  Stipulation #10.

156.    Despite this clear notice, Diamondback has continued to make and sell disposable
setting tools that practice the claims of the '035 Patent.  Tr. 190 (Drury).  By doing so,
Diamondback has infringed the '035 Patent and breached the License, and continues to do so.

157.    Diamondback's actions and infringement were and are willful.  The following
facts support this finding:  (a) Diamondback was the patent holder, knew the scope of the patent
claims, and knew its products practiced the '035 Patent, *see* Ex. 290; (b) Diamondback knew that
it granted exclusive rights in the patent to Repeat Precision, *see* Exs. 1 & 2.; (c) Diamondback

implicitly confirmed its knowledge that the License granted Repeat Precision exclusive rights in the patent when Diamondback attempted to rewrite the License to remove those provisions, *see* Exs. 40 & 2024, (d) Diamondback continued to sell its infringing products after Repeat Precision requested Diamondback to stop making and selling disposable setting tools on November 26, 2018, Stipulation #10, Tr. 290 (Drury); and, (e) Diamondback has continued to make and sell its infringing products even after this Court construed the terms of the License, explaining that it was a grant of exclusive rights, even as to the licensor, *see* ECF89, Tr. 290 (Drury) (Diamondback is still selling disposable setting tools as of the time of trial).   In fact, Diamondback actually grew its market share from 65% of the disposable setting tools market to 75% after the Court entered its order construing the License as granting Repeat Precision the exclusive rights under the '035 Patent.  *See* Ex. 2212 at 78.

### J.  DIAMONDBACK RETALIATED AGAINST REPEAT PRECISION'S ENFORCEMENT OF ITS RIGHTS BY CUTTING OFF THE SUPPLY OF POWER CHARGES TO REPEAT PRECISION'S CUSTOMERS.

158.    Diamondback retaliated against Repeat Precision by cutting off the supply of power charges to customers who purchased disposable setting tools from Repeat Precision. Diamondback also refused to sell power charges to wireline companies working with Repeat Precision's customers.  Exs. 71-74 & 598.  This was an across-the-board order applying to all Repeat Precision's customers.  Tr. 196 (Drury), 804 (J. Cheek).  In addition, for two customers (Mewbourne and Altitude), Drury sent written communications informing them of Diamondback's false charges that Defendants had engaged in fraud and misappropriated Diamondback trade secrets.  Exs. 73 & 74 ("We are in litigation with NCS/Repeat Precision that pertains to IP Theft, Fraudulent inducement, and Breach of Contract amongst other things"); *see also* Tr. 703-04 (T. Cheek).

159.     Not to put too fine a point on it, but just as one example, it is clear to the Court after trial that Mr. Drury made the allegation of theft of IP to these third parties without having any basis to do so. This is the type of allegation that few if any third parties would take a risk on ignoring, lest they also become embroiled in litigation.

160.     Diamondback's boycott of Repeat Precision and its customers was an intentional effort to shut down Repeat Precision.  Tr. 195, 208-09 (Drury), 676 (Andres). This is not a finding being made by the Court despite Diamondback contesting it. Mr. Drury admitted that the boycott was designed with this intention in mind. Diamondback was the only supplier of power charges that worked with Repeat Precision's disposable setting tools.  Ex. 72; Tr. 197-98, 206, 209 (Drury), 676-77 (Andres).   Accordingly, Diamondback could (and intended to) render Repeat Precision's products worthless and unusable due to the absence of the power charge needed to operate the tool.  Tr. 676 (Andres).

161.     Even had Mr. Drury not admitted that this decision was for this reason, the evidence would establish that injuring Repeat Precision was the purpose. Diamondback did not also cut off supplies for firing heads to Repeat Precision customers. Why?  Because firing heads were available from other companies.  Tr. 198, 207 (Drury). For the boycott to succeed, Diamondback had to withhold a product that it had a monopoly over and that could be obtained from no other source.

162.     Drury admitted that he voluntarily implemented the boycott against Repeat Precision and its customers out of anger and spite towards Repeat Precision. Tr. 208-09 (Drury) ("Q:  You did this, in part, because you were angry.  You did it to kind of spite Repeat Precision, right?  A:  Yes.").  Andres confirmed this as well.  Tr. 682 (Andres) ("Q: I was going to ask why you made that decision [to stop selling power charges to Repeat Precision customers].  Is there

45

anything you'd like to add to the answer that you just gave?  A: No.  Just the fact that from what Derrek talked to me about I decided, I felt like we were kind of done dirty.").

163.    The Court finds by clear and convincing evidence that Diamondback acted with malice and a specific intent to harm Repeat Precision when it cut off the power charge supply to Repeat Precision and its customers. *See* Tr. 208-09 (Drury); *see also* K. Bellah Dep. at 103:24-104:12 (expressing concern that withholding charges would hurt Diamondback due to lost sales).

164.    The Court finds that Diamondback's boycott was a specific attempt to monopolize the disposable setting tool market. Diamondback holds market power and monopoly power in the market for power charges for disposable setting tools. Beginning in November 2018, Diamondback used that power to alter and suppress competition in the disposable setting tool market.

165.    The Court finds that Diamondback's withholding of power charges harmed competition.

166.    The Court finds that by withholding power charges, Diamondback prevented customers from making a free choice to purchase disposable setting tools from Repeat Precision.

167.    Mewbourne is one customer that was directly affected by Diamondback's anticompetitive conduct.  Diamondback knew that Mewbourne was a Repeat Precision customer prior to November 26, 2018.  Ex. 225; Tr. 703-04 (T. Cheek); C. Bellah Dep. at 26:21-27:9; K. Bellah Dep. at 76:10-77:7. Mewbourne primarily purchased standalone disposable setting tools instead of the PurpleSeal Express™.  Tr. 456-57 (Gr. Marin).

168.    On November 30, 2018, Diamondback refused to sell power charges to the wireline company working with Mewbourne.  *See* Tr. 457 (Gr. Martin). Mr. Drury directly communicated the reason why—Diamondback was no longer going to sell power charges to

companies, like Mewbourne, that purchased disposable setting tools from Repeat Precision. Ex. 74. As a result, Mewbourne returned a shipment of disposable setting tools it had purchased from Repeat Precision. Tr. 457-58 (Gr. Martin). Mewbourne, acting through its wireline contractor Altitude Energy, then bought replacement disposable setting tools from Diamondback. Tr. 217 (Drury), 879-81 (House). It is important to note that prior to this incident, Mewbourne had never purchased a disposable setting tool from Diamondback. Tr. 701 (T. Cheek). Diamondback was not even in discussions to sell disposable setting tools to Mewbourne prior to this incident. Tr. 215, 217 (Drury). Diamondback proffered no other evidence or explanation at trial for why Mewbourne returned the tools to Repeat Precision or decided to purchase them from Plaintiff.

169. A similar event happened with respect to Concho, which was another Repeat Precision customer. Diamondback knew that Silvertip wireline was running Repeat Precision's PurpleSeal Express for Concho. K. Bellah Dep. at 71:13-71:17, 73:5-8; Tr. 701 (T. Cheek). In early December, Diamondback refused to sell power charges to Silvertip, knowing that the charges would be used with a Repeat Precision setting tool. Ex. 1210; Tr. 218 (Drury), 703 (T. Cheek). Soon thereafter, Diamondback met with Silvertip and then started selling its disposable setting tools to Concho through another wireline company. K. Bellah Dep. at 82:4-83:5, 83:14-84:13. Diamondback recognized that this was a "big deal" that Concho was now using Diamondback's tool. Ex. 75.

170. Diamondback's actions also constituted an unlawful tying of goods because Diamondback refused to sell its Eliminator™ power charges to customers unless they also purchased disposable setting tools from Diamondback. Tr. 702 (T. Cheek) (explaining that Drury's order required a one-to-one purchase of disposable setting tools and related power

charges). Given that the Eliminator™ power charge was essential to operate the disposable setting tools practicing the claims of the '035 Patent, this tying of products was a way of excluding competitors from the market, which limited consumer choices and also limited supply. Diamondback had an established history of being unable to manufacture a sufficient number of disposable setting tools to service the market, *see* Ex. 270, so limiting the supply of tools in the market was harmful to competition.

171. Although Diamondback has attempted to downplay the size of the impact of its decision to wrongfully withhold power charges from Repeat Precision and its customers, the Court finds there are a couple of factors that have extended the impact of Diamondback's anti-competitive behavior into 2019 and beyond. First, after Diamondback agreed to resume selling power charges to Repeat Precision and its customers, Diamondback did not take corrective steps in the market to inform consumers of Diamondback's change in position (even though Diamondback said it would). Ex. 309; Tr. 225-26 (Drury); 804 (J. Cheek), 973-75 (Chron); C. Bellah Dep. at 41:3-41:7, 73:15-73:25; *see also* C. Bellah Dep. at 76:18-77:13 (admitting that when he spoke to Altitude, he successfully got them to buy disposable setting tools from Diamondback); Chron Dep. at 256:20-257:16 (asking Drury to take corrective action, but he has no personal knowledge whether Drury did it); K. Bellah Dep. at 109:22-110:12, 112:6-112:23 (believing that Christian Bellah may have contacted people). This failure to take corrective action has suppressed the market and harmed Repeat Precision's efforts to sell products. Thus output of disposable setting tools was suppressed and reduced.

172. Diamondback's past refusal to sell power charges necessary for Repeat Precision's disposable setting tools raises the obvious concern throughout the entire market that Diamondback might repeat its misconduct. *See* Exs. 2029 & 2030. (asserting right to withhold

charges from whomever Diamondback choses). Businesses are naturally hesitant to purchase new products with that associated uncertainty and risk. Tr. 877-78 (House). The Court finds that it is highly likely that many customers (in addition to Mewbourne) refused to buy disposable setting tools for months or longer from Repeat Precision after hearing that Diamondback refused to sell power charges to Repeat Precision's customers.

173. Moreover, Diamondback only agreed to resume selling power charges to Repeat Precision and its customers in return for a significant concession—that Repeat Precision would cease selling standalone disposable setting tools while the parties attempted to work out a broader resolution of their disagreements. Ex. 305 & 307; Tr. 227 (Drury), 599-600 (Nipper); Chron Dep. at 250:9-250:19, 253:9-254:7; *see also* Tr. 968 (Chron) (acknowledging that the withholding of power charges was one reason that the parties reinitiated negotiations).

174. Repeat Precision proposed this deal on December 5, 2018. Ex. 305; Tr. 598-599 (Nipper); Chron Dep. at 249:2-249:18. Prior to that time, Diamondback admitted that all settlement talks between the parties were dead. Tr. 967 (Chron); Chron Dep. at 246:13-246:21. Immediately after learning of Diamondback's power charge boycott, Repeat Precision was in a state of near panic. Tr. 597 (Nipper). Repeat Precision had just invested millions in facilities that would be unusable if it could not restore the power charge supply. Tr. 597-98 (Nipper); Chron Dep. at 248:4-248:16. Repeat Precision had no choice but to succumb to Diamondback's demands to cease selling standalone disposable setting tools for a period of time. Tr. 459 (Gr. Martin), 599 (Nipper). Thus, Repeat Precision reengaged in talks with Diamondback to try to obtain access to power charges. Tr. 967-68 (Chron).

175. The Court finds that Diamondback's exercise of market power and monopoly power in the power charge market to exclude Repeat Precision from the disposable setting tool

market harmed consumers and competition by depriving them of the choice of Repeat Precision's standalone setting tools. This also limited the supply of those innovative and superior products in the market, thereby harming competition.

176. At trial, Diamondback tried to claim that it resumed selling power charges to Repeat Precision's customers on its own, and not as a result of the agreement reflected in Exhibits 305 & 307. *See* Tr. 965-66 (Chron); Chron Dep. at 258:2-258:4. Unfortunately for Diamondback, the only evidence to support this statement is from Mr. Drury's self-serving assertions. Tr. 972 (Chron). As the Court has noted throughout this order, Mr. Drury appears not to have missed an opportunity to be untruthful about a myriad of issues, therefore the Court finds that Mr. Drury's statement lacks credibility, and there is no evidence to independently support the truth of Mr. Drury's assertions. An additional reason to disbelieve the assertions made by Mr. Drury is the total absence of any evidence that Diamondback ever communicated this position to Repeat Precision or its customers—that Diamondback was resuming sales to Repeat Precision's customers even without concessions from Repeat Precision. The Court finds Diamondback's contention, at best, to not be credible. There is no reason to believe that Repeat Precision would have agreed to give up its valuable rights to sell standalone disposable setting tools unless Diamondback had forced it to do son by boycotting power charges.

177. When the parties reached an impasse in their negotiations at the beginning of February 2019, Diamondback reasserted its claimed "right" to refuse to sell power charges to Repeat Precision and its customers. Exs. 2029 & 2030.

178. This Court entered a preliminary injunction on February 19, 2019 to protect the market, consumers, and Repeat Precision because, as the Court still concludes today, Diamondback was seeking and threatening to assert a right it does not have. Diamondback's

attempt to use its market power and monopoly power in the power charge market for charges that work with the disposable setting tools, violates federal and state antitrust laws, as well as the License. *See* ECF15. The Court addresses the need for continuing this injunction below.

### K. DIAMONDBACK STOLE THE MEWBOURNE BUSINESS RELATIONSHIP THROUGH ITS TORTIOUS AND ANTI-COMPETITIVE CONDUCT.

179.     As a direct result of Diamondback's boycott, Diamondback interfered with Repeat Precision's business relationship with Mewbourne. Prior to November 26, 2018, Repeat Precision had sold hundreds of its standalone disposable setting tools to Mewbourne. *See* Ex. 2060A; *see also* Tr. 456-67 (Gr. Martin).  After Mewbourne received the notice from Drury that Diamondback would no longer supply power charges to Repeat Precision customers, Ex. 74, Mewbourne ceased purchasing standalone tools from Repeat Precision.  Tr. 457 (Gr. Martin).  It did not resume purchasing standalone tools from Repeat Precision until a couple of months after this Court entered its preliminary injunction compelling Diamondback to sell power charges to all customers.  Ex. 2206; *see also* Tr. 879–81 (House).

180.     A preponderance of the evidence shows that this tortious interference conduct by Diamondback directly and proximately caused damage to Repeat Precision.

181.     As a natural, probable, and foreseeable consequence, Repeat Precision has suffered the pecuniary loss of the benefits of the Mewbourne existing contract and relationship, namely the sales that Repeat Precision would have made to Mewbourne had the relationship remained intact.  Thus, Diamondback deprived Repeat Precision of the sales of disposable setting tools that Mewbourne purchased from December 2018 through April of 2019.

182.     Further proof that Mewbourne would have purchased disposable setting tools from Repeat Precision is demonstrated by the fact that after the supply for power charges required to operate the Repeat Precision disposable setting tools was more certain, Mewbourne

shifted its purchases away from Diamondback and back to Repeat Precision. Exs. 605Y & 2208; Tr. 879-81 (House).

183.    Not only did Repeat Precision lose a significant volume of Mewbourne-related sales, Diamondback was successful in securing these sales for itself.  Although Mewbourne never purchased disposable setting tools directly from Diamondback, Mewbourne's wireline contractors, Altitude Energy and Reliance-Midland, started purchasing disposable setting tools for use on Mewbourne wells almost immediately after Drury's notice.  *See* Exs. 74, 76, 286, 605Y, 2067, & 2208; Tr. 702, 713 (T. Cheek), 879-81 (House); C. Bellah Dep. at 42:11-42:17; K. Bellah Dep. at 118:17-19.  Diamondback's Christian Bellah went to visit Mewbourne for a direct sales meeting soon thereafter.  C. Bellah Dep. at 36:7-36:24.

184.    Diamondback's accounting system does not track where particular tools are used. Tr. 714-715 (T. Cheek).  However, Diamondback's invoices confirm substantial sales of disposable setting tools to Altitude Energy and Reliance-Midland for use on Mewbourne wells in December 2018 and January 2019.  *See, e.g.*, Exs. 227-230, 235-237, 239, 285; *see also* K. Bellah Dep. at 118:17-118:19 (admitting sales in January 2019).  But Diamondback does not regularly include the ultimate location where its disposable setting tools are being used, so the absence of a reference to Mewbourne is not an indication that tools were used elsewhere.  Tr. 715-716 (T. Cheek)

185.    Diamondback employees admitted knowing that Altitude Energy and Reliance-Midland were purchasing disposable setting tools for use on Mewbourne wells.  Ex. 237; Tr. 706-07, 710 (T. Cheek); C. Bellah Dep. at 26:21-27:9, 89:19-90:7. Mr. Drury was very pleased by this development.  Ex. 238 ("GREATNESS"); Tr. 711 (T. Cheek).  That Diamondback's scheme was successful is underscored by the speed at which Diamondback acquired these new

52

sales. SO quickly for Mewbourne that Diamondback's Midland field office ran out of disposable setting tools on hand. Ex. 240; Tr. 712 (T. Cheek); C. Bellah Dep. at 87:19-88:5.

186.    The dramatic shift in Mewbourne business from Repeat Precision to Diamondback and back is illustrated in the following chart admitted at trial:



Ex. 605Y.

187.    Diamondback's sales records show that it sold zero disposable setting tools to Reliance-Midland before November 26, 2018, and had only limited sales of disposable setting tools to Altitude Energy before November 26, 2018. Exs. 76, 286, & 2067; Tr. 704-05, 708-10 (T. Cheek).

188.    Diamondback's total sales of disposable setting tools to these two wireline companies from December 2018 through April 2019 equaled ███ units. *See* Exs. 605N, 605O, 2063A, & 2065A. Diamondback sold ███ disposable setting tools to Reliance-Midland and 903 disposable setting tools to Altitude Energy. Exs. 76, 226, 286, 2067, & 2208; Tr. 709-10 (T. Cheek).

189. Repeat Precision's expert, Dr. House, explained that Diamondback's sales of disposable setting tools to these two wireline companies are the best measure of Repeat Precision's lost unit sales from the Mewbourne relationship. Tr. 879-81 (House).

190. To these lost units, an average price of ████ per unit is used. Tr. 845-46 (House); *see also* Exs. 605W & 2058A. Further, an average profit margin of ████ for the RP10 size disposable setting tool and ████ for the RP20 size disposable setting tool is applied to calculate the lost profits with reasonable certainty. Tr. 865 (House). These average sales prices and profit margins were based on the evidence of Repeat Precision's historical sales prices and costs. *Id.*; *see also* Exs. 605X, 2058A, 2060A & 2210. Dr. House appropriately calculated the incremental costs in arriving at the profit margin and lost profit figures he presented. Tr. 841-52 (House). This calculation results in a lost profits damage number with respect to Mewbourne of $273,379. *See* Exs. 605N, 605O, 2058A, 2060A, 2061, & 2065A; Tr. 938, 883-84 (House).

191. The Court concludes that this evidence supports damages of $273,379 in lost sales that Repeat Precision would have made to Mewbourne but for Diamondback's tortious and anti-competitive conduct. *See* Tr. 839, 883–84 (House).

192. Diamondback's interference with Repeat Precision's existing and prospective business relationship with Mewbourne was intentional and malicious.

## L. DIAMONDBACK'S SALES AND REPEAT PRECISION'S LOST PROFITS ON THOSE SALES.

### 1. Lost Profits Due to Sales Diverted to Diamondback.

193. Between November 26, 2018 and December 31, 2019, Diamondback sold approximately ████ disposable setting tools. Exs. 605L, 605M, 2063A, & 2065A. These numbers are calculated based on reports of Diamondback's actual sales of its SS10 and SS20 disposable setting tools through December 31, 2019, which will need to be updated through the

date of judgment.  Exs. 2063A & 2065A; Tr. 867-68 (House).  Those sales were in breach of the License and infringed the '035 Patent.

194.    But for Diamondback's infringing conduct, these sales would have been made by Repeat Precision.  Indeed, these infringing sales included sales to customers like Schlumberger and Mewbourne (via its wireline contractors) who had already expressed a clear interest and willingness to buy Repeat Precision's products.  Aviles Dep. at 67:13–68:22; *see also* Ex. 505; Tr. 454, 456-57 (Gr. Martin).  Moreover, because Repeat Precision and Diamondback were the only suppliers of disposable setting tools during this time period, if customers were unable to purchase the tools from Diamondback, they almost certainly would have purchased them from Repeat Precision.

195.    Repeat Precision also proved the amount of profit it would have made on each of these lost sales.  Repeat Precision's expert broke down the sales of Diamondback's disposable setting tools by type, applied an average price for them based on reasonable historical records, and applied an average profit margin calculated after taking into account the variable costs that would have been associated with making those additional units (as well as the economies of scale that would have been achieved at higher levels of production).  *See* Exs. 605L, 605M, 2058A , 2060A, 2061, 2063A, & 2065A; Tr. 841-42 (House).  Dr. House's damage calculations were based on competent evidence using a reliable methodology and were done with reasonable certainty.

196.    During the relevant time period, the average per-unit sales price for Repeat Precision's RP10 and RP20 disposable setting tools was ▮.  Exs. 605W & 2058A; Tr. 845-46 (House).

197.     During the relevant time period, the average incremental cost to make the RP10 was ████ per unit, which includes the $20 royalty due to Diamondback under the License. *See* Exs. 605G, 2059, 2061, 2071-74; Tr. 852 (House).

198.     During the relevant time period, the average incremental cost to make the RP20 was ████ per unit, which includes the $20 royalty due to Diamondback under the License. *See.* Exs. 605G, 2059, 2061, 2071-74; Tr. 852 (House).

199.     During the trial, Dr. House explained his methodology for calculating incremental costs. Tr. 841–43 (House). The incremental cost is the cost for each additional unit produced, as opposed to the average production cost of every unit. *Id.* This is an appropriate measure of incremental costs. *See Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 501 (2002) (rejecting argument that plain language requires "cost" methodology tied to historical investment and affirming forward-looking approach); *Int'l Air Indus., Inc. v. Am. Excelsior Co.*, 517 F.2d 714, 724 (5th Cir. 1975) ("It is frequently quite difficult to calculate the incremental cost of making and selling the last unit (i.e., marginal cost) from a conventional business account. Consequently, the firm's average variable cost may be effectively substituted for marginal cost . . . ." (footnote and citation omitted)); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (explaining that complete calculation of lost profits required evidence of either (1) evidence of actual expenses, or (2) evidence that the business expenses and overhead were static).

200.     The profits that Repeat Precision lost due to Diamondback's sales of the 10 size disposable setting tools through December 31, 2019, is $1,585,150. *See* Exs. 605L, 2058A, 2060A, 2061, 2063A, & 2065A; Tr. 866 (House).

201.    The profits that Repeat Precision lost due to Diamondback's sales of the 20 size disposable setting tools through December 31, 2019, is $6,993,977. *See* Exs. 605W, 2058A, 2060A, 2061, 2063A, & 2065A; Tr. 867 (House).

202.    Repeat Precision has suffered total lost profits of $8,579,127 due to Diamondback's infringing sales and breach of the License between November 26, 2018 and December 31, 2019. Tr. 867 (House).

203.    Furthermore, Repeat Precision has suffered additional damages up to the present date, which are yet to be calculated based on Diamondback's sales figures this year. *See* Tr. 867–68 (House). The Court finds that Diamondback's actual sales figures are preferred for accuracy over mere projections. *See id.*; *see also* Tr. 783 (Benoit). Within fourteen days of the entry of these findings of fact and conclusions of law, the Court orders Diamondback to produce a sworn statement identifying the number of disposable setting tools that Diamondback has sold in 2020 through the date of these findings, which will enable the Court to do a conservative calculation of Repeat Precision's additional lost profits on these sales. The Court further orders that it be executed by an officer of Diamondback other than Mr. Drury.

204.    In performing his analysis, Dr. House considered a reasonable average price to be charged for each disposable setting tool based on a historical average of ███. Tr. 845-46 (House). A higher number could have been used given that there was evidence that Diamondback eroded the price of the disposable setting tools as part of its tactics against Repeat Precision. *See Power Integrations, Inc., v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d 1348, 1378 (Fed. Cir. 2013) ("Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages."). Thus, the calculated lost profit margin is conservative and could reasonably have been higher.

## 2.     *Lost Profits from the Missed Hunting-Titan Opportunity.*

205.     In addition to interfering with Repeat Precision's relationship with Mewbourne, a preponderance of the evidence shows that Diamondback tortiously interfered with Repeat Precision's prospective business relationship with Hunting-Titan and directly and proximately caused damage to Repeat Precision.

206.     As a natural, probable, and foreseeable consequence, Repeat Precision has suffered the pecuniary loss of the benefits of the Hunting-Titan relationship, namely the sales that Repeat Precision would have made to Hunting-Titan had Diamondback not interfered with the potential relationship.   Thus, Diamondback deprived Repeat Precision of the sales of disposable setting tools that Hunting-Titan would have purchased from Repeat Precision from January 2019 through February 2020, which assumes that Repeat Precision will secure the relationship with Hunting-Titan as of March 2020.  See Tr. 840–41 (House) ("We're assuming that by March 1st we would have retained Hunting-Titan as a client and been in full production.").

207.     Hunting-Titan's internal communications regarding disposable setting tools and its negotiations with Repeat Precision are the best indicators of the unit sales Repeat Precision lost as a result of Diamondback's interference.   Rowell Dep. at 49:2–49:20.   According to evidence in this case, Hunting-Titan was going to buy between ▆▆▆ and ▆▆▆ units per month from Repeat Precision.  Rowell Dep. at 49:2–49:4.

208.     To these lost units, Dr. House applied the negotiated price of ▆▆▆ per unit to calculate Repeat Precision's damages.  Ex. 484; *see also* Tr. 884–85 (House).  An average profit margin of ▆▆▆ for the RP10 size disposable setting tool and ▆▆▆ for the RP20 size disposable setting tool were used to calculate the lost profits with reasonable certainty.  *See* Exs. 484, 605P, 605Q, 2058A, 2060A, 2061 2063A, & 2065A; Tr. 886 (House).   Using the methodology

explained above, Dr. House appropriately calculated the incremental costs in arriving at the profit margin and lost profit figures he presented. Tr. 841-52 (House). This calculation results in a lost profits damage number with respect to Hunting-Titan of $6,187,659. Tr. 840, 886 (House).

### 3. Repeat Precision Had Sufficient Manufacturing Capacity and Marketing Capabilities to Make These Lost Sales.

209.    Repeat Precision had sufficient manufacturing capacity to be able to fill all of the sales orders and opportunities that it lost as a result of Diamondback's conduct. *See Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 275 (Fed. Cir. 1985) ("It is well settled that proof of lost profits need not be absolute but may not be speculative; lost profits must be proven to a reasonable probability.").

210.    As discussed in more detail in paragraphs 125-132 above, by late November 2018, Repeat Precision had the capacity to manufacture approximately 6,200 disposable setting tools per month in its Ojinaga facility. Tr. 427-28 (Gr. Martin), 887-88 (House). Repeat Precision also made arrangements with a Chinese manufacturer that was prepared to produce 10,500 disposable setting tools per month, which means that Repeat Precision could obtain another 126,000 tools per year from this supplier if necessary. Ex. 1169; Tr. 430-33 (Gr. Martin), 888-89 (House). This increased Repeat Precision's capacity. *See, e.g., World Wide Stationery Mfg., Co. v. Bensons Int'l Sys., Inc.*, 2012 WL 3241835, at *4 (N.D. Ohio Aug. 7, 2012) ("It is clear from the case law that the only question that matters under the third factor of a lost profit analysis is whether the patentee can meet the market demand—not whether the patentee itself manufactures its own product.").

211.    The unit cost to import products from China range from ████ (RP10) to ████ (RP20) per unit. Exs. 605G, 1169, 2059, 2061, 2071-72, & 2074; Tr. 430-33 (Gr.

59

Martin), 857 (House). In comparison to Mexico, the cost is roughly ■ more per tool. Tr. 857 (House). These costs include the $20 royalty due to Diamondback. *Id.*

212. Dr. House has analyzed Repeat Precision's manufacturing capacity and has persuasively shown that Repeat Precision could have manufactured sufficient tools by using its own facilities with supplementation from the Chinese supplier to cover all of Repeat Precision's historic sales plus all of the lost opportunities due to Diamondback's infringement and interference. Ex. 605U. The following chart illustrates Dr. House's analysis:



Ex. 605U. *See Linear Tech Corp. v. Micrel, Inc.*, 2006 WL 8425047, at *6 (N.D. Cal. June 9, 2006) (holding that the third Panduit factor was met "[g]iven [the patentee's] expanding capacity during the relevant time period").

213. There are no capacity limitations that would limit Repeat Precision's ability to recover its full damages. Tr. 887-89 (House).

214.    Repeat Precision also had the sales and marketing capabilities to make the sales to customers who ultimately selected Diamondback.  *See* Tr. 508-11 (Nipper), 844–45, 922, 937, 940–41 (House).  Repeat Precision's and Diamondback's sales personnel largely operated in the same locations, such as Midland, South Texas, and the Appalachia/Pennsylvania region. *Compare* Tr. 361 (Gr. Martin) *with* Tr. 689 (T. Cheek).  But Repeat Precision had broader capabilities to reach the market given its offices in the Rocky Mountain/Wyoming region and its access and ability to use NCS offices in Canada and in the Oklahoma City/SCOOP-STACK Basin.  Tr. 361-62 (Gr. Martin).

## M.    DIAMONDBACK HAS ADMITTED THAT MANY OF THE CLAIMS IT FILED AGAINST DEFENDANTS WERE BASELESS.

215.    By the time this case went to trial in January 2020, Diamondback had significantly changed its legal theories from what had been asserted in its Original Complaint (ECF1), Second Amended Original Complaint (ECF61), and Original Answer to Repeat Precision's Complaint (ECF25).  Diamondback dropped the vast majority of its claims and defenses.  As set forth briefly below, the Court finds that Diamondback dismissed these claims because they were wholly lacking in merits when originally filed.

216.    Although it ordinarily would not be necessary to discuss claims that were voluntarily dismissed with prejudice, the Court finds it necessary to address these claims for three reasons.  First, Diamondback made representations to Repeat Precision's customers and potential customers, accusing Repeat Precision of fraud and misappropriation. A discussion of those claims is necessary to assess the truth and accuracy of Diamondback's allegations. Second, Repeat Precision is seeking to recover its reasonable attorneys' fees. An understanding of the nature of this litigation and the claims asserted is needed to assess whether an attorney fee award

is appropriate.  Third, Diamondback's behavior in this litigation is relevant to assessing whether this is an exceptional case warranting enhanced damages for patent infringement.

### 1. Misappropriation of Trade Secrets

217.    Diamondback's Original and Second Amended Complaints prominently alleged misappropriation of trade secret claims against Repeat Precision, NCS, Gary Martin, Grant Martin, and Robert Nipper.  ECF1, ¶¶84-109 (Claims I & II for Misappropriation of Trade Secrets), ¶¶187-196 (Claim XIV for Conspiracy), ECF 61, ¶¶141-169, 199-202.  Diamondback had two theories on how its alleged trade secrets were misappropriated:  (a) from the Project Power Data Room and (b) through former employees Trea and Justice Baker.  ECF61, ¶¶145 & 146.  However, after discovery was closed in this case, Diamondback dismissed its trade secrets claims with prejudice.  ECF104.  The evidence at trial quickly established why these claims were dismissed.

a.    Regarding the Data Room, Diamondback's representatives told Repeat Precision and NCS that there were no trade secrets in the Data Room.  *See* Ex. 131-32 ("After discussing with Derrek [Drury], he is willing to go with the strategy of not providing trade secret information at this point and if we do, then handling it with a separate agreement.").  And NCS's representative understood that the Data Room had been carefully reviewed to ensure that no such trade secrets were in there.  Tr. 815-18 (Sheppard).

b.    Regarding the Bakers, Mr. Drury admitted that even after discovery was closed, he had no actual evidence to show that the Bakers shared any trade secrets with the Defendants; it was just his "speculation."  Tr. 154 (Drury).

218.    The Court finds that Plaintiff's misappropriation of trade secret claims were not filed in good faith and as such should never have been filed.  Diamondback caused the

Defendants to spend an enormous amount of time defending against these theories, despite the lack of any basis for Diamondback to assert them. *See* Tr. 627 (Nipper) (explaining how disruptive and expensive this case has been).

219. Even more troubling, when Diamondback filed its misappropriation of trade secret claims, Diamondback included a public declaration from Mr. Drury in which he testified under oath that: "Almost all of the data Diamondback provided through the secure virtual data room were confidential trade secrets. … NCSM, NCSM-H, and R-P were aware that Diamondback considered all of this information to be confidential trade secrets." ECF1-2, ¶9. The Court can come to no other conclusion that that Mr. Drury's sworn statements were false, and that he knew they were false at the time he signed the declaration. *See* Exs. 131 & 132.

### 2. Fraud and Fraud in the Inducement of the Original License

220. Another claim that featured prominently in Diamondback's Original Complaint and Second Amended Complaint was Diamondback's theory of fraud related to the procurement of the Original License by Repeat Precision. *See* ECF1, ¶¶110-132 (Claims III, IV, & V), ECF61, ¶¶107-121. Defendants filed several motions to dismiss these fraud claims for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6). *See* ECF22, 23, 24, 26, 27, 37, 38, 39, 43, 44. The Court allowed Diamondback to re-plead its claims, which resulted in the Second Amended Complaint in which Diamondback described the basis of its fraud and fraud in the inducement claims as follows:

> 110. On February 8, 2018 over the telephone and again on February 19, 2018 in person at Diamondback's offices in Crowley, Texas, Gary Martin, acting on behalf of Repeat Precision, NCS Multistage, and NCS Multistage Holdings misrepresented to Diamondback that (1) he owned Repeat Precision; (2) Repeat Precision was developing its own disposable short setting tool; (3) Repeat Precision could design around his patent; (4) Repeat Precision had international manufacturing capability; (5) Repeat Precision would purchase and promote Diamondback's power charges; and (6) Repeat Precision intended to purchase Diamondback.

* * *

112. On February 8, 2018 over the telephone and again on February 19, 2018, in person at Diamondback's offices in Crowley, Texas, Gary Martin, acting on behalf of Repeat Precision, NCS Multistage, and NCS Multistage Holdings, concealed the true ownership of Repeat Precision by NCS Multistage and NCS Multistage Holdings, Diamondback's competitor.

Diamondback's allegations continued by accusing Defendants of failing to meet their duty to disclose the true set of facts. *See* ECF 61, ¶¶114-121.

221. In the Pre-Trial Order, Diamondback did not abandon these meritless claims but instead listed these fraud claims as being among the claims it was pursuing at trial. *See* ECF152 at 2 (claims i, ii, and iii). Therefore, Diamondback actually maintained that these claims were meritorious when it began the trial of this case. At the close of Diamondback's case Defendants announced their intention to move for directed verdict. Tr. 800. Following a brief recess, Diamondback withdrew all of its fraud and fraudulent inducement claims relating to the Original License. Tr. 802. Had Plaintiff not dismissed these claims this Court would have granted a directed verdict. Those claims were baseless and were not made in good faith.

222. For example, Diamondback made an allegation that the Defendants had failed to disclose the true ownership of Repeat Precision and the relationship between NCS and Repeat Precision. It is clear to the Court that this claim was absolutely without merit and was not made in good faith. The evidence is undisputed that this information was disclosed to Diamondback and that this was clear *before* the suit was filed. Repeat Precision identified NCS as an "affiliate" in the Original License and even in the first draft of that license. *See* Exs. 1 ¶1 & 31 ¶1. Mr. Drury actually corresponded directly with representatives with an NCS email address regarding the license. Exs. 34 & 35. The relationship between Repeat Precision and NCS was publicly disclosed in governmental filings. Exs. 108, 109, 2056, 2057; Tr. 561-66 (Nipper). The Court would expect Diamondback to have conducted some form of due diligence regarding

Repeat Precision and NCS before entering into the Original License. *See* Tr. 581 (Drury never asked about the ownership relationship). The failure by the Plaintiff to do so (if one stretches credulity to believe that it was unaware of the relationship) does not create liability and could not create liability on the part of the Defendants absent evidence of some effort by the Defendants to conceal it. Of course, there is no such evidence. Even after information was disclosed to Drury by his representatives regarding NCS, *see* Exs. 146 & 175; Tr. 123-24 (Drury); R. Huey Dep. (6/26/2019) at 64:17-65:19, 68:11-68:24, 69:9-69:20, Diamondback expressly ratified the Original License. Ex. 2 ¶4; Tr. 132 (Drury).

223.     There was no fraud based on the failure to disclose the ownership relationship between NCS and Repeat Precision, and it certainly was not material to Diamondback given that Mr. Drury did not raise this issue with the Defendants until he filed his lawsuit which was over seven-and-a-half months after entering into the Original License. Tr. 290 (Drury); Tr. 626 (Nipper).

224.     There was also no fraud based on statements that Repeat Precision was working on its own disposable setting tools and was going to try to design around the '035 Patent. The evidence is undisputed that, prior to entering into the Original License, Repeat Precision was trying to do this. It hired lawyers to analyze the '035 Patent. Tr. 478 (Ga. Martin), 569 (Nipper). It hired a consultant to work on designs. Tr. 382 (Gr. Martin), 478 (Ga Martin), 569 (Nipper); *see also* Ex. 2204 (message 8 from Grant Martin to Gary Martin: "Just sent you the update from the third-party guy looking into setting tool."). None of this conduct is illegal or even improper in and of itself. To the contrary, the reason that patents are published (in part) is to give the public notice of the claims so that a competitor can determine whether or not it might infringe, and if it might, whether the patent is valid. While it might be possible to cobble together a claim

related to this conduct in a philosophical manner, there would have to be some evidence of improper conduct if it had made a false statement related to it for any liability to attach. Here there was absolutely no evidence of a false statement made by Repeat Precision on this topic, and certainly not a materially false statement. Moreover, there is literally no reason to believe that Diamondback possessed any facts from which it could reasonably even make this assertion.

225.    There was also no evidence that Repeat Precision made any false statements to Diamondback regarding Repeat Precision's international manufacturing capabilities. Indeed, while not the most important of the allegations that the Plaintiff made, it may be the one in which it is obvious that Mr. Drury literally was in possession of the information that made the allegation impossible to assert in good faith. The evidence at trial established (without any effort to be controverted) to the contrary. Grant Martin provided a detailed presentation at trial showing some of Repeat Precision's manufacturing facilities in Mexico, including explaining what they were like in the spring of 2018 when the parties entered into the Original License.  Tr. 404–413, 419–430 (Gr. Martin); Exs. 422, 2062, 2088, 2109, 2138, 2160–61, 2164–65, 2167–69.  The reason that this is significant is because Mr. Drury went to visit Repeat Precision's operations in Mexico *before* he signed the Original License.  *See* Exs. 428 & 2199 (message 36 from Gary Martin to Derrek Drury on March 5, 2018: "High temp tomorrow 65 bring a jacket").  He also visited those facilities again between the times when he signed the Original and Amended License.  Tr. 44-45 (Drury), 479 (Ga. Martin).  That the Plaintiff would make this allegation against the backdrop of this evidence is stunning to the Court. Not only did Repeat Precision not conceal that it had international manufacturing capabilities, Drury personally viewed them. The Court believes that Diamondback knew it had no basis for asserting this fraud theory before and at the time it filed its claims in this case.

66

226. The Court also rejects any allegations that Repeat Precision committed fraud with respect to any representations that it would promote Diamondback's power charges. The evidence is undisputed that Repeat Precision encouraged its customers to use Diamondback's charges. Exs. 2016 & 2044. Mr. Drury literally coordinated with Grant Martin to prepare marketing flyers. Tr. 176-77 (Drury), 391-94 (Gr. Martin); Exs. 2011, 2012, 2014, & 2015. The Court finds that Diamondback knew Repeat Precision was promoting Diamondback power charges before Diamondback filed this claim. Repeat Precision never tried to find an alternative source for power charges until after Diamondback disrupted the power charge supply in late November 2018. Tr. 602 (Nipper). This allegation is the equivalent of an arsonist starting a fire and then complaining about fire truck noise.

227. Finally, the Court addresses the allegation regarding Defendants' intent to acquire Diamondback. The evidence established that they were seriously interested in an acquisition. *See, e.g.*, Tr. 402 (Gr. Martin) ("Q: From your discussions with Mr. Gary Martin, was he interested in acquiring Diamondback? A: Yes. He was."). The parties signed a letter of intent. Ex. 3. They also moved forward with performing due diligence. Tr. 808-20 (Sheppard); Exs. 123, 137, 406, 414. However, everything changed when two concealed facts came to light:

    a. Defendants discovered that Hunting-Titan, one of Diamondback's largest customers, planned to enter the power charge market to compete against Diamondback. Tr. 442-43 (Gr. Martin), 610-614 (Nipper), 813, 819-20 (Sheppard). Drury knew this fact long before the parties signed the LOI, but concealed it from the Defendants. Tr. 664-65 (Andres); K. Bellah Dep. at 93:3-94:21; C. Bellah Dep. at 45:8-45:19, 46:3-46:12, 46:20-47:13, 48:9-49:17, 63:3-63:8; Exs 284 & 319 (June 7, 2018 text). Hunting-Titan's

entry into the power charge market was a significant, negative change in events that caused Defendants' to re-evaluate the proposed acquisition.  Tr. 818-20 (Sheppard).

        b.      Defendants also learned of rumors of significant environmental issues at Diamondback, including the burying of hazardous chemicals and explosives in the ground.  Tr. 502-03 (Ga. Martin).  At trial, Diamondback admitted what it had buried.  Tr. 229-30 (Drury), 665-675 (Andres).  Prior to this case, Drury had denied that any such burying occurred.  Tr. 503 (Ga. Martin); *see also* Tr. 232 (Drury admitting he did not tell Gary Martin about what was buried on the property).  Although Diamondback's Rob Andres downplayed the significance of the materials that the Plaintiff is burying, he admitted they had safety concerns about handling the chemicals, which is why they wore safety suits and protective gear when handling the chemicals and why they did not transport the chemicals elsewhere for proper disposal.  Tr. 671-73 (Andres).  The hazardous chemicals were buried on Diamondback's property after 2016.  Tr. 654, 677 (Andres).

The Court finds that Defendants' decision not to acquire Diamondback was not the result of any fraud or false statements of intentions.  To the contrary, Defendants made the decision not to acquire Diamondback based on their well-founded concerns about Diamondback's business and potential liabilities and the simple fact that Mr. Drury wanted the Defendants to pay a much greater amount than Repeat Precision believed the acquisition to be worth. There was some evidence that Mr. Drury even suggested to third parties that it was his decision not to move forward with the acquisition.  Atherton Dep. at 22:2–18.  Moreover, contrary to Diamondback's allegations that false statements were made by Repeat Precision related to this topic in February 2018, Plaintiff failed to produce any evidence of any discussions between Diamondback and

Defendants regarding an acquisition until after the parties entered into the Original License. As a matter of law, any after-the-fact statements (whether false or not) cannot give rise to a claim of fraud regarding the execution of a license that had already been signed.

228. Although Diamondback's fraud allegations regarding the Original License take up significant space in Diamondback's complaints, it is notable that Drury offered literally no sworn testimony to support these fraud allegations at trial. The Court doubts that this was an oversight. It is clear to the Court that Diamondback knew even before it filed this lawsuit that this allegation had no merit and that there was no evidence to support it. The Court finds that Diamondback did not have a good faith factual or legal basis for asserting fraud claims against any of Defendants regarding entry into the Original License.

229. Diamondback's filing of these false allegations of fraud is also significant for purposes of the claims that went to trial. Diamondback repeatedly used these fraud allegations to try to undermine Repeat Precision's breach of contract and patent infringement claims. The Court finds that Repeat Precision's defense of these fraud claims was inextricably intertwined with Repeat Precision's efforts to affirmatively prove its claims for breach of contract and patent infringement.

### 3. *Tortious Interference with Prospective Business Relationships*

230. Diamondback sued the Defendants for allegedly tortiously interfering with Diamondback's ongoing business relationships with Hunting-Titan, described as Diamondback's largest customer. ECF1, ¶¶143-150 (Claim VII); ECF61, ¶¶192-198. After discovery closed, Diamondback dismissed this claim with prejudice, too. ECF104. Based on the evidence that was adduced at trial, it is clear to the Court that this was not a claim that could have been brought in good faith at any time.

231. Diamondback's tortious interference claim was fatally defective at the time the complaint was filed because Defendants were in negotiations with Hunting-Titan to distribute disposable setting tools, whereas Diamondback never had any intention in such a distribution relationship. Tr. 229 (Drury), 435-48 (Gr. Martin). Indeed, far from being Diamondback's largest disposable setting tool customer, Diamondback had never sold any disposable setting tools to Hunting-Titan. Tr. 136 (Drury); *see also* Ex. 2065A; Tr. 437 (Gr. Martin). Diamondback had even declined Hunting-Titan's request for an opportunity to discussion distribution opportunities for the disposable setting tools. Ex. 2000. Hunting-Titan was a Diamondback power charge customer. Defendants were not selling or even attempting to sell power charges at the time of the alleged interference. Tr. 602 (Nipper) (focused on getting charges from Diamondback until late November 2018). It is impossible for the Court to understand how the Plaintiff could have made this legal claim when Defendants did not even make or sell power charges during the relevant time.

232. Diamondback acknowledged that it could not control who Hunting-Titan chose to do business with. Diamondback admitted that there would be nothing wrong with Hunting-Titan choosing to reach out to Repeat Precision to start a business discussion. Tr. 171 (Drury); Drury Dep. 231:7-231:12 (impeachment clip). These are critical admissions because the evidence conclusively established that this is exactly what happened—Hunting-Titan initiated business discussions with Repeat Precision on May 23, 2018. Ex. 395 at RP0010546; *see also* Tr. 435-36 (Gr. Martin). Diamondback had no legal right to interfere with that opportunity.

233. Diamondback dismissed its tortious interference claim because it was lacking a basis in law or fact when filed and when ultimately dismissed.

4. *Computer Fraud & Abuse Act Claims*

234.    Diamondback also sued Defendants under the Computer Fraud & Abuse Act, 18 U.S.C. §1030, and under Chapter 143 of the Texas Civil Practice & Remedies Code.  ECF1, ¶¶151, 155 (Claim VIII); ECF61, ¶¶183-191.   After discovery, Diamondback also voluntarily dismissed these claims with prejudice.  ECF104. What is incredibly troubling to the Court is that even before Diamondback filed its complaint against Defendants, it knew that it was suing parties who had never accessed Diamondback's computers.  *See* ECF1-10 (access log showing that Robert Nipper and Gary Martin never accessed the Data Room); Tr. 590 (Nipper) ("Q:  Did you ever access Diamondback's data room?  A:  I did not."). Thus, the Plaintiff had no good faith basis for having made this allegation. This claim was obviously made in a public filing. It is the opinion of the Court that this allegation, along with many of the others, was alleged exclusively for the purpose of intimidating potential customers of Repeat Precision despite the fact that there was literally no good faith basis for making the allegation.

5. *Challenging the Amended License by Alleging Lack of Consideration*

235.    From the moment that Diamondback filed its' original complaint it has attempted to challenge Repeat Precision's rights under the Amended License by arguing that there was no consideration supporting the License.  *See* ECF1, ¶175 (Claim XII); ECF25 (defense 8).  To that end, Diamondback also asserted an alleged lack of consideration in defense of Repeat Precision's request for a preliminary injunction.  *See* ECF14 at 10 (Case 00036).  At trial, Drury contradicted Diamondback's prior position and admitted that there was consideration supporting both the original and amended license.  Tr. 115-116 (Drury).  Diamondback did not withdraw these claims until Defendants expressed their intent to move for directed verdict on the consideration issues.  Tr. 800-802.

71

236.     Diamondback's lack of consideration arguments were baseless and, in the Court's opinion, were not made in good faith. Diamondback has been paid significant royalties from Repeat Precision. *See* Exs. 260-262 & 2050-2054. These royalties include payments on standalone setting tools made by Repeat Precision, which was an additional product Repeat Precision was authorized to make and sell as a direct result of the Amended License. The Amended License was also necessary for Repeat Precision to agree to expand its manufacturing operations in Mexico, which in turn results in Diamondback receiving additional royalties on product sales and the opportunity to make substantial additional revenues on power charge sales. There was ample consideration supporting the Amended License, and Diamondback should have known this before filing its claims in this lawsuit.

### 6.     Other Issues

237.     There are several other claims and issues that warrant a brief mention.

238.     Diamondback's conduct related to filing claims either without adequate vetting (at best) or with actual awareness of their lack of merit was replete throughout the entire course of this litigation.

239.     Diamondback sued Defendants for securities fraud violations in the Original Complaint alleging damages in excess of $100,000,000, *see* ECF1, ¶¶179-186, only to dismiss those allegations after Defendants briefed the issues, including the fact that there was no purchase or sale of a security alleged in this case. ECF23 at 20-21.

240.     Diamondback accused Defendants of violating Texas Penal Code section 32.45 by "misapplication of fiduciary property or property of a financial institution," as part of Diamondback's threat to hold Defendants accountable for uncapped exemplary damages. *See* ECF61, ¶¶209-210. Diamondback dismissed these allegations, but not until Defendants

announced their intention to move for a directed verdict.  Tr. 800-02. Diamondback never identified any fiduciary property or property of a financial institution to support its's allegations.

241.    Diamondback also asserted the affirmative defense of duress.  ECF25 (defense 6). Diamondback failed to adequately explain the basis for alleging this defense and eventually simply Diamondback dismissed it.  The Court cannot find any good faith basis for asserting this defense given that Mr. Drury admitted he entered into the Amended License freely, voluntarily, and not as a result of any pressure from others.  Tr. 128-31 (Drury).

242.    The Court addresses these claims even though they have been dismissed with prejudice to illustrate how Diamondback's lack of good faith with respect to what claims and/or affirmative defenses should be asserted was not merely incidental or the result of an oversight. It was methodic and repetitive, and it was clearly calculated to inflict the maximum amount of harm possible against Repeat Precision. It also needlessly made this case more complicated and expensive than it should have been given as the result of the numerous, baseless claims that were asserted.

## CONCLUSIONS OF LAW

### A.    JURISDICTION AND VENUE.

1.    The Court has subject matter jurisdiction over this case under 28 U.S.C. §§1331, 1337, 1338, & 1367.  Stipulation #1.

2.    Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this case occurred in this District and Division.  Moreover, all parties have consented to venue in this District and Division.  Ex. 308; Stipulation #11.

### B.    THE LICENSE IS A VALID AND ENFORCEABLE CONTRACT.

3.    The License—including the Original License and Amended License—is a valid and enforceable agreement between Diamondback and Repeat Precision.  Diamondback has

withdrawn its challenges to the validity of the Original License. Tr. 801-02. For the reasons that follow, Diamondback's challenge to the validity of the Amended License fail.

      1.    *The Amended License Granted the Exclusive Rights under the '035 Patent to Repeat Precision; It Was Not the Product of a Mutual Mistake.*

    4.    The Amended License was negotiated at arms' length, and accurately reflects the terms of the parties' agreement. There was a meeting of the minds between Diamondback and Repeat Precision, which is reflected in the Amended License. Both parties accepted it. *See* Exs. 2 & 41; Tr. 128-131 (Drury).

    5.    As this Court previously explained, in the License Diamondback grants Repeat Precision the exclusive rights under the '035 Patent, including the exclusion of Diamondback. *See* ECF89. A patent license does not reserve any rights to the licensor absent a specific agreement in the license that the parties agree to. With respect to the License in this litigation, there is no such language that allows Diamondback to practice the '035 Patent. *See* Ex. 2. The Court hereby incorporates its prior ruling construing the License as if fully set forth herein.

    6.    Although this Court previously granted summary judgment in favor of Defendants and against Diamondback holding that the Amended License was the product of a mutual mistake, *see* ECF137, Diamondback continues to argue that there was a mutual mistake. *See* ECF157 (proposed Conclusion of Law 19) ("Diamondback and Repeat entered into a license agreement that excluded Diamondback from manufacturing tools that practice the '035 Patent by mutual mistake."). Having heard and considered the evidence that Diamondback offered at trial, the Court confirms its prior decision to reject Diamondback's mutual mistake defense.

    7.    To establish a mutual mistake, Diamondback would need to prove: (a) an original agreement and (b) a mutual mistake that occurred when reducing this agreement to writing. ECF137 at 2. However, Diamondback's evidence at trial conclusively established that, prior to

Drury's execution of the Amended License (Exs. 2 & 41), there was no agreement between the parties to amend the License Agreement. For example, Drury testified:

> Q:     All right. And there was no agreement between Repeat and Diamondback on the amended license at least as of April 17, 2018, right?
>
> A:     That's correct.

Tr. 122 (Drury). Later, Mr. Drury admitted he had his lawyers review every draft, and that in May 2018, the parties were still exchanging drafts for a proposed amendment. Tr. 125-27 (Drury). When he ultimately signed the amendment after the May 22, 2018 lunch in Fort Worth, Mr. Drury knew the document had the broad exclusivity language that Repeat Precision had been requiring in its prior drafts and that Repeat Precision had not agreed to the proposal that Diamondback had made with respect to this issue. Tr. 128-31 (Drury).

8.     Rather than establish that there was a mistake, Diamondback's own evidence shows a careful and willful decision to enter into the Amended License that happened only after consulting with lawyers. *Id.* Drury acknowledged that this was not something he would have "lightly entered" into. *Id.* at 129. The only real "evidence" that Diamondback has offered that this language was the result of a mutual mistake is the fact that Repeat Precision did not immediately exercise its right to exclude Diamondback. The Court rejected this in deciding the summary judgment motion on this issue and Diamondback did not proffer any evidence during trial that would change the Court's legal analysis or call into question the clear and unambiguous language of the License.

9.     Because the Court finds that Repeat Precision has a valid, express license under the '035 Patent, the Court need not consider Repeat Precision's implied license defense. *See* ECF73 at 51 ¶4. To the extent that the Court must consider it, the Court finds as a matter of law that Plaintiff's defense based on an implied license is without merit.

2.      *There Was No Fraud or Fraud in the Inducement.*

10.      Diamondback challenges the Amended License as being the product of fraud. As should be evident at this point, the Court has serious reservations how it could have asserted this argument in good faith based on the facts involved in the negotiation of the Amended License, most of which are undisputed.

11.      To prove a fraud claim, Diamondback must establish: (a) a material representation, (b) that was false when made, (c) that the speaker knew was false or was made without knowledge of its truth, (d) that the speaker intended the false statement to be acted upon, (e) the plaintiff acted on that statement, and (f) suffered damages as a result. *Malacara v. Garber*, 353 F.3d 393, 403-04 (5th Cir. 2003). The elements for a claim of fraud in the inducement are essentially the same. *See Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).

12.      A representation of fact is material when "a reasonable person would attach importance to and would be induced to act on the information in determining [the person's] choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)).

13.      To determine whether a plaintiff can justifiably rely on the defendant's allegedly false representations, the Texas Supreme Court explains that courts must consider the "nature of the parties' relationship and the contract." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018) (quoting *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.)). The Court continued with language particularly appropriate here:

"In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests. ... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." And when a party fails to exercise such diligence, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." To this end, that party "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations."

*Id.* (citations omitted).

14.     Diamondback's fraud theory at trial was immediately suspect given that it was very different than the one stated in Diamondback's pleadings and interrogatory answers. *See* Tr. 93-104 (Drury). Although the fraud theories Diamondback asserted in its complaint and interrogatories focused on allegedly false statements made by Gary Martin, Mr. Drury did not offer *any* testimony at trial regarding even a single allegedly false statement made by Gary Martin. This failure was compounded by his failure to testify at all about how Diamondback relied upon or was harmed by any allegedly false statement by Gary Martin. The Court can only assume that Mr. Drury elected not to testify with respect to either of these issues because Gary Martin never made a false statement to him and that Mr. Drury could not testify truthfully at trial that he made any reliance on any such statement. This failure to present evidence again raises serious questions about whether the fraud theory had any good faith basis at the time it was asserted. The Court presumes that there was none.

15.     Instead of going to trial on the fraud claims Diamondback pleaded, Diamondback shifted tactics and asserted two new theories in its proposed pre-trial findings of fact and conclusions of law: (a) that Robert Nipper (not Gary Martin) allegedly made representations to Diamondback that Diamondback would be able to continue selling disposable setting tools after entering into the Amended License, *see* ECF152 (COL #15), and (b) that Repeat Precision failed to disclose that it was negotiating to sell products covered by the '035 Patent to Hunting-Titan

77

when it requested an amended license, *see* ECF152 (COL#17). Assuming but not deciding that these claims are properly before the Court, they fail. *See Smith v. EMC Corp.*, 393 F.3d 590, 596–97 (5th Cir. 2004) (explaining that Federal Rule of Civil Procedure 15(b) treats new issues raised at trial as if raised in the pleadings only with "the parties' express or implied consent").

16.     First, there is no credible evidence that Mr. Nipper ever represented to Diamondback that Diamondback would have the right continue to be able to make and sell its disposable setting tools after entering into the Amended License. This topic was not discussed on April 11, 2018, when Mr. Nipper and Mr. Drury first discussed amending the license. Tr. 480, 500 (Ga. Martin), 522 (Nipper), 574 (Nipper). It was not discussed at the May 22, 2018 lunch in Fort Worth. Tr. 52-53 (Drury), 399-400 (Gr. Martin), 501 (Ga. Martin), 578-81 (Nipper). And there is no evidence it was *ever* discussed between Repeat Precision and Diamondback. Tr. 53, 90 (Drury), 480-81 (Ga. Martin), 521-23, 578 (Nipper); *see also* Tr. 580 (Nipper) (he never purported to give legal advice to Diamondback regarding the meaning of the amendment's terms); Tr. 583 (Nipper) (request for exclusivity was made in the written draft of the amendment). To the extent that Mr. Drury's testified at trial that the Mr. Nipper made such representations, the Court accords no weight to this testimony because deserves no credibility as a fact witness. Indeed, the Court accords even less credibility based on the fact that this claim was only raised as a "Hail Mary" after it became apparent to Diamondback that it had no basis for asserting a claim of fraud based on any statements allegedly made by Gary Martin.

17.     While the Court is reluctant to accord Mr. Drury's testimony that he had heard such a representation even a scintilla of weight, the Court also finds that there was no reason that he would have been justified in relying on it. The evidence established beyond any doubt that Diamondback was and is a sophisticated party that had its own sophisticated lawyers to evaluate

the terms of the proposed Amended License.  *See* Exs. 40, 106-107, 112-113; Tr. 119-22 (Drury), 396-99 (Gr. Martin).

18.     Moreover, the language of the Amended License is unambiguous in granting the exclusive rights under the '035 Patent to Repeat Precision.  ECF89.  Diamondback could not justifiably rely upon any representations that were directly contradicted by the plain language of the Amended License.  *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 559 (Tex. 2019) ("Because Carduco's claim of fraudulent inducement is directly contradicted by the contract's terms, we agree that there could be no justifiable reliance as a matter of law.").

19.     Diamondback has also failed to identify any damages flowing from this alleged misrepresentation.  To the contrary, the record establishes that Diamondback made profits from sales of disposable setting tools through late November 2018, which Diamondback is being allowed to keep.  *See* Tr. 617 (Nipper) (regarding Repeat Precision's decision not to seek damages for sales before November 26, 2018).  Moreover, the evidence established that Diamondback made no capital investments or expenditures to expand its manufacturing capabilities for disposable setting tools in 2018, meaning that Diamondback has failed to prove any reliance-based damages.  Tr. 133 (Drury), 699 (T. Cheek).

20.     Diamondback's second new fraud theory—that Repeat Precision allegedly failed to disclose its negotiations with Hunting-Titan when it requested the Amended License—also fails.

21.     First, Diamondback has not proven that Repeat Precision had any legal duty to disclose its potential customers and alleged negotiations with Hunting-Titan to Diamondback.

22.     But even if there was such a duty, Diamondback's claim fails on the timing alone.  Hunting-Titan's first contact with Repeat Precision was by email on May 23, 2018.  *See* Ex. 395;

Tr. 435-36 (Gr. Martin).  By this point, Repeat Precision had already provided Diamondback with both the April 11 Draft and May 22 Draft of the proposed amendments.  *See* Exs. 37 & 41. Thus, contrary to Diamondback's allegation in its proposed findings of fact, Repeat Precision requested the Amended License *before* it had any contacts with Hunting-Titan.  And, Repeat Precision received the executed amendment *before* Repeat Precision had any substantive communications with Hunting-Titan.  *Compare* Ex. 41 *with* Tr. 436-439 (Gr. Martin).

23.     Diamondback also failed to prove that it suffered any damages from this alleged non-disclosure (particularly given that Diamondback had not previously sold disposable setting tools to Hunting-Titan), nor has Diamondback provided evidence of any actions it took in justifiable reliance on the allegedly non-disclosed negotiations between Repeat Precision and Diamondback.

24.     In sum, Diamondback's fraud and fraudulent inducement claims fail because (a) Diamondback has failed to prove any false statements or actionable omissions of material fact by Repeat Precision or NCS, (b) Diamondback failed to prove that it has justifiably relied on any allegedly false statements or actionable omissions of material fact by Defendants, and (c) Diamondback suffered no damages based on the theories of fraud it alleged.

### 3.     *Diamondback Does Not Have an Implied License to Practice the '035 Patent.*

25.     Diamondback does not have an implied license to practice the '035 Patent over Repeat Precision's express objections.   *See* ECF157 (proposed Conclusion of Law 13) (explaining Diamondback's implied license defense).

26.     "In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention."  *Wang Labs. Inc. v. Mitsubishi Electronics Am. Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997).  An implied

license may exist where: (a) a relationship existed between the parties; (b) within the relationship, the patentee granted the defendant a right to use the invention; (c) the patentee received valuable consideration for that grant of right; (d) the patentee denied that the defendant had an implied license; and (e) the patentee's statements and conduct created the impression that the patentee consented to the defendant's making, using or selling of the invention. *Id.* at 1579 (finding implied license arose from the entire course of conduct). An implied license "cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983).

27. For an implied license to exist, there must be an affirmative grant of consent to use the patent. *Id.* at 1581; *see also Winbond Electronics Corp. v. ITC*, 262 F.3d 1363, 1374 (Fed. Cir. 2001). Here, Diamondback has failed to show that Repeat Precision affirmatively granted Diamondback the right to continue practicing the '035 Patent over Repeat Precision's objections. Instead, when Diamondback attempted to redraft the Amended License to remove the exclusivity language, Repeat Precision rejected that request. *See* Exs. 80 & 2024.

28. Diamondback also has failed to show that it provided consideration to Repeat Precision for the grant of the alleged implied license. Because Diamondback is seeking an implied license after entry into the Amended License on June 4, 2018, Diamondback would need to show some consideration it provided to Repeat Precision after June 4, 2018. Otherwise the clear and unambiguous terms of the Amended License must control. Here, Diamondback has shown no consideration it provided to Repeat Precision in return for the implied license Diamondback is claiming. Indeed, most of the benefits Diamondback claims to have provided to Repeat Precision (such as information on how to make and manufacture disposable setting tools),

was provided prior to June 4, 2018, pursuant to the terms of the Original License, or pursuant to other agreements with the Defendants.

29. The Court finds that any alleged benefits or information provided to Defendants in support of its existing contracts with Repeat Precision is not consideration supporting an implied license to practice the '035 Patent in express contradiction of the terms of the Amended License.

30. Reviewing the evidence as a whole, the Court further finds that there is no evidence that Defendants' conduct created or could have created the impression that Diamondback would have the perpetual right to continue practicing the '035 Patent. There was no evidence that Defendants engaged in any conduct that could create the impression that Defendants were waiving their exclusive rights under that patent. Again, Diamondback argues that Repeat Precision's failure to enforce its exclusive rights by demanding that Diamondback take or not take some action is insufficient, as a matter of law, to alter the clear meaning of the language that is in the License and that the Parties agreed to.

31. Viewing the evidence as a whole, Diamondback is not entitled to an implied license under the '035 Patent that would have the effect of changing the plain, unambiguous, and expressed language of the Amended License.

       *4.     Repeat Precision Is Not Estopped or Otherwise Barred from Asserting Its Rights under the License.*

32. The Court also rejects Diamondback's equitable estoppel defense. *See* ECF157 (proposed Conclusions of Law 11-13) (explaining Diamondback's equitable estoppel claim).

33. "[T]he doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of

obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (1998). There are multiple reasons why Diamondback's equitable estoppel claims fails.

34.     First, Diamondback has failed to establish a false representation or concealment of material facts by Defendants. The Court concludes there is no credible evidence that Defendants told Diamondback that it would be allowed to continue manufacturing and selling disposable setting tools after entering into the Amended License. And even if Defendants allowed Diamondback to manufacture and selling disposable setting tools after June 4, 2018, Defendants never represented that they were giving up their rights to enforce the Amended License as written. Defendants also did not conceal the language of the Amended License from Diamondback. To the contrary, Diamondback had the language and had it reviewed by its lawyers by signing the Amended License. Tr. 129-31 (Drury). Thus, Diamondback has failed to prove the type of representation or concealment necessary to invoke the doctrine of equitable estoppel.

35.     Because Diamondback not only had a copy of the Amended License, but also had it reviewed by lawyers, Diamondback also cannot show that it was without knowledge or means of obtaining knowledge of the true facts—here, the scope of Repeat Precision's right to exclude Diamondback from practicing the '035 Patent. The fact that Diamondback's lawyers even attempted to change the language of the Amended License to remove the exclusivity provisions, *see* Ex. 2024, is proof that Diamondback had knowledge of the true state of facts.

36.     Diamondback also has failed to show detrimental reliance on any allegedly false representations or concealment of material facts by Defendants. Diamondback offers two factual theories in an attempt to show detrimental reliance: (a) Diamondback's decision to continue

manufacturing and selling disposable setting tools after Mr. Drury signed the Amended License and (b) Diamondback's alleged capital investments in facilities and equipment to make disposable setting tools. Neither theory is sufficient to establish detrimental reliance.

37. Contrary to establish detrimental reliance, Diamondback's decision to continue manufacturing and selling disposable setting tools after Mr. Drury signed the Amended License was business as usual. In other words, Diamondback cannot show that it changed its position in any material way based on Defendants' alleged misrepresentations and concealment. Accordingly, the Court finds Diamondback's post-contracting behavior insufficient to establish the detrimental reliance necessary to invoke equitable estoppel.

38. The Court also rejects Diamondback's theory of estoppel based on alleged capital expenditures relating to the manufacture and sale of disposable setting tools. Diamondback's head of accounting admitted that Diamondback made no such capital expenditures in 2018 to expand its capacity to make disposable setting tools. Tr. 698-99 (T. Cheek) (and impeachment clip T. Cheek Dep. at 47:11-47:15). Diamondback did not even have a budget for such expenditures. *Id.*

39. In addition to the foregoing deficiencies in Diamondback's equitable estoppel claim, the Court further denies relief on this claim due to Diamondback's unclean hands, as discussed in the next section. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 165-66 (Tex. App.—Houston [14th Dist.] 1991, no writ) (citing many cases for the proposition that unclean hands may bar a party seeking relief under an equitable estoppel theory).

> **5.** *Repeat Precision Did Not Waive Its Right to Enforce the Amended License as Written.*

40.    The Court also finds that Defendants have not waived their rights to enforce the Amended License as written. *See* ECF157 (proposed Conclusion of Law 9) (explaining Diamondback's waiver theory).

41.    Waiver is the intentional relinquishment of a known right. *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 6 (Tex. 2014). Waiver is a matter of intent. *Id.* "There can be no waiver unless so intended by one party and so understood by the other." *Id.* "To be effective, a waiver must be clear and specific." *Id.* Here, there is no evidence to support any clear and specific waiver of Repeat Precision's exclusive rights under the Amended License.

42.    Although Repeat Precision may have allowed Diamondback to make and sell disposable setting tools for a period of time, it did not give up its right to enforce the Amended License as written, which is what Repeat Precision is claiming in this case. Because Repeat Precision is not seeking damages prior to November 26, 2018—the date when Repeat Precision gave Diamondback unequivocal notice that it was exercising the right to exclude—the Court finds that Diamondback has no evidence or colorable argument to support a waiver. The Court declines Diamondback's request to rewrite the Amended License based on the fact that Repeat Precision did not immediately exercise its right to exclude Diamondback from practicing the '035 Patent.

> **6.** *Diamondback's Requests for Equitable Relief to Void, Set Aside, or Change the License Are Barred by Diamondback's Unclean Hands.*

43.    The Court also finds that Diamondback is not entitled to equitable relief to rescind or reform the License because it has not come to this Court with clean hands. *See* ECF73 at 51–52 ¶5 (asserting the unclean hands defense).

44.     "[A] party seeking an equitable remedy must do equity and come to court with clean hands." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988).  "Under the doctrine of unclean hands, a court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct regarding the issue in dispute."  *Lazy M Ranch, Ltd. v. TXI Operations, LP*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied).

45.     Prior to asking this Court to rescind the License, Diamondback attempted to obtain this same relief through abusive and anti-competitive conduct.   More particularly, Diamondback intentionally cut off the supply of power charges to Repeat Precision's customers in an attempt to force Repeat Precision to give up the rights it has received under the License.

46.     Having chosen to take matters into its own hands, rather than allowing for this matter to proceed through the court system, the Court finds that Diamondback has failed to come to Court with clean hands and thereby has waived its right to seek equitable relief.

> 7.     *Diamondback's Attempt to Seek Relief Based on Fraud or Fraud in the Inducement Are Barred by Ratification and Estoppel.*

47.     Even if Diamondback could have established a fraud claim, that would only make the License voidable.  *See Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied); *see also Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 618 (Tex. 2007).  The Court finds that Diamondback's conduct precludes it from seeking to set aside the License because (a) Diamondback ratified the License, and (b) it is estopped from challenging the License.  *See* ECF73 at 50–51 ¶¶2 & 3.

> a.     Ratification.

48.     A party may not sue to rescind a contract in fraud if it has ratified the contract with knowledge of the fraud.  *See Harris*, 134 S.W.3d at 427 (citing *Rosenbaum v. Tex. Bldg. & Mortg. Co.*, 167 S.W.2d 506, 508 (Tex. 1943)); *see also Fortune Prod. Co. v. Conoco, Inc.*, 52

S.W.3d 671, 678 (Tex. 2000) (prohibiting recovery of damages for the period of time after the party knew of and ratified the fraud). Stated differently, "[a] principal may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *Land Title Co. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980); *see also Wright v. Calhoun*, 19 Tex. 412, 422 (1857) ("It is good as a whole, or not good at all. It cannot be adopted in part or rejected in part."). Ratification gives rise to a waiver of the right to rescind a contract procured by fraud. *Lamoyne v. Parks*, 295 S.W.2d 917, 919-20 (Tex. Civ. App.—Waco 1956, writ ref'd n.r.e.).

49. Ratification may occur in many different ways, including by express agreement or by accepting royalties under the document in question. *See MCZ, Inc. v. Triolo*, 708 S.W.2d 49, 53 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (ratification by written agreement); *Yelderman v. McCarthy*, 474 S.W.2d 781, 784 (Tex. Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.) (ratification by accepting royalty payments). Ratification prevents a party from accepting benefits under an agreement, while simultaneously challenging its validity. *See Webb Materials, Inc. v. Lacey*, 364 S.W.2d 473, 475 (Tex. Civ. App.—San Antonio 1963, writ ref'd n.r.e.) (a person induced by fraud "who after knowledge of the fraud accepts the benefits of the contract, waives the right of rescission"); *Braxton v. Haney*, 82 S.W.2d 984, 986 (Tex. Civ. App.—Waco 1935, writ ref'd) (person ratifying deeds "cannot accept the benefits conferred by these deeds without assuming the burdens imposed therein").

50. Diamondback ratified the Amended License by accepting and retaining benefits under the Amended License. Several facts establish Diamondback's ratification, including (a) Diamondback accepted and kept royalty payments under the License, including the initial $55,000 up-front royalty and the March 2019 royalty payment after this lawsuit was filed, *see*

Exs. 262, 263 & 2050, Tr. 388 (Gr. Martin), 695 (T. Cheek), 789-90 (Benoit), (b) Diamondback sold power charges to Repeat Precision customers, earning substantial profits, *see* Ex. 2065A, (c) Diamondback sold products to Repeat Precision (such as a firing head) in September 2018 that would be unnecessary but for Repeat Precision having a valid license and need to test its products, Tr. 592-93 (Nipper), 696 (T. Cheek), and (d) Diamondback established Repeat Precision as a vendor in its system to enable Repeat Precision to purchase additional products, *see* Ex. 258, Tr. 695-96 (T. Cheek). Having accepted these benefits after having knowledge of the facts allegedly supporting its fraud claims, Diamondback has ratified the Amended License.

b.      Estoppel.

51.      Diamondback is also estopped from challenging the validity of the Amended License. Estoppel prevents a party from accepting the benefits of a transaction or inducing another party to act in reliance upon a promise and then taking an inconsistent position to avoid corresponding obligations or effects. *See Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 387-88 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 636 (Tex. 1997) 944 S.W.2d 631, 636 (Tex. 1997) (citing *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965)).

52.      Prior to entering into the Amended License, Diamondback understood that Repeat Precision was requesting expanded rights under the '035 Patent to justify its investment of several million dollars to increase its manufacturing capacity in Mexico. Tr. 582-84 (Nipper). Following entry into the Amended License, Repeat Precision followed through and made the investments it told Diamondback it would make in reliance on the Amended License. Ex. 2175; Tr. 419–30 (Gr. Martin) (detailing investments), 638 (Nipper) (describing backup documentation for investments). But for the expanded definition of Licensed Products, Repeat Precision would not have made the investments that it did. Tr. 422 (Gr. Martin), 582-84 (Nipper). Now that

88

Repeat Precision has acted in reliance on the Amended License with Diamondback's knowledge, acquiescence, and approval, Diamondback is estopped from seeking to rescind the license.

### C. DIAMONDBACK WILLFULLY INFRINGED THE '035 PATENT.

#### 1. *Diamondback Is Liable for Infringing the '035 Patent.*

53.     35 U.S.C. §271(a) provides:  "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

54.     Diamondback has made and sold, and continues to make and sell, disposable setting tools that practice the claims of the '035 Patent.  Stipulation #7; Tr. 190 (Drury), 658 (Andres).  It is infringing the '035 Patent unless it is acting with authority to make and sell its disposable setting tool products.

55.     By virtue of the License, Repeat Precision holds the exclusive rights to make and sell disposable setting tools that practice the '035 Patent.  The License grants standing for Repeat Precision to sue Diamondback for patent infringement.  *See* ECF89 at 5–8.

56.     As an exclusive licensee, Repeat Precision received a right to use the invention, "accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave."  *Textile Prod., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) (quoting *W. Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d. Cir. 1930); *Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010).

57.     The grant of the exclusive license to Repeat Precision even precludes Diamondback, as the patent holder, from practicing the invention without Repeat Precision's permission.  *See Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891); *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1370-71 (Fed. Cir. 2000); *see also* BLACK'S LAW DICTIONARY, *License,*

89

*exclusive license* (11th ed. 2019) (explaining the well-established definition of an exclusive license as precluding the grantor from performing the licensed act).

58.     On November 26, 2018, Repeat Precision provided notice to Diamondback that Diamondback was not authorized to make or sell disposable setting tools.  Tr. 616 (Nipper); Stipulation #10.  Therefore, Diamondback both had actual knowledge of the patent and notice that it was allegedly infringing the '035 Patent for which Repeat Precision was the exclusive licensee no later than November 26, 2018.  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016) (noting that the accused infringer must have knowledge of the patent).

59.     Since November 26, 2018, Diamondback has been infringing the '035 Patent by continuing to make, sell, and offer for sale disposable setting tools without authorization from Repeat Precision, the holder of the exclusive rights under the '035 Patent.  Tr. 190 (Drury).

    2.     *Repeat Precision Is Entitled to Recover Its Lost Profits.*

60.     Repeat Precision is entitled to recover compensatory damages due to Diamondback's infringement.  *See* 35 U.S.C. §284 ("Upon finding [infringement] the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.").

61.     One potential measure of damages is a "reasonable royalty."  The only evidence in the record to establish a reasonable royalty is the rate actually negotiated between Diamondback and Repeat Precision, which was a royalty of $20 per tool.  Ex. 1  at ¶4.2. Although the Court finds that this rate is reasonable as a royalty, the Court also finds that it does not adequately compensate Repeat Precision for the damage caused by Diamondback's infringement.

62.  Another accepted measure for calculating patent infringement damages is a "lost profits" model.  "To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer."  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).

63.  The Federal Circuit has not restricted the patent infringement plaintiff to any particular method for establishing lost profits, so long as the method used gives rise to a reasonable inference of the lost sales but for the infringement.  *See Micro Chem., Inc. v. Lextron Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).  However, the *Panduit* factors and the two-market supplier test are two well-established methods to establish the "but for" causation necessary to obtain an award of lost profits.  *Id.* ; *see also* Tr. 843–45 (House).  Accordingly, the Court will begin its analysis with these standards.  The Court concludes that Repeat Precision has established its damages "but for" Diamondback's infringement under either test.

64.  Applying the *Panduit* factors, Repeat Precision must establish:  (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit it would have made.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).  Using these factors, the Court concludes that Repeat Precision should recover lost profits, as explained in the following paragraphs.  Tr. 843-57 (House).

65.  Here, there is a demand for the product at issue—the disposable setting tool.  Diamondback admits that this product is rapidly becoming the industry standard.  Ex. 316 at 7; Ex. 470 at 6; *see also* Tr. 571 (Nipper) (explaining his belief that the disposable setting tool will become the majority of the setting tool business).  Moreover, the record establishes that customers have been willing to use either Repeat Precision's or Diamondback's products, as if

they are substitutes for each other. *See* Tr. 786-87 (Benoit) (admitting that Diamondback's and Repeat Precision's disposable setting tools are substitutes for each other); *see e.g.*, Exs. 605Y, 2206 & 2208 (illustrating the Mewbourne, Altitude, and Reliance-Midland switch); Ex. 509 (Schlumberger evaluating both Diamondback and Repeat Precision before selecting Diamondback because of the litigation risks); Ex. 75 (Repeat Precision customer, Concho, purchasing from Diamondback). Given the nature of the disposable setting tool market, the Court concludes that this is not just evidence that Repeat Precision could have made the lost sales, but that there is a reasonable probability that it would have made such sales. Accordingly, if Diamondback's disposable setting tools had been unavailable, it is reasonable to conclude that customers would have purchased Repeat Precision's tools instead. *See BIC Leisure Prods., Inc. v. Windsurfer Int'l. Inc.*, 1 F.3d 1214, 1218–19 (Fed. Cir. 1993) (recognizing that evidence of the infringer's sales may support a finding of demand for the product under the first *Panduit* factor when the products at issue are substitutes).

66.     There are no non-infringing alternatives to Repeat Precision's disposable setting tools. Conventional setting tools operate different than the disposable setting tools, at a significantly different price point, and with additional operational risks that are not present in the disposable setting tools. Customers who use disposable setting tools have recognized the benefits of the disposable setting tool by making the switch. Diamondback customers could obtain the benefits of the disposable setting tools by switching to Repeat Precision products, and not by using conventional tools. Moreover, no other non-infringing disposable setting tools— even if they could be designed—were available. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("When an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available

as a noninfringing substitute at that time. . . . Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not."). Accordingly, it is reasonable that Diamondback's customers would have purchased Repeat Precision's disposable setting tools if Diamondback's tools were unavailable. *See BIC Leisure Prods., Inc.,* 1 F.3d at 1218–19 (recognizing that products at a significantly different price with different functionality are not alternatives under the second *Panduit* factor); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012) ("In some instances, . . . products lacking the advantages of the patented invention 'can hardly be termed a substitute acceptable to the customer who wants those advantages.'" (quoting *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986))); *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991) ("To be deemed *acceptable*, the alleged acceptable noninfringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product."); Tr. 788 (Benoit) (agreeing that he is "unaware of any evidence indicating that Repeat Precision or any other competitor can design around the claims of the '035 patent").

67.     The Court finds that Repeat Precision had ample manufacturing capacity to service the market, including its own customers and Diamondback's customers. As explained above, Repeat Precision has had the ability to make up to 74,400 disposable setting tools per year in its own facilities in Mexico. Repeat Precision also has a qualified supplier in China to manufacture disposable setting tools for Repeat Precision. *See World Wide Stationery Mfg., Co.*, 2012 WL 3241835, at *4 ("It is clear from the case law that the only question that matters under the third factor of a lost profit analysis is whether the patentee can meet the market demand—not whether the patentee itself manufactures its own product."). As demonstrated by

Dr. House's analysis, Repeat Precision had the manufacturing capabilities to serve the entire disposable setting tool market for each and every month since November 26, 2018. *See* Exs. 605U, 2058A, 2060A, 2063A, & 2065A; Tr. 888-90 (House). Accordingly, manufacturing constraints do not limit Repeat Precision's ability to recover lost profits.

68. The Court finds that Repeat Precision also had the marketing capacity to service the market, including its own customers and Diamondback's customers. *See Linear Tech. Corp.*, 2006 WL 8425047, at *46 (holding that the third Panduit factor was met where, "[d]uring the period of infringement, [the patent holder] had strong direct and distribution channel sales forces with many sales offices both nationally and internationally" and its "sales force was sufficient in size and ability to capture all the sales of the [infringing product]"). Repeat Precision had field offices in the same locations as Diamondback (*i.e.* the Permian Basin, Appalachia, and South Texas)—as well as additional locations beyond these where Diamondback had no office—which means that Repeat Precision had field personnel ready to meet with all disposable setting tool customers. *Compare* Tr. 361-62 (Gr. Martin *with* Tr. 689 (T. Cheek). Repeat Precision also had access to a sales force of 25-30 people. Tr. 330 (Gr. Martin), 509-11 (Nipper).

69. As explained above, Repeat Precision lost $8,579,127 in profits as a direct and proximate result of Diamondback's infringement. Exs. 605L, 605M, 2058A, 2060A, 2061, 2063A, 2065A; Tr. 838 (House).

70. Another way of assessing whether lost profits should be awarded is by using the two-supplier market test. "In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor." *Micro Chem., Inc.*, 318 F.3d at 1124. Thus, under this standard, the patentee must "show: 1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales

that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales." *Id.* Factors 2 and 3 are established for the reasons explained in paragraphs 39-41 above.

71.    Here, the Court finds that there are only two suppliers in the disposable setting tool market. The third market entrant, Kingdom Downhole, has failed to gain any meaningful market share during the relevant time period. Tr. 567 (Nipper), 787 (Benoit). Moreover, Diamondback has demanded Kingdom Downhole to stop selling its products, and even sued it for patent infringement, alleging that Kingdom Downhole does not have the right to participate in the disposable setting tool market. Ex. 2055; Tr. 244 (Drury), 659-60 (Andres), 788 (Benoit). Moreover, when Diamondback has made statements to potential investors (including Defendants), Diamondback has been clear that there are no direct competitors for the disposable setting tool practicing the claims of the '035 Patent. Exs. 20, & 316 at 7, & Ex. 470 at 6; *see also* Tr. 788 (Benoit); Atherton Dep. at 29:12–30:4, 113:13–21 (explaining that Exhibit 470 was prepared with Diamondback's input). Under these circumstances, the Court finds that Repeat Precision is entitled to recover its lost profits under the two-supplier market test.

72.    There are additional factors that make an award of lost profits appropriate here. For example, the record establishes actual sales opportunities being diverted from Repeat Precision to the infringer, Diamondback, including the Schlumberger and Mewbourne sales. Moreover, Diamondback earns royalties and substantial profits from power charge sales to Repeat Precision customers. Accordingly, if Diamondback were unable to sell its own disposable setting tools, it is reasonable and rational to conclude that Diamondback would encourage its potential customers to buy Repeat Precision's tools, which in turn generate royalties and power charge revenues for Diamondback.

73.    Regardless of the method used to assess whether a lost profit damage award is appropriate, the Court concludes that Repeat Precision is entitled to an award of lost profits in the amount of $8,579,127, which covers the time period through December 31, 2019.  To be clear, the methods discussed above are independent, alternative methods to support this conclusion.

### 3.    An Award of Enhanced Damages Under 35 U.S.C. §284 Is Warranted.

74.    The Court also finds that treble damages should be awarded against Diamondback based on Diamondback's willful infringement, intentional targeting of Repeat Precision customers, and malicious conduct against Repeat Precision in the marketplace.  Under 35 U.S.C. §284, "the court may increase the damages up to three times the amount found or assessed."  The Court finds that enhanced damages of two times the compensatory damages awarded above are appropriate.

75.    The Supreme Court's decision in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931–34 (2016), explains the scope of discretion that trial courts have to impose enhanced damages in egregious cases. The Court has rejected the use of rigid formulations or tests for imposing enhanced damages.  *Id.* at 1932-33.  Instead, the Court should take into account "the particular circumstances of each case in deciding whether to award damages, and in what amount." *Id.* at 1933.

76.    "Section 284 allows district courts to punish the full range of culpable behavior." *Id.*  Enhanced damages may be appropriate in cases involving conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  *Id.* at 1932.  "[S]uch punishment should generally be reserved for egregious cases typified by willful misconduct."  *Id.* at 1934.

96

77. When assessing Diamondback's culpability, the Court must measure it "against the knowledge of the actor at the time of the challenged conduct." *Id.* at 1933. Here, Repeat Precision has limited its damages claims to the period of time from November 26, 2018 through the present, which begins on the day when Repeat Precision unequivocally gave Diamondback notice that its conduct was infringing. Tr. 616 (Nipper); Stipulation #10. Accordingly, Diamondback's conduct will be assessed by focusing on this time period.

78. The Court finds that there are a myriad of reasons why enhanced damages are appropriate here, starting with the fact that Diamondback's conduct was willful. During the relevant time period, Diamondback had actual knowledge that Repeat Precision considered Diamondback's conduct to be infringing; nevertheless, Diamondback did not stop making or selling its infringing disposable setting tools. Even prior to November 26, 2018, Diamondback attempted on several occasions to renegotiate its license with Repeat Precision to remove the exclusivity provisions in the contract, which further shows Diamondback's awareness that it had contracted away the right to make and sell disposable setting tools. *See, e.g.,* Exs. 40 & 2024; Tr. 182-83 (Drury). And, even after this Court informed Diamondback that the License granted exclusive rights under the '035 Patent to Repeat Precision, *see* ECF89, Diamondback continued its infringing behavior. Accordingly, the Court finds that this case is one that meets the "subjective willfulness" standard. *See Arctic Cat Inc. v. Bombardier Recreational Products, Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017). (explaining the standard).

79. But not only did Diamondback act willfully when infringing Repeat Precision's rights, Diamondback repeatedly acted with wanton and malicious intent toward Repeat Precision. Instead of honoring Repeat Precision's exclusive rights as it was obligated to by the License it had entered into, Diamondback made the conscious decision to approach large

potential customers, including Hunting-Titan and Schlumberger, and to Repeat Precision's actual customers (including Mewbourne) and presented them with allegations against Repeat Precision they knew to be false. *See, e.g.,* Exs. 73, 74, 518, & 2025; Tr. 161-62, 220-22 (Drury). Diamondback also made misrepresentations to potential customers that Repeat Precision was not authorized to make or sell disposable setting tools, which was objectively false given the explicit language of the License it had negotiated and signed. Through this appalling conduct, Diamondback not only secured infringing sales for itself (from Schlumberger, for example), Diamondback also obstructed Repeat Precision's right to capitalize on its own exclusive rights in the '035 Patent. This is an egregious case of willful infringement in which the infringer has actively targeted the lawful holder of the exclusive rights under the '035 Patent, causing damages far in excess of what is readily measured in the lost profits model above.

80. Diamondback also retaliated against Repeat Precision for asserting its exclusive rights under the License. As discussed above, when Repeat Precision provided notice to Diamondback regarding its infringing conduct, Diamondback took actions for the express purpose of trying to shut down Repeat Precision. Diamondback cut off the supply of power charges to Repeat Precision's customers in a manner that the company's own CEO characterized as a "boycott" and an "embargo." This act was malicious and an attempt to bully Repeat Precision into giving up valuable rights under the License, even after Repeat Precision had invested millions of dollars in additional manufacturing operations and facilities in reliance on the License. *See* Tr. 208-09 (Drury); 682 (Andres). Indeed, Diamondback's bullying tactics worked, causing Repeat Precision to stop selling disposable setting tools for a period of time beginning in early December 2018 and continuing until February 2019. *See* Exs. 305 & 307. But for the Court's intervention by issuing a preliminary injunction to compel Diamondback to

resume selling power charges, the Court is convinced that Diamondback's bullying tactics would have continued. The evidence establishes that Diamondback's actions in withholding power charges not only cost Repeat Precision its business relationship with Mewbourne for an extended period of time, but it also disrupted Repeat Precision's growth and expansion into the market. *See* Tr. 877-78 (House).

81. Diamondback's conduct in this litigation further supports an award of enhanced damages. *See WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018) (recognizing that "the infringer's behavior as a party to the litigation" is a factor to consider when assessing whether enhanced damages are appropriate). Here, Diamondback has aggressively pursued claims against individuals and owners of Repeat Precision without any legitimate basis to sue them in their individual capacities. Diamondback also has asserted wide-ranging, but baseless, claims accusing the Defendants of misappropriating trade secrets and tortiously interfering with customer relationships, later dismissing those claims after causing the Defendants to spend significant resources responding to the allegations. Diamondback should have never filed those misappropriation and tortious interference claims. Regarding the claims Diamondback took to trial, including its fraud theories, the Court finds that those claims lack merit. In short, Diamondback has made this case far more expensive and complicated than was needed if Diamondback had wished to seek Court guidance regarding the scope of its rights under the '035 Patent.

82. Although the Court is not obligated to apply the *Read* factors to determine whether enhanced damages should issue, the Court finds that enhanced damages are appropriate under those factors, too. *See Presidio Components, Inc. v. American Technical Ceramics Corp.*,

875 F.3d 1369, 1382 (Fed. Cir. 2017). (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992)).

83.    "The Read factors include 1) whether the infringer deliberately copied the ideas or designs of another; 2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; 3) the infringer's behavior as a party to the litigation 4) defendant's size and financial condition 5) closeness of the case; 6) duration of defendant's misconduct; 7) remedial action by the defendant; 8) defendant's motivation to harm; and 9) whether defendant attempted to conceal its misconduct." *Apple Inc. v. Samsung Elec. Co. Ltd.*, 258 F. Supp. 3d 1013, 1030 (N.D. Cal. 2017) (citing *Read*, 970 F.2d at 827).   Here, as explained above, factors 2, 3, and 8 strongly weigh in favor of enhanced damages given Diamondback's willful and malicious conduct, and its behavior in this litigation.   In particular, as described below, Diamondback's filing of the reissue patent application is a prime example of Diamondback's willful and malicious conduct.  Factor 4 favors enhanced damages because Diamondback is a larger player in the power charge market that took advantage of its position to interfere with the rights of Repeat Precision, a smaller, new entrant into the disposable setting tool market.   Factor 5 strongly favors enhanced damages because this case was not close.   Factor 6 favors enhanced damages because Diamondback's infringement has occurred over a period over one year at a critical time that has greatly interfered with Repeat Precision's ability to obtain the "first mover" advantage.  Tr. 891-902 (House).  Factor 7 strongly favors enhanced damages because, instead of taking remedial measures to minimize the impact of its infringement, Diamondback has taken aggressive action against Repeat Precision to undermine Repeat Precision's exclusive patent rights.  Factors 1 and 9 are neutral in this case, as they do not apply to a situation of infringement

arising from parties to a contractual relationship.  *See VirnetX Inc. v. Apple Inc.*, 324 F.Supp3d 836, 868-69 (E.D. Tex. 2017), *aff'd*, 748 Fed. Appx. 332 (Fed. Cir. 2019) (finding factor 1 neutral when there was no evidence of copying); *see Apple Inc.*, 258 F. Supp.  3d 1013, 1036 (N.D. Cal. 2017) (finding factor 9 neutral in circumstances where concealment of infringing conduct is not possible).

84.     In *Halo,* the Supreme Court adopted a preponderance of the evidence standard for use in assessing whether enhanced damages should be awarded.  *See* 136 S. Ct. at 1934. However, even if a clear and convincing standard were used, which was the pre-*Halo* standard, the Court finds that an award of enhanced damages is appropriate in this case.

85.     Accordingly, the lost profits award to Repeat Precision is hereby increased to $17,158,254.

>    *4.     This Is an Exceptional Case Warranting an Award of Attorneys'*
>    *Fees Under 35 U.S.C. §285.*

86.     Under 35 U.S.C. §285, the Court may award reasonable attorneys' fees to the prevailing party in "exceptional cases."  In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the Supreme Court rejected any unduly rigid requirements for imposing attorneys' fees to the prevailing party in patent cases, explaining that the only requirement is that the case must be "exceptional."  572 U.S. 545, 553-54 (2014).  "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the fact of the case) or the unreasonable manner in which the case was litigated."  *Id.* at 554.  District courts should exercise their discretion to award attorneys' fees on a "case-by-case" basis.  *Id.*  The prevailing party must establish its right to recover fees by a preponderance of the evidence, and not by clear and convincing evidence. *Id.* at 557.

87.     The Court finds that this is an exceptional case for many reasons, including: (a) Diamondback willfully infringed Repeat Precision's exclusive rights under the '035 Patent, (b) Diamondback engaged in intentional, abusive conduct (such as withholding power charges from Repeat Precision customers or filing a reissue patent application) to pressure Repeat Precision to settle and to give up the valuable rights it acquired through the License, (c) Diamondback asserted a myriad of meritless claims, most of which it voluntarily dismissed before trial because they lacked merit (such as Diamondback's trade secret allegations, which were alleged with no evidentiary support), and (d) Diamondback also made this case personal by suing corporate officers individually, instead of allowing this matter to be treated as a pure business-to-business dispute.   Each of these reasons independently justifies an award of attorneys' fees under 35 U.S.C. §285.

88.     The Court finds that based on Diamondback's willful infringement and litigation misconduct, Repeat Precision was forced to file suit for patent infringement and also defend against Diamondback's related non-patent claims for fraud, misappropriation of trade secrets, breach of contract, etc.   The Court further finds that Diamondback's affirmative claims are so intertwined with Repeat Precision's patent claim and patent-related evidence that the same evidence is material to all of the issues.   Therefore, the fees associated with these claims may be properly awarded under 35 U.S.C. § 285 as they are inseparable from those fees accrued with regard to the purely patent claim.   *See Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08CV1992 AJB MDD, 2013 WL 410103, at *6 (S.D. Cal. Feb. 1, 2013), *aff'd*, 560 F. App'x 966 (Fed. Cir. 2014) (finding that the non-patent causes of action of misappropriation, breach of contract, fraud, fraudulent inducement, tortious interference, conversion, unfair competition, and unjust

enrichment were all "so intertwined" with the patent claims to justify award of fees on all claims).

89.     For each and all of these reasons, the Court determines that Repeat Precision should recover its reasonable attorneys' fees incurred in this matter, with the amount of those fees to be determined by subsequent order.

### D.     DIAMONDBACK BREACHED THE LICENSE BY MANUFACTURING AND SELLING DISPOSABLE SETTING TOOLS IN VIOLATION OF REPEAT PRECISION'S RIGHTS.

90.     Repeat Precision has sued Diamondback for making, selling, and offering to sell disposable setting tools in violation of Repeat Precision's exclusive rights under the License. "To succeed on a breach of contract claim, a plaintiff must show: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Marquis Acquisitions, Inc. v. Steadfast Ins. Co.*, 409 S.W.3d 808, 813 (Tex. App.—Dallas 2013, no pet.).

91.     The Court finds that the License is a valid and enforceable contract. And as explained above, Repeat Precision has fully performed its obligations under the License.

92.     In the Court's September 11, 2019 Order, the Court construed the License as granting Repeat Precision the exclusive rights to make and sell disposable setting tools that practice the '035 Patent. *See* ECF89.

93.     To briefly summarize the Court's construction of the License, Paragraph 2 contains a broad grant of exclusive rights to Repeat Precision: "Licensor hereby grants to Licensee and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory." Ex. 1 at ¶2. "Licensed Patents" is defined to include the '035 Patent. Ex. 1 at ¶1. And by virtue of the Amended License, Licensed Products is defined as: "an electric wireline

setting tool used for well competitions and any other products that may be agreed upon in writing by Licensor and Licensee from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where a Valid Claim exists." Ex. 2 at ¶2.1. This definition encompasses the entirety of the invention disclosed by the '035 Patent. There are no reservations of the right to practice in the License. *See* ECF89. By manufacturing, selling, and offering to sell disposable setting tools without Repeat Precision's permission, Diamondback has materially breached the License.

94. All conduct at issue in this case occurred in the licensed "Territory," which is "the United States, Canada, Mexico, Argentina, China, Russia and any other territory that may be agreed upon in writing by Licensor and Licensee from time to time." Ex. 1 at ¶1. Diamondback's primary manufacturing operations and sales are in the United States. Tr. 690 (T. Cheek). Although Diamondback has sold some disposable setting tools in Canada, those products were assembled in Texas and shipped from Texas. *Id.* To the extent that Diamondback had tools manufactured outside of the United States, those tools were still manufactured in a licensed "Territory"—China—then shipped to the United States for assembly and sale. Tr. 690-91 (T. Cheek).

95. An overwhelming preponderance of the evidence shows that Diamondback's breach resulted in and caused injury to Repeat Precision.

96. Repeat Precision is entitled to recover its actual damages, which are to compensate Repeat Precision for the injuries suffered as a natural, probable, and foreseeable consequence of Diamondback's breach. *See Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). These damages include "expectancy" or "benefit of the bargain" damages, which

are intended to put the plaintiff in as good a position as it would have been in if the contract had been performed. *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888–89 (Tex. App.— Dallas 2004, pet. denied).

97.    When, as here, a plaintiff seeks to recover its lost profits due to the breach of contract, the Court may award net profits for the losses incurred as a result of the breach. *See Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002); *Cherokee Cty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The Court need not apply the *Panduit* factors to this analysis. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) ("A trial court has discretion both in selecting the methodology for and in calculating a damage award."); *see also Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017) (explaining that lost profit damages are similar to breach of contract damages in that "[t]he goal . . . is to place the patentee in the same position it would have occupied had there been no infringement," not that the damages calculation is the same).

98.    Repeat Precision has proved its damages to a reasonable certainty. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010).

99.    Here, the natural, probable, and foreseeable consequence of Diamondback's breach is that Diamondback made sales of its disposable setting tools that otherwise would have been made by Repeat Precision of its disposable setting tools. Thus, the result of Diamondback's breach is that Repeat Precision lost the profits it would have received had it made those sales.

100.    Repeat Precision's actual damages (through December 31, 2019) due to Diamondback's breach of contract consists of the $8,579,127 in lost sales to Diamondback but

for Diamondback's interference with Repeat Precision's exclusive rights. *See* Exs. 605L, 605M, 2058A, 2060A, 2061, 2063A, 2065A; Tr. 838 (House).

101. As the prevailing party on its claim for breach of contract, Repeat Precision is entitled to recover its reasonable and necessary attorneys' fees under Tex. Civ. Prac. & Rem. Code §38.001, *et seq*. Repeat Precision presented its breach of contract claim to Diamondback for payment, but Diamondback failed to pay such claim. *See* Ex. 2032. The Court finds that all prerequisites for Repeat Precision to recover its reasonable and necessary attorneys' fees have been satisfied. The Court will determine the amount of attorneys' fees to be paid to Repeat Precision in a subsequent order.

### E.   DIAMONDBACK BREACHED THE LICENSE WHEN IT CUT OFF THE SUPPLY OF POWER CHARGES TO REPEAT PRECISION'S CUSTOMERS.

102. Through a series of causes of action, Repeat Precision seeks to hold Diamondback liable for the harm caused to Repeat Precision, its customers, and the market flowing from Diamondback's decision to cut off the power charge supply to Repeat Precision's customers and then to use its market position to compel Repeat Precision to temporarily exit the market for standalone disposable setting tools. Repeat Precision seeks recovery of damages and injunctive relief. Because the Court finds that Repeat Precision's primary causes of action under the License and under the federal and state antitrust laws are well taken, the Court need not address Repeat Precision's alternative request for reliance damages under the promissory estoppel claim. *See* RP Compl. at ¶¶159–164.

#### 1.   *The License Imposes Contractual Obligations Requiring Diamondback to Sell Power Charges to Repeat Precision and Its Customers.*

103. The License is governed by Texas law. Ex. 1 at ¶13.14(a). It imposes both express and implied obligations on Diamondback to sell power charges to Repeat Precision's

106

customers. By cutting off the power charge supply from Repeat Precision and its customers, even for a temporary period of time, Diamondback breached the License.

> a. The Obligation to Sell Power Charges Arises from the Express Terms of the License.

104. The Texas Supreme Court explains how contracts should be interpreted:

> When a contract's meaning is unambiguous, our task is to determine the parties' intentions as expressed in the written instrument. Our approach is holistic. We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone is controlling, but rather all provisions are considered with reference to the whole instrument. Moreover, we construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served.

*Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 906-07 (Tex. 2016) (citations and quotation marks omitted).

105. Read as a whole, the Court finds that the fundamental purpose of the License was to enable Repeat Precision to make and sell standalone disposable setting tools, *see* Ex. 1 ¶¶1 & 2, and Ex. 2 ¶2.1, in return for which, Diamondback receives a per-tool royalty, *see* Ex. 1 ¶4.2, and the opportunity to earn substantial profits from selling power charges.

106. A power charge is necessary for Repeat Precision to be able to sell a useable product to its customers. *See, e.g.*, Tr. 392 (Gr. Martin). Indeed, the need to use a power charge is disclosed in the '035 Patent. *See, e.g.*, '035 Patent claims 1, 7, 10, and 15. As Drury admitted at trial, a power charge was "obviously included" in what customers would buy since the charge was needed to operate the tool, and those charges were sold "one to one" with the tools. Tr. 115 (Drury).

107. At the time when Diamondback withheld power charges from Repeat Precision's customers in late 2018, Diamondback was the only supplier of power charges that work with the disposable setting tools. Tr. 206-07 (Drury), 392 (Gr. Martin), 605 (Nipper), 677 (Andres).

108.     To this day, Diamondback controls about 99% of the power charge market for disposable setting tools.     Tr. 206-07 (Drury), 938-39 (House).     Thus, Diamondback's cooperation by selling power charges to Repeat Precision and its customers is necessary for Repeat Precision to be able to exercise its rights and to fulfill its obligations under the License.

109.     Paragraph 13.3 of the License provides:  "[e]ach party shall, upon the reasonable request of the other party, promptly . . . perform such acts as may be necessary to give full effect to the terms of this Agreement."  Ex. 1 ¶13.3.

110.     Under Paragraph 9.2(a) of the License, Diamondback further represented and warranted that it has granted Repeat Precision all of Diamondback's patent rights that are "necessary or useful" for making the disposable setting tools.  Ex. 1 ¶9.2(a).

111.     Read as a whole, the Court construes these provisions as obligating Diamondback to continue to provide power charges to Repeat Precision and its customers, thereby enabling the parties to fulfill the terms of their contract.

        b.     Texas Law and Federal Circuit Precedent Further Preclude Diamondback from Acting to Frustrate Repeat Precision's Rights and Ability to Perform Under the License.

112.     Not only does the License expressly require Diamondback to cooperate with Repeat Precision to fulfill the purposes of the License, controlling authorities from Texas courts and the Federal Circuit impose similar duties of cooperation.

113.     Although Texas courts are reluctant to imply duties into a contract in many instances, this case implicates one implied duty recognized in Texas contracts—the "duty to cooperate."  *See Tex. Nat'l Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 698 (5th Cir. 1989) ("[I]n every contract there exists an implied promise that a party will not do anything to prevent or delay the other party from performing the contract.").  The "duty to cooperate" is implied in "every contract in which cooperation is necessary for performance of the contract."  *Nationwide*

*Ins. Indep. Contractors Ass'n v. Nationwide Mut. Ins. Co.*, No. A-11-CA-450-SS, 2012 WL 13032957, at *5 (W.D. Tex. Apr. 16, 2012) (citing *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 770 (Tex. App.—Dallas 2005, no pet.)); *see also Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 400 (N.D. Tex. 2016) (quoting *Bank One Tex., N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, no pet.)). The duty to cooperate has been recognized in the context of licensor-licensee relationships. *See Case Corp.*, 184 S.W.3d at 770 (party to a contract "may not hinder, prevent, or interfere with another party's ability to perform its duties").

114. The Federal Circuit has similarly recognized that a patent licensor is barred from taking actions and asserting other rights that it may hold to deprive its licensee of the benefit of the bargain. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275-76 (Fed. Cir. 2009). This principle is grounded in estoppel, and prevents a patent holder who has licensed valuable rights to another from taking acts "to derogate from the right granted." *Id.* at 1279 (quoting *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581 (Fed. Cir. 1997)). Stated differently, the patent holder is estopped "from taking back in any extent that for which he has already received consideration." *Id.* (quoting *AMP Inc. v. United States*, 389 F.2d 448, 452 (Ct. Cl. 1968)); *see also Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1101 (Fed. Cir. 2004) (finding it "unlikely" that a licensee "would have contracted for the right to manufacture and sell a product knowing that its customers would be unable to use the product that it sold them for the bargained-for purpose").

115. Here, the duty to cooperate requires Diamondback to sell power charges to Repeat Precision and its customers. Without having access to the power charges essential to operate

disposable setting tools, Repeat Precision's rights under the License would be rendered worthless.

116.    Similarly, following the Federal Circuit's guidance, this Court concludes that it is completely implausible that the parties intended for Diamondback to retain a unilateral right to withhold power charges, thereby depriving Repeat Precision of its benefit of the bargain.

c.    Diamondback Breached Its Duty Which Caused Damage.

117.    When Diamondback withheld power charges from Repeat Precision and its customers, Diamondback breached its express and implied obligations under the License to cooperate with Repeat Precision by providing an adequate supply of power charges.

118.    Repeat Precision suffered damages as a natural, direct, and foreseeable result of Diamondback's breach.

119.    At a minimum, Repeat Precision suffered significant lost sales to Mewbourne, which have been reasonably calculated to be worth $273,379.  Exs. 605N, 605O, 2058A, 2060A, 2061, 2063A, 2065A; Tr. 839, 883–84 (House).

120.    In addition, Repeat Precision is entitled to recover its reasonable and necessary attorneys' fees under Texas Civil Practice & Remedies Code §38.001, *et seq*.

2.    *Diamondback Breached Its Implied-in-Fact Contract to Supply Power Charges to Repeat Precision and Its Customers.*

121.    Even if the License did not expressly require Diamondback to sell its Eliminator™ power charges to Repeat Precision customers, the facts of this case establish an implied-in-fact contract requiring Diamondback to sell those charges.

122.    Implied contracts are ones in which the meeting of the minds to form an agreement is established by the parties' conduct, course of dealings, and the surrounding circumstances.  *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480

110

S.W.2d 607, 609 (Tex. 1972); *see also Cotton v. Tex. Express Pipeline, LLC*, 2017   WL

3709093, at *10 (W.D. Tex. Jul. 19, 2017).

123.     Here, the key facts are that:   (a) Diamondback was the exclusive supplier of

power charges for disposable setting tools throughout 2018, *see* Tr. 574-86 (Nipper); (b)

Diamondback told Repeat Precision that it did not want Repeat Precision to enter the power

charge market, *id.*; (c) Diamondback encouraged Repeat Precision to invest millions of dollars to

expand its manufacturing capabilities to sell disposable setting tools on a large scale basis,

thereby enabling Diamondback to earn royalties and profits from power charges sales, *id.*; (d)

Repeat Precision was counting on Diamondback to supply the necessary power charges when

Repeat Precision made its investments, and Diamondback knew that, *id.*; and, (e) at

Diamondback's request, Repeat Precision promoted Diamondback's Eliminator™ power charges

to Repeat Precision customers, *see* Exs. 2011, 2012, 2014, 2016, & 2044.

124.     Under these circumstances, the Court finds that there was and is an implied-in-

fact contractual obligation requiring Diamondback to sell Eliminator™ power charges to Repeat

Precision and its customers.

125.     There are no express provisions in the License that conflict with this implied-in-

fact obligation.   To the contrary, as explained in the prior section, the Court finds that this

obligation is also compelled under the express language of the License.

126.     When Diamondback withheld power charges from Repeat Precision and its

customers, Diamondback breached its implied-in-fact obligation.

127.     Repeat Precision suffered damages as a natural, direct, and foreseeable result of

Diamondback's breach.   At a minimum, Repeat Precision suffered significant lost sales to

Mewbourne, which have been reasonably calculated to be worth $273,379.  Exs. 605N, 605O,
2058A, 2060A, 2061, 2063A, 2065A; Tr. 839, 883–84 (House).

### F.  DIAMONDBACK VIOLATED FEDERAL AND STATE ANTITRUST LAWS WHEN IT CUT OFF THE POWER CHARGE SUPPLY.

#### 1.  Diamondback Attempted to Monopolize the Disposable Setting Tools Market.

128.    Section 2 of the Sherman Act prohibits monopolization and attempts to
monopolize a market.   15 U.S.C. §2.    Texas law imposes similar prohibitions against
monopolistic behavior *See* Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com.
Code §§15.05(b) & 15.21.  Because the Texas statute is construed "in harmony" with federal
laws, the Court will focus its analysis on Diamondback's violations of federal law.  *See Coca-
Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688 (Tex. 2006).

129.    Monopolization claims have "two elements: (1) the possession of monopoly
power in the relevant market and (2) the willful acquisition or maintenance of that power as
distinguished from growth or development as a consequence of a superior product, business
acumen, or historic accident."  *Alcatel USA, Inc. v. DGI Techs, Inc.*, 166 F.3d 772, 781 (5th Cir.
1999) (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992)).

130.    Attempted monopolization "has three elements, namely: (1) that the defendant
engaged in predatory or exclusionary conduct, (2) that the defendant possessed the specific intent
to monopolize, and (3) that there was a dangerous probability that the defendant would succeed
in

his attempt."  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (citing *Taylor
Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000)).

131.    Here, Dr. House opined that the relevant product market is the disposable setting
tool market, and the relevant geographic market is the United States and Canada.  Tr. 868-70

(House).  Diamondback offered no rebuttal testimony on these points. The Court finds that Dr. House is well-qualified to give these opinions, and that his opinions are amply supported by the record.  Accordingly, the Court finds that the relevant product market is the disposable setting tool market and the relevant geographical area is the United States and Canada.  *See id.*

132.    Although Diamondback once had a lawful patent monopoly in the disposable setting tool market, Diamondback voluntarily granted Repeat Precision rights to enter that market, including granting Repeat Precision the exclusive rights to make and sell disposable setting tools that practice the '035 Patent.  *See* Exs. 1 & 2.  But beginning in late November 2018, Diamondback used its monopoly power in the power charge market to attempt to maintain and/or regain its monopoly in the disposable setting tool market.  *See* Exs. 71-74 & 598.

133.    The Court finds that Diamondback engaged in predatory and exclusionary conduct when it withheld and threatened to withhold power charges from Repeat Precision's customers.  Diamondback was willing to forego short term profits from power charge sales in order to gain a much larger share of the disposable setting tool market over the long term.

134.    Diamondback had a specific intent to monopolize the disposable setting tool market.  Indeed, Diamondback's witnesses have admitted that the decision to cut off the power charge supply was intended to shut down Repeat Precision, which was Diamondback's only competitor in the disposable setting tool market.  *See* Tr. 195, 208-09 (Drury), 676 (Andres).

135.    There was a serious probability that Diamondback would succeed in this attempt. As of February 2019, Diamondback admitted that it controlled about 90% of the disposable setting tools market despite the License under which Diamondback voluntarily transferred its exclusive rights under the '035 Patent to Repeat Precision.  *See* ECF14 at 23 (Case No. 6:19-cv-00036).  Diamondback still holds a 65-75% share of the disposable setting tool market despite

this Court's preliminary injunction. Tr. 902-03 (House); *see also* Ex. 2212 at 78. Diamondback's position is not based on having a superior product, its business acumen, or historic accident. Diamondback also has only one competitor in this market, Repeat Precision, the target of Diamondback's exclusionary and predatory conduct. If Diamondback succeeded in excluding Repeat Precision from the market, that would give Diamondback a complete monopoly in the disposable setting tool market. And because a power charge from Diamondback was essential for Repeat Precision to be able to sell useable products for its customers, the Court finds that Diamondback has and had a dangerous probability of success in obtaining a monopoly in the disposable setting tool market as a result of its predatory and exclusionary conduct.

136. Although Diamondback has attempted to downplay the significance of its actions by arguing that it allowed Repeat Precision to resume selling its PurpleSeal Express™ products in December, Diamondback's arguments are unpersuasive. There are between 20 and 30 competitors in the frac plug industry. Tr. 470 (Gr. Martin), 566-67 (Nipper). Repeat Precision is a small player in that industry. When Diamondback agreed to resume selling power charges to Repeat Precision customers in December 2018, Diamondback conditioned this on Repeat Precision stopping its sale of standalone tools. Exs. 305 & 307. Thus, the only customers who could get disposable setting tools from Repeat Precision were the ones who also wanted Repeat Precision's frac plugs. If customers elected to buy frac plugs from any of the 20+ other frac plug manufacturers, they could only buy disposable setting tools from Diamondback. Tr. 227 (Drury). Even under Diamondback's temporary agreement to resume selling charges starting in December 2018, the Court finds that Diamondback had a dangerous probability of success in monopolizing the disposable setting tools market. Moreover, Diamondback's refusal to sell

power charges to Repeat Precision's customers, even if initially for a short period of time, created uncertainty in the market about the future ability to operate Repeat Precision's disposable setting tools and thus suppressed the market in general and enhanced Diamondback's probability of success.

137.    Diamondback's likelihood of success in monopolizing the disposable setting tool market was significantly increased because of the barriers to entry in that market. Tr. 788-89 (Benoit). In addition to the fact that the disposable setting tool was covered by a patent, to participate successfully in the disposable setting tool market, it requires significant capital investments to have the facilities and equipment to make disposable setting tools. *Id.* It also requires access to a power charge supply that works with the disposable setting tools. By controlling the power charge supply, Diamondback controlled who could compete in the disposable setting tool market. And there were and are significant barriers to entry in the power charge market that protect Diamondback's position, including that (a) would-be competitors would need to obtain government licenses to enter the power charge market, (b) it requires a significant capital investment to have the facilities to make power charges, especially in a quantity sufficient to serve the disposable setting tool market, and (c) consumers are generally reluctant to try a new source of explosives. Ex. 316 at 15; Ex. 470 at 17; Tr. 593-94, 605, 608-09 (Nipper). Accordingly, new market entrants in the disposable setting tool market are unlikely so long as uncertainties remain regarding access to power charges for disposable setting tools.

138.    The Court thus finds that Diamondback attempted to monopolize the disposable setting tool market in violation of Section 2 of the Sherman Act and Sections 15.05(b) & 15.21 of the Texas Free Enterprise and Antitrust Act of 1983. Because the relief requested may be

granted under this theory, the Court need not address whether Diamondback also violated Section 2 by actual monopolization.

139.    Diamondback's actions were the but-for and proximate cause of damage to Repeat Precision in the form of lost customers and sales.

> 2.    *Diamondback Unlawfully Tied its Power Charges and Disposable Setting Tools Causing Harm to Competition in the Disposable Setting Tool Market.*

140.    When Diamondback refused to sell power charges to any customers who purchased disposable setting tools from Repeat Precision instead of Diamondback, Diamondback committed a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. §1) and Sections 15.05(a) & 15.21 of the Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Com. Code §§15.05(a) & 15.21).

141.    The "[t]ying doctrine in antitrust law aims to prohibit a defendant from leveraging monopolistic market power in one market to monopolize another."  *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 271 (6th Cir. 2015).  A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Eastman Kodak*, 504 U.S. at 461 (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)).  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

142.    A tying arrangement is *per se* unlawful when:  (1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the

116

other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a "not insubstantial" amount of interstate commerce in the tied product is affected. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017).

143.     The requirements to prove unlawful tying under Texas law are similar:  "An illegal tying arrangement has five elements: (1) a tying; (2) actual coercion by the seller that forced the buyer to purchase the tied product; (3) the seller must have sufficient market power in the tying product market to force the buyer to accept the tied product; (4) there are anticompetitive effects in the tied market; and (5) the seller's activity in the tied product must involve a substantial amount of interstate commerce."  *RTLC AG Prods., Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 830 (Tex. App.—Dallas 2006, no pet.).

144.     The Court finds that each element of an unlawful tying relationship is satisfied.

145.     First, the Court must identify the relevant markets to review for purposes of analyzing whether an unlawful tying arrangement existed.  A relevant market includes all those products consumers are willing to substitute based on prices and features in a relevant area of geography.  *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245-46 (5th Cir. 1985) (noting that relevant market must include the extent to which the monopolist's product is "interchangeable" in use and the degree of "cross-elasticity of demand between the product itself and substitutes for it").  The Court finds that the relevant product markets to be considered are the disposable setting tool market and the market for power charges for disposable setting tools. Tr. 872-74 (House).  As discussed at length above, disposable setting tools function differently and are at a significantly different price point than conventional setting tools.  *See, e.g.*, Exs. 15,

432, 2207; Tr. 366 (Gr. Martin), 559–60 (Nipper).  Moreover, power charges for disposable setting tools are of different sizes and formulations than charges for conventional tools.

146.    Second, there are two separate products involved: the disposable setting tool and the Eliminator™ power charge.  Tr. 872-74 (House).

147.    Third, Diamondback created an explicit tie between its Eliminator™ power charge and its disposable setting tools.  *See* Exs. 71-73 & 598; Tr. 701-03 (T. Cheek); *see also Collins Inkjet Corp.*, 781 F.3d at 272 ("An explicit tie has a coercive effect so long as buyers cannot turn elsewhere for the tying product because buyers who need the tying product may have no option but to purchase the tied product from the defendant.").  Because Repeat Precision is the only other competitor with Diamondback in the market for disposable setting tools, this has the immediate effect of coercing consumers into buying Diamondback's disposable setting tool if they want a power charge to power the tool.

148.    Fourth, Diamondback has sufficient economic power in the tying product market (for power charges) to enable it to restrain trade in the tied product market (for disposable setting tools).  Tr. 870-72 (House).  "Market power" is defined as the power "to force a purchaser to do something that he would not do in a competitive market."  *Hyde*, 466 U.S. at 14.  A plaintiff may establish that a tying arrangement is illegal *per se* under the antitrust laws by demonstrating that the defendant had sufficient control over the tying market to likely have an anticompetitive effect on the tied product market.  *Breaux Bros. Farms, Inc. v Teche Sugar Co., Inc.*, 21 F.3d 83, 86 (5th Cir. 1994).  "Significant market power" is usually demonstrated by measuring the defendant's market share in the tying product market.  *Id.* at 87; *see also Eastman Kodak*, 504 U.S. at 464 (allowing inference of market power based on dominant market share).  Here, Diamondback had a 100% market share in the power charge market for disposable setting tools

at the time it tied its products to sales of its disposable setting tools. Tr. 676-77 (Andres), 871 (House). Accordingly, this element is satisfied.

149.    Finally, a not insubstantial amount of commerce was involved. Diamondback's unlawful tying scheme caused several hundred thousand dollars in sales to shift from Repeat Precision to Diamondback. And but for this Court's injunction, a significantly greater amount of commerce would have been affected.

150.    Diamondback's tying scheme not only harmed competition in the disposable setting tool market, it was also the "but for" and proximate cause of damages to Repeat Precision.

151.    Even if Diamondback's conduct was not *per se* unlawful, it still violates the antitrust laws under a rule of reason analysis. Under the rule of reason, the plaintiff bears the burden to show the defendant "unreasonably restrained competition" in violation of the Sherman Act. *Suture Express*, 851 F.3d at 1037; *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n.2 (5th Cir. 1996) (quoting *Hyde*, 466 U.S. at 29). This "necessarily involves an inquiry into the actual effect of the [tying arrangement] on competition." *Suture Express*, 851 F.3d at 1037 (quoting *Hyde*, 466 U.S. at 29). Because the Court has found that Diamondback's tying arrangement harmed competition, the burden then shifts to Diamondback to show evidence of procompetitive justifications for the practice. *See id.* at 1038. However, Diamondback has offered no procompetitive justifications for its conduct. Indeed, Diamondback's conduct was economically irrational (but for its goal in foreclosing competition) because Diamondback would earn royalties and substantial profits by selling power charges to Repeat Precision's customers.

152.    Diamondback has attempted to downplay the impact of its unlawful tying arrangement by arguing that it was in place for only a limited period of time. The Court is not persuaded. Diamondback's initial scheme created an express tie between Diamondback's Eliminator™ power charges and Diamondback's disposable setting tools, which eliminated all competition in the disposable setting tool market while in place. Because of the devastating impact that arrangement had on Repeat Precision, Repeat Precision quickly agreed to a temporary arrangement that narrowed the impact of the tie. Under the temporary arrangement, Diamondback agreed to resume selling Eliminator™ power charges to customers who bought Repeat Precision's PurpleSeal Express™. But the tie remained in place for all standalone disposable setting tools. Accordingly, for any and all customers who wished to use a non-Repeat Precision frac plug with a disposable setting tool, they had no choice but to buy Diamondback's disposable setting tools. Thus, Diamondback's tying scheme enabled Diamondback to secure 100% of all sales for standalone disposable setting tools while the arrangement was in place. This Court's preliminary injunction was necessary to end the unlawful tying arrangement.

### 3.    Repeat Precision Suffered Antitrust Injury.

153.    Private plaintiffs are authorized to sue to enforce federal and state antitrust laws under Section 4 of the Clayton Act (15 U.S.C. §15(a)) and Section 15.21 of the Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Com. Code §15.21).

154.    Antitrust plaintiffs must generally show "antitrust injury" to pursue their claims, which is an "injury of the type the antitrust laws were intended to prevent . . . ." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Establishing antitrust injury means that (1) the plaintiff's "injury [is] causally linked to an illegal presence in the market," and (2) is "attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick*, 429 U.S. at 489).

120

"The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (quoting *Brunswick*, 429 U.S. at 489).

155.     Repeat Precision has suffered antitrust injury and has antitrust standing.

156.     Diamondback's conduct has created significant market uncertainties about the availability of disposable setting tools.  Tr. 877-78, 882-83 (House).  Diamondback also directly interfered with the transition of customers to this new, innovative product for setting frac plugs, which also has significant safety benefits.  *Id.*  As a result, consumers have been harmed.  *Id.*

157.     Not only was the market harmed, but Diamondback's anticompetitive conduct harmed Repeat Precision. But for the actions of Diamondback, consumers would have bought disposable setting tools from Repeat Precision for use with Diamondback's Eliminator™ power charges.

158.     Repeat Precision was prevented from selling its disposable setting tools due to the inability of customers to purchase Eliminator™ power charges to use with those tools.

159.     And although Diamondback narrowed the scope of its unlawful conduct when it agreed to resume selling power charges to Repeat Precision's PurpleSeal Express™ customers, Diamondback's actions still excluded Repeat Precision from being able to sell standalone disposable setting tools.

160.     Repeat Precision's lost sales to Mewbourne illustrate the problem.  Mewbourne primarily bought standalone disposable setting tools from Repeat Precision, choosing to buy frac plugs from another supplier.  Tr. 456-57 (Gr. Martin).  As a direct and proximate result of Diamondback's unlawful conduct, Mewbourne returned many standalone disposable setting tools to Repeat Precision and then purchased its supply of disposable setting tools and power

charges from Diamondback through Mewbourne's wireline contractors (Altitude Energy and Reliance-Midland).  Tr. 217 (Drury), 457-58 (Gr. Martin), 879-81 (House); Exs. 74, 2206 & 2208.  This pattern continued for several months, and only stopped because of this Court's preliminary injunction.  And even after the Court's preliminary injunction, uncertainty remained in the market about future supply of power charges for Repeat Precision's products that artificially suppressed demand for disposable setting tools.  Tr. 877-78 (House).

> 4.  *Repeat Precision Is Entitled to Recover Damages Due to Diamondback's Antitrust Violations.*

161.  In addition to proving antitrust violations, a plaintiff suing under Section 4 of the Clayton Act must prove the fact of damage and some indication of amount.  *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004) (quoting *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982)).

162.  When these elements are established, the damage recovery under Section 4 of the Clayton Act is automatically trebled.  *See Pollock & Riley, Inc. v. Pearl Brewing Co.*, 362 F. Supp. 335, 337 (W.D. Tex. 1973); *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 579 (5th Cir. 1982) ("[T]o recover treble damages under Section 4 of the Clayton Act, a plaintiff must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of the damage.").

163.  Repeat Precision has proved the fact of damages (*i.e.* "cognizable injury attributable to the violation").  Diamondback's conduct actually caused injury to Repeat Precision's business or property.  *See Bell Atl. Corp.*, 339 F.3d at 302 (quoting *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir. 1978)).  And, Repeat Precision's injury was causally and proximately related to Diamondback's antitrust violations, and attributable to an

anti-competitive aspect of the practice under scrutiny. *See Cargill, Inc. v. Monfort of Colo, Inc.*, 479 U.S. 104, 109–10 (1986) (quoting *Brunswick*, 429 U.S. at 488).

164.    Having proved the fact of antitrust damages, a lower burden of proof applies for the amount of damages than would be needed for an award in other civil cases. *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 206–07 (5th Cir. 2000); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 438-39 (5th Cir. 1985); *see also Bell Atl. Corp.*, 339 F.3d at 303 (requiring only "some indication of the amount of damage" and "declin[ing] to hold antitrust plaintiffs to the same burden of proof of damages as demanded of plaintiffs in other civil cases").

165.    Repeat Precision need only provide a just and reasonable estimate of damages based on relevant data. *See Bell Atl. Corp.*, 339 F.3d at 303.

166.    "Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La. 2016). "While the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures of lost profits, a plaintiff may prove damages by a different measure tailored to the facts of the case, so long as the estimates and assumptions used rest on adequate data." *Eleven Line*, 213 F.3d at 207 (footnote omitted).

167.    Repeat Precision's damage model is tailored to the facts of this case and its estimate and assumptions rest on adequate data.

168.    On the low end, Repeat Precision established that its damage due to Diamondback's antitrust violations are at least $273,379—the amount of the lost sales relating to Mewbourne. Exs. 605N, 605O, 2058A, 2060A, 2061, 2063A, & 2065A; Tr. 839, 883–84 (House).

169.    However, this amount does not take into account the damages caused to Repeat Precision due to Diamondback's obstruction of Repeat Precision's ability to sell disposable setting tools to potential customers.  This amount also does not take into account the delay damages Repeat Precision has incurred—*i.e.*, damages to compensate Repeat Precision for the many months it has lost in trying to expand its market share.  That is, but for Diamondback's violations, Repeat Precision would have been able to more aggressively grow its market share in the disposable setting tool market.  This amount also does not take into account the market suppression caused by the uncertainties Diamondback created regarding whether power charges would be available to those who purchased products from Repeat Precision.

170.    As Dr. House correctly explains, Repeat Precision should have had the benefit of being the "first-mover" with the exclusive rights to the disposable setting tools during all relevant time periods to this suit.  *See* Tr. 892–904 (House).  Repeat Precision (and the overall market) have been seriously harmed by having the uptake of disposable tools suppressed due to Diamondback's anti-competitive conduct.  *Id.*  Diamondback has created market uncertainties that have chilled the entire market.  *Id.*

171.    Dr. House's calculation of the "but for" market damage model establishing the full impact of Diamondback's conduct on Repeat Precision considers a variety of factors and issues raised by Diamondback's conduct including: failing to abide by the exclusivity language in the parties' Amended License, failing to provide Repeat Precision's customers with access to power charges in accordance with the License, exercising market power in the power charge market to disrupt the market for disposable setting tools, and forcing customers to buy tools tied to power charges from Diamondback.  *Id.*  This conduct has resulted in a long-term market effect

that also injured Repeat Precision's future business to the tune of millions of dollars of damages. *Id.*

172.    The Court concludes that Repeat Precision is entitled to additional antitrust damages of $273,379, which must be trebled under the law.  Exs. 605N, 605O, 2058A, 2060A, 2061, 2063A, & 2065A; Tr. 839, 883-84 (House).

173.    As the prevailing party on its antitrust claims, Repeat Precision is entitled to recover its reasonable and necessary attorneys' fees under 15 U.S.C. §15(a) and TEX. BUS. & COM. CODE §15.21(a), which will be determined in a separate order.

G.    **DIAMONDBACK TORTIOUSLY INTERFERED WITH REPEAT PRECISION'S EXISTING AND PROSPECTIVE CUSTOMER RELATIONSHIPS.**

174.    Texas law recognizes two types of tortious interference claims:  (1) interference with an existing contract, and (2) interference with prospective business relationships.  *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421 (Tex. 2017).  The latter includes tortious conduct that interferes with potential future business from existing or former customers, even when those relationships are not memorialized in a formal contract.  *See Heil-Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210, 214 (Tex. App.—Houston [14th Dist.] 1993), writ granted, judgm't vacated w.r.m., 877 S.W.2d 300 (Tex. 1994); *Whisenhunt v. Lippincott*, 474 S.W.3d 30, 44 n.14 (Tex. App.—Texarkana 2015, no pet.); *see also Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 633 & n.54 (Tex. App.—Fort Worth 2007, pet denied) ("The types of business relationships protected against interference include continuing business relationships.");  RESTATEMENT OF TORTS (SECOND) §766B, cmt. c ("The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. . . .").  Repeat Precision has asserted claims under both theories.

125

        1.    *Tortious Interference with Existing Contracts.*

175.    To prove a claim for tortious interference with an existing contract, a plaintiff is required to establish (1) a contract subject to interference; (2) a willful and intentional act of interference; (3) that was a proximate cause of the plaintiff's damages; and (4) actual damage. *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016).

176.    Repeat Precision proved that it entered into a contract with Mewbourne under which Mewbourne purchased disposable setting tools prior to November 26, 2018.  Tr. 457-58 (Gr. Martin).

177.    Diamondback willfully and intentionally interfered with that contract by refusing to supply the necessary power charges to Mewbourne's wireline contractor, Altitude Energy. *See* Tr. 703 (T. Cheek).  As explained above, Diamondback's actions violated the License and antitrust laws.

178.    Diamondback's interference was the proximate cause of Repeat Precision's injury.  After Mewbourne was unable to obtain the power charges it needed, Mewbourne returned the disposable setting tools to Repeat Precision for a credit.  Tr. 457-58 (Gr. Martin).

179.    Repeat Precision suffered actual damages as a natural, probable, and foreseeable result of Diamondback's interference.  However, the amount of Repeat Precision's damages has already been fully compensated under Repeat Precision's patent infringement and breach of contract claims, as Diamondback successfully sold replacement disposable setting tools for use by Mewbourne.  Accordingly, Repeat Precision's damages are subsumed in the lost profits damage calculation discussed above.

        2.    *Tortious Interference with Prospective Business Relationships.*

180.    To prove a claim for tortious interference with a prospective business relationship, a plaintiff must show: "that (1) there was a reasonable probability that the plaintiff would have

entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *D'Onofrio v. Vacation Publ'ns., Inc.*, 888 F.3d 197, 214 (5th Cir. 2018) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)).

181. The Texas Supreme Court explained in *Wal-Mart Stores, Inc. v. Sturges*:

> By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort. Thus, for example, a plaintiff may recover for tortious interference from a defendant who makes fraudulent statements about the plaintiff to a third person without proving that the third person was actually defrauded.

52 S.W.3d 711, 726 (Tex. 2001).

182. Not only are false statements to a third party actionable, *see id.*, but it is also well settled that acts of unfair competition, such as Diamondback's anticompetitive conduct discussed above, are also actionable in tortious interference claims, *see Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 81 (Tex. 2000).

183. Repeat Precision has proven that Diamondback has tortiously interfered with Repeat Precision's prospective business relationships with Hunting-Titan and Mewbourne.

184. Regarding Hunting-Titan, the Court finds that there was a reasonable probability that Repeat Precision and Hunting-Titan would have entered into a business relationship. Diamondback acted with a conscious desire to prevent that relationship from being consummated and knew its actions were substantially certain to interfere with that relationship. Diamondback's independently tortious actions included the false statements of material facts that

Drury made to Hunting-Titan, accusing Repeat Precision of stealing and misappropriating Diamondback's technology. Diamondback's false statements proximately caused injury to Repeat Precision. As explained above, the natural, probable, and foreseeable result of Diamondback's interference was that Repeat Precision lost profits in the amount of $6,187,659. *See* Exs. 484, 605P, 605Q, 2058A, 2060A, 2061, 2063A, 2065A;Tr. 840, 886 (House).

185. Regarding Mewbourne, Repeat Precision and Mewbourne had a prior business relationship before Diamondback's acts of interference. *See* Tr. 456-57 (Gr. Martin). The Court finds that there was a reasonable probability that Repeat Precision and Mewbourne would have continued to grow that business relationship with additional product sales. Diamondback acted with a conscious desire to prevent that relationship from developing, and knew its actions were substantially certain to interfere with that relationship. Diamondback's independently tortious actions included its unlawful attempt to monopolize the disposable setting tool market, its unlawful tying of goods in violation of federal and state antitrust laws, and its making of false allegations against Repeat Precision (accusing it of fraud and misappropriation). *See* Ex. 73. Diamondback's anticompetitive and tortious conduct proximately caused injury to Repeat Precision. As explained above, the natural, probable, and foreseeable result of Diamondback's interference was that Repeat Precision lost profits in the amount of $273,379. Exs. 605N, 605O, 2058A, 2060A, 2061, 2063A, 2065A;Tr. 839, 833-34 (House).

### 3. *Exemplary Damages.*

186. Exemplary damages may be awarded to a plaintiff who successfully proves its tortious interference claims. *See Seelbach v. Clubb*, 7 S.W.3d 749, 756-57 (Tex. App.—Texarkana 1999, pet. denied); *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 866–67 (Tex. 2017).

187.    To obtain an award of exemplary damages, the plaintiff must prove by clear and convincing evidence that the injury it suffered for which exemplary damages are recoverable was the product of fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code §41.003(a).

188.    "Clear and convincing" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Civ. Prac. & Rem. Code §41.001(2).

189.    "Malice" is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant."  Tex. Civ. Prac. & Rem. Code §41.001(7).

190.    "Fraud" is defined as "fraud other than constructive fraud."  Tex. Civ. Prac. & Rem. Code §41.001(6).

191.    The amount of exemplary damages awarded may not exceed the greater of (a) two times the amount of the economic damages awarded plus an amount equal to the noneconomic damages awarded (up to $750,000), or (b) $200,000.  Tex. Civ. Prac. & Rem. Code §41.008(b).

192.    "Exemplary damages may not be awarded to a claimant who elects to have his recovery multiplied under another statute."  Tex. Civ. Prac. & Rem. Code §41.004(b).

193.    Repeat Precision has proven by clearing and convincing evidence that the injury it has suffered as a result of Diamondback's tortious interference with Repeat Precision's business relationships with Mewbourne and Hunting-Titan was the result of malice.

194.    Repeat Precision has proven by clear and convincing evidence that the injury it has suffered as a result of Diamondback's tortious interference with Repeat Precision's business relationships with Hunting-Titan was the result of fraud.

195.    The Court finds that an award of exemplary damages is appropriate.

196.    The Court hereby awards Repeat Precision exemplary damages equal to two times the amount of the economic damages Repeat Precision suffered as a result of Diamondback's interference with Repeat Precision's prospective business relationship with Hunting-Titan. Accordingly, the Court awards Repeat Precision exemplary damages in the amount of $12,375,318.

197.    Repeat Precision's recovery of damages for Diamondback's tortious interference with the Hunting-Titan relationship is not covered by any other causes of action allowing for enhanced or multiple damages. Accordingly, an award of exemplary damages relating to Diamondback's interference with the Hunting-Titan relationship is not barred by Tex. Civ. Prac. & Rem. Code §41.004(b).

198.    Although the Court finds that an award of exemplary damages as a result of Diamondback's tortious interference with Repeat Precision's existing and prospective business relationship with Mewbourne would also be appropriate, the Court declines to award exemplary damages on this portion of Repeat Precision's damages claims under Texas Civil Practice & Remedies Code §41.004(b). Repeat Precision's damages relating to the interference with the Mewbourne relationship are already covered by Repeat Precision's patent infringement and antitrust claims, meaning that Repeat Precision is already receiving a treble damage recovery for the lost Mewbourne relationship. *See* Tr. 839-40 (House). Thus, additional exemplary damages are not available on this part of Repeat Precision's tortious interference claim. Tex. Civ. Prac. & Rem. Code §41.004(b).

## H.    OTHER CONTRACT-RELATED CLAIMS.

### 1.    *Repeat Precision's Right to Practice Diamondback's Power Charge Patents.*

199.    Repeat Precision seeks a declaratory judgment regarding its rights under the License to Diamondback's power charge patents—the '382 Patent and '054 Patent. RP Compl. ¶¶156–158. Repeat Precision also sued Diamondback for breach of contract for failing to convey Repeat Precision rights in those patents. RP Compl. ¶¶150–155.

200.    Diamondback has conceded that Repeat Precision and its affiliates (including NCS) have the right to make their own power charges, as well as the right to have other parties make power charges for Repeat Precision and its customers. *See* ECF14 at 31 (Case 00036). However, Diamondback denies that Repeat Precision and its affiliates have the right to practice the '382 and '054 Patents, or to have other parties make power charges that practice the '382 and '054 Patents, even when such power charges are to be used with Repeat Precision's disposable setting tools.

201.    The Court finds that there is a live and justiciable controversy regarding the scope and meaning of the License. The Court has authority to resolve this dispute under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*

202.    The License granted Repeat Precision the right to make, have made, use, sell, and offer to sell disposable setting tools. Power charges are necessary to operate those tools and are even expressly referenced in the '035 Patent. Although Repeat Precision originally intended for Diamondback to sell its power charges to Repeat Precision's customers, Diamondback has failed to provide a stable power charge supply for Repeat Precision and its customers, which has made it necessary for Repeat Precision to try to find additional sources for power charges to return stability to the market.

203.    Although the definition of "Licensed Patents" in the License only expressly names the '035 Patent, in Paragraph 9.2 of the License, Diamondback represented that the Licensed Patents "are all the patents and patent applications owned by Licensor . . . that are necessary or useful for Licensee to make, have made, use, offer to sell, sell, and import the Licensed Products . . . ." Ex. 1 ¶9.2(a).

204.    Diamondback's '382 and '054 Patents disclose inventions that are "useful" for Repeat Precision to "make, have made, use, offer to sell, [and] sell" disposable setting tools.  Tr. 661-63 (Andres).    Thus, Diamondback's '382 and '054 Patents fall squarely within the representation in Paragraph 9.2(a).

205.    By failing to grant a license to Repeat Precision for the '382 and '054 Patents, Diamondback breached its representation and warranty to Repeat Precision.

206.    Moreover, to the extent that it is necessary or useful for Repeat Precision or its designees to practice the claims of Diamondback's '382 and '054 Patents in order for Repeat Precision to receive the benefit of its bargain under the License, controlling Federal Circuit authority precludes Diamondback from asserting its patent rights under the '382 and '054 Patents against Repeat Precision and its designees.  *See TransCore*, 563 F.3d at 1279; *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1101 (Fed. Cir. 2004); *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355, 1361-62 (Fed. Cir. 2011).  Under the Federal Circuit's decisions in *TransCore*, *Jacobs*, and *General Protecht Group*, the right to practice the power charge patents is at least impliedly licensed to Repeat Precision.

207.    The Court further finds and declares that the proper remedy and construction of the License given the representation and warranty in Paragraph 9.2(a) of the License is that Repeat Precision and its designees have an implied, non-exclusive license under the '382 and

'054 Patents to make, have made, use, offer to sell, sell, and import power charges that practice the '382 and '054 Patents.

        2.    *Diamondback Breached the License by Filing a Reissue Application with the PTO Without Consulting and Obtaining Consent from Repeat Precision.*

208.    The Court turns now to an issue of particular concern to it.

209.    On November 7, 2019, Diamondback filed Reissue Application No. 16677372 (the "Reissue Application") with the PTO, offering to surrender the '035 Patent, in return for new and different patent claims that are subject to full scrutiny by the PTO. Ex. 2033; *see also* 37 C.F.R. §1.178 (noting that a reissue application is an offer to surrender the existing patent). Understandably, Diamondback did not consult with or seek approval from Repeat Precision prior to filing the Reissue Application. Tr. 619 (Nipper). Instead, Diamondback served Repeat Precision with the Reissue Application, which was Repeat Precision's first notice, but not until one week after the Reissue Application was filed.

210.    Repeat Precision objects to Diamondback's filing and continued pursuit of the Reissue Application. *See* Ex. 2034; Tr. 620 (Nipper) ("Q: Now that you've seen Exhibit 2033, does Repeat Precision consent to the filing and pursuit of this application with the Patent and Trademark Office? A: Absolutely not."). More specifically, Repeat Precision contends that the License (a) required Diamondback to consult with Repeat Precision prior to filing the Reissue Application, and (b) requires Repeat Precision's consent to take actions that could result in the surrender, abandonment, or narrowing of the scope of the claims under the '035 Patent. Ex. 2034. Repeat Precision is not willing to risk a reexamination of the rights it is entitled to receive under the '035 Patent. Tr. 620 (Nipper).

211.    Repeat Precision sued Diamondback for breaching the License and for declaratory and injunctive relief to stop Diamondback from pursuing the Reissue Application. ECF131.

212.    The Court finds that there is a live case or controversy regarding the Reissue Application that is sufficient to authorize the Court to declare the parties' respective rights regarding the Reissue Application.  *See* 28 U.S.C. §2201.

213.    Several provisions in the License are relevant to the current claim that protect Repeat Precision against Diamondback's unilateral actions.

214.    Paragraph 5.1(b) requires Diamondback to "maintain" the '035 Patent, which includes the obligation to keep the '035 Patent in effect.  Ex. 1 ¶5.1(b).  Surrendering or allowing the '035 Patent to be narrowed is the opposite of maintaining the '035 Patent.

215.    Paragraph 5.1(d) requires Diamondback to keep Repeat Precision informed about patent prosecution activities, with Paragraph 5.1(e) requiring Diamondback to "consult with [Repeat Precision] concerning any decisions which could affect the scope or enforcement of any issued claims or the potential abandonment of such patent application or patent . . . ."  Ex. 1 ¶5.1(e).  Unilaterally taking action that could result in the reexamination, narrowing, or rejection of the existing claims of the '035 Patent, falls squarely within this provision.

216.    The License also prevents Diamondback from unilaterally offering to give up all or part of the patent rights that it exclusively licensed to Repeat Precision:  "Licensor shall not abandon any such Licensed Patent except upon the prior written consent of Licensee."  *See* Ex. 1 ¶5.2.  This provision expressly requires notice and Repeat Precision's consent before abandoning such rights.  *Id.*  Diamondback failed to comply with Paragraph 5.2.

217.    Reading the License as a whole, the Court finds that Diamondback breached the License by filing the Reissue Application without Repeat Precision's consent.

218.    The Court finds the decision to file this Reissue Application to be a willful breach and to be unconscionable. Diamondback has not, and in the Court's opinion, cannot, proffer any

legitimate reason it would take this action other than for the express purpose of doing injury to Repeat Precision.

219.    By continuing to pursue the Reissue Application over Repeat Precision's objections, the Court finds that Diamondback is continuing to breach the License by, among other things, offering to surrender and abandon the '035 Patent.   Moreover, the License precludes Diamondback from taking actions that could adversely impact the meaning and scope of the rights under the '035 Patent that were licensed to Repeat Precision.

220.    Although the Court finds that Repeat Precision has not yet suffered actual damages as a result of Diamondback's breach of the License relating to the Reissue Application, if and when the PTO acts on Diamondback's Reissue Application, Repeat Precision faces a serious risk of irreparable harm.   Accordingly, the Court finds that Diamondback's plea for the Court to withhold ruling on this claim is unwarranted.   The Court need not wait for irreparable harm to Repeat Precision's rights under the License before addressing the scope of the parties' rights.

221.    In the License, Diamondback agreed that it "shall, upon the reasonable request of the other party, promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement."   *See* Ex. 1 ¶13.3.

222.    Repeat Precision made a reasonable request on November 20, 2019 for Diamondback to prepare and file the necessary documentation to withdraw the Reissue Application. Ex. 2034.  Diamondback has so far refused to dismiss the Reissue Application. The Court finds this refusal to also be unconscionable.

223.    The Court finds that injunctive relief is warranted as articulated below.

3.      *The Parties Never Reached an Agreement to Amend the License to Remove the Right-of-First Refusal.*

224.     In Section 3 of the Amended License, Diamondback granted Repeat Precision a right of first refusal ("ROFR") on certain bona fide proposed sales of Diamondback's assets or stock.  *See* Ex. 2 ¶¶3.1 – 3.3.

225.     Diamondback seeks a declaratory judgment that the ROFR has terminated. ECF61 ¶¶181–182.  Repeat Precision denies that the ROFR has terminated.  Tr. 621 (Nipper) ("Q:  Has the right of first refusal in the amended license been terminated?  A: It has not.  Q: Can you tell us why that is, why it has not been terminated?  A:  Because we've never executed the document to allow it to be terminated.").  Thus, there is a live case or controversy regarding the ROFR that is sufficient to authorize the Court to declare the parties' respective rights regarding the ROFR.  *See* 28 U.S.C. § 2201.

226.     The ROFR is part of a valid and enforceable contract.  Ex. 2.  Diamondback bears the burden to prove that the ROFR has terminated or has been released.  Diamondback has failed to meet that burden.  The Court finds and declares that the ROFR has not terminated and remains in full force and effect.

227.     Although Repeat Precision expressed a willingness to release the ROFR, Repeat Precision also disclosed the terms under which it was willing to do so.  Ex. 80; Tr. 621-622 (Nipper).  More specifically, Repeat Precision conditioned its willingness to release the ROFR on Diamondback's agreement to expressly reaffirm the License.  Ex. 80.  Diamondback refused to reaffirm the License and, instead, has sued seeking to set it aside.  Thus, there was never a meeting of the minds between Repeat Precision and Diamondback on the release of the ROFR.

4.      *Defendants Did Not Breach the July 2018 Non-Disclosure Agreement between NCS and Diamondback.*

228.    Diamondback has sued Defendants for allegedly breaching the non-disclosure agreement entered into between Diamondback and NCS Repeat Precision in July 2018.   Ex. 5. Mr. Drury explained that this claim was based on Defendants allegedly meeting with and providing confidential information to Hunting-Titan and Schlumberger.   Tr. 174-75 (Drury). When pressed, however, Mr. Drury admitted he had no evidence to support this claim.   Tr. 175-76 (Drury) (agreeing that it was a "hunch").   Diamondback's allegations were based on a hunch and his beliefs based on who the Defendants were talking to, *id.*, but Diamondback did not support this statement of belief with any competent evidence that confidential information was shared.   To the contrary, the record is undisputed that Repeat Precision did not share any Diamondback information with these potential customers.   Tr. 437 (Gr. Martin).

229.    Diamondback has offered no evidence to prove a breach of the July 2018 agreement.   Diamondback has also failed to offer any evidence of compensable damage suffered as a result of an alleged breach.

5.      *Defendants Did Not Breach the License.*

230.    Diamondback has also sued Defendants for allegedly breaching the License when Repeat Precision sued Diamondback for patent infringement in November 2018. Diamondback's theory appears to be that Repeat Precision failed to provide Diamondback with a timely notice under Paragraph 6.1 of the License of Repeat Precision's position that Diamondback no longer had the right to practice under the '035 Patent.   As a result of that alleged breach, Diamondback contends that the entire License has terminated under Paragraph 12.2(b), which allows for termination in the case of a material breach that is incurable or is not cured within 180 days of receipt of notice of the breach.

231.    The Court finds that Defendants did not breach the License. There are several independent reasons why Diamondback's claim fails.

232.    First, Mr. Drury testified that he was not suing Defendants for breaching the Original License. Tr. 174 (Drury). This is fatal since the notice provision was in the Original License.

233.    Second, the License did not require Repeat Precision to provide notice to Diamondback that Diamondback was infringing. Paragraph 6.1 focuses on third party infringement allegations. The Court recognizes that the heading "Third-Party Infringement" for Section of the License may not be used when construing the License. *See* Ex. 1 ¶13.8. However, the plain language of Paragraph 6.1 indicates that it is referring to the receipt of infringement allegations from someone other than Diamondback or Repeat Precision. *See* Ex. 1 ¶6.1 ("A party receiving notice of alleged infringement . . ."). Repeat Precision's infringement allegations are not based on Repeat Precision "receiving notice of alleged infringement;" it is based on Repeat Precision's interpretation of the plain language of the License. The Court finds that Paragraph 6.1's notice provision is inapplicable here.

234.    But, even if it applied, the purposes of the notice were satisfied. *See James Construction Grp., LLC v. Westlake Chemical Corp.*, 2019 WL 7373429, at *11 (Tex. App.—Houston [14th Dist.], Dec. 17, 2019) (holding that Chemical's failure to comply with the written notice provision of the contract was not a material breach because James received actual notice and the form of that notice did not severely impair the notice provision's purpose). Diamondback received Repeat Precision's lawsuit accusing Diamondback of infringement on or about November 2018. Repeat Precision then withdrew that lawsuit and did not re-file its infringement claims against Diamondback until February 2019 in this Court. During that time

period, Diamondback did not stop its infringing conduct.  Thus, to the extent that notice was required, Diamondback received notice and had an opportunity to change its conduct to comply with the License, but it chose to continue infringing the '035 Patent.  *See S. Tex. Elec. Co-op v. Dresser-Rand Co.*, 575 F.3d 504, 507 (5th Cir. 2009) (holding that STEC's failure to provide notice under the contract did not excuse Dresser from performance because Dresser had actual notice of the issue, but chose not to remedy the issue anyway).  Defendants did not breach the License.  Diamondback did.

235.    Diamondback has also failed to show any damages tied to Defendants' alleged untimely notice of infringement.  The lack of any cognizable damages to Diamondback flowing from the breach further shows the lack of materiality of Diamondback's claim.  *See James Construction Grp.*, 2019 WL 7373429, at *11.  Accordingly, Diamondback lacks any legitimate basis terminate the License under Paragraph 12.2(b).

**I.    DEFENDANTS ARE ENTITLED TO RECOVER ATTORNEYS' FEES AS THE PREVAILING PARTY ON DIAMONDBACK'S TRADE SECRETS CLAIMS.**

236.    In addition to the claims addressed above, Diamondback also sued Repeat Precision, NCS, Gary Martin, Grant Martin, and Robert Nipper under both the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, and the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code §314A.001, *et. seq.  See* ECF62 ¶¶141-169. Diamondback accused the Defendants of misappropriating a wide range of trade secrets, but there was little specificity to what was allegedly taken.  Diamondback's theory was the Defendants either misappropriated alleged trade secrets by obtaining them from former employees Trea and Justice Baker, or that Defendants misappropriated trade secrets by obtaining them from the data room set up for due diligence during the potential transaction between Defendants and Diamondback.

237. After extensive discovery on the trade secret claims, Diamondback voluntarily dismissed with prejudice its trade secret misappropriation claims. *See* ECF104.

238. Diamondback's dismissal of its trade secret claims was to avoid an adverse judgement on the merits of those claims.

239. During discovery, Mr. Drury, who authorized the filing of the trade secret claims admitted that he had no personal knowledge of the Bakers sharing trade secrets with the Defendants. It was just Drury's belief, like many of the other allegations, and after months of discovery, Diamondback still had no evidence to support those beliefs. Tr. 154 (Drury).

240. There were also no trade secrets misappropriated through the data room. Prior to the day when Defendants' representatives were given access to the data room, Diamondback and Defendants agreed that no trade secrets were to be placed in the data room. Exs. 131 & 132. The written communications confirming that agreement indicate that Drury knew about and approved this agreement. *Id.* Accordingly, he had actual knowledge that his theory of misappropriation of trade secrets from the data room was false at the time Diamondback filed it.

241. Despite the lack of a factual basis to file trade secret claims against Defendants, Diamondback forced Defendants to engage in expensive discovery to defend those claims for several months. The deposition of Artmark, which occurred in Florida, illustrates this point. Although Diamondback claimed its drawings for its disposable setting tools were trade secrets, the evidence established that Diamondback was regularly sharing those drawings with a broker, Artmark, who then sent them to multiple locations in China for bids on manufacturing. O'Keefe Dep. at 20:12-20:22, 22:2-25:10, 62:9-64:10, 130:16-130:22, 133:7-134:1. While the Court does not fault Diamondback for working with brokers or seeking manufacturing sources, the issue here is that Diamondback shared those allegedly trade secret drawings without any

140

confidentiality agreements or other measures to protect the alleged secrets. O'Keefe Dep. at 125:3-125:11, 128:5-128:13, 63:8-63:11; Ex. 375. In other words, Diamondback voluntarily disclosed them in a manner that was not private or confidential. This lack of protection is fatal to claiming trade secret protections. The Court is surprised and extremely concerned that Diamondback would assert a trade secret claim being aware that it had already surrendered the trade secret status. Parties are required to act in good faith when they bring claims in federal court and it is difficult if not impossible for the Court to understand how anyone could believe that this claim had any merit.

242. Both the DTSA and TUTSA authorize the Court to award attorneys' fees to the prevailing party in a case where the trade secrets claim was brought in bad faith. *See* 18 U.S.C. § 1836(b)(3)(D) ("[I]f a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, [a court may] award reasonable attorney's fees to the prevailing party."); Tex. Civ. Prac. & Rem. Code §134A.005 ("The Court may award reasonable attorneys' fees to the prevailing party if . . . a claim of misappropriation is made in bad faith.").

243. Defendants are the prevailing parties on Diamondback's trade secret claims as a result of Diamondback's dismissal of those claims with prejudice. "[A] defendant can be considered a prevailing party if the plaintiff voluntarily dismisses a case with prejudice because 'a dismissal with prejudice gives the defendant the full relief to which he is legally entitled and is tantamount to a judgment on the merits.'" *Stockade Cos., LLC v. Kelly Rest. Grp., LLC*, 2018 WL 3018177, at *4 (W.D. Tex. June 15, 2018) (quoting *Schwarz v. Folloder*, 767 F.2d 125, 130

(5th Cir. 1985)). "[W]e have no doubt that a defendant who is the beneficiary of a nonsuit with prejudice would be a prevailing party." *Epps v. Fowler*, 351 S.W.3d 862, 868 (Tex. 2011).

244.    "'Bad faith' generally means the conscious doing of a wrong for dishonest, discriminatory, or malicious purpose . . . ." *Performance Pulsation Control, Inc. v. Sigma Drilling Techs., LLC*, 2018 WL 6599180, at *2 (Tex. App.—Dallas 2018, no pet. h.) (citing *D Design Holdings, L.P. v. MMP Corp.*, 339 S.W.3d 195, 203 (Tex. App.—Dallas 2011, no pet.)); *see also Stockade Cos.*, 2018 WL 3018177, at *6.

245.    Diamondback's trade secret claims were brought in bad faith.  Diamondback had no factual basis to support either theory of misappropriation (*i.e.*, through the Bakers or from the data room).  Diamondback never even discussed this topic with Defendants before filing suit, which indicates no real attempt to investigate its claims before filing.  And the record in this case establishes an overall malicious attitude and attempt by Diamondback to bully Repeat Precision to give up its valuable rights under the License.

246.    By filing its baseless trade secrets claim, Diamondback misused the legal process and caused Defendants to incur an enormous amount of legal fees.  The Court awards Defendants recovery of their attorneys' fees for having to defend Diamondback's trade secret claims, in an amount that will be determined by post-trial submissions.

## J.    RECAPPING REPEAT PRECISION'S DAMAGE RECOVERY.

247.    Because of the numerous claims upon which recovery is being awarded, as well as the overlap between some of those claims, the Court provides a brief recap of the damages being awarded.

248.    First, Repeat Precision is being awarded lost profits damages of $8,579,127.  This recovery is independently supported by Repeat Precision's patent infringement claim and its claim for Diamondback's breach of the exclusivity provisions of the License.

142

249.    Second, Repeat Precision is being awarded enhanced damages of $8,579,127 on its patent infringement claim.

250.    Although Repeat Precision proved that it is suffered lost profits in the amount of $273,379 relating to Mewbourne under Repeat Precision's antitrust claims and tortious interference claims, these lost profits are already subsumed within Repeat Precision's recovery under its patent infringement and breach of License claims.  Tr. 839-40 (House).  Moreover, although the antitrust verdict would also be trebled, that treble-damage recovery is already subsumed within Repeat Precision's recovery of enhanced damages under its patent infringement claim.

251.    Third, the Court found that Repeat Precision suffered $6,187,659 million in damages due to Diamondback's tortious interference with Repeat Precision's prospective business relationship with Hunting-Titan.   However, as Dr. House correctly explained, that number must be reduced if the Court awards damages for Repeat Precision's lost profits too because it would be necessary for Repeat Precision to obtain some of the disposable setting tools from its Chinese supplier to fill all of the orders subject to the damages award.  Tr. 889-91 (House); Ex. 605U.  Moreover, the incremental cost of obtaining disposable setting tools from China is slightly higher than the incremental cost of the tools built in Mexico.  Tr. 857 (House).  Accordingly, Repeat Precision's recovery for tortious interference with the Hunting-Titan relationship must be reduced by $443,223, *see* Ex. 605V, which lowers Repeat Precision's recovery for this element of damages to $5,744,436.

252.    Fourth, the Court is awarding Repeat Precision exemplary damages equal to twice times the amount of Repeat Precision's damages for tortious interference due to Diamondback's

malicious and fraudulent conduct. Accordingly, Repeat Precision is awarded $11,488,872 in exemplary damages which are in addition to the actual damages.

253. Thus, the total monetary award to Repeat Precision for the items listed above is $34,391,562.

254. In addition, because the lost profits calculations above are based on actual data that only goes through December 31, 2019, yet Diamondback continued selling infringing product in 2020, the Court awards Repeat Precision recovery of additional lost profits for Diamondback's continued infringing sales. Within five days of entry of these findings, Diamondback shall provide the Court with a sworn statement identifying the number of disposable setting tools it sold during this time period so that Repeat Precision's additional damages may be included in the Court's final judgment. The Court will then award Repeat Precision recovery of its lost profits assuming the most conservative assumptions as possible, which are that (a) all of the tools would have been RP20's, which have a lower profit margin than RP10's, and (b) all of the tools would have been manufactured in China, where the cost would be higher. Thus, Repeat Precision's additional lost profits damages will be calculated by multiplying the number of tools sold by Diamondback during this time period times ███, which is the difference between Repeat Precision's average sales price (███) minus the incremental cost of making the tools in China (███). *See* Ex. 605G.

255. In addition, Repeat Precision is entitled to recover its reasonable and necessary attorneys' fees incurred in this matter, as well as the declaratory relief set forth above.

### A PERMANENT INJUNCTION IS WARRANTED FOR SOME ISSUES

256. A permanent injunction may issue when the movant has shown: (a) actual success on the merits, (b) the failure to grant the injunction will result in irreparable harm, (c) the injury outweighs any damage that the injunction will cause to the opposing party, and (d) the

injunction will not disserve the public interest. *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492-93 (5th Cir. 2017).

257. The determination of whether each of the four injunction factors has been satisfied is a question of fact. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017); *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016); *Peaches Entm't Corp. v. Entm't Repertoire Assoc., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995).

258. The ultimate decision whether to grant permanent injunctive relief rests within the Court's discretion. *Peaches Entm't Corp.*, 62 F.3d at 693.

## A. DIAMONDBACK IS ENJOINED FROM MAKING, SELLING, OR OFFERING TO SELL DISPOSABLE SETTING TOOLS THAT PRACTICE THE CLAIMS OF THE '035 PATENT.

259. Repeat Precision has demonstrated actual success on the merits on its claims for patent infringement and breach of the exclusivity provisions of that License, each of which independently warrants a permanent injunction to prevent Diamondback from making, selling, or offering to sell disposable setting tools that practice one or more claims of the '035 Patent.

260. The Court finds that Repeat Precision will be irreparably harmed if an injunction is not entered. "Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013); *see also Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). Past lost sales are relevant to the analysis, as they may be an indicator of continued and future lost sales as a result of the infringement. *Presidio Components, Inc.*, 875 F.3d at 1383.

261.    "Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc.*, 702 F.3d at 1363; *see also Douglas Dynamics,* 717 F.3d at 1345 (recognizing the harm suffered by infringement from a direct competitor is "often irreparable").  "Intellectual property enjoys its highest value when it is asserted against a direct competitor in the plaintiff's market." *Visto Corp. v. Seven Networks, Inc.*, 2006 WL 3741891, at *4 (E.D. Tex. Dec. 19, 2006).

262.    The Federal Circuit recognizes that irreparable harm may occur when a party is deprived of its ability to market itself as the holder of exclusive rights, particularly for products that are relatively new in the market.  *See Celsis In Vitro*, 664 F.3d at 930–31.  The need to build brand awareness, reputation, and a customer base are particularly important at the growth stage of the market.  *Id.* at 931.  As one court aptly explained:

> Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm—Plaintiff is losing market share at a critical time in the market's development, market share that it will not have the same opportunity to capture once the market matures.

*TiVo Inc. v. EchoStar Commc'ns Corp.*, 446 F. Supp. 2d 664, 669–70 (E.D. Tex. 2006), *aff'd in part, rev'd in part on other grounds and remanded*, 516 F.3d 1290 (Fed. Cir. 2008).

263.    Here, Repeat Precision will be irreparably harmed if Diamondback is allowed to continue selling disposable setting tools.  Diamondback is a direct competitor of Repeat Precision.  There is extensive evidence that Repeat Precision has already lost sales to Diamondback.  Without an injunction, Repeat Precision will continue to lose those sales to Diamondback, though the quantity that will be lost is hard to predict.  *See* Tr. 903-05 (House).  And, Repeat Precision is being deprived of its rightful market share and ability to build its brand due to the infringing competition from Diamondback.

146

264.    The injury to Repeat Precision far outweighs the harm to Diamondback if an injunction is entered.  As explained above, Diamondback will not be harmed by an injunction because it already gave up the right to practice the '035 Patent when it entered into the License, and it will receive the $20 per tool royalty in the License.  In contrast, without an injunction, Repeat Precision will lose the benefits of the exclusive rights it is entitled to under the License. And as Dr. House has shown, the damage to Repeat Precision due to the lost value of its exclusive rights is enormous, and continues to grow the longer that Repeat Precision is denied exclusivity. *See* 891-905 (House).

265.    An injunction will not disserve the public interest.  To the contrary, the public interest is best served by honoring and enforcing contracts as written.

**B.    BASED ON DIAMONDBACK'S REPRESENTATIONS, DIAMONDBACK IS NOT ENJOINED FROM CUTTING OFF THE POWER CHARGE SUPPLY TO REPEAT PRECISION AND ITS CUSTOMERS.**

266.    During Diamondback's closing statement, Diamondback's counsel represented that Diamondback would "continue to sell the power charge to them and their customers on exactly the same terms we sell it to our customers if we're allowed to sell the tool. And that we won't discontinue it without giving them a year's notice."  Feb. 25, 2020 Tr. 114:11-15; *see also* Feb 25, 2020 Tr. 114:15-115:7.  Based on that representation, the Court does not find that Repeat Precision will suffer irreparable harm and thus a permanent injunction is not warranted at this time.

**C.    DIAMONDBACK IS ENJOINED FROM CONTINUING TO PURSUE THE REISSUE APPLICATION OVER REPEAT PRECISION'S OBJECTIONS.**

267.    As explained above, Repeat Precision demonstrated actual success on the merits on its claims showing that Diamondback breached the License when it filed the Reissue

Application. Repeat Precision further demonstrated that it faces a serious risk of irreparable harm if the Reissue Application is allowed to proceed.

268. Diamondback complains that its rights will be adversely impacted if the Court orders Diamondback to withdraw the Reissue Application. The Court is not persuaded. Diamondback chose to wait to the last minute before filing the Reissue Application. There was nothing stopping Diamondback from acting months earlier, including leaving enough time for it to consult with Repeat Precision on the best course of action to preserve the rights under the '035 Patent that were licensed to Repeat Precision. Diamondback cannot unilaterally undermine Repeat Precision's rights under the License by voluntarily choosing to wait to take action before the PTO that could materially and adversely impact Repeat Precision's rights.

269. Diamondback also seeks to delay an order for relief on this issue by arguing that there is no imminent decision from the PTO on the Reissue Application. Diamondback's plea for delay misses the point. If the Reissue Application is allowed to proceed, the reexamination process likely would require Diamondback to make disclosures regarding the '035 Patent that could be used against Repeat Precision in future proceedings over its patent rights. Moreover, there is no realistic way to assess when the PTO will act on the Reissue Application. As a result, if delay is allowed, Repeat Precision could suffer irreparable harm during the interim period. Nothing good comes from delay.

270. The Court finds that the serious risk of irreparable harm to Repeat Precision far outweighs any harm to Diamondback if the Reissue Application is withdrawn.

271. The public interest is best served by enforcing the parties' rights as written. The Court finds that no public harm will occur by leaving the claims and scope of the '035 Patent in

place, as originally issued by the PTO. The public interest will not be disserved by stopping Diamondback from seeking to expand the scope of the claims of the '035 Patent.

### D. THE INJUNCTION'S TERMS.

272.    Under Federal Rule of Civil Procedure 65(d), "every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

273.    The Court has stated the reasons why it is entering an injunction at length above.

274.    The terms of the injunction and the acts restrained or required are as follows:

    a.    Diamondback, its officers, directors, employees, agents, and all those acting in concert with Diamondback who receive actual notice hereof (the "Enjoined Parties"), are hereby enjoined from manufacturing, importing, exporting, using, selling, or offering to sell Diamondback's SS line of setting tools, including but not limited to the SS10 and SS20 setting tool and any rebrands thereof, either alone or in combination with any other product, including but not limited to Schlumberger's FracXion Unity product, and all other products that are only colorably different therefrom, whether individually or in combination with other products or as part of another product (collectively the "Infringing Products").

    b.    The Enjoined Parties are further required to provide Repeat Precision with at least thirty (30) days' advance written notice before offering to sell any new products that compete with the Infringing Products and include the following elements: (a) a mandrel, (b) a barrel-piston that is slideably mounted to the exterior of the mandrel, (c) a retainer ring/cap that secures the barrel-piston to the mandrel in the run-in position and that prevents the barrel-piston from sliding completely over the mandrel when being set, and (d) a vent port such that the setting tool is capable of self-venting when the setting tool is set. The Enjoined Parties' noticed under this paragraph must: (a) identify the competing product Diamondback intends to sell, (b) set forth the asserted grounds for alleged non-infringement of the '035 Patent and thus exclusion from the license to Repeat Precision, and (c) identifying whether the proposed product is covered by a patent or pending patent application (including identification of such patent or patent application).

    c.    Diamondback shall promptly provide written notice of this Order and the Injunction ordered to its officers, directors, agents, servants, representatives, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with them, including all manufacturers, distributors and service providers who have been involved in making, selling, offering for sale, or importing the Infringing Products, either alone or in combination with any other product.

     d.   The Injunction imposed in paragraphs (a) and (b) shall remain in place until the termination of the License, which currently extends until the expiration of the '035 Patent.

275.    The injunction immediately above shall remain in place for the life of the '035 Patent, which is also the term period specified in the License. *See* Ex. 1.

276.    Regarding Diamondback's Reissue Application, Diamondback, its officers, directors, employees, agents, and all those acting in concert with Diamondback are hereby enjoined as follows:

    a.   Diamondback shall dismiss the Reissue Application by filing the appropriate pleadings with the PTO to withdraw the Reissue Application within 7 days of this Court's judgment;

    b.   Diamondback is enjoined from taking any actions to pursue the Reissue Application on its merits; and,

    c.   Other than filing the necessary pleadings and other documents with the PTO that are necessary to dismiss the Reissue Application, Diamondback shall make no filings with the PTO in connection with the Reissue Application or in any other proceeding before the PTO that could result in the narrowing or abandonment of the '035 Patent.

277.    The Court hereby retains continuing jurisdiction over this injunction and its terms.

## THE COURT WILL NOT DELAY ENTRY OF FINAL JUDGMENT WHILE ATTORNEY FEE AND COST ISSUES ARE BEING RESOLVED

278.    As noted above, the Court intends to handle applications for attorneys' fees and costs post-judgment in accordance with Federal Rule of Civil Procedure 54(d). The parties will submit a joint schedule for any party seeking recovery of fees and costs to submit its application for such fees and costs, as well as the schedule for any objections and briefing on the issues of attorneys' fees and costs.

279.    Because the Court is granting injunctive relief and because Repeat Precision's damages will continue to accrue each day that Diamondback continues making and selling disposable setting tools, the Court will not delay entry of final judgment while attorney fee and

cost issues are being resolved.  *See* Fed. R. Civ. P. 58(e) (recognizing that the Court has discretion, and is not required, to delay entry of judgment pending fee and cost issues).

## CONCLUSION

280.    The Court ORDERS that Repeat Precision will submit a proposed final judgment consistent with the findings of fact and conclusions of law set forth above within seven (7) days of this order.

SIGNED this 13th day of March, 2020.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE