Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 1 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 30 of 200   PageID 90

*[Execution Version]*

# Patent License Agreement

This Patent License Agreement ("**Agreement**"), dated as of March 16, 2018 (the "**Effective Date**"), is by and between Diamondback Industries, Inc., a Texas corporation ("**Licensor**"), and Repeat Precision, LLC, a Texas limited liability company ("**Licensee**").

WHEREAS, Licensor is owns all right, title, and interest in and has the right to license to Licensee the Licensed Patents (as defined below); and

WHEREAS, Licensee wishes to practice the Licensed Patents in the Territory (as defined below) in connection with the Licensed Products (as defined below) and Licensor is willing to grant to Licensee a license to the Licensed Patents on the terms and conditions set out in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

    "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person through the ownership of voting securities, by contract, or otherwise/direct or indirect ownership of more than 50% of the voting securities of a Person. Affiliates shall not include parties that are controlled by Advent International Corporation other than NCS Multistage Holdings, Inc. and entities within its corporate structure.

    For the avoidance of doubt, any Person that is not an Affiliate as of the Effective Date, but later becomes an Affiliate of Licensee through any transaction or series of related transactions shall be deemed to be an Affiliate of Licensee for purposes of this Agreement.

    "**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in New York, NY are authorized or required by Law to be closed for business.

    "**Confidential Information**" means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party. Confidential Information shall not include Nonproprietary Information.

    "**Disclosing Party**" means a party disclosing Confidential Information.



EXHIBIT
1
6:19-CV-00034

Case 6:19-cv-00034-ADA    Document 213-1    Filed 04/09/20    Page 2 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 31 of 200   PageID 91

"**Improvement**" means (a) any new or modified product that performs the same function as the Licensed Products but (i) does so in a better or more economical way (including by reason of better quality, ease of use, efficacy, safety, or performance); (ii) has a longer service life; (iii) has additional or broader functions or applicability; (iv) costs less to manufacture, package, distribute, or otherwise commercialize; (v) has a better appearance; or (vi) is more marketable, for any reason, than the Licensed Products; or (b) any enhancement or modification to the technology that is the subject of the Licensed Patents.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, award, decree, other requirement or rule of law of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

"**Licensed Patents**" means (a) United States Letters Patent No. 9,810,035 Bl, and all continuations, continuations-in-part, divisions, extensions, substitutions, reissues, re-examinations, and renewals of any of the foregoing, including any foreign counterparts in the Territory, and (b) any patents in the Territory issuing from any applications filed after the Effective Date and that claim priority from any of the patents or patent applications identified in subsection (a) or from which any of the patents or patent applications identified in subsection (a) claim priority.

"**Licensed Products**" means a bridge plug that is coupled with the Company or its Affiliates' isolation tool used for well completions and any other products that may be agreed upon in writing by Licensor and Licensee from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where such a Valid Claim exists.

"**Losses**" means all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers.

"**Net Sales Price**" means Licensee's invoice price less returns, allowances, or credits, rebates, excise, sales, use or value-added taxes, costs of packing, transportation, and insurance, delivery charges, cash and trade discounts allowed, import duty, and commissions to agents.

"**Nonproprietary Information**" means the information with respect to which the Receiving Party is able to establish:

(a)    at the time of disclosure is, or thereafter becomes, generally available to the public, other than directly or indirectly, any violation of this Agreement by the Receiving Party or its Representatives or anyone to whom the Receiving Party or its Representatives disclosed such information;

(b)    at the time of disclosure is, or thereafter becomes, available to the Receiving Party or its Representatives on a non-confidential basis from a third-party source, provided that, such third party is not and was not prohibited from disclosing such Confidential Information to the Receiving Party by a legal, fiduciary, or contractual obligation to the Disclosing Party;

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 3 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 32 of 200   PageID 92

(c) by documentary evidence that it was known by or in the possession of the Receiving Party or its Representatives prior to being disclosed by or on behalf of the Disclosing Party pursuant to this Agreement, provided that such information is not subject to another confidentiality agreement or other obligation of secrecy; or

(d) was or is independently prepared by the Receiving Party or its Representatives prior to being disclosed by or on behalf of the Disclosing Party pursuant to this Agreement, without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information;

provided that, any combination of the information which comprises part of the Confidential Information shall not be deemed to be Nonproprietary Information merely because individual parts of that information were within the above clauses, unless the combination itself was within any of the above clauses.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

"**Quarterly Period**" means each three-month period commencing on the 1st of January, 1st of April, 1st of July, and 1st of October, except that the first and last periods may be "short," depending on the Effective Date of this Agreement.

"**Receiving Party**" means a party receiving Confidential Information.

"**Representatives**" means a party's and its Affiliates' employees, officers, directors, consultants, and legal advisors.

"**Territory**" means the United States, Canada, Mexico, Argentina, China, Russia and any other territory that may be agreed upon in writing by Licensor and Licensee from time to time.

"**Valid Claim**" means, on a country-by-country basis, a claim of an unexpired issued or granted Licensed Patent, as long as the claim has not been admitted by Licensor or otherwise caused to be invalid or unenforceable through reissue, disclaimer, or otherwise, or held invalid or unenforceable by a tribunal or governmental agency of competent jurisdiction from whose judgment no appeal is allowed or timely taken.

2.   Grant. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory.

3.   Improvements.

3.1   Notice of Improvements. If Licensor files a patent application anywhere in the Territory for any Improvement, Licensor shall provide written notice (the "**Improvement Notice**") to Licensee within 30 Business Days after the filing date of the patent application, with a copy of the patent application and such other details of the Improvement as Licensee reasonably requires to effectively evaluate the Improvement. If Licensee wishes to include any Improvement patent as a

029
DI-NDTex-000031
DI-WDTex 0020892

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 4 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 33 of 200   PageID 93

Licensed Patent under this Agreement, Licensee shall provide within 30 Business Days of the Improvement Notice written notice to Licensor specifying the particular Improvement patents Licensee wishes to include as a Licensed Patent. Unless the Licensor object to such request within 7 Business Days of the notice specifying the particular Improvement patents Licensee wishes to include, each Improvement Patent identified by Licensee in the notice will be a Licensed Patent under this Agreement.

3.2   License to Improvements. Licensee may include any patent application covering Improvements as a Licensed Patent under this Agreement by providing written notice to Licensor within 30 Business Days after the Improvement Notice identifying the Improvement patent applications Licensee chooses to include as a Licensed Patent. Such Improvement patent applications will be deemed to be a Licensed Patent and, for the avoidance of doubt, shall not require any Earned Royalty Payments for the sale of the Licensed Products, unless the sale of a Licensed Product in a Territory would infringe on the then existing Licensed Patent, without taking into account the Improvement patent.

3.3   No Grant-Backs. All right, title, and interest in an Improvement conceived, made, or reduced to practice by either party during the Term of this Agreement, and all patents and patent applications claiming its Improvements, shall:

(a)   remain the sole and exclusive property of the party making the Improvement or filing the patent; and

(b)   not be licensed to the other party, unless the Parties otherwise specifically agree in writing.

4.   Royalties.

4.1   Upfront Payment. On the Effective Date, Licensee shall pay to Licensor the sum of $55,000.

4.2   Earned Royalty. Licensee shall pay to Licensor on or before the last Business Day of each Quarterly Period during the Term a royalty of $20 for each Licensed Product sold by Licensee in the Territory during the respective preceding Quarterly Period ("**Earned Royalty**"). For the avoidance of doubt, Licensee shall only pay the Earned Royalty fee for each Licensed Product sold in a Territory with a Licensed Patent that, but for this Agreement, the sale of the Licensed Product in the Territory would infringe on one or more Valid Claims necessary for the sale of the Licensed Product.

4.3   Taxes. If Licensee is required by Law to withhold taxes in connection with any sums payable to Licensor under this Agreement, Licensee may deduct the amount of the withholding from the payment it otherwise would have made to Licensor under this Agreement and shall include in the Payment Statement the gross amount due, the amount of the sum deducted under this section, and the actual amount paid.

4.4   Payment Terms and Royalty Statements.

030
DI-NDTex-000032
DI-WDTex 0020893

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 5 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 34 of 200   PageID 94

(a)   All Earned Royalties and any other sums payable under this Agreement shall be paid in US dollars within 90 days of the end of each successive Quarterly Period.

(b)   Payments to Licensor may be accompanied by a statement (a "**Payment Statement**").

4.5   Payment Disputes. Licensee may withhold from payment any and all payments and amounts Licensee disputes in good faith, pending resolution of the dispute.

5.   Patent Prosecution and Maintenance.

5.1   Patent Prosecution and Maintenance. For each patent application and patent under the Licensed Patents, Licensor shall:

(a)   prepare, file, and prosecute such patent application;

(b)   maintain such patent;

(c)   pay all fees and expenses associated with such activities;

(d)   keep Licensee currently informed of the filing and progress of all material aspects of the prosecution of such patent application and the issuance of patents from any such patent application;

(e)   consult with Licensee concerning any decisions which could affect the scope or enforcement of any issued claims or the potential abandonment of such patent application or patent; and

(f)   notify Licensee in writing of any additions, deletions, or changes in the status of such patent or patent application.

5.2   Abandonment. If Licensor wishes to abandon any patent application or patent that is a Licensed Patent, it shall give Licensee 60 days prior written notice of the desired abandonment. Licensor shall not abandon any such Licensed Patent except upon the prior written consent of Licensee. On Licensee's request, which may be provided at any time after the notice of desired abandonment, Licensor shall assign to Licensee any such patent application or patent Licensor wishes to abandon. Effective as of the effective date of the assignment, such patent application or patent shall no longer be a Licensed Patent and Licensee shall not have any further royalty or other payment obligation for such patent application or patent.

6.   Third-Party Infringement.

6.1   A party receiving notice of alleged infringement of any Licensed Patent in the Territory, or having a declaratory judgment action alleging invalidity or noninfringement of any Licensed Patent in the Territory brought against it, shall promptly provide written notice to the other party of the alleged infringement or declaratory judgment action, as applicable.

5

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 6 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 35 of 200   PageID 95

6.2     Licensor may, at its sole option, choose to bring suit to stop infringement of the Licensed Patent or defend a declaratory judgment action or other proceeding alleging noninfringement, invalidity, or unenforceability of the Licensed Patent. If Licensor elects not to bring such suit or assert such defense within one month of such notice, then Licensee may bring such suit or assert such defense and may join Licensor in the proceeding as necessary. The party bringing such suit or asserting such defense may control the conduct of the prosecution or defense of any proceeding under this section, including settlement, and the other party will provide assistance as necessary with reasonable out-of-pocket expenses to be timely reimbursed by the party controlling such proceeding. Licensee must obtain prior approval from Licensor of any settlement terms for other than monetary damages paid to Licensee.

6.3     In the event that neither Licensor nor Licensee chooses to defend an attack on the validity of any patent claims necessary for the Licensed Product pursuant to <u>Section 6.2</u>, no further compensation shall be due, and Licensee shall immediately have a fully paid license under the Licensed Patent pursuant to the terms of <u>Section 2</u>, including the restrictions on the Licensee set forth in <u>Section 2</u>.

7.      <u>Compliance with Laws</u>.

7.1     <u>Regulatory Clearance</u>. Licensor shall reasonably cooperate with Licensee in obtaining any clearances from governmental agencies to market the Licensed Products.

7.2     <u>Recordation of License</u>. Licensor shall record this Agreement as required by any applicable laws of any jurisdiction as a prerequisite to enforceability of this Agreement or for other reasons and any recordation fees and related costs and expenses shall be at Licensor's expense.

8.      <u>Confidentiality</u>.

8.1     <u>Confidentiality Obligations</u>. The parties acknowledges that in connection with this Agreement it will gain access to Confidential Information of the other party. As a condition to being furnished with Confidential Information, parties agree, during the Term and for 1 years thereafter to:

(a)     not use the Disclosing Party's Confidential Information other than as strictly necessary to exercise its rights and perform its obligations under this Agreement; and

(b)     maintain the Disclosing Party's Confidential Information in strict confidence and, subject to the exceptions below, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent, provided, however, the Receiving Party may disclose the Confidential Information to its Representatives who:

(i)     have a "need to know" for purposes of the Receiving Party's performance, or exercise of its rights with respect to such Confidential Information, under this Agreement;

(ii)    are aware of this restriction; and

032
DI-NDTex-000034
DI-WDTex 0020895

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 7 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 36 of 200   PageID 96

(iii)   are themselves bound by confidentiality, provided further that the Receiving Party shall be responsible for ensuring its Representatives' compliance with, and shall be liable for any breach by its Representatives of, this section.

The Receiving Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

8.2   Exceptions. If the Receiving Party becomes legally compelled to disclose any Confidential Information, the Receiving Party shall:

(a)   provide prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy or waive its rights under this section; and

(b)   disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance, the Receiving Party shall, at the Disclosing Party's expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

8.3   Securities Laws. Each Party hereby acknowledges that it is aware, and will ensure that its Representatives to whom any Confidential Information is disclosed are also aware, of the general nature of applicable securities laws, including, without limitation, all applicable securities laws which may prohibit any person, firm or corporation who has material, non-public information concerning the matters which are the subject of this Agreement, from trading in securities of a company which may be party to a transaction of the nature contemplated herein or from communicating such information to other persons under circumstances in which it is reasonably foreseeable that such other person is likely to purchase or sell such securities.

9.   Representations and Warranties.

9.1   Mutual Representations and Warranties. Each party represents and warrants to the other party that:

(a)   it is duly organized, validly existing, and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

(b)   it has, and throughout the Term shall retain, the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

(c)   the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary organizational action of the party; and

**033**
DI-NDTex-000035
DI-WDTex 0020896

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 8 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 37 of 200   PageID 97

(d)   when executed and delivered by such party, this Agreement shall constitute the legal, valid, and binding obligation of that party, enforceable against that party in accordance with its terms.

9.2   Licensor's Representations and Warranties. Licensor represents and warrants that:

(a)   The patents and patent applications of the Licensed Patent are all the patents and patent applications owned by Licensor, or in which Licensor has a licensable interest, that are necessary or useful for Licensee to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory;

(b)   it is the legal and beneficial owner of the entire right, title, and interest in and to the Licensed Patents, and is the record owner of all patent applications and issued patents that are Licensed Patents;

(c)   it has, and throughout the Term will retain, the unconditional and irrevocable right, power, and authority to grant the license hereunder;

(d)   neither its grant of the license, nor its performance of any of its obligations, under this Agreement does or will at any time during the Term:

  (i)   conflict with or violate any applicable Law;

  (ii)   require the consent, approval, or authorization of any governmental or regulatory authority or other third party; or

  (iii)   require the provision of any payment or other consideration to any third party.

(e)   it has not granted and will not grant any licenses or other contingent or non-contingent right, title, or interest under or relating to Licensed Patents, and is not or will not be under any obligation, that does or will conflict with or otherwise affect this Agreement, including any of Licensor's representations, warranties, or obligations, or Licensee's rights or licenses hereunder;

(f)   there neither are nor at any time during the Term will be any encumbrances, liens, or security interests involving any Licensed Patent;

(g)   no prior art or other information exists that would adversely affect the validity, enforceability, term, or scope of any Licensed Patent;

(h)   there is no settled, pending, or threatened litigation or reissue application, re-examination, post-grant, *inter partes*, or covered business method patent review, interference, derivation, opposition, claim of invalidity, or other claim or proceeding (including in the form of any offer to obtain a license):

  (i)   alleging the unpatentability, invalidity, misuse, unregisterability, unenforceability, or noninfringement of, or error in any Licensed Patent;

**034**
DI-NDTex-000036
DI-WDTex 0020897

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 9 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 38 of 200   PageID 98

(ii) challenging Licensor's ownership of, or right to practice or license, any Licensed Patent, or alleging any adverse right, title, or interest with respect thereto; or

(iii) alleging that the practice of any Licensed Patent or the making, using, offering to sell, sale, or importation of any Licensed Product in the Territory does or would infringe, misappropriate, or otherwise violate any patent, trade secret, or other intellectual property of any third party.

(i) it has no knowledge of any factual, legal, or other reasonable basis for any litigation, claim, or proceeding described in Section 9.2(h);

(j) it has not received any written, oral, or other notice of any litigation, claim, or proceeding described in Section 9.2(h); and

(k) it has not brought or threatened any claim against any third party alleging infringement of any Licensed Patent, nor is any third party infringing or preparing or threatening to infringe any patent, or practicing any claim of any patent application, included as a Licensed Patent.

10. Exclusion of Consequential and Other Direct Damages. To the fullest extent permitted by Law, Licensee shall not be liable to Licensor for any injury to or loss of goodwill, reputation, business production, revenues, profits, anticipated profits, contracts, or opportunities (irrespective of how these are classified as damages), or for any consequential, incidental, indirect, exemplary, special, punitive, or enhanced damages, whether arising out of breach of contract, tort (including negligence), or otherwise (including the entry into, performance or breach of this Agreement), regardless of whether such damage was foreseeable and whether or not the other party has been advised of the possibility of such damages.

11. Indemnification.

11.1 Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, employees, agents, successors, and assigns (each, an "**Indemnitee**") against all Losses arising out of or resulting from any third party claim, suit, action, or proceeding (each an "**Action**") related to, arising out of, or resulting from Licensor's breach of any representation, warranty, covenant, or obligation under this Agreement.

11.2 Licensor shall indemnify, defend, and hold harmless each of the Indemnitees against all Losses arising out of, resulting from, or relating to any Action involving a claim that any manufacture, use, sale, offer for sale, or importation of any Licensed Product in the Territory, or the exercise of any rights or privileges by Licensee granted to it under this Agreement, infringes any patent or other intellectual property right of any third party.

11.3 Indemnification Procedure. The indemnified party shall promptly notify the indemnifying party in writing of any Action and cooperate with the indemnified party at the indemnifying party's sole cost and expense. The indemnifying party shall immediately take control of the defense and investigation of the Action and shall employ counsel reasonably acceptable to indemnified party to handle and defend the same, at the indemnifying party's sole cost and expense. The indemnified party's failure to perform any obligations under this section shall not relieve the

indemnifying party of its obligation under this section except to the extent that the indemnifying party can demonstrate that it has been materially prejudiced as a result of the failure. The indemnified party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

12. Term and Termination.

    12.1 Term. This Agreement shall commence as of the Effective Date and, unless terminated earlier in accordance with Section 12.2, shall remain in force on a Licensed-Product-by-Licensed-Product and country-by-country basis until the expiration of the last Valid Claim to expire of the Licensed Patents covering such Licensed Product in such country (the "**Term**"). As used in this section, "expiration" and "expire," when referring to a Licensed Patent means any expiration, revocation, invalidation, or other termination of such Licensed Patent.

    12.2 Termination by Licensee.

    (a) Licensee may terminate this Agreement at any time without cause, and without incurring any additional obligation, liability, or penalty, by providing at least 30 Business Days' prior written notice to licensor.

    (b) Either may terminate this Agreement on written notice to other party if the other party materially breaches this Agreement and such breach:

        (i) is incapable of cure; or

        (ii) being capable of cure, remains uncured 180 days after the breaching party receives written notice thereof.

    (c) Either party may terminate this Agreement by written notice to the other party if the other party:

        (i) becomes insolvent or admits inability to pay its debts generally as they become due;

        (ii) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within 30 Business Days or is not dismissed or vacated within 30 Business Days after filing;

        (iii) is dissolved or liquidated or takes any corporate action for such purpose;

        (iv) makes a general assignment for the benefit of creditors; or

        (v) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

    12.3 Effect of Termination.

(a) On any expiration or termination of the entirety of this Agreement, upon the request of the Disclosing Party for any reason whatsoever, and within five (5) days of such request, the Receiving Party shall return all original copies of the Confidential Information to the Disclosing Party and shall destroy any and all copies or other reproductions or extracts thereof (both written and electronic), together with such documents, memoranda, analyses, notes and other writings whatsoever prepared by the Receiving Party and its Representatives based on the Confidential Information. Upon any such request, a senior officer or manager of the Receiving Party shall certify in writing to the Disclosing Party that all of the documents constituting Confidential Information, including documents constituting Confidential Information held by the Receiving Party and its Representatives, have been returned or destroyed.

(b) Notwithstanding the foregoing, the Parties acknowledge and agree that the Receiving Party may retain copies of the Confidential Information as may be required to comply with applicable Laws. Any Confidential Information retained pursuant to this section will be held subject to the terms of this Agreement.

12.4 Expiration. At the expiration of the last patent to expire under the Licensed Patents in any country in the Territory with respect to any Licensed Product, provided Licensee is not at that time in breach of this Agreement, Licensee shall have a completely paid-up, royalty-free right and license to subsequently make, have made, use, offer to sell, sell, and import in that country any and all products that were previously Licensed Products and shall have no further obligations to Licensor in that country with respect to such Licensed Patents or such Products.

12.5 Sell-Off Period. On termination of this Agreement for any reason, Licensee shall have the right to dispose of all stocks of Licensed Products in its possession and all Licensed Products in the course of manufacture at the date of termination for a period of 90 days after the date of termination (the "**Sell-Off Period**"), in each case, in accordance with the terms and conditions of this Agreement. Any royalty payable under the provisions of Section 4.2 shall be paid to Licensor within 60 days after (a) termination, with respect to royalties accrued prior to the effective date of termination, and (b) the expiration of the Sell-Off Period, with respect to royalties accrued during the Sell-Off Period.

12.6 Survival. The rights and obligations of the parties set forth in this section and Section 1 (Definitions), Section 8 (Confidentiality), Section 9 (Representations and Warranties), Section 11 (Indemnification), Section 12.3 (Effect of Termination), Section 12.4 (Expiration), Section 12.5 (Sell-off Period) and Section 13 (Miscellaneous), and any right, obligation, or required performance of the parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration.

13. Miscellaneous.

13.1 Bankruptcy. All rights and licenses granted by Licensor under this Agreement are and shall be deemed to be rights and licenses to "intellectual property'" as such term is used in, and interpreted under, Section 365(n) of the United States Bankruptcy Code (the "**Bankruptcy Code**") (11 U.S.C. § 365(n)). Licensee shall have all rights, elections, and protections under the Bankruptcy Code and all other bankruptcy, insolvency, and similar laws with respect to the Agreement, and the

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 12 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 41 of 200   PageID 101

subject matter hereof. Without limiting the generality of the foregoing, Licensor acknowledges and agrees that, if Licensor or its estate shall become subject to any bankruptcy or similar proceeding:

   . (a)   subject to Licensee's rights of election under Section 365(n), all rights, licenses, and privileges granted to Licensee under this Agreement will continue subject to the respective terms and conditions hereof, and will not be affected, even by Licensor's rejection of this Agreement; and

   (b)   Licensee shall be entitled to a complete duplicate of, or complete access to, as appropriate, all such intellectual property and embodiments of intellectual property, which, if not already in Licensee's possession, shall be promptly delivered to Licensee or its designee, unless Licensor elects to and does in fact continue to perform all of its obligations under this Agreement.

   13.2   Force Majeure. Neither party shall be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including any obligation to timely make any payment hereunder, when and to the extent such failure or delay is caused by: (i) acts of nature; (ii) flood, fire, or explosion; (iii) war, terrorism, invasion, riot, or other civil unrest; (iv) embargoes or blockades in effect on or after the date of this Agreement; (v) or national or regional emergency (each of the foregoing, a "**Force Majeure Event**"), in each case, provided that (i) such event is outside the reasonable control of the affected party; (ii) the affected party provides prompt notice to the other party, stating the period of time the occurrence is expected to continue; and (iii) the affected party uses diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event. Licensee may terminate this Agreement if a Force Majeure Event affecting Licensor continues substantially uninterrupted for a period of 30 days or more. Unless Licensee terminates this Agreement pursuant to the preceding sentence, all dates by which Licensee must perform any act or on which a Licensee obligation is due shall automatically be extended for a period up to the duration of the Force Majeure Event.

   13.3   Further Assurances. Each party shall, upon the reasonable request of the other party, promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.

   13.4   Independent Contractors. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

   13.5   No Public Announcements. Neither party shall issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement or, unless expressly permitted under this Agreement, otherwise use the other party's trademarks, service marks, trade names, logos, domain names, or other indicia of source, association, or sponsorship, in each case, without the prior written consent of the other party.

038
DI-NDTex-000040
DI-WDTex 0020901

13.6   Notices. All notices, requests, consents, claims, demands, waivers, and other communications (other than routine communications having no legal effect) shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section).

If to Licensor:                             Repeat Precision, LLC
                                            19450 State Hwy 249, STE 200
                                            Houston, TX 77070
                                            Attn: General Counsel
If to Licensee:                             Diamondback Industries, Inc.
                                            3824 Williamson Road
                                            Crowley, TX 76036

13.7   Interpretation. For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

Unless the context otherwise requires, references herein: (x) to Sections and Schedules refer to the Sections of and Schedules attached to this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. Any Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

13.8   Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

13.9   Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter, which includes but is not limited to that certain Mutual Confidentiality and Non-Disclosure Agreement dated as of February 16, 2018 ("**Mutual CA**"). The parties hereto

039
DI-NDTex-000041
DI-WDTex 0020902

acknowledge and agree that, effective as of the Effective Date, the Mutual CA is terminated and such termination is deemed to be effective as of February 16, 2018. In addition, the parties hereto acknowledge and agree that the provisions in Section 8 shall govern any disclosure of Confidential Information that occurred between February 16, 2018 through the Effective Date.

13.10   Assignment. Licensee may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement without Licensor's consent. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective permitted successors and assigns.

13.11   No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever, under, or by reason of this Agreement.

13.12   Amendment; Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the waiving party. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

13.13   Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.14   Governing Law; Submission to Jurisdiction.

(a)     This Agreement and all related documents, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Texas, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas

(b)     Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder shall be instituted in the federal courts of the United States or the courts of the State of Texas, in each case located in the city of Houston and County of Harris County, and each party irrevocably submits to the jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by

**040**
DI-NDTex-000042
DI-WDTex 0020903

mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court.

13.15 <u>Waiver of Jury Trial</u>. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

13.16 <u>Equitable Relief</u>. Each party acknowledges that a breach by the other party of <u>Section 8</u> may cause the non-breaching party irreparable harm, for which an award of damages would not be adequate compensation, and agrees that, in the event of such a breach or threatened breach, the non-breaching party will be entitled to seek equitable relief, including in the form of orders for preliminary or permanent injunction, specific performance, and any other relief that may be available from any court. These remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available under this Agreement at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

13.17 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (to which a signed PDF copy is attached) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

Case 6:19-cv-00034-ADA   Document 213-1   Filed 04/09/20   Page 16 of 17
**EXHIBIT 20**
Case 4:18-cv-00902-A   Document 1-1   Filed 11/02/18   Page 45 of 200   PageID 105

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

                                  **DIAMONDBACK INDUSTRIES, INC.**

                                  By_____
                                  Name:
                                  Title:

                                  **REPEAT PRECISION, LLC**

                                  By_____
                                  Name:
                                  Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

DIAMONDBACK INDUSTRIES, INC.

By _[signature]_
Name: Derrek Drury
Title: President

REPEAT PRECISION, LLC

By _____
Name:
Title: